UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BAHSID MCLEAN,

                            Plaintiff,

v.                                                      9:20-CV-1115
                                                        (TJM/TWD)

AMY FERGUSON, CARL J. KOENIGSMANN,
WAYNE VISALLI, and WILLIAM FENNESSEY,

                            Defendants.
_____

APPEARANCES:                          OF COUNSEL:

BAHSID MCLEAN
Plaintiff, *pro se*
16-A-5033
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

HON. LETITIA JAMES                    AIMEE COWAN
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendant
300 South State Street
Suite 300
Syracuse, New York 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

        Bahsid McClean ("Plaintiff"), an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se*

action pursuant to 42 U.S.C. § 1983, asserting his constitutional rights were violated at Mid-State

Correctional Facility ("Mid-State C.F.").  (Dkt. No. 11 (the "amended complaint").)  The

Honorable Thomas J. McAvoy, Senior United States District Judge, reviewed the amended

complaint in accordance with 28 U.S.C. § 1915, and found Plaintiff's state law medical malpractice, negligence, and Eighth Amendment deliberate indifference claims against Amy Ferguson ("Ferguson"), Carl J. Koenigsmann ("Koenigsmann"), Wayne Visalli ("Visalli"), and William Fennessey ("Fennessey") (collectively "Defendants") survived initial review and required a response.  (Dkt. No. 20.[1])

Rather than answering, Defendants have moved to dismiss the amended complaint for failure to state a claim and for lack of subject matter jurisdiction.  (Dkt. No. 23 (involving just Ferguson); Dkt. No. 41 (involving Koenigsmann, Visalli, and Fennessey).)  These motions have been referred to this Court for a Report-Recommendation.  For the reasons that follow, the Court recommends granting Defendants' motions.

## I.    BACKGROUND[2]

In medical records filed on the docket, it appears Plaintiff was diagnosed with "MILD RETROLISTHESIS OF L6 ON S1, MILD LEFTWARD SCOLIOSIS, SMALL DISC BULGES/HERNIATIONS AT L1-2 THROUGH L5-S1" after imaging was taken on November

---

[1]  The amended complaint also asserted claims against a defendant named "Nurse Rowick." However, those claims were dismissed without prejudice on August 16, 2021, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.  (Dkt. No. 43.)

[2]  The background section is derived from allegations in Plaintiff's amended complaint and accepted as true for the purpose of this motion.  To supplement these allegations, Defendants filed certain documents with their motions to dismiss and Plaintiff previously filed documents related to his medical treatment.  (Dkt. No. 15-1 (Plaintiff's submission of medical records); Dkt. No. 23-1 (Defendants' attorney declaration describing the filed exhibits including Plaintiff's medical records and relevant grievance documents).)  For purposes of deciding this motion, the Court finds it can consider grievance documents and medical records related to the claims in this action because they are incorporated by reference in Plaintiff's amended complaint.  *See Xiao Qing Liu v. New York State Dep't of Health*, No. 16 CIV. 4046 (ER), 2017 WL 3393944, at *4 (S.D.N.Y. Aug. 7, 2017) (considering medical records); *Savage v. OFC. Michael Acquino*, No. 13-CV-6376, 2016 WL 5793422, at *2 n.4 (W.D.N.Y. Sept. 30, 2016) (considering grievance documents).  Where relevant, the Court will note when it is pulling facts from these record documents.

19, 2017.  (Dkt. No. 15-1 at 3.)  Those records further show that, during his time at Attica

Correctional Facility, Plaintiff was approved for eight physical therapy appointments to address

his back pain.  *Id*. at 5-12.  He participated in physical therapy in June and July of 2019.  *Id*.

Some of the assigned exercises included press ups, planks, and bird dogs.  *See, e.g.*, *id*. at 17.  It

also appears Plaintiff was prescribed "Mobic 15 mg"[3] to start on December 5, 2019, and to end

on June 2, 2020.  *Id*. at 38.

   In his amended complaint, Plaintiff asserts his scoliosis causes "severe pain," and he was

denied his prescription for "meloxicam" which "alleviates that pain."  (Dkt. No. 11 at 5.)

Specifically, Plaintiff alleges that, when he arrived at Mid-State C.F. on February 5, 2020,

defendant nurse practitioner Ferguson failed to provide the medication he was prescribed despite

his documented history of scoliosis and back pain.  *Id*.  According to Plaintiff, Ferguson

explained to him that, "because [he] was exercising when she came to see [him], [he] didn't need

any pain medication and that [he] should use over the counter treatment even though [he] had

informed her of [his] spinal condition and the immence (sic) amount of pain [he] was in[.]"  *Id*.

at 6.  Plaintiff further contends his medical records demonstrate that over the counter pain

medication does not work to alleviate his symptoms.  *Id*. at 7.  Thus, Plaintiff asserts he suffered

"extreme pain" after his appointment with Ferguson because he was not provided the appropriate

pain medication.  *Id*. at 5.

   Plaintiff alleges he filed a grievance related to Ferguson's decision after nurses Rowick

and Visalli urged him to do so.  *Id*. at 7.  Plaintiff claims Visalli knew Ferguson's action was

unprofessional and he had an obligation to report the "misconduct" but failed to do so.  *Id*.  In

response to Plaintiff's grievance, Ferguson noted: "upon approaching the cell 2/5/20 PT was

---

[3] "Mobic" is the brand name for the drug meloxicam.

observed doing full push ups in his cell, 0 signs of pain or discomfort . . . 0 indication for Rx pain meds at this time." (Dkt. No. 23-4 at 9.) Plaintiff claims Fennessey, the superintendent at Mid-State C.F., improperly denied his grievance. (Dkt. No. 11 at 7.) In that grievance denial on February 21, 2020, Fennessey noted "[m]edical . . . reports that there is no indication for prescription pain medication . . . ." (Dkt. No. 23-4 at 6.) Plaintiff asserts Fennessey "did not have [his] grievance properly investigated" and instead relied upon the reports of the same medical professional—Ferguson—about whom he was complaining. (Dkt. No. 11 at 7.) Notably, in an email on April 23, 2020, DOCCS personnel confirm Plaintiff was prescribed meloxicam for pain. (Dkt. No. 23-4 at 8.) Thus, Plaintiff argues that, had Fennessey made any independent effort to consider his medical claims, Fennessey would have discovered he was prescribed pain medication and acted on his grievance.

After his grievance was denied, Plaintiff alleges he wrote to Deputy Commissioner and Chief Medical Officer Koenigsmann explaining that he was denied his prescription medicine. (Dkt. No. 11 at 5.) According to Plaintiff, Koenigsmann responded that he did not have a prescription for pain medication. *Id*. Plaintiff asserts that, if Koenigsmann properly investigated his complaint, he would have discovered he was prescribed meloxicam prior to coming to Mid-State C.F. *Id*. at 7.

Plaintiff claims it was not until he was moved to Auburn Correctional Facility on March 18, 2020, that he finally started to receive his prescription pain medication. *Id*. at 6.

Based on these allegations, as noted above, Plaintiff asserts Eighth Amendment deliberate indifference, negligence, and medical malpractice claims against Ferguson, Koenigsmann, Visalli, and Fennessey.

Ferguson was served before the other defendants and moved to dismiss the claims against her. (Dkt. No. 23.) For her part, she argues "that the decision to prescribe one form of pain medication in place of another does *not* constitute deliberate indifference to a prisoner's serious medical needs." (Dkt. No. 23-5 at 10 (citations omitted) (emphasis in the original).) Thus, Ferguson argues that "Plaintiff's difference in opinion as to the appropriate pain medication he should have received does not support a claim that [she] was deliberately indifferent to his 'serious medical need.'" *Id*. at 12. Ferguson also suggests the amended complaint fails to allege she acted with a culpable mindset because her reason for not giving Plaintiff prescription medication—that he was doing pushups before he was evaluated—suggests she did not know of and disregard a serious risk to Plaintiff's health. *Id*. at 13.

For his part, Koenigsmann argues he should be dismissed because he retired from his position of Deputy Commissioner and Chief Medical Officer for DOCCS on October 30, 2018, and, thus, could not have been the person involved in this claim. (Dkt. No. 41-4 at 11.) Koenigsmann requests that the Court consider his declaration regarding his retirement in deciding this motion or convert this motion to a motion for summary judgment to have him dismissed. *Id*. In any event, however, Koenigsmann argues Plaintiff has failed to demonstrate that he acted with deliberate indifference. *Id*. at 12.

Similarly, Visalli filed a declaration asserting he did not work for DOCCS in any capacity in 2020. *Id*. at 13. However, he also argues the amended complaint fails to allege he acted with deliberate indifference. *Id*. at 13-14.

Fennessey contends he should be dismissed because he merely denied an administrative grievance regarding Plaintiff's medical treatment and "'the review, denial or affirmance of a

denial of a grievance is insufficient to establish personal involvement' of a supervisor."  *Id*. at 15

(citation omitted).

Finally, each defendant argues the state law claims should be dismissed pursuant to New

York Corrections Law Section 24 for lack of subject matter jurisdiction.  (Dkt. No. 23-5 at 14;

Dkt. No. 41-4 at 15-17.)

Plaintiff did not respond to either of Defendants' motions.  However, this Court is still

required to determine whether the motions are meritorious.  *See McCall v. Pataki*, 232 F.3d 321,

323 (2d Cir. 2000) ("If a complaint is sufficient to state a claim on which relief can be granted,

the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal."); *Girotto*

*v. Andrianna Shamaris Inc.*, No. 19-CV-913, 2019 WL 5634199, at *2 (S.D.N.Y. Oct. 31, 2019)

("[E]ven an unopposed motion to dismiss must demonstrate that the complaint has failed to state

a claim."); L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed a*nd the Court*

*determines that the moving party has met its burden to demonstrate entitlement to the relief*

*requested therein*, the non-moving party's failure to file or serve any papers as this Rule requires

shall be deemed as consent to the granting or denial of the motion, as the case may be, unless

good cause is shown." (emphasis added)).

## II.    MOTION TO DISMISS

### A.    Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which

relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion

tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal

Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."  *Id*. at 679 (internal citation and punctuation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not

required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.*

### B.    Eighth Amendment Claims

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks and citation omitted).  To state a claim for deliberate indifference to a serious medical need, a plaintiff's claim must satisfy both objective and subjective elements. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  First, the alleged deprivation "must be, in objective terms, sufficiently serious." *Id.* (quotations and citations omitted).  "Second, the charged official must act with a sufficiently culpable state of mind." *Id*.

Under the objective prong, the inmate's medical need or condition must be "a serious one." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  The objective component has two subparts.  "The first inquiry is whether the prisoner was actually deprived of adequate medical care," keeping in mind that only "reasonable care" is required.  *See Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 845–47 (1970)).  "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious" by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id*. at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)).

To satisfy the subjective prong, a prison official or medical staff member must have been aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions.  *See Salahuddin*, 467 F.3d at 279-80; *see also Farmer*, 511 U.S. at 837

("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Here, Plaintiff alleges he suffers from scoliosis and that condition causes him severe pain and discomfort. (Dkt. No. 11 at 5.) The Court notes Defendants casually contest Plaintiff's allegation that he was diagnosed with scoliosis and that he suffered pain. (Dkt. No. 23-5 at 10.) Specifically, they assert "[a] list of his active and inactive medical conditions maintained by . . . DOCCS . . . does not reflect" a diagnosis for scoliosis. *Id*. However, the Court is required to accept Plaintiff's allegations as true for the purpose of this motion and, moreover, there are medical records on the docket that seem to indicate Plaintiff was diagnosed with scoliosis in 2017. (Dkt. No. 15-1 at 3.)

Defendants' primary argument with respect to Plaintiff's claim is that Ferguson's decision to treat Plaintiff's back pain with over the counter medication instead of prescription medication amounts to a mere disagreement in treatment which is not actionable. (Dkt. No. 23-5 at 8-14.) To that end, it is well established that "[t]he decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs." *Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013), *aff'd sub nom. Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016) (summary order).

In *Rush*, for example, the plaintiff alleged the nurse "at Sing Sing acted with deliberate indifference to his serious medical needs when she did not provide him with the narcotic medication Percocet." *Rush*, 923 F. Supp. 2d at 554. The nurse, however, did provide him with ibuprofen to "manage his pain." *Id*. at 554-55. The court found that "the plaintiff has provided no factual allegations that the decision to provide ibuprofen in lieu of Percocet deviated from reasonable medical practice for the treatment of his pain, much less that [the nurse] acted with a

culpable state of mind in making this decision." *Id*. at 554.  In sum, the court found "[t]he

plaintiff's allegations demonstrate a 'mere disagreement over the proper treatment' of his pain,

which 'does not give rise to an Eighth Amendment violation.'" *Id*. (quoting *Chance*, 143 F.3d at

703.)  Thus, *Rush* stands for the proposition that, "[t]o meet the deliberate indifference threshold,

a plaintiff must set forth facts in the record establishing that the decision to prescribe a certain

medication, and a determination concerning the severity of the medical condition presented, was

based on something other than medical judgment." *Aikens v. Herbst*, No. 16-CV-772S, 2017

WL 1208666, at *3 (W.D.N.Y. Apr. 3, 2017) (citing *Rush*, 923 F. Supp. 2d at 555).

Similarly, in *Harris v. Westchester Cty. Med. Ctr.*, No. 08 CIV. 1128 RJH, 2011 WL

2637429 (S.D.N.Y. July 6, 2011), the plaintiff raised a putative deliberate indifference claim

against a defendant physician assistant ("PA") for giving him Tylenol instead of the Vicodin that

his doctor had prescribed.  *Id*. at *1.  The court swiftly rejected this allegation as a basis for an

Eighth Amendment claim because "these allegations state only the bare fact that [the PA] took

those actions, and give no reason to suspect that [she] acted for reasons that would subject her to

Eighth Amendment liability." *Id*. at *3 (citing *Ravenell v. Van der Steeg*, No. 05 Civ.

4042(WHP), 2007 WL 765716, at *6 (S.D.N.Y. Mar. 14, 2007) ("That Magill disagreed with

Foster does not transform Foster's conservative recommendation into cruel and unusual

punishment.  The question of what diagnostic techniques and treatments should be administered

to an inmate is a 'classic example of a matter for medical judgment'; accordingly, prison medical

personnel are vested with broad discretion to determine what method of care and treatment to

provide to their patients." (quoting *Estelle*, 429 U.S. at 107)); *McKenna v. Wright*, No. 01 Civ.

6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) ("The mere fact that the defendant

physicians may have made a different medical decision with respect to Plaintiff's treatment than

that purportedly recommended by Dr. Maliakkal does not indicate that they acted for culpable reasons.")).

Here, the Court finds the facts as alleged in the amended complaint do not rise to a level of deliberate indifference. Rather Plaintiff's allegations amount to a "mere disagreement over the proper treatment" of his pain, which "does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see also Hill v. Curcione*, 657 F.3d at 123 ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."). Specifically, Plaintiff appears to rest his claim on the basis that, because he was *previously* prescribed meloxicam, he was entitled to receive meloxicam moving forward. However, the record establishes Ferguson exercised her medical judgment to determine Plaintiff did not require prescription medication because he was observed working out and in no acute distress. (Dkt. No. 11 at 5; Dkt. No. 23-4 at 9.) To be sure, Ferguson may be faulted for failing to look into his past medical records; however, that failure alone is insufficient to find she was deliberately indifferent to Plaintiff's medical needs.[4] In sum, the Court finds Ferguson's decision to provide over the counter medication in lieu of meloxicam was a reasonable exercise in medical judgment and is not actionable.

The Court further finds that the amended complaint does not state a claim against Vissali. Specifically, the only allegation in the amended complaint is that he failed to report Ferguson's

_____

[4] To that end, the Court recognizes the argument that, had Ferguson investigated his medical condition, she could have discovered Plaintiff's pushups were related to his physical therapy exercises and that over the counter medication previously did not work to alleviate his pain. Though these allegations may state a claim for medical malpractice or negligence, they do not rise to a level of deliberate indifference. *See Estelle*, 429 at 106 n.14 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *see also Hathaway*, 37 F.3d at 68 ("mere medical malpractice does not constitute an Eighth Amendment violation").

decision to deny him prescription medication.  (Dkt. No. 11 at 7.)  However, there is no

indication that Visalli acted with deliberate indifference merely because he failed to report

Ferguson's alleged mistake.[5]  *See Abreu v. Farley*, No. 6:11-CV-06251 EAW, 2019 WL

1230778, at *29 (W.D.N.Y. Mar. 15, 2019) (failure to report alleged injury is insufficient to state

a deliberate indifference claim) (citing *White v. Rock*, No. 9:13-CV-392 (GTS/CFH), 2016 WL

11478222, at *12 (N.D.N.Y. Feb. 23, 2016) ("The claim that a defendant failed to file an injury

report is insufficient to satisfy the subjective prong of the deliberate indifference test."), *report

and recommendation adopted*, 2016 WL 1248904 (N.D.N.Y. Mar. 29, 2016); *Harris v. Howard*,

No. 907-CV-1065 TJM/GJD, 2009 WL 537550, at *12 (N.D.N.Y. Mar. 3, 2009) ("Failure to

complete reports is simply not an Eighth Amendment claim under any view of the facts.")).

Likewise, the Court finds the amended complaint fails to state a claim against

Koenigsmann[6] and Fennessey.  To that end, "[t]he dismissal of the Section 1983 claims against

the defendants actually involved in [Plaintiff's] ongoing medical care mandates dismissal of the

supervisory liability claim[s]" against Koenigsmann and Fennessey.  *See Gonzalez v. Wright*,

665 F. Supp. 2d 334, 356 (S.D.N.Y. 2009).  However, even were the Court to consider the claims

on their own, the amended complaint would still fail to assert claims against these supervisory

officials.  First, as Defendants contend, the amended complaint simply does not support the

inference that Koenigsmann "knew of and disregarded a substantial risk from the alleged

discontinuance of pain medication by Nurse Ferguson in the sense that [he] was both 'aware of

---

[5]  As noted above, Visalli filed a declaration suggesting he did not work for DOCCS during the relevant time.  (Dkt. No. 41-3.)  The Court will not consider this declaration in deciding the motion to dismiss because it is ultimately unnecessary.

[6]  Koenigsmann filed a declaration asserting he had retired from DOCCS as of October 30, 2018. (Dkt. No. 41-2.)  However, as with Visalli's declaration, the Court declines to consider it because it is unnecessary.

facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that] he . . . also dr[e]w the inference.'" (Dkt. No. 41-4 at 12 (citations omitted).) Moreover, "'[i]t is clear that affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983[.]'" *Viera v. Sheahan*, No. 6:17-CV-06844 EAW, 2021 WL 1226482, at *5 (W.D.N.Y. Mar. 31, 2021) (quoting *Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014)).

In sum, the Court finds Plaintiff's complaint fails to state an Eighth Amendment claim against any of the named defendants. Accordingly, the Court recommends granting Defendants' motions. However, giving special solicitude to Plaintiff, the Court recommends the dismissal be without prejudice and with leave to amend. *See Cuoco*, 222 F. 3d at 112.

**C.    State Law Claims**

Finally, the Court finds Plaintiff's state law claims of negligence and medical malpractice are barred by New York Correction Law Section 24, which provides that "[n]o civil action shall be brought in any court of the state . . . against any officer or employee of [DOCCS] . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of employment and in the discharge of duties by such officer or employee." N.Y. Corr. Law § 24; *see also Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996) (holding that Section 24 applies to claims in federal court). "Courts in the Second Circuit have long held that Section 24 precludes a plaintiff from raising state law claims in federal court against state employees in their personal capacities for actions arising within the scope of their employment." *Davis v. McCready*, 283 F. Supp. 3d 108, 123 (S.D.N.Y. 2017) (collecting cases).

Courts consider a variety of factors when determining a correction officer's scope of employment, including "the connection between the time, place and occasion for the act; . . .

whether the act is one commonly done by any employee; the extent of the departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated." *Degrafinreid v. Ricks*, 452 F. Supp. 2d 328, 332–33 (S.D.N.Y. 2006) (quoting *Riviello v. Waldron*, 47 N.Y. 2d 297, 303 (N.Y. 1979)).  Moreover, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of instructions.'" *Degrafinreid*, 452 F. Supp. 2d at 333 (quoting *Cepeda v. Coughlin*, 128 A.D.2d 995, 996 (3d Dep't 1987)).

Here, the amended complaint alleges Defendants were DOCCS' employees and were performing their duties when the alleged malpractice and negligence took place.  Accordingly, insofar as Plaintiff asserts state law claims against Ferguson, Visalli, Fennessey, and Koenigsmann, the Court finds those claims should be dismissed pursuant to Corrections Law Section 24 for lack of subject matter jurisdiction.  *See, e.g.*, *Heyliger v. Gebler*, 496 F. Supp. 2d 250, 253 (W.D.N.Y. 2007).

If an action is dismissed for lack of subject matter jurisdiction, the court is without power to dismiss with prejudice, and any dismissal must be without prejudice.  *See Faculty v. New York Univ.*, 11 F.4th 68, 78 (2d Cir. 2021) ("Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist.").  However, the court may dismiss without prejudice, while denying leave to amend based on the lack of subject matter jurisdiction.  *See Guillory v. Bishop Nursing Home*, 5:21-CV-410 (MAD), 2021 WL 2431259, at *3 (N.D.N.Y. June 15, 2021) (dismissing the complaint "without prejudice" and "without leave to amend" because the Court "lack[ed] . . . subject matter jurisdiction.").

III.    **CONCLUSION**

For the reasons stated above, the Court finds Plaintiff's amended complaint fails to state an Eighth Amendment claim against Defendants and this Court lacks subject matter jurisdiction to consider his state law claims.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant Ferguson's motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction (Dkt. No. 23) be **GRANTED WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND** only the Eighth Amendment claim; and it is further

**RECOMMENDED** that Defendants Visalli, Koenigsmann, and Fennessey's motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction (Dkt. No. 41) be **GRANTED WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND** only the Eighth Amendment claims; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

---

[7] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

**WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.


Dated:  November 4, 2021
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2017 WL 3393944
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

XIAO QING LIU, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF HEALTH,
New York Police Department 5th Precinct,
Bellevue Hospital Center, Ryan Nena Community
Health Center, USPS, and FedEx, Defendants.

16 Civ. 4046 (ER)
|
Signed August 4, 2017
|
Filed 08/07/2017

**Attorneys and Law Firms**

John Eric Knudsen, Law Offices of John Knudsen, LLC,
White Plains, NY, for Plaintiff.

Xiao Qing Liu, New York, NY, pro se.

Lienne Pisano, Fumuso Kelly Swart Farrell Polin &
Christesen, Hauppauge, NY, Ashley Satterfield Patterson,
Brian K. Coleman, Colleen Hitch Wilson, Federal Express
Corporation, Memphis, TN, Austa Starr Devlin, David Rosen,
Heidell, Pittoni, Murphy & Bach, LLP, Erin Teresa Ryan,
New York City Law Department, New York, NY, for
Defendants.

**OPINION & ORDER**

Edgardo Ramos, U.S.D.J.

**\*1** Plaintiff Xiao Liu brings this *pro se* action pursuant
to 42 U.S.C. § 1983 against the City of New York (the
"City"), Ryan NENA Community Health Center ("Ryan
NENA"), Federal Express Corporation ("FedEx"), New
York City Health and Hospitals Corporation ("NYCHH")
and a number of their respective employees.[1] Plaintiff
asserts claims for, among other things, false arrest, false
imprisonment, and involuntary confinement in violation of
her First, Fourth, Fifth, Sixth, and Fourteenth Amendment
rights.

Before the Court are Defendants' motions to dismiss pursuant
to Rules 12(b)(1) and (6) of the Federal Rules of Civil
Procedure. For the reasons set forth below, Defendants'
motions are GRANTED in part and DENIED in part.

**I. Background**

Plaintiff is a sixty-five year old Chinese woman whose
primary language is Mandarin. Her capacity to speak and
understand English is limited. Amended Complaint (Doc. 71)
at 4. Though the Amended Complaint is a not a model of
clarity, the Court endeavors to construe Plaintiff's claims to
raise the strongest arguments that they suggest. *Triestman
v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

Plaintiff alleges that on December 30, 2014, she appeared
voluntarily to meet with Sergeant Bertran Bouillon at the 5th
Precinct of the New York City Police Department to discuss
a "verichip-locator" she claimed had been implanted in her
body. Amended Complaint at 4. Weeks later, on January 18,
2015, at approximately 10:00 am, she returned to the precinct
to report a burglary and seek further assistance with removing
the tracking device in her body. In response to her request, a
lieutenant—who Plaintiff does not name or otherwise identify
—suggested that she go to a hospital. *Id.* She informed the
lieutenant that she would go at a later date because she did
not have the proper foot attire or an umbrella, and had other
chores to accomplish. *Id.* Plaintiff claims that at no point
during this interaction with the lieutenant did she "verbally or
physically threaten, intimidate, or frighten another person" or
pose a danger to herself. *Id.* Nevertheless, without telling her,
the lieutenant called an ambulance at approximately 10:40
am. *Id.*

Once the ambulance arrived, Plaintiff informed the
emergency medical personnel ("EMTs") that a tracking
device had been implanted in her body and that she did not
want to go to the hospital. *Id.* at 5. She claims that while
speaking to the EMTs, officers, including Officer Matthew
Decagna, grabbed her bag and umbrella, handcuffed her, and
dragged her into the ambulance.[2] *Id.* at 5. Somehow, Plaintiff
managed to free one hand from the handcuffs and was once
again restrained. *Id.* Although Plaintiff continued to tell the
officers and EMTs that she did not want to go to the hospital
and ask that she be let go, her requests were ignored. *Id.*

**\*2** The ambulance arrived at Bellevue Hospital at
approximately 11:30 am. *Id.* Plaintiff was immediately taken
to the psychiatric unit where the handcuffs were removed

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 18 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

and she was told that she was not free to leave. *Id.* Plaintiff claims that she did not engage in any violent or threatening behavior at the hospital and that she was "well-groomed, appeared physically health[y] ... and sane." *Id.* Nevertheless, Dr. Camila Lyons did not perform an independent assessment of her medical condition to confirm the EMTs' account and instead forcibly hospitalized her based on their statements. *Id.* Dr. Lyons' decision was affirmed—again without further assessment—by Doctors Abigail Hawkins, Sunil Penestti, Jonathan Howard, and John Udarbe. *Id.* at 5, 7. Additionally, Plaintiff alleges that Trista Chu—the social worker assigned to her case—made a number of false allegations in her report, including that Plaintiff swung at the EMTs and that she endangered others. *Id.* at 8.

Plaintiff also alleges that she was prevented from speaking with her daughter, who had been called by hospital staff, and told that she not could not leave the hospital until she took "Risperidone"—a type of anti-psychosis medication. *Id.* at 6. Specifically, she claims that Dr. Xiaoling Song ordered her to take medication and because she refused, the hospital staff put the medication into her food. Plaintiff claims that the medication caused her to experience headaches, dizziness, facial numbness, chest pain, bilateral paralysis and cramps. *Id.* at 7. She further alleges that she attempted to file complaints against the hospital and its staff and also requested multiple hearings to challenge her confinement. These attempts were allegedly rebuffed and Plaintiff remained in the hospital until February 3, 2015, for a total of sixteen days, when she was ordered to be released by a judge. The judge found that she was not an imminent risk of danger to herself or others. *Id.* Upon release from the hospital, Plaintiff was not given any prescriptions or instructed to take any medicine. *Id.* Plaintiff claims that at no point during her stay at the hospital did she ever engage in any physically violent behavior against herself or others. She also states that she does not have a history of violence and that the hospital's own records confirm this history.

In a separate set of allegations, Plaintiff alleges that later that year, in September, she became an outpatient at Ryan NENA. *Id.* at 9. The doctor with whom she visited suggested that various tests be run. *Id.* Plaintiff claims that she was injected with something that made her left arm feel tender, numb, and weak and that several blood tests were completed. *Id.* She also understood that they would be implanting another "locator" in her chest. *Id.* On December 27, 2015, Plaintiff returned to Ryan NENA and asked for her medical records. *Id.* She claims that she was not provided with a complete set of her medical records and that information was withheld from her. Plaintiff claims that she contacted the New York State Department of Health Division of Certification and Surveillance ("NYSDH") in order to complain about her treatment. *Id.* at 10. The NYSDH responded to Plaintiff via letter, which she alleges was dismissive of her complaint. *Id.*

Plaintiff sent letters to the NYSDH via the United States Postal Service ("USPS") and FedEx complaining about her treatment at Ryan NENA. She claims that although she sent the letters by overnight priority, the USPS and FedEx purposely delayed her mailings; and the letters did not arrive on time. *Id.* at 11, 12.

## II. Procedural History

On May 31, 2016, Plaintiff filed a Complaint against the NYSDH, the 5th Precinct of the New York Police Department ("NYPD"), Bellevue Hospital Center, Ryan NENA, USPS and FedEx. (Doc. 2). By order dated August 15, 2016, the Court *sua sponte* dismissed the NYSDH and the USPS as defendants as entitled to immunity under the Eleventh Amendment and the doctrine to sovereign immunity, respectively. The Court also directed the Clerk of Court to amend the caption of the action to replace Bellevue Hospital Center and the NYPD with the proper defendants: New York City Health and Hospitals Corporation ("NYCHH") and the City of New York, respectively. (Doc. 6).

**\*3** On October 13, 2016, NYCHH filed a letter requesting a pre-motion conference to seek leave to file a motion to dismiss. (Doc. 15). Shortly thereafter, the City of New York, FedEx, and Ryan NENA also filed letters seeking to file motions to dismiss. The Court granted leave and Defendants timely filed their motions. (Docs. 35, 41, 44, 49). On March 20, 2017, without leave from the Court, Plaintiff filed an Amended Complaint adding allegations and over thirty individual defendants. (Doc. 71). In response, Defendants filed a letter requesting a pre-motion conference for leave to file a motion to strike the Amended Complaint. (Doc. 72). At the pre-motion conference, the Court denied Defendants' request, and noting Plaintiff's *pro se* status, deemed the filing as a motion to amend. The Court granted Plaintiff's motion, but allowed the parties to file supplemental briefing to address the additional allegations in the Amended Complaint. [3]

## III. Legal Standard

### A. Rule 12(b)(1)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 19 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. See *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings may be considered by the court to resolve the disputed jurisdictional fact issues. See *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); see also *Morrison*, 547 F.3d at 170. When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not necessarily draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

**B. Rule 12(b)(6)**

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); see also *id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The same standard applies to motions to dismiss *pro se* complaints. See *Mancuso v. Hynes*, 379 Fed.Appx. 60, 61 (2d Cir. 2010). However, the Court is also obligated to construe a *pro se* complaint liberally and to interpret a *pro se* plaintiff's claims as raising the strongest arguments they suggest. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011); *Triestman*, 470 F.3d at 474. The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). A complaint that "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks and brackets omitted); see also *Triestman*, 470 F.3d at 477 ("*[P]ro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' ") (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)) (internal quotation marks omitted).

**C. Extrinsic Materials**

\*4  "When presented with a motion to dismiss pursuant to Rule 12(b)(6), the court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Here, in addition to its supplemental briefing, NYCHH attaches Plaintiff's medical records, which it claims are referenced in and are an integral part of the Amended Complaint. Memorandum in Further Support ("NYCHH Supp. Memo") (Doc. 87), Ex. B ("Plaintiff's Medical Records").

The Court finds that the medical records are incorporated by reference into the Amended Complaint and thus they

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 20 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

may be considered at this stage. It is abundantly clear that Plaintiff relied heavily on the records in drafting the Amended Complaint. Unlike the Complaint, the Amended Complaint specifically names over thirty individuals, including eighteen hospital employees. Plaintiff also relies on the medical records to show that she did not engage in violent behavior. In support of her claim, she explicitly quotes language from various documents in the record. Accordingly, the Court will consider Plaintiff's medical records in assessing Defendants' motion to dismiss. *See Simmons v. Pedroza*, No. 10 Civ. 821 (PGG), 2011 WL 814551, at *3 n.2 (S.D.N.Y. Mar. 7, 2011) ("Because [plaintiff's] medical records are incorporated by reference into his Complaint, they are properly considered on Defendants' motion to dismiss.") (citing *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

## IV. Discussion

Section 1983 grants a right of action to any "citizen of the United States or other person within the jurisdiction thereof" who has been deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege that: (1) a right secured by the Constitution or federal law was violated by defendants, and (2) the alleged violation was committed by a person acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Construing the Amended Complaint liberally, Plaintiff seems to allege that she was falsely arrested and involuntarily confined in violation of her First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights. [4]

### A. The City's Motion

Plaintiff asserts claims for false arrest and false imprisonment against the City, Sergeant Bouillon, Officer Decagna, and several unnamed officers. Amended Complaint at 2–8.

### 1. Claims Against Individual City Employees

**\*5** To establish a claim for false arrest and false imprisonment under both Section 1983 and New York law, a plaintiff must prove: (1) that the defendants intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged. *See Jocks v.*

*Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451 (1975)); *see also Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) ("In New York, the tort of false arrest is synonymous with that of false imprisonment."). Because there appears to be no dispute that Plaintiff was intentionally confined and that she was aware of it and did not consent, the only disputed element is whether the officers were authorized to confine her.

Pursuant to New York Mental Hygiene Law ("MHL") § 9.41, a police officer is authorized to "take into custody any person who appears to be mentally ill and is conducting ... herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41. "Likely to result in serious harm" is defined as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01. The officer may direct the removal of such person or directly remove her to an approved hospital or psychiatric emergency program. *Id.* "In assessing whether an officer had probable cause to arrest a person under this statute, courts apply the same objective reasonableness standard that governs Fourth Amendment claims." *Arroyo v. City of N.Y.*, No. 14 Civ. 9953 (JPO), 2016 WL 8677162, at *3 (S.D.N.Y. July 8, 2016), *aff'd*, No. 16-2425-CV, 2017 WL 1087926 (2d Cir. Mar. 21, 2017); *see also Kerman v. City of New York*, 261 F.3d 229, 240 n.8 (2d Cir. 2001). The question thus becomes whether the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant a person of reasonable caution to believe that she might be mentally ill and conducting herself in a manner likely to result in serious harm to herself or others. *Dunkelberger v. Dunkelberger*, No. 14 Civ. 3877

Case 9:20-cv-01115-TJM-TWD  Document 47  Filed 11/05/21  Page 21 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

(KMK), 2015 WL 5730605, at *12 (S.D.N.Y. Sept. 30, 2015). "Courts have held that a showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015) (internal quotation marks and citation omitted), *aff'd*, 2016 WL 6561491 (2d Cir. Nov. 4, 2016).

Here, Plaintiff alleges that she met with Sergeant Bouillon at the 5 th Precinct on December 30, 2014 to "investigate [a] verichip-locator which [was] implanted into her body." Amended Complaint at 4. The Amended Complaint does not indicate what, if anything, Sergeant Bouillon said or what the outcome of the meeting was. Weeks later, on January 18, 2015, Plaintiff returned to the Precinct to report a burglary and to request further assistance with "pinpointing and removing a tracking device that had been placed into her body." *Id.* When it was suggested that she go to the hospital, she demurred because she was busy and not dressed properly. She did, however, indicate that she would "go at a later date." *Id.* Plaintiff asserts that at no point during this interaction did she pose a danger to herself or others. *Id.* Nevertheless, the lieutenant called an ambulance. When the EMTs arrived, Plaintiff claims that she informed them about the verichip-locator and again stated that she did not wish to go to the hospital. Plaintiff asserts that she was forcibly handcuffed, dragged into the ambulance and taken to the hospital.

**\*6** Taking Plaintiff's facts as true—as the Court is required to do at this stage—the Court finds that it cannot determine whether there was probable cause to detain Plaintiff pursuant to the MHL. Although Plaintiff's statements regarding the locator chip implanted in her body may have been concerning evidence of a mental health issue, Plaintiff does not describe any actions on her part from which the Court can infer that she engaged in any violent or aggressive behavior at the time the ambulance was called, or even that there was a "probability or substantial chance" that she would engage in such dangerous behavior. Courts in this Circuit have allowed complaints to survive the motion to dismiss stage where it is unclear whether the plaintiff actually posed a danger to herself or others. *See Amid v. Police Officer Thomas R. Lamb (in His Individual Capacity)*, No. 14 Civ. 3151 (LDW), 2016 WL 1070814, at *3–*4 (E.D.N.Y. Mar. 15, 2016) (noting that plaintiff conceded that she called a hotline contemplating suicide, but denying motion to dismiss because it was disputed whether plaintiff posed a danger to herself or others when officers arrived at her home); *see also Amato v.*

*Hartnett*, 936 F. Supp. 2d 416, 435 (S.D.N.Y. 2013) (crediting plaintiff's allegations that he had not made any statements indicating that he was contemplating hurting himself, and holding that question of whether plaintiff posed a "substantial risk of physical harm" to himself for others was a question of fact for the jury).

Moreover, refusal to accept medical treatment, by itself, does not establish that a person poses a threat to herself or others.

*See* 🔖 *Schoolcraft v. City of N.Y.*, 103 F. Supp. 3d 465, 505 (S.D.N.Y. 2015), *on reconsideration in part*, 133 F. Supp. 3d 563 (S.D.N.Y. 2015) (denying summary judgment because although plaintiff refused medical treatment, the record was devoid of any violent behavior or indication that he posed a danger to himself or others); *see also Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016) (noting that a "person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others" and vacating district court's grant of qualified immunity to officer defendant for lack of evidence substantiating plaintiff's dangerousness).

Accordingly, Plaintiff's claims against the unnamed lieutenant and Officer Decagna survive the motion to dismiss stage. However, because Plaintiff does not allege that Sergeant Bouillon was involved in the seizure or decision to transport her to the hospital, the claims against him are DISMISSED.

### 2. Municipal Liability

"[T]o prevail on a claim against a municipality under 🔖 section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." 🔖 *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing 🔖 *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). "The fifth element reflects the notion that 'a municipality may not be held liable under 🔖 § 1983 solely because it employs a tortfeasor.'" ⚠️*Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 438-39 (S.D.N.Y. 2012) (quoting 🔖 *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. 🔖 *Brown*, 520 U.S. at 403-04; *see also* 🔖 *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A municipality or

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 22 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

other local government may be liable under [ § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting  *Monell*, 436 U.S. at 692). Here, Plaintiff does not allege the existence of a City policy or custom that caused her injuries. She also does not allege that the officers involved in her arrest were decisionmakers or improperly trained.

Accordingly, the City's motion to dismiss Plaintiff's claims against it is GRANTED.

**B. NYCHH's Motion**

Plaintiff alleges that the NYCHH and its staff violated her right to procedural and substantive due process under the Fourteenth Amendment by involuntarily committing her to Bellevue Hospital. The NYCHH staff includes Doctors Lyons, Hawkins, Penestti, Howard, Udarbe, Song; Nurses Charlene, Phunstock, Behrens, Lam, Velasco, Zenaida, Hsu; and Chiu, a social worker. Plaintiff also asserts her claims against Chen, Williams, an advocacy director, and Daridson, who works at the Medicaid Office at Bellevue Hospital. Amended Complaint at 2–8.

**1. Claims Against Individual NYCHH Employees**

**\*7** As an initial matter, NYCHH argues that the claims against nurses Charlene, Phunstock, Behrens, Lam, Velasco, Zenaida and Hsu, and the other Bellevue employees, including Chiu, Chen, Williams, and Daridson should be dismissed because Plaintiff does not sufficiently allege that they were personally involved in a constitutional deprivation. NYCHH Supp. at 12.

The Court agrees. Plaintiff's conclusory statement that the nurses "directly participated in and facilitated" her confinement and that Williams and Daridson included false statements in her records are insufficient to state a cause of action against them. Similarly, Plaintiff fails to adequately allege facts to support claims against Chiu, a social worker, and Chen, a licensed therapist. Plaintiff claims that Chiu made a number of false allegations in her assessment, including that Plaintiff "swung at the EMT" and that she was engaging in "violence or endangering others." Amended Complaint at 8. She also alleges that Chen wrote that she "was a danger to self" and that she had "poor coping skills." *Id.* A review of these records indicates that both Chiu and Chen were merely summarizing what had been reported to them as the reason for

Plaintiff's admission to the hospital. *See* Plaintiff's Medical Records at 93 (including Chiu's assessment and stating that Plaintiff "required restraints in the ambulance but got out and swung at the EMT"); *id.* at 344 (including Chen's assessment stating that "Patient was admitted to [the hospital] for danger to self"). Chen's individual assessment that Plaintiff had "poor coping skills," does not create liability for a constitutional violation. Accordingly, Plaintiff's claims against Charlene, Phunstock, Behrens, Lam, Velasco, Zenaida, Hsu, Chiu, Chen, Williams, and Daridson are DISMISSED. [5]

**i. Procedural Due Process**

Plaintiff asserts that the doctors at Bellevue did not perform an independent assessment of her, but rather relied on the erroneous allegations made by the emergency medical personnel. Amended Complaint at 4–5. She also claims that she requested hearings to challenge her confinement, but that her requests were ignored. *Id.* at 7.

 New York Mental Hygiene Law § 9.39 provides for the temporary involuntary commitment of persons to mental health facilities:

> The director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill ... may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness ... which is likely to result in serious harm to himself or others.

 N.Y. Mental Hyg. Law § 9.39(a). The patient must be given a statement of her status and her rights at the time of admission, and the Mental Hygiene Legal Service [6] must be notified. *Id.*; *see also Fisk v. Letterman*, 501 F. Supp. 2d 505, 514 (S.D.N.Y. 2007). If a person admitted according to  Section 9.39 is to be retained in the hospital for a period of more than forty-eight hours, then (within that forty-eight hour period) "another physician who shall be a member of the psychiatric staff of the hospital" must examine the person

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 23 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

and confirm that she "qualifies under the requirements of Section 9.39. N.Y. Mental Hyg. Law § 9.39; *see also Phelps v. Bosco*, No. 13 Civ. 1510 (GTS), 2017 WL 437407, at *6 (N.D.N.Y. Feb. 1, 2017). Upon request, a hearing must be held within five days of the patient's admission to determine whether there is reasonable cause to believe that the patient has a mental illness for which immediate inpatient care and treatment is appropriate and which is likely to result in serious harm to herself or others. N.Y. Mental Hyg. Law § 9.39. The Second Circuit has held that the MHL meets the requirements of procedural due process. *See Project Release v. Prevost*, 722 F.2d 960, 973 (2d Cir. 1983); *see also Fisk*, 501 F. Supp. 2d at 514. Therefore, if Defendants' actions comported with the "strictures of [the MHL], they also satisfied the requirements of procedural due process." *Capellupo v. Nassau Health Care Corp.*, No. 06 Civ. 4922 (JFB), 2009 WL 1705749, at *7 (E.D.N.Y. June 16, 2009).

**\*8** Based on Plaintiff's allegations and the medical records upon which she relies, the Court finds that the procedural requirements for involuntary confinement were met. Plaintiff was admitted pursuant to Section 9.39 and a form was completed detailing the reasons for her confinement. *See* Plaintiff's Medical Records at 28. [7] Hours after she was transported to Bellevue Hospital, a physician examined her and found that confinement pursuant to Section 9.39 was appropriate because there was reasonable cause to believe that she had a mental illness that would likely result in serious harm to herself or others. [8] *Id.* Plaintiff was given notice of her status and rights. *Id.* at 30. On January 19—less than forty-eight hours after admission—Plaintiff was examined by another physician who found that she was suffering from psychosis, was delusional, and unable to take care of herself. The physician determined that she was at risk of serious harm to herself or others and that involuntary confinement was appropriate. [9] *Id.* at 29. On January 23, Plaintiff made a request for a court hearing to challenge her involuntary confinement, which was received on January 26, 2015. *Id.* at 43. The hearing was scheduled for January 27, 2015. *Id.* at 42. The hearing was ultimately postponed until February 3, 2015.

Within fifteen days of her admission, the Director at Bellevue completed an application for Plaintiff to be admitted pursuant to Section 9.27, which allows the director of a hospital to retain a patient "alleged to be mentally ill and in need of involuntary care and treatment." [10] *Id.* at 32–33; N.Y.

Mental Hyg. Law § 9.27. The application was accompanied by the certifications of two doctors who examined her separately. *Id.* at 34–37; *see* N.Y. Mental Hyg. Law § 9.27 (requiring certificates of "two examining physicians, accompanied by an application for the admission" of a patient). The doctors found Plaintiff to be suffering from "worsening psychosis" and "persecutory delusions," and recommended that she remain in the hospital for treatment. *Id.* Plaintiff was given notice of this attempt to change her status. *Id.* at 38. The medical records also indicate that Plaintiff made a subsequent request for a court hearing, on January 30, to challenge her confinement, which was addressed at the February 3 hearing. *Id.* at 40. Thus, Plaintiff was afforded all of the process she was due.

**\*9** Accordingly, NYCHH's motion to dismiss Plaintiff's procedural due process claim is GRANTED.

### ii. Substantive Due Process

Plaintiff alleges that the Bellevue Hospital doctors had no basis for her confinement and that because she refused to take medication, the hospital staff concealed the medicine in her food. Amended Complaint at 6. NYCHH argues that Plaintiff's claims against the Bellevue Hospital doctors should be dismissed because their actions in treating Plaintiff were not a "substantial departure from accepted judgment, practice, or standards." NYCHH Supp. at 8.

"As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975)). Further, the right to refuse medication is protected by the Due Process Clause of the Fourteenth Amendment and is derived from the New York Code of Rules and Regulations, which provides that "[p]atients who object to any proposed medical treatment or procedure ... may not be treated over their objection except" in narrow circumstances, including "where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness." 14 N.Y.C.R.R. § 527.8(c)(1). However, due process does not "require a guarantee that a physician's assessment of the likelihood of serious harm be correct." *Rodriguez*, 72 F.3d at 1062. Therefore, "a doctor will

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 24 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.' " *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996).

The Second Circuit has determined that a doctor's decision to commit someone involuntarily under the MHL "does not ordinarily involve matters 'within the layman's realm of knowledge.' " *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987)). The decision is " 'based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.' " *Id.* Thus, whether it violates a person's right to substantive due process " 'turns on the *meaning* of the facts which [typically] must be interpreted by expert psychiatrists and psychologists.' " *Id.* at 191 (emphasis and alteration in original) (quoting *Addington*, 441 U.S. at 429). Therefore, in order to demonstrate an objective violation of those standards, a plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated.

Here, Plaintiff alleges that she did not engage in any conduct while at the hospital that would indicate that she was a danger to herself or others. As a result, her confinement and the subsequent administration of anti-psychotic drugs without her consent were a violation of her rights. The physicians found Plaintiff to be psychotic and delusional, however, based on the Court's review, the medical records submitted by the NYCHH and Plaintiff appear to bear out her claim that she was not a danger to herself or others. The medical records indicate Plaintiff generally presented a "low risk" for suicide, appeared calm, and did not engage in aggressive or violent behavior during her stay at Bellevue Hospital. *See* Plaintiff's Medical Records at 65 (record for 1/18/15 noting absence of any physically or verbally threatening behavior), 121, 133 (record for 1/19/15 noting same and that Plaintiff was "quiet and calm"), 137 (record for 1/20/15 noting same and that "no aggressive behavior [by Plaintiff] presented so far"), 157 (record for 1/21/15 noting same and that Plaintiff exhibited a "safe disposition"), 183 (record for 1/22/15 noting Plaintiff had no "insight into her illness" and that there had been no "aggressive behavior so far"), 204 (record for 1/24/15 noting that Plaintiff "was calm" and that there had been "no incidence of elopement or assault throughout the shift"), and

311 (record for 2/2/15 noting Plaintiff "was calm and free of behavioral problems during this tour"). The records also indicate that the hospital staff did not administer anti-psychotic drugs, but rather gave her amlodipine, with her consent, to address her high blood pressure. *Id.* at 105. Thus, taking Plaintiff's allegations as true, the Court finds that whether the doctors' decision to involuntarily commit Plaintiff was a substantial departure from accepted practice is not proper for resolution at the motion to dismiss stage. Consequently, NYCHH's motion to dismiss Plaintiff's claims against NYCHH and its doctors is DENIED.

### 2. Municipal Liability

**\*10** As with the claims against the City, to assert a claim against the NYCHH, Plaintiff was required to allege that a NYCHH policy or custom is causally connected to the alleged constitutional deprivation. The Amended Complaint does not refer to any NYCHH policy or custom. Accordingly, Plaintiff's claims against the NYCHH are DISMISSED.

### C. Ryan NENA's Motion to Dismiss

Plaintiff asserts claims against Ryan NENA for implanting a locator chip in her chest, for conducting illegal blood testing, and for failure to provide a complete set of medical records to her upon request. Amended Complaint at 9–10. Ryan NENA moves to dismiss Plaintiff's claims for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

Under the Federal Torts Claims Act ("FTCA"), a claimant must exhaust all administrative remedies with the appropriate federal agency—here, the Department of Health and Human Services ("HHS")—prior to filing a complaint in federal district court. *Porter v. Hirsch*, 345 F. Supp. 2d 400, 403 (S.D.N.Y. 2004); *see also* 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages for injury ... or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate federal agency"). The exhaustion requirement under Section 2675(a) is jurisdictional, and failure to exhaust administrative remedies prior to bringing a claim under the FTCA divests the district court of subject matter jurisdiction over that claim. *Bueno v. Sheldon*, No. 99 Civ. 1034 (JGK), 2000 WL 565192, at \*4 (S.D.N.Y. May 9, 2000). The Amended Complaint is silent as to whether Plaintiff presented her claims to HHS. Because Plaintiff has failed to file an administrative claim,

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 25 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

as required by Section 2675, the Court lacks subject matter jurisdiction over this action. *See Porter*, 345 F. Supp. 2d at 403 (dismissing action for lack of subject matter jurisdiction due to plaintiff's failure to file administrative claim with HHS).

Additionally, the Court finds that Ryan NENA is not a proper defendant in this matter. The Federally Supported Health Care Center Assistance Act of 1992 ("FSHCAA"), 42 U.S.C. § 233, extended Federal Torts Claims Act coverage to certain health centers that receive federal funding under Section 330 of the Public Health Service Act by authorizing the Department of Health and Human Services ("HHS") to "deem" them employees of the Public Health Service. *See* 42 U.S.C. § 233(g)-(n). Once deemed Public Health Service employees, a community health center and its employees enjoy immunity for their acts which relate to their employment, and any actions against them are treated as actions against the United States. 42 U.S.C. § 233(a). Thus, a plaintiff's remedy for alleged negligence by deemed health centers and their employees "shall lie against the United States only." *Id.*

Here, as evidenced by the "Deeming Notices" issued by the Health Resources and Services Administration and attached to its motion, Ryan NENA was deemed a Public Health Service employee for purposes of the FSHCAA during the relevant time period. Affirmation of Lienne Pisano (Doc. 50), Ex. D. Thus, Ryan NENA, and its employees—Doctors Becky Lou and Khin Win, and interpreter Mey Leon Chen—are not the correct defendants. Plaintiff should have filed the action against the United States.

**\*11** Accordingly, Ryan NENA's motion to dismiss Plaintiff's claims against Ryan NENA and its employees is GRANTED.

### D. FedEx's Motion

Plaintiff claims that FedEx's alleged actions causing the delay in delivering her Complaint to NYS DOH is a "wanton[ ] violation of [her] human rights." Amended Complaint at 13.

FedEx argues that it cannot be held liable under Section 1983 because it is not a state actor. Defendant Federal Express Corporation's Motion to Dismiss & Memorandum of Law in Support ("FedEx Memo") (Doc. 41) at 4. Moreover, even if could be considered a state actor, Plaintiff has failed to adequately allege that FedEx violated a federal constitutional right. *Id.*

To sustain a claim under Section 1983, a plaintiff must first establish that a defendant acted under color of state law. *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir. 2008). To constitute state action, there must be an alleged deprivation of a federal right "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982); *see also Den Hollander v. Copacabana Nightclub,* 624 F.3d 30, 33 (2d Cir. 2010) (referring to and applying the "two prong" test outlined in *Lugar*).

The Court finds that FedEx is not a state actor for the purposes of Plaintiff's Section 1983 claim. FedEx is a private entity and the Amended Complaint does not allege that FedEx, by purportedly delaying her mailings, acted under color of state law. Accordingly, FedEx's motion to dismiss is GRANTED.

### V. Conclusion
For the reasons set forth above, Defendants motions are GRANTED in part and DENIED in part, as summarized below:

- The City's motion to dismiss Plaintiff's claims against the City is GRANTED.

- NYCHH's motion to dismiss Plaintiff's claims against NYCHH is GRANTED.

- Ryan NENA's motion to dismiss is GRANTED.

- FedEx's motion to dismiss is GRANTED.

- Plaintiff's claims against Bertran Bouillon, Harley Charlene, Tsering Phunstock, Kim Behrens, Yin Lam, Analyn Velasco, Igama Zenaida, Chih Hsu; Trista Chiu, Yu-Ying Chen, Williams, Sona Daridson, Becky Lou, Khin Win, Mey Leon Chen, and Annmarie Britten-Franklin are DISMISSED.

What remains of the Amended Complaint are Plaintiff's claims against Officer Decargna for false arrest and false imprisonment, and Doctors Lyons, Hawkins, Penestti, Howard, Udarbe, and Song for involuntary confinement.

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 26 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

The Clerk of Court is respectfully directed to mail a copy of this Order to Plaintiff and terminate the motions, Docs. 35, 41, 44, 49.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3393944

## Footnotes

1    The individual defendants added to the Amended Complaint include, Sergeant Bertran Bouillon and Officer Matthew Decagna of the 5th Precinct; Doctors Camila Lyons, Abigail Hawkins, Sunil Penestti, Jonathan Howard, John Udarbe, and Xiaoling Song, and Nurses Harley Charlene, Tsering Phunstock, Kim Behrens, Yin Lam, Analyn Velasco, Igama Zenaida, Chih Hsu from Bellevue Hospital; and Trista Chiu, a social worker, Yu-Ying Chen, an "LCAT," Mr. Williams, an advocacy director, and Sona Daridson, from the Medicaid Office at Bellevue Hospital. Plaintiff also names numerous individuals employed by Ryan NENA. None of these individuals have been served.

2    Plaintiff claims that she received a letter from the City Law Department stating that because the criminal charges against her had been dismissed, the records pertaining to her arrest had been sealed. She argues that she should be granted access to those documents and that the officers lied about her behavior being "violent" or "endangering others." Amended Complaint at 5.

3    Defendants all filed supplemental memoranda. (Docs. 87–89, 92–95). To her opposition, Plaintiff attached a document titled "A Leading List of Medical Record Bellevue Hospital Center Inpatient Chart" in which she organized her approximately 300 page medical records and provided her comments on the medical staffs' assessments. (Doc. 90). Plaintiff also attaches her medical records, which the Court previously received from NYCHH. (Doc. 91).

4    Plaintiff asserts that her First, Fifth, and Sixth Amendment rights were violated. However, even construing the Amended Complaint liberally, Plaintiff has not alleged any facts from which the Court can discern an intelligible, much less cognizable, claim based on a First Amendment violation. In addition, "[b]ecause the Fifth Amendment applies only to the federal government, Plaintiff cannot state a claim for deprivation of due process in violation of the Fifth Amendment where, as here, there are no allegations of federal action." *Cortlandt v. Westchester Cty.*, No. 07 Civ. 1783 (MDF), 2007 WL 3238674, at *5 (S.D.N.Y. Oct. 31, 2007). Lastly, the Sixth Amendment right to counsel is inapplicable in civil cases. Accordingly, Plaintiff's claims that her First, Fifth, and Sixth Amendment rights were violated are DISMISSED.

5    The Court also dismisses Plaintiff's claims against Official Annmarie Britten-Franklin. The Amended Complaint alleges that "Plaintiff has been implanted the verichip-locator in her body, inquire deeply into the cause of happening above things, the actor is NYS WCDB, by Annmarie Britten-Franklin." Amended Complaint at 8. This allegation is insufficient to state a claim under Section 1983 against Britten-Franklin.

6    The Mental Hygiene Legal Service is a New York State agency responsible for representing, advocating and litigating on behalf of individuals receiving services for a mental disability. https://www.nycourts.gov/courts/ad2/mhls_mainpage.shtml

7    As noted previously, NYCHH submitted under seal a copy of Plaintiff's medical records as an Exhibit to its supplemental memoranda. Plaintiff also attached a copy of these medical records to her supplemental submissions and argued that NYCHH had obtained her medical records improperly. *See* Docs. 91, 92.

8    Specifically, Dr. Hawkins noted that Plaintiff's

likely chronic psychosis has led to violence today and puts her at significant risk of harm to herself as well. Thus she meets criteria for involuntary admission and will be admitted 9.39. She is at chronically increased

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 27 of 141

Xiao Qing Liu v. New York State Department of Health, Not Reported in Fed. Supp. (2017)

risk of danger to self and others given history of chronic delusions. She is at acutely elevated risk given the intensity of her delusions that led to violence today and impaired decision making that could have led to her being injured by NYPD for her threatening behavior.

Plaintiff's Medical Records at 91.

9   N.Y. Mental Hyg. Law § 9.39(a)(2) provides that

[t]he director shall admit such person pursuant to the provisions of this section only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section. Such person shall not be retained for a period of more than forty-eight hours unless within such period such finding is confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital.

10   N.Y. Mental Hyg. Law § 9.39(b) provides that

[w]ithin fifteen days of arrival at the hospital, if a determination is made that the person is not in need of involuntary care and treatment, he shall be discharged unless he agrees to remain as a voluntary or informal patient. If he is in need of involuntary care and treatment and does not agree to remain as a voluntary or informal patient, he may be retained beyond such fifteen day period only by admission to such hospital or another appropriate hospital pursuant to the provisions governing involuntary admission on application supported by medical certification and subject to the provisions for notice, hearing, review, and judicial approval of retention or transfer and retention governing such admissions, provided that, for the purposes of such provisions, the date of admission of the patient shall be deemed to be the date when the patient was first received under this section.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 28 of 141

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

2016 WL 5793422
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Damone Taree SAVAGE, Plaintiff,

v.

OFC. MICHAEL ACQUINO, OFC. Mark Hamilton,
OFC. Mark White, OFC. Jeremy Connolly;

Michael Reardon, 1ˢᵗ Deputy Superintendent;
Dr. HielinBurger, Doctor of Erie County Medical
Staff; and Guadalupe Stabler, nurse, Defendants.

13-CV-6376
|
Signed September 29, 2016
|
Filed 09/30/2016

**Attorneys and Law Firms**

Damone Taree Savage, Auburn, NY, pro se.

David M. Lee, Corporation Counsel, Kenneth R. Kirby, Department of Law, Kathleen Marie Sweet, Melissa L. Zittel, Gibson, McAskill & Crosby, LLP, Buffalo, NY, for Defendants.

**DECISION & ORDER**

JONATHAN W. FELDMAN, United States Magistrate Judge

**PRELIMINARY STATEMENT**

**\*1** Plaintiff Damone Savage ("plaintiff"), an individual previously detained at the Erie County Holding Center ("ECHC"), brings this pro se action against Buffalo Police Department ("BPD") officers and ECHC officials pursuant to 42 U.S.C. § 1983. See Docket #7. In his Amended Complaint, plaintiff asserts: (1) a cause of action against Officers Michael Acquino and Mark Hamilton, alleging violations of his Fourth Amendment rights; (2) a cause of action against Officers Michael Acquino, Mark Hamilton, Mark White, and Jeremy Connolly, alleging violations of his Eighth Amendment rights; and (3) a cause of action against Dr. Edwin Heidelberger ("Heidelberger"), Nurse Guadalupe Stabler ("Stabler"), and Superintendent Michael Reardon ("Reardon"), alleging violations of his Eighth Amendment

rights. Id. Pursuant to the provisions of 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court for all dispositive matters, including trial. See Docket # 46.

Currently pending before the Court are Reardon's motion for judgment on the pleadings (Docket # 64), Stabler's motion for judgment on the pleadings (Docket # 68), and Heidelberger's motion to dismiss (Docket # 77). Because plaintiff asserts the same claim against all three defendants and because defendants raise similar arguments, the Court will consider these motions simultaneously. Based on a review of the parties' submissions and for the reasons discussed below, Reardon's motion for judgment on the pleadings and Stabler's motion for judgment on the pleadings are **granted**. Heidelberger's motion to dismiss is converted to a motion for summary judgment and is **denied without prejudice** to renew.

**FACTUAL BACKGROUND**

The following is based solely on the allegations contained on the face of plaintiff's Amended Complaint.[1] Docket # 7. On January 18, 2013, plaintiff was arrested by BPD officers for criminal possession of a firearm. Id. at 8. Plaintiff alleges that the arrest was unlawful, and asserts that BPD officers assaulted him and illegally searched his person during the course of the arrest. Id. at 6. As a result, plaintiff claims to have suffered permanent injuries to his neck, left shoulder, and left wrist, as well as other injuries to his eyes, face, head, legs, hips, and back. Id. at 6, 17.

**\*2** Following his arrest, plaintiff was transported to ECHC, where he was examined by Stabler for intake processing. Id. at 17. According to his Amended Complaint, plaintiff arrived at ECHC with: unspecified injuries to his eyes, face, and head; his left shoulder in a sling; lacerations on his wrists that required stitches; and bruising on his knees, legs, hips, and back. Id. Plaintiff alleges that during his initial meeting with Stabler, she "refused to look into [his] complaints or review any of [his] wounds," instead telling him that he was experiencing "head trauma" and was "fine." Id. He further alleges that additional nurses declined to treat him over the course of his detention at ECHC, telling plaintiff that "only the Doctor could give [him] the medication [he] needed." Id. Accordingly, plaintiff claims, he made "many" requests to see a doctor,[2] including through the filing of grievances with the

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 29 of 141

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

New York State Commission of Correction on February 15, 2013 and June 28, 2013. Id.

The issues in plaintiff's February 15, 2013 grievance mirror many of the issues raised in plaintiff's Amended Complaint – namely, that he requested to be examined by "Dr. H" multiple times, and that those requests were ignored. Id. at 19. Plaintiff specifically requested in his grievance that he "receive proper treatment," and be referred to "the 'doctor' " and not "the nurse," who claimed to be unable to assist him. Id. (emphasis in original). On the grievance form, ECHC staff indicated that "Deputy Brown" and "Nurse Debbie" informed plaintiff that he was scheduled to see the doctor later. Id. Below that, and in large capital letters in quotations, someone wrote "WAS NEVER CALLED TO SEE DOCTOR." Id. Plaintiff indicated that he did not accept the "informal resolution" of his grievance and appealed the decision. Id. On February 20, 2013, plaintiff received a memorandum formally denying his requests and barring further appeal from Sergeant A. Harris with the Erie County Sheriff's Office.[3] Id. at 17-18.

On April 4, 2013 and May 5, 2013, plaintiff alleges, he met with "the Doctor," who informed him that he needed shoulder surgery but would not receive it while at ECHC. Id. at 17. Plaintiff claims that, on June 13, 2013, he met with Reardon to discuss his release so that he could have the necessary surgery. Id. According to plaintiff, Reardon promised him that he would have the shoulder surgery while at ECHC, but never followed through on that promise. Id.

On June 28, 2013, plaintiff filed his second grievance, claiming that he was being denied proper medical treatment.[4] Docket # 66-7. In that grievance, plaintiff noted that after filing three "sick slips" on June 2, June 15, and June 25, 2013, he had not been called for treatment. Id. He also wrote that he needed surgery and requested that he: receive stronger medication to cope with his "non-stop pain"; be examined by a neurologist for his headaches; and be given access to his medical records to make a motion for release for medical surgery. Id. ECHG staff noted on the grievance form that plaintiff's requests required action beyond the scope of their duties, and plaintiff indicated that he agreed to the informal resolution of his grievance. Id.

**\*3** These allegations form the basis of plaintiff's current claim against Reardon, Stabler, and Heidelberger. On July 22, 2013, plaintiff filed his first Complaint, suing Stabler, Reardon, Heidelberger, and "Sheriff Timothy Howard" for denying him medical treatment in violation of his Eighth Amendment protection against cruel and unusual punishment. Docket # 1 at 7. The Honorable Richard J. Arcara, United States District Judge, issued an Order on October 17, 2013, permitting, inter alia, plaintiff's claim for insufficient medical care against Stabler, Reardon, and Heidelberger to proceed and providing plaintiff an opportunity to amend his Complaint. See Docket # 5 at 5-6. On November 8, 2013, plaintiff filed the current Amended Complaint, once again stating a cause of action against Stabler, Reardon, and Heidelberger for allegedly denying him proper medical care while he was held at ECHC. Docket # 7 at 17. For relief, plaintiff requests five million dollars, compensation for his medical bills from ECHC, and termination of "the Medical Staff" and Reardon. Id. The Honorable Frank P. Geraci, Jr., Chief United States District Judge, issued an Order on April 25, 2014 permitting plaintiff's claim against Stabler, Reardon, and Heidelberger to proceed. Docket # 8.

On July 18, 2014, defendants Stabler and Reardon filed their Answers to the Amended Complaint, denying plaintiff's allegations regarding deliberate indifference to his serious medical needs and setting forth, among others, an affirmative defense that plaintiff failed to comply with the requirements of the Prison Litigation Reform Act ("PLRA"). Docket ## 13 at ¶ 18, 14 at ¶ 18. Heidelberger filed his Answer to plaintiff's Amended Complaint on July 30, 2014, also denying plaintiff's allegations that he was deliberately indifferent to plaintiff's serious medical need and raising an affirmative defense that plaintiff failed to comply with the requirements of the PLRA. Docket # 15 at ¶ 28.

## DISCUSSION

Relying on Rule 12 (c) of the Federal Rules of Civil Procedure, Reardon and Stabler[5] now seek dismissal of the claim against them, arguing that: (1) plaintiff did not exhaust all administrative remedies available to him before bringing the instant action in accordance with the PLRA; and (2) plaintiff's Amended Complaint fails to state the elements of a claim against them for deliberate indifference to serious medical needs.[6] See Docket ## 67 at 5-24, 71 at 5-24. Heidelberger similarly seeks dismissal of the claim against him pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, adopting the arguments of Reardon and Stabler regarding exhaustion under the PLRA and asserting that: (1) plaintiff has failed to state a claim for deliberate indifference to medical need; and (2) plaintiff received adequate medical care while detained at ECHC. See Docket # 77-17 at 1-8.

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

## I. Legal Standard Applicable to Rule 12 (c) Motions

"In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b) (6)." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994). "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim of relief." Zucco v. Auto Zone, Inc., 800 F. Supp. 2d 473, 475 (W.D.N.Y. 2011). In other words, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Turkmen v. Ashcroft, 589 F.3d 542, 546 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009)).

In determining whether dismissal of the complaint is warranted, "a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991). While "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant," Sheppard, 18 F.3d at 150, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. "[A]t a bare minimum, the operative standard requires the plaintiff to provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (quotations and citations omitted).

**\*4** This standard applies to claims brought by pro se litigants, but, "[a]t the same time, ... a 'document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " Zucco, 800 F. Supp. 2d at 475-76 (quoting Boykin v. KeyCorp, 521 F.3d 202, 214 (2d Cir. 2008)). "Nevertheless, all pleadings, pro se or otherwise, must contain enough factual allegations to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Id. (quoting Boykin, 521 F.3d at 214).

## II. Legal Standard Applicable to Eighth Amendment Claims of Deliberate Indifference Standard

Plaintiff alleges that Reardon, Stabler, and Heidelberger violated his Eighth Amendment rights by denying him proper medical care while he was detained at ECHC. Under the Eighth Amendment, which prohibits the infliction of cruel and unusual punishment, inmates are protected from punishments that "involve the unnecessary and wanton infliction of pain." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). This protection extends to pretrial detainees held in state facilities through the Fourteenth Amendment, see Tramell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003) (citation omitted), and applies to any actions that "transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' " Hutto v. Finney, 437 U.S. 678, 685 (1978) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). Inadequate medical treatment qualifies as cruel and unusual punishment proscribed by the Eighth Amendment when an inmate can prove "that defendants' actions or omissions amounted to 'deliberate indifference to a serious medical need.' " Evan v. Manos, 33 6 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (quoting Estelle, 429 U.S. at 106).

"The deliberate indifference standard embodies both an objective and a subjective prong." Hathaway, 37 F.3d at 66. Objectively, an inmate must demonstrate "a deprivation that is ... sufficiently serious [such] that he was denied the minimal civilized measure of life's necessities ...." Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (internal quotation and citation omitted). Whether the deprivation of medical care is objectively serious requires inquiries into: (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy of the medical care is sufficiently serious." Salahuddin v. Goord, 467

F.3d 263, 279-80 (2d Cir. 2006). The first inquiry entails an assessment of whether prison officials acted reasonably in response to a medical condition; the second requires courts to examine the harm caused by any inadequate action based on, among other things, the seriousness of the medical condition. Id. There is no "precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," but courts in the Second Circuit consider a number of factors.

Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). Medical need is sufficiently serious for constitutional purposes when, for example, "it presents a condition of urgency that may result in degeneration or extreme pain." See, e.g., Moran v. Livingston, 155 F. Supp. 3d 278, 288 (W.D.N.Y. 2016). While an inmate is not required "to demonstrate that he or she experiences pain that is at the limit of human ability to bear," Brock, 315 F.3d at 163, an unsupported "assertion of pain sensation alone ... does not amount to a serious medical need under the Eighth Amendment." Evan, 336 F. Supp. 2d at 260 (internal quotation and citation omitted). Other factors indicative of serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation and citation omitted).

**\*5** The subjective prong of the deliberate indifference standard requires that the charged official "act[ed] with a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Id. (citation omitted); see also Estelle, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); Moran, 155 F. Supp. 3d at 288 ("More than medical malpractice is required to establish a constitutional violation."). The charged official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). In other words, the

official must have acted with the "equivalent of criminal recklessness." Moran, 155 F. Supp. 3d at 288 (citation omitted); see also Beaman v. Unger, 83 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) ("To establish deliberate indifference, therefore, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain." (citations omitted)). The official's behavior should be "repugnant to the conscience of mankind or incompatible with the evolving standards of decency that mark the progress of maturing society." Evan, 336 F. Supp. 2d at 261 (internal citations and quotations omitted). "[M]ere disagreement over the proper treatment," on the other hand, falls short of creating a constitutional claim. See, e.g., Chance, 143 F.3d at 703.

### III. Legal Standard Applicable to Claims of Failure to Exhaust Administrative Remedies under the PLRA

Relying on the PLRA, defendants first contend that plaintiff has failed to exhaust the administrative remedies available to him and, thus, argue that his Amended Complaint must be dismissed. See Docket ## 67 at 5-16, 71 at 5-17, 77-17 at 1. The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 19 83 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has instructed that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Collins v. Gruen, 2014 WL 4923586, at *7 (W.D.N.Y. Sept. 30, 2014). Passed in an effort "to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court," id. at 528, the PLRA should be applied "regardless of the type of facility in which [an inmate is] imprisoned." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).

Under the PLRA's exhaustion requirement, an inmate must "utilize the available grievance procedures, regardless of whether the relief sought is offered through those procedures." Collins, 2014 WL 4923586, at *7. Accordingly, before bringing a case in federal court, an inmate "must complete the administrative review process in accordance

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 32 of 141

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

with the applicable procedural rules – rules that are defined not by the PLRA, but by the prison grievance process itself."

Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012). No special circumstances exist that relieve an inmate of their obligation to adhere to the PLRA's exhaustion requirement; an inmate's failure to exhaust the available administrative remedies is only excusable where the remedies are, in fact, unavailable. See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016) (noting that the Supreme Court's decision in Ross v. Blake, ___ U.S. ___, 136 S. Ct. 1850 (2016) abrogated the Second Circuit's special-circumstances exception for an inmate's failure to exhaust under the PLRA and "fram[ed] the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate"). Generally, there are "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."[7] Ross, 136 S. Ct. at 1859. "First, an administrative remedy may be unavailable when it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates, Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Williams, 829 F.3d at 123-24 (internal quotations and citations omitted). "Third, an administrative remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id.

## IV Analysis

**\*6   Exhaustion of Administrative Remedies:** Based on the legal standard set forth above, the PLRA applies to plaintiff's circumstances – he is alleging a series of constitutional violations that occurred while he was housed at ECHC, a county jail facility that had an administrative remedy "officially on the books." Ross, 136 S. Ct. at 1859. Moreover, "[b]ecause all of the motions filed by the [d]efendants relative to the issue of exhaustion are directed to the allegations in the Amended Complaint and Plaintiff's statements therein that he did not exhaust his administrative remedies, the Court will consider all such motions under Rule 12(b)(6)."[8] Collins, 2014 WL 4923586, at \*7. Accordingly, as a preliminary matter, the Court must determine whether

plaintiff satisfied the PLRA's exhaustion requirement prior to filing his Amended Complaint.

At ECHC, inmate complaints are resolved through a grievance program, administered by the Erie County Sheriff's Office ("ECSO"). Docket # 66 at 3. Plaintiff was notified of the grievance program through an Inmate Handbook that he received when he first entered ECHC. Id. According to the program described in the handbook, an inmate can resolve issues through either an informal or formal process. Id.; see also Docket # 66-3 at 21-22. Under the informal system, inmates are instructed to make verbal or written complaints, which ECSO staff will attempt to resolve immediately. Id. If the grievance is not immediately resolved, it should be recorded on an "Inmate Request Slip" and "forwarded to the appropriate person or office for review and consideration ... without undue delay." Id.

Under the formal procedure, an inmate with a complaint is instructed to fill out and submit a grievance form to the Housing Area Officer within five days of the incident giving rise to the complaint. Id. at 22. Once a grievance is filed, the inmate will receive a written answer from the Grievance Coordinator within five business days. Id. If the inmate is dissatisfied with the answer provided, they are instructed to appeal to the Superintendent within two business days, and the Superintendent will review the grievance and issue a written answer within five business days. Id. If dissatisfied with the Superintendent's response, the inmate is instructed to appeal within three business days to the Commission of Corrections. Id. Thereafter, the Citizens' Policy and Complaint review council will make a determination and deliver it to the inmate within forty-five business days. Id.

As noted, plaintiff's Amended Complaint makes reference to two grievances – one filed on February 15, 2013 and one filed on June 28, 2013. Docket # 7 at 17. Plaintiff indicates specifically that he did not appeal the decisions issued in response to his grievances. Id. The documents attached to plaintiff's Amended Complaint, however, reveal that plaintiff appealed the decision on his February 15, 2013 grievance. Id. at 17-19. Indeed, a reading of plaintiff's Amended Complaint establishes that, after following the steps outlined in the administrative scheme for remedies, he received a memorandum from the ESCO informing him that he was barred from appealing his grievance any further. Id. at 18. It appears to the Court, therefore, that plaintiff exhausted the available administrative remedies outlined in the ESCO

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 33 of 141

Savage v. UFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

Inmate Handbook for the complaints in his grievance filed on February 15, 2013.

**\*7** Plaintiff's June 28, 2013 grievance, however, presents a different story. On the grievance form, plaintiff explicitly indicated that he "agree[d] to accept the informal resolution to [his] [g]rievance" without further appeal. Docket # 66-7. Moreover, in his response to the instant motions, plaintiff acknowledges that he did not appeal the decision on his June 28, 2013 grievance and indicates that at least some of the requests made in that grievance were satisfied. See Docket # 80 at 12. Even when "interpret[ing] [plaintiff's pro se Amended Complaint] to raise the strongest claims that it suggests," Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir. 2013) (citations omitted), the Court is unable to reasonably infer that plaintiff was unaware of his ability and duty to appeal his June 28, 2013 grievance before filing the instant suit in federal court. The Amended Complaint contains language explicitly informing plaintiff of his obligation to follow the PLRA's exhaustion requirements and provide information related to his efforts to exhaust the available administrative remedies. [9] Docket # 7 at 4. He honored this obligation with the grievance he filed on February 15, 2013, but, inexplicably, did not with his later grievance. Taken together, these facts fail to give rise to an inference that the administrative remedy available to plaintiff was "a simple dead end," or that the process for obtaining relief was so complicated that "no ordinary prisoner [could] discern or navigate it," or that the ECHC administrators "thwart[ed] [plaintiff] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1859. Accordingly, with respect to the issues raised in his June 28, 2013 grievance, I find that plaintiff failed to exhaust the administrative remedies available to him before filing his Amended Complaint.

The Court's inquiry, however, does not end here. Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, a party's failure to set forth an affirmative defense in responsive pleadings constitutes "waiver of that defense and its exclusion from the case." Boston v. Takos, 2002 WL 31663510, at \*3 (W.D.N.Y. Oct. 4, 2002) (quoting U.S. For and on Behalf of Maritime Admin v. Continental Illinois Nat. Bank and Trust Co. of Chicago, 889 F.2d 1248, 1253 (2d Cir. 1989)). In the Second Circuit, exhaustion under the PLRA is an affirmative defense that must be raised in a responsive pleading, see id. (citing Jenkins v. Haubert, 179 F.3d 19,

28-29 (2d Cir. 1999)), which defendants Reardon, Stabler, and Heidelberger did. See Docket ## 13 at ¶ 18, 14 at ¶ 18,15 at ¶ 28. Since defendants did not waive their right to assert this defense, I find that plaintiff is barred from raising the deliberate indifference claim contained in his June 28, 2013 grievance in the instant suit. See Jones v. Block, 549 U.S. 199, 223 (2007) (instructing courts to evaluate exhaustion under the PLRA on a claim-by-claim basis); see also Gomez v. Westchester County, 2015 WL 1054902, at \*6 (S.D.N.Y. Mar. 10, 2015) (reviewing exhaustion on a claim-by-claim and grievance-by-grievance basis); Collins, 2014 WL 4923586, at.\*10 (dismissing case where plaintiff failed to "file a grievance or an appeal with respect to either of his claims").

Moreover, because plaintiff only exhausted the issues raised in his February 15, 2013 grievance, and because that grievance makes no mention of plaintiff's current claims against defendants Reardon and Stabler, the Court has no choice but to dismiss plaintiff's Amended Complaint against them without prejudice. See Boston, 2002 WL 31663510, at \*3 (noting that, in order to exhaust administrative remedies under the PLRA "as to the acts allegedly committed by" defendants, an inmate must file a grievance and appeal that grievance against each defendant). Indeed, the conversation between plaintiff and Reardon, which is the sole incident alleged in plaintiff's Amended Complaint giving rise to a claim against Reardon, occurred four months after the February 15, 2013 grievance. See Docket # 7 at 17 ("I then spoke to Sup. Int. Reardon on June 13, 2013 about my surgery or relase [sic] he said he would see to [i]t that I had said surgery while in facility I wrote him a reminder"). Similarly, while plaintiff asserts in his Amended Complaint that Stabler denied him appropriate medical care when he first entered ECHC, his February 15, 2013 grievance makes no mention of Stabler or the adequacy of the medical care he received upon admission to ECHC. Id. at 19. In fact, based on this Court's generous interpretation of plaintiff's pro se pleading, Heidelberger [10] is the only one of the three defendants subject to plaintiff's deliberate indifference claim mentioned in his exhausted grievance. See id. ("I have made many attempts to be seen by the medical 'Dr. H' of this facility ...."). Accordingly, plaintiff's lawsuit against Reardon and Stabler, filed before the exhaustion of available administrative remedies, must be dismissed.

**\*8 Plaintiff's Remaining Eighth Amendment Claims for Deliberate Indifference to Medical Need:** Based on the

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 34 of 141

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

above, the only remaining defendant subject to plaintiff's claim of deliberate indifference to his serious medical need is Heidelberger. Additionally, because plaintiff failed to exhaust the administrative remedies available to him with respect to the June 28, 2013 grievance, the only issues that are properly raised here are those contained in his February 15, 2013 grievance. See Gomez, 2015 WL 1054 902, at *6 2015 WL 1054 902, at *6 ("The Court thus concludes that although Gomez exhausted other dental claims, including his November claim regarding pain from an exposed cavity, he failed to exhaust any claim regarding dental care he received in August 2012, and is thus barred from asserting it here." (citation omitted)). To reiterate, that includes plaintiff's allegations that he made "many attempts" to be seen by Heidelberger for severe headaches and blurred vision, but that he was improperly denied treatment. Docket # 7 at 19. Plaintiff's additional complaints, including that Heidelberger denied him a necessary surgery while he was housed at ECHC, have not been properly exhausted under the PLRA and cannot be adjudicated in the instant litigation. The Court's only remaining task with respect to the claim against Heidelberger, therefore, is to determine whether he has sufficiently stated a claim for deliberate indifference based on the allegations contained on the face of his Amended Complaint.

In support of his motion to dismiss plaintiff's Amended Complaint, Heidelberger relies on, inter alia, plaintiff's statements at the April 28, 2015 Scheduling Conference with the Court (see Docket # 77-17 at 5); plaintiff's medical treatment before his admission into ECHC (see id.); plaintiff's referral to an orthopedic surgeon at ECHC (see id. at 6); the results of plaintiff's visit to "the ECMC Orthopedic Clinic" (see id. at 7); plaintiff's physical therapy (see id.); plaintiff's examination by a neurologist (see id. at 7); an x-ray of plaintiff's left shoulder (see id.); a report from plaintiff's orthopedic surgeon, Dr. Michael Rauh, M.D., purportedly indicating that plaintiff did not need shoulder surgery (see id. at 8); and an affidavit from Heidelberger averring that he provided plaintiff with reasonably appropriate medical care (see Docket # 77-18). While these materials may be relevant to the adjudication of the merits of plaintiff's claim, the Court finds it improper to consider them in the context of a motion to dismiss. The Federal Rules of Civil Procedure make clear that this Court is barred from considering matters presented outside the pleadings on a motion to dismiss without converting that motion to one for summary judgment under Rule 56 and giving the opposing party notice of the conversion and a reasonable opportunity to submit the

pertinent materials in response. See Fed. R. Civ. P. 12(d); see also Hernandez v. Coffey, 582 F.3d 303, 307 (2d Cir. 2009) ("[A] district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the rule requires that the court give sufficient notice to an opposing party and an opportunity for that party to respond." (internal quotations and citation omitted)). Finding that Heidelberger presented materials outside the scope of plaintiff's Amended Complaint in support of his motion, and noting that, at this stage in the litigation and with few facts, developed, it would be exceedingly difficult for this Court to determine the seriousness of plaintiff's injury or his deprivation of medical care, see Rosales v. Fischer, 2009 WL 928260, at *12 (S.D.N.Y. Mar. 31, 2009) ("[G]iven the liberal construction afforded pro se complaints, determination of whether an alleged injury is sufficiently serious is often premature at the pleading stage and better suited to resolution on summary judgment."), this Court hereby converts Heidelberger's motion to dismiss to a motion for summary judgment. See Fed. R. Civ. P. 12(d).

As stated above, when a court converts a motion to dismiss to a motion for summary judgment, "the rule requires that the court give sufficient notice to an opposing party and an opportunity for that party to respond." Hernandez, 582 F.3d at 307 (internal quotation and citation omitted). "In the case of a pro se party, ... 'notice is particularly important' because the pro se litigant 'may be unaware of the consequences of his failure to offer evidence bearing on triable issues.' " Id. (quoting Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir. 1983)). Relatedly, in Irby v. New York City Transit Auth., 262 F.3d 412 (2d Cir. 2001), the Second Circuit recognized "that district courts and represented litigants who move for summary judgment against pro se parties must provide any pro se party with notice of the requirements of Rule 56 of the Federal Rules of Civil Procedure and 'the consequences of noncompliance' with the rules." Malcolm v. Honeoye Falls-Lima Educ. Ass'n, 2014 WL 2519968, at *1 (W.D.N.Y. Mar. 31, 2014) (citing Irby, 262 F.3d at 413). Since Irby, this district has implemented mandatory summary judgment notice requirements, adopted in our Local Rules of Civil Procedure. See W.D.N.Y. Loc. R. Civ. P. 56(b).

**\*9** While the Court may excuse the failure to attach an Irby Notice to a motion for summary judgment if the moving party establishes that the pro se litigant clearly understood the requirements of Rule 56, see Irby, 262 F.3d at 414, no

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 35 of 141

such showing has been made here. A review of plaintiff's response in opposition establishes that he did not fully understand the challenges raised in Heidelberger's motion to dismiss, let alone that the motion might be converted into one for summary judgment. See Docket # 80. Accordingly, Heidelberger's converted motion for summary judgment (Docket #77) is **denied without prejudice to renew** upon the filing of a revised version of his motion papers addressing the surviving issues raised in plaintiff's February 15, 2013 exhausted grievance.

## CONCLUSION

For the reasons stated, Reardon's motion for judgment on the pleadings (Docket # 64) and Stabler's motion for judgment on the pleadings (Docket # 68) are **granted**, and Heidelberger's motion to dismiss (Docket # 77) is **denied without prejudice to renew** as a converted motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Both plaintiff and defendant are reminded that, pursuant to the Court's findings in the instant Decision and Order, the only issues remaining for this Court to resolve with respect to plaintiff's claim against Heidelberger for deliberate indifference to his serious medical need are those raised in his February 15, 2013 exhausted grievance. By failing to exhaust the administrative remedies available to him with respect to the issues raised in his June 28, 2013 grievance, plaintiff has forfeited his right to adjudicate them here. Additionally, the Court is attaching to this Decision and Order a copy of the court-required Irby Notice, and defendant is instructed to attach same to his moving papers. Plaintiff is directed to respond to the revised summary judgment motion thirty (30) days after service of the motion papers. Defendant shall have fourteen (14) days to reply. No further discovery shall occur pending a determination of the summary judgment motion. Should plaintiff believe that he is unable to present facts needed to justify his opposition to summary judgment, he must file an affidavit or declaration pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.

**SO ORDERED.**

Dated: September 29, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5793422

## Footnotes

1    The parties have submitted certain materials to the Court that contain factual matter outside the scope of the Amended Complaint. See Docket ## 64-75, 77, 80, 82. The Court has not considered these materials in its resolution of defendants' motions because, "when considering ... a motion to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) ("[A] ruling on a motion to dismiss ... is not an occasion for the court to make findings of fact."). For purposes of this rule, material falling within the scope of the complaint covers "any document incorporated in it by reference, annexed to it as an exhibit, or integral to it because it relies heavily upon its terms and effect," id. (internal quotations and citations omitted), including "documents plaintiffs had either in their possession or had knowledge of and upon which they relied in bringing suit." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quotations and citation omitted).

2    Plaintiff attached to his Amended Complaint six separate "sick call request" forms dated February 26, 2013; July 17, 2013; July 24, 2013; August 2, 2013; August 18, 2013: and November 3, 2013. Docket # 7 at 20-25. In the requests, plaintiff complained of "extreme headaches," "numbness in [his] wrists," and "constant pain." Id. He also reported blurred vision. Id. He made a request to see "Doctor H," but also noted in the forms that he was prescribed various medications and was examined by a neurologist. Id.

3    In full, the memorandum reads: "Mr. Savage, I cannot sustain your request for an examination by the doctor. Minimum standard 9 CRR-NY 7032.4(h) says that issues outside the authority of the chief administrative office are not grievable. The chief administrative officer cannot dictate who performs medical evaluations.

Savage v. OFC. Michael Acquino, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 36 of 141

Medical personnel make that determination. You may not appeal this issue to the chief administrative officer or the Citizen's Policy and Complaint Review Council." Docket # 7 at 18.

4    Plaintiff did not attach his second grievance to his Amended Complaint, but, since it is plainly referenced in his Amended Complaint and qualifies as a document that he "had either in [his] possession or had knowledge of and upon which [he] relied in bringing suit," Chambers, 282 F.3d at 153, the Court considers it a part of plaintiff's pleading for purposes of the instant motions to dismiss. See Ellison v. Evans, 2013 WL 5863545, at *1 n.5 (S.D.N.Y. Oct. 31, 2013) (considering grievances submitted by defendant in motion to dismiss "[b]ecause these documents [we]re either explicitly referred to or incorporated by reference in plaintiff's complaint ..."), aff'd sub nom., Fuller v. Evans, 586 Fed.Appx. 825 (2d Cir. 2014), cert. denied, 135 S. Ct. 2807 (2015); see also, Sanchez v. Velez, 2009 WL 2252319, at *1 n.1 (S.D.N.Y. July 24, 2009) ("Because plaintiff's grievances are referenced in the complaint, the grievance documents are incorporated by reference and properly considered on a motion to dismiss." (citations omitted)).

5    Though Reardon and Stabler filed separate motions, they are nearly identical in form and substance.

6    Defendants Reardon and Stabler additionally move for an Order from the Court staying this action pending resolution of the instant motions. See Docket ## 67 at 24-25, 71 at 24-25. On November 16, 2015, this Court issued an Order granting that request. See Docket # 78.

7    As explained by the Second Circuit in Williams, the list of circumstances where administrative remedies are effectively unavailable provided by the Supreme Court in Ross is not exhaustive. 829 F.3d at 123 n.2.

8    While an inmate is not required to specially plead exhaustion, "a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." Williams, 829 F.3d at 122 (2d Cir. July 12, 2016) (citing Jones v. Block, 549 U.S. 199, 215-16 (2007)); see also Gomez v. Westchester County, 2015 WL 1054902, at *5 (S.D.N.Y. Mar. 10, 2015) ("The Court may dismiss a complaint under Rule 12(b)(6) for failure to exhaust if non-exhaustion is clear from the face of the complaint." (citing Kasiem v. Swift, 756 F. Supp. 2d 570, 574 (S.D.N.Y. 2010))); McCoy v. Goord, 255 F. Supp. 2d 233, 249 (S.D.N.Y. 2003) ("If failure to exhaust is apparent from the face of the complaint, ... a Rule 12(b)(6) motion is the proper vehicle."). Here, plaintiff's Amended Complaint plainly states that he did not appeal both of his grievances, meaning the failure to exhaust defense is properly adjudicated through the instant motions.

9    Under a section titled "Exhaustion of Administrative Remedies," the Amended Complaint states: "Note that according to 42 U.S.C. § 1997e(a), '[n]o actions shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prison[er] confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' You must provide information about the extent of your efforts to grieve, appeal, or otherwise exhaust your administrative remedies, and you must attach copies of any decisions or other documents which indicate that you have exhausted your remedies for each claim you assert in this action." Docket # 7 at 4 (emphasis in original).

10   The Court infers that plaintiff was referring to Heidelberger when he requested to see "Dr. H" in his February 15, 2013 grievance. Docket # 7 at 19.

---

End of Document    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 37 of 141

Girotto v. Andrianna Shamaris Inc., Not Reported in Fed. Supp. (2019)

2019 WL 5634199
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Luigi GIROTTO, Plaintiff,
v.
ANDRIANNA SHAMARIS INC., et al., Defendants.

19-CV-913 (JPO)
|
Signed 10/31/2019

**Attorneys and Law Firms**

Ben-Zion Bradley Weitz, The Weitz Law Firm, P.A.,
Aventura, FL, for Plaintiff.

James Patterson, Anastasia Anne Stylianou, McElroy,
Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, for
Defendant Andrianna Shamaris Inc.

Evan Andrew Belosa, McDermott Will & Emery LLP, New
York, NY, Kerry Alan Scanlon, Natalie Colvin, McDermott,
Will & Emery, Washington, DC, for Defendant Hudson
Square Realty, LLC.

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

 **\*1**  Plaintiff Luigi Girotto filed this action on January 30,
2019, alleging violations by Defendants Andrianna Shamaris
Inc. and Hudson Square Realty, LLC of the Americans with
Disabilities Act, the New York State Human Rights Law,
and the New York City Human Rights Law. (*See* Dkt. No.
1 ("Compl.").) Girotto, who uses a wheelchair, alleges that
he attempted to visit Defendants' facilities and was denied
access because of various architectural barriers. (*See* Compl.
¶¶ 4, 16.) Before the Court are Defendants' motions to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the
alternative, for a more definite statement pursuant to Federal
Rule of Civil Procedure 12(e). Also pending before the Court
are two motions for extensions of the time for Plaintiff to file
his oppositions to the motions to dismiss. For the reasons that
follow, the motions for extensions are denied, the motions
to dismiss are denied, and the motions for a more definite
statement are granted.

As a preliminary matter, the Court denies Girotto's motions
for extensions, strikes his untimely opposition, and deems
Defendants' motions unopposed. Prior to the motions
for extensions at issue, Girotto's counsel had requested
extensions of the time to oppose Defendants' motions to
dismiss on five occasions. (*See* Dkt. Nos. 23, 27, 30, 33, 35.)
(Defendants' motions were supported by materially identical
two-page briefs. (*See* Dkt. Nos. 17, 20).) Three of the first
four of those motions were untimely under section 3(C) of
this Court's Individual Rules of Practice in Civil Cases, which
requires that motions for extensions be made at least forty-
eight hours before the deadline the movant seeks to extend.
Consequently, on August 9, 2019, this Court reminded the
parties of its Individual Rules and warned that the Court "will
not grant any further untimely motions for extensions." (Dkt.
No. 34.)

On August 21, 2019, Plaintiff's counsel again moved for an
extension of the deadline to file its opposition (by then the
sixth such request). (*See* Dkt. No. 37.) The letter motion was
filed on August 21, 2019, only one day before the deadline
at issue, and therefore in violation of the Court's forty-eight-
hour rule and warning. [1]  (*See* Dkt. Nos. 36, 37.) On August
28, 2019, counsel for Plaintiff again moved for an extension
of the August 22, 2019, [2] deadline. [3] (Dkt. No. 38.) The Court
did not act on either motion at that time.

On September 13, 2019, twenty-three days after the extended
deadline, and 117 days after the original deadline, Plaintiff
submitted a two-and-a-half-page, double-spaced brief in
opposition to the motions to dismiss. (*See* Dkt. No. 39.)

 **\*2**  Federal Rule of Civil Procedure 6(b) provides that a court
"may, for good cause, extend the time ... on a motion made
after the time has expired if the party failed to act because of
excusable neglect." Thus, a court may extend a lapsed
deadline in purely procedural matters, "at least when the delay
was not long, there is no bad faith, there is no prejudice to
the opposing party, and movant's excuse has some merit."

*LoSacco v. City of Middletown*, 71 F.3d 88, 93 (2d Cir.
1995) (citation omitted).

Neither of Girotto's submissions provides a justification that
satisfies even this admittedly modest standard. Instead, the
first notes merely that Plaintiff's counsel expected the case
to have settled by the date of the motion's filing, and the
second emphasizes that the parties remained in settlement
discussions. (Dkt. Nos. 38, 39.) Neither of those statements

Girotto v. Andrianna Shamaris Inc., Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 38 of 141

furnishes anything resembling an explanation, let alone an excuse, for requiring 117 days to file a brief of fewer than three pages or the repeated failure to adhere to the Court's Individual Rules for extensions. The motions are therefore denied, the opposition struck, and the motions deemed unopposed.

Nonetheless, even an unopposed motion to dismiss must demonstrate that the complaint has failed to state a claim. Defendants' sole argument in support of the motions to dismiss is that Girotto failed to allege a date on which he visited Defendants' premises. That omission, they contend, amounts to a failure to state a claim. They invoke 🔖 Federal Rule of Civil Procedure 9(f) in support of their position, which provides that "[a]n allegation of time or place is material when testing the sufficiency of a pleading." But "🔖 Rule 9(f) does not impose a requirement that allegations of time or place be made with particularity; it merely indicates the significance of those allegations when they are made." 5A Wright & Miller, Federal Practice and Procedure § 1308 (4th ed. 2019). In short, it "allows a limitations defense to be expeditiously raised in a Rule 12(b)(6) motion—as opposed to an answer—when it is apparent from the face of the complaint that the time limit for bringing the claim has passed," *Tammaro v. City of New York*, No. 13 Civ. 6190, 2018 WL 1621535, at *11 (S.D.N.Y. Mar. 30, 2018) (citation and quotation marks omitted), but it does not impose on litigants an affirmative pleading obligation. The absence of specific temporal allegations therefore does not entitle Defendants to dismissal of the complaint.

It does, however, entitle Defendants to a more definite statement. *See Tammaro*, 2018 WL 1621353, at *11. Federal Rule of Civil Procedure 12(e) permits a "party [to] move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Because the complaint contains no details as to the date of the alleged visit, Defendants "cannot reasonably prepare a response," *id.*; for example, without even an approximate date of the alleged visit, Defendants cannot reasonably determine whether to assert a statute of limitations defense.

**\*3** For the foregoing reasons, Plaintiff's motions for extensions are DENIED, Defendants' motions to dismiss are DENIED, and Defendants' motions for a more definite statement are GRANTED. Plaintiff is directed to file an amended complaint indicating the date of his alleged visit to Defendants' premises within 14 days of the date of this Opinion and Order. Failure to do so may result in the dismissal of the complaint or any other appropriate measure. *See* Fed. R. Civ. P. 12(e).

The Clerk of Court is directed to close the motions at Docket Numbers 16, 19, 37, and 38.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 5634199

---

### Footnotes

1    The letter motion also did not state how many prior extensions had been requested in the matter, as required by this Court's Individual Rules, noting only that there had been "several." (Dkt. No. 37.)
2    Both of Plaintiff's motions for extensions stated the deadline as August 21, 2019, but the deadline set by the Court was August 22, 2019. (*See* Dkt. Nos. 36, 37, 38.)
3    The motion once again stated only that there had been "several" prior requests. (Dkt. No. 38.)

649 Fed.Appx. 70
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Basheen RUSH, Plaintiff–Appellant,
v.
Wesley CANFIELD, at the Southport Correctional
Facility, et al., Defendants–Appellees,
Nurse Brown, at the Sing Sing
Correctional Facility, et al., Defendants.

No. 15–896.
|
May 20, 2016.

Appeal from a judgment of the United States District Court
for the Western District of New York (William M. Skretny,
Judge).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the District Court is **AFFIRMED.**

**Attorneys and Law Firms**

Basheen Rush, pro se, Albion, NY, for Plaintiff–Appellant.

Andrew Ayers and Kathleen M. Treasure, Assistant Solicitors
General, for Eric T. Schneiderman, Attorney General of the
State of New York, Albany, NY, for Defendants–Appellees.

PRESENT: JON O. NEWMAN, JOSÉ A. CABRANES, and
RAYMOND J. LOHIER, JR., Circuit Judges.

**SUMMARY ORDER**

Appellant Basheen Rush, proceeding pro se, appeals the
District Court's judgment of March 10, 2015, which dismissed
a number of Rush's claims under 42 U.S.C. § 1983 and
granted summary judgment on the remainder. We assume the
parties' familiarity with the underlying facts, the procedural
history of the case, and the issues on appeal.

"Our standard of review for both motions to dismiss and
motions for summary judgment is *de novo.*" *Miller v.
Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003).
To survive a motion to dismiss, a complaint must plead
"enough facts to state a claim to relief that is plausible on its
face," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127
S.Ct. 1955, 167 L.Ed.2d 929 (2007), and "allow[ ] the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged," *Ashcroft v. Iqbal,* 556 U.S. 662,
678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A motion for
summary judgment tests the non-moving party's evidence, not
just its bare allegations or denials, but the court must resolve
all ambiguities and draw all reasonable inferences in the non-
movant's favor. *Nationwide Life Ins. Co. v. Bankers Leasing
Ass'n, Inc.,* 182 F.3d 157, 160 (2d Cir.1999). "Summary
judgment is appropriate only if the moving party shows that
there are no genuine issues of material fact and that the
moving party is entitled to judgment as a matter of law."
*Miller,* 321 F.3d at 300.

We conclude that the District Court properly dismissed Rush's
claims in part and granted summary judgment on the rest.
Except as noted below, we affirm for substantially the reasons
stated by the **\*71** District Court in its February 14, 2013
order of dismissal, *see Rush v. Fischer,* 923 F.Supp.2d 545
(S.D.N.Y.2013), and by Magistrate Judge McCarthy in his
January 6, 2015 report and recommendation, which was
adopted by the District Court in its entirety, *see* D.A. 298–
312, 315.

We pause to note that the District Court erred in determining
that Rush abandoned the due-process claims related to his
disciplinary hearing by failing to respond to defendants'
argument that those claims should be dismissed. "If a
complaint is sufficient to state a claim on which relief can
be granted, the plaintiff's failure to respond to a Rule 12(b)

(6) motion does not warrant dismissal." *McCall v. Pataki,* 232 F.3d 321, 323 (2d Cir.2000). We nevertheless affirm, because Rush's conclusory allegations failed to state a claim that he was deprived of a liberty interest without due process of law. *See Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993) ("We may affirm ... on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely."). A prisoner possesses a "circumscribed right" to call witnesses at a disciplinary hearing, *Ponte v. Real,* 471 U.S. 491, 498, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985), as well as a "qualified right" to assistance in preparing his defense, *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009). But Rush's assertion that he was "denied the right to call witnesses and the right to assistance," D.A. 24, is a bare legal conclusion incapable of surviving a motion to dismiss, *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

We have considered all of Rush's arguments on appeal and find them to be without merit. We thus **AFFIRM** the March 10, 2015 judgment of the District Court.

### All Citations

649 Fed.Appx. 70

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 41 of 141

Aikens v. Herbst, Not Reported in Fed. Supp. (2017)

2017 WL 1208666
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Anthony AIKENS, Plaintiff,
v.
Mr. HERBST, et al., Defendants.

16-CV-772S
|
Signed 04/03/2017

**Attorneys and Law Firms**

Anthony Aikens, Attica, NY, pro se.

ORDER

William M. Skretny, United States District Judge

**\*1** Plaintiff, an inmate at the Attica Correctional Facility ("Attica"), filed this *pro se* action pursuant to 42 U.S.C. § 1983 and the Eighth Amendment alleging deliberate indifference to his medical needs by several correctional officers and the prison medical staff. Plaintiff filed his original Complaint on September 26, 2016 along with a Motion for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a). (Docket Nos. 1, 2). Plaintiff filed an Amended Complaint on October 20, 2016 (Docket No. 4), and, on November 8, 2016, he filed a Second Amended Complaint, which will be addressed herein as the operative pleading (Docket No. 6). This Court finds that Plaintiff has met the statutory requirements to proceed as a poor person and has submitted a signed Authorization. Therefore, Plaintiff's request to proceed *in forma pauperis* is granted.

Plaintiff has also filed an *ex parte* Motion for a temporary restraining order and preliminary injunction seeking an order enjoining the Defendants from inflicting "any harm, assaults on person [and] property and any form of retaliation in any way, and cruel and unusual punishment or violation of any United States constitutional rights of plaintiff." (Docket No. 8.) In support of the Motion for a temporary restraining order and preliminary injunction, Plaintiff asserts that since filing a prior action in this Court (*Aikens v. Rao*, 13-CV-01088-WMS), he has been "constantly" harassed; his mail has been tampered with or thrown away; he has been denied access

to the court and the legal resources needed to litigate his case; his cell is repeatedly searched; and he is being denied medical care. Plaintiff has attached to his Motion a medical record containing the results of magnetic resonance imaging ("MRI") of his spine, which revealed a large central disc protrusion at L4-L5 causing severe central canal stenosis and moderate central canal stenosis at L3-L4. (Docket No. 8.) He also submits a sworn affidavit alleging that he no longer has access to a "TENS unit," which was necessary to treat his back pain. (Id.)

Rule 65(b) (1) of the Federal Rules of Civil Procedure provides that:

> The court may issue a temporary restraining order without written or oral notice to the adverse party ... only if (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). "Generally, a party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party." *Mullins v. City of N.Y.*, 626 F.3d 47, 52-53 (2d Cir. 2010) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir. 2010)).

**\*2** Here, Plaintiff does not demonstrate any effort to notify the Defendants of his request for injunctive relief, nor do his papers demonstrate a likelihood of success on the merits and irreparable injury, or raise any serious questions going to the merits. Moreover, none of the Defendants named in the Second Amended Complaint are alleged to have engaged in any of the actions asserted in the Motion, nor is any

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 42 of 141

Aikens v. Herbst, Not Reported in Fed. Supp. (2017)

Defendant alleged to be in position to engage in the non-medical acts Plaintiff seeks to enjoin. *See Allen v. Brown, 1998 WL 214418, *4 (N.D.N.Y. Apr. 28, 1998)* ("the relief that a plaintiff seeks by way of injunction must relate to the allegations contained in the underlying complaint"). Plaintiff has not stated any factual allegations to support his general assertions that unnamed prison staff members have been harassing him and tampering with his mail. With respect to the denial of medical care, Plaintiff has not raised any serious questions going to the merits of this claim. This Court also notes that the medical record related to his back condition does not support his Motion in any relevant manner.

Consequently, Plaintiff's Motion for a temporary restraining order and preliminary injunction is denied.

In addition to the above findings, this Court has screened Plaintiff's Second Amended Complaint with respect to the 28 U.S.C. §§ 1915(e) and 1915A criteria. Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007)* (citing *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)*). Section 1915(e) provides that a court shall dismiss a case in which *in forma pauperis* status has been granted if, at any time, the court determines that the action (1) is frivolous or malicious; (2) fails to state a claim upon which relief may be granted; or (3) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(b). Generally, however, a court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Id.* (internal quotation marks omitted).

In order to state a claim of deliberate indifference to medical needs under the Eighth Amendment, Plaintiff must establish that Defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble, 429 U.S. 97, 104 (1976)*. "[T]he deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)*. The subjective component requires "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result," but "more than mere negligence." *Farmer v. Brennan, 511 U.S. 825, 835 (1994)*. A "mere

disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)*.

In his Second Amended Complaint, Plaintiff alleges that he developed a severe rash due to infected bedding after being moved to a new unit in the prison on November 19, 2015. Plaintiff was seen the same day by Defendant Herbst, who was delivering pain medication to treat Plaintiff's back condition. Defendant Herbst advised him to "drop a sick call slip to be seen for the severe rash." (Docket No. 6 ¶ 3.) Plaintiff also flagged down Defendant Sgt. Zolads and advised him that his bedding and mattress had caused him to develop a severe rash. Sgt. Zolads responded that he would "see what [he] could do." (Docket No. 6 ¶ 4.) Plaintiff's mattress and bedding were changed at 2:30 P.M. on the following day, November 20, 2015. Fifteen minutes later, Defendant Herbst responded to Plaintiff's cell for the sick call and provided him with three doses of "Diphen" to treat the rash. (Docket No. 6 ¶ 11.) Defendant Herbst declined Plaintiff's request to see a doctor, stating that the condition of the rash was not severe enough and advising Plaintiff to file a grievance. Plaintiff alleges that he was then threatened by an unknown correction officer to avoid causing "any problems because things will happen to [Plaintiff] and he would never leave the SHU in one peace [sic]." (Docket No. 6 ¶ 12.) The next day, Nurse Singleton, who was delivering Plaintiff's back pain medication, assessed Plaintiff's rash and advised him that she would process an order for the proper medication to treat his rash and itchiness. Plaintiff alleges that the promised medication did not arrive until November 27, 2015 and that, in the meantime, he was deprived of sleep for approximately seven days.

**\*3** Under the standard stated above, the facts as they are alleged in the Second Amended Complaint are not sufficient to demonstrate a claim of deliberate indifference to Plaintiff's medical needs by Defendants. "[T]he liberal treatment afforded to *pro se* litigants does not exempt a *pro se* party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013)* (internal quotation marks omitted). First, Plaintiff has not alleged the existence of a serious medical condition. *See Chance, 143 F.3d at 702* (noting that a serious medical condition is one that may result in death,

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 43 of 141

Aikens v. Herbst, Not Reported in Fed. Supp. (2017)

degeneration, or chronic and substantial pain); *Lewal v. Wiley*, 29 Fed.Appx. 26, 29 (2d Cir. 2002) (prisoner's allegations of a persistent rash were not sufficient to allege the existence of a serious medical condition).

Second, Plaintiff has failed to allege anything more than mere negligence on the part of the prison medical staff, and he has failed to allege any wrongdoing on the part of the non-medical staff. The decision to prescribe one form of medication in lieu of another does not constitute deliberate indifference to a prisoner's serious medical needs. *See Rush v. Fischer*, 923 F.Supp.2d 545, 555 (S.D.N.Y. 2013). To meet the deliberate indifference threshold, a plaintiff must set forth facts in the record establishing that the decision to prescribe a certain medication, and a determination concerning the severity of the medical condition presented, was based on something other than medical judgment. *See id.*, at 555 (plaintiff provided no factual allegations establishing that the decision to provide a less strong pain medication deviated from reasonable medical practice for the treatment of his pain). A plaintiff must also set forth factual allegations establishing that the named defendants acted with the culpable state of mind in making these decisions. Furthermore, to the extent that Plaintiff has attempted to raise an Eighth Amendment sleep deprivation claim for the period before his rash medication was received, he has failed to allege any harmful effects on his health beyond mere discomfort. *See Holmes v. Fischer*, 2016 WL 552962, at *17 (W.D.N.Y. 2016) (citing *Jones v. Smith*, 2015 WL 5750136, at *15 (N.D.N.Y. Sept. 30, 2015) ("Plaintiff does not allege any health effects resulting from the alleged sleep deprivation that would rise to the severity necessary to trigger Eighth Amendment concerns.")).

Because Plaintiff has not alleged facts sufficient to sustain a claim of deliberate indifference to medical needs or prison conditions against any of the Defendants, the Second Amended Complaint is subject to dismissal. However, this Court will permit Plaintiff to file an amended complaint in which the necessary factual allegations, as discussed above, must be set forth. *See Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir. 1994) ("Sparse pleadings by a *pro se* litigant unfamiliar with the requirements of the legal system may be sufficient at least to permit the plaintiff to amend his complaint to state a cause of action"); *Fed. R. Civ. P. 15(a)* (leave to amend shall be freely given).

## CONCLUSION

Because Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization, his request to proceed *in forma pauperis* is granted (Docket No. 2). Plaintiff's Motion for a Temporary Restraining Order is denied. (Docket No. 8). For the reasons set forth above, the Second Amended Complaint (Docket No. 6) must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) unless Plaintiff files an amended complaint by **May 15, 2017** in which he includes the necessary allegations as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

 **\*4** Plaintiff is advised that an amended complaint is intended to **completely replace** the prior Complaints in the action, and thus it "renders [any prior complaint] of no legal effect." *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). Therefore, Plaintiff's amended complaint must include all of the allegations against each Defendant so that the amended complaint may stand alone as the sole complaint in this action which the Defendants must answer.

## ORDER

IT HEREBY IS ORDERED, that Plaintiff's motion to proceed *in forma pauperis* (Docket No. 2) is granted;

FURTHER, that Plaintiff's Motion for a Temporary Restraining Order (Docket No. 8) is denied;

FURTHER, that Plaintiff is granted leave to file an amended complaint only as directed above by **May 15, 2017;**

FURTHER, that if Plaintiff does not file an amended complaint as directed above, that the Second Amended Complaint (Docket No. 6) is dismissed with prejudice;

FURTHER, that in the event the Second Amended Complaint is dismissed because Plaintiff has failed to amend, the Clerk of Court shall close this case as dismissed with prejudice without further order;

FURTHER, that in the event the Second Amended Complaint is dismissed because Plaintiff has failed to amend, Court

Aikens v. Herbst, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 44 of 141

hereby certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *See Coppedge v. United States*, 369 U.S. 438 (1962). Requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals

for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1208666

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2637429
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert HARRIS, Plaintiff,
v.
WESTCHESTER COUNTY MEDICAL
CENTER, Dr. McGill, Westchester County
Department of Corrections, Superintendent
Rocco Pozzi, NP—Maria Taylor and
PA—Norris Nosworthy, Defendants.

No. 08 Civ. 1128(RJH).
|
July 6, 2011.

### MEMORANDUM OPINION AND ORDER

RICHARD J. HOLWELL, District Judge.

 **\*1**  Plaintiff *pro se* Robert Harris, currently incarcerated at Oneida Correctional Facility, commenced this action on February 4, 2008, alleging deliberate indifference to his medical needs in violation of 42 U.S.C. § 1983. Now before the Court is defendants' motion to dismiss. For the reasons that follow, that motion is GRANTED.

### BACKGROUND

For the purposes of this motion, the following facts are taken as true.

On May 15, 2007, Harris injured his left pinky finger while playing basketball. (Third Amended Complaint ("Compl.") at unnumbered pg. 4.) He was seen that day by the medical staff at Valhalla Correctional Facility ("Valhalla"), where he was then incarcerated, given ibuprofen, and returned to his cell. (Typewritten Attachment to Compl. ("Compl.Attach.") at unnumbered pg. 1.) Every night, Harris was given ibuprofen until May 22, 2007, when he was given an x-ray examination. (*Id.*) Harris alleges that he was in "constant and unbated [sic] pain" during that time. (*Id.*)

On May 22, 2007, Nurse Practitioner Maria Taylor took x-rays of Harris's hand, which showed no broken bones.

(*Id.*) She then gave Harris ibuprofen despite his protests that ibuprofen left him in pain. (*Id.*) A day or two later, Harris requested stronger medication, but Taylor denied his request. (*Id.*)

On May 25, 2007, Harris underwent another x-ray exam, and Taylor told him that he had a severe dislocation and torn ligaments in his left pinky finger. (*Id.*) Harris again requested stronger medication, but Taylor denied the request. (*Id.*)

About two months later, Harris was taken to Westchester County Medical Center, where Dr. McGill performed surgery on his left pinky. (*Id.* at 3.) In doing so, McGill inserted a pin in Harris's pinky without informing Harris that he would do so. (*Id.* at 3, 4.) Harris alleges that as a consequence, his finger is permanently bent, and he cannot straighten it out. (*Id.* at 3.) Harris was returned to Valhalla, seen at the infirmary, was sent back to general population "even though [he] was heavily sedated, groggy, and in severe pain." (*Id.*) Harris requested to stay overnight in the infirmary, but that request was denied. (*Id.*) His placement in general population was in the top tier, meaning that he "had to walk down the stairs to get [his] food," and was "bumped into by other inmates which caused [him] severe pain in his left pinky." (*Id.*) When it was time to receive his pain medication, Physician Assistant Norris Nosworthy gave him Tylenol "instead of the Vicodin that Dr. McGill prescribed." (*Id.*)

Harris's pinky was bandaged and tied to his ring finger. (*Id.* at 3, 4.) Harris was told that the bandages would be on for six to eight weeks, but they were on for twelve weeks. (*Id.* at 4.) His ring finger also became stiff during this time. (*Id.*)

The bandages were removed on October 24, 2007, and two weeks later Harris went to physical therapy. (*Id.*) He attended physical therapy at Valhalla two or three times, where the physical therapist informed him that he "should be able to get [his] ring finger back but [his] left pinky will never be the same" and that "form [sic] the looks of your pinky the surgery did'nt [sic] go well." (*Id.*) On February 16, 2008, Harris was transferred to Elmira Correctional Facility ("Elmira"). (*Id.*) While incarcerated there, he underwent physical therapy for about two months at Five Points Correctional Facility, since Elmira did not have physical therapy. (*Id.* at 5.) Harris's complaint states that he "still cannot bend [his] left pinky or ring finger as of today." (*Id.*)

 **\*2**  Harris commenced this action on February 4, 2008. By order dated that same day, Judge Kimba M. Wood directed

Harris to file an amended complaint within sixty days of the order addressing certain deficiencies in the complaint and advised Harris that failure to do so would result in dismissal. (ECF No. 3.) Specifically, Judge Wood found that Harris's allegations in his original complaint, namely that the initial x-rays showed no broken bones, that a subsequent x-ray showed severe dislocation, and that surgery was not performed until some months later failed to show deliberate indifference. (*Id.* at 3.) Harris did not timely file an amended complaint, and the complaint was dismissed without prejudice on April 11, 2008. (ECF No. 4.) On January 12, 2009, Harris moved to reopen his case, and his motion was granted by Judge Leonard B. Sand on February 6, 2009. (ECF Nos. 6, 7.) Judge Sand directed Harris to file an amended complaint within sixty days of his order, which Harris did on March 31, 2009. (ECF No. 8.) Judge Loretta A. Preska then granted Harris leave to file a second amended complaint on September 30, 2009, which Harris did on November 30, 2009. (ECF Nos. 9, 10.) The case was then reassigned to the undersigned, and Harris requested permission to file a third amended complaint to identify the Jane and John Does in his complaint. (ECF No. 13.) The Court granted him permission to do so, and he did on May 28, 2010. (*See* ECF Nos. 13–15.) On January 3, 2011, defendants brought this motion to dismiss the complaint. Prior to the resolution of this motion, Harris requested appointed counsel on April 26, 2011. (ECF No. 29.) On May 4, 2011, Magistrate Judge Kevin Nathaniel Fox denied the application, finding that Harris's complaint lacked sufficient merit to warrant appointing counsel. (ECF Nos. 29, 30.)

## DISCUSSION

### I. Standard of Review for Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 129 S.Ct. at 1950). Thus, "[w]here a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557). In applying this standard of facial plausibility, the Court takes all "factual allegations to be true and draw[s] all reasonable inferences in the plaintiff's favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009). But the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal,* 129 S.Ct. at 1949.

**\*3** "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). Accordingly, "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006) (internal quotation marks and emphasis omitted).

### II. Judge Wood's February 4, 2008 Order

As an initial matter, defendants contend that plaintiff's complaint should be dismissed because he "did not file the third amended complaint until well after the 60 day time limitation established by Judge Wood." (Def.'s Mem. at 5.) But this ignores the procedural history of this case after that order, detailed above. Numerous other court orders authorized Harris's first, second, and third amended complaints, and this argument is therefore unavailing.

### III. Failure To State a Claim

Harris's action arises under 42 U.S.C. § 1983 and alleges inadequate medical care. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). "The standard of deliberate indifference includes both subjective and objective components." *Id.* "Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted). "[T]he subjective element

of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). "[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference," although "certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness." *Id.*

Harris's claim fails to meet this standard. Assuming *arguendo* that the injury to his finger constitutes a sufficiently serious medical condition, the claim of deliberate indifference is based on: (1) Taylor's initial misdiagnosis of his finger injury; (2) Taylor's failure to provide him stronger pain medication; (3) Dr. McGill's surgery on the finger; (4) Nosworthy's disbursement of Tylenol instead of Vicodin; and (5) the failure to provide an overnight stay in the infirmary. None of these allegations, however, rise to the level of deliberate indifference. As for misdiagnosis, without more, "[a]llegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." *Anderson v. Lapolt,* No. 9:07–CV–l 184, 2009 WL 3232418, at \*13 (N.D.N.Y. Oct. 1, 2009); *accord Burgess v. Cnty. of Rensselaer,* No. l:03–CV–00652 (NPM–RFT), 2006 WL 3729750, at \*8 (N.D.N.Y. Dec. 18, 2006) ("[A] claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983."). The failure to provide stronger pain medication does not constitute deliberate indifference.

*See Veloz v. New York,* 339 F.Supp.2d 505, 525 (S .D.N.Y.2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment."); *Fernandez v. Fed. Bureau of Prisons,* No. 99 Civ. 4944(VM), 2001 WL 913929, at \*2–3 (S.D.N.Y. Aug. 13, 2001) (finding that when plaintiff based his claim on defendants' "(1) not choosing to follow the Aftercare Suggestions; (2) ignoring his pleas for medical care for the pain he was experiencing; and (3) failing to provide him with adequate pain medication" that such pleadings "cannot satisfy both prongs for establishing deliberate indifference to his medical needs"). Harris's allegations regarding the quality of Dr. McGill's surgery, or of adverse consequences from the surgery also do not amount to plausible allegations of deliberate indifference. *See Martinez v. Ravikumar,* 616 F.Supp.2d 455, 459 (S.D.N.Y.2009) ("Martinez does not allege that Ravikumar knew of and disregarded an

excessive risk to her health and safety while conducting the surgery .... Rather, she alleges that Ravikumar's treatment and diagnoses were not effective. At most, Martinez alleges that Ravikumar was negligent in his performance of the surgery and subsequent examinations. Such allegations do not give rise to a valid claim of medical mistreatment under the Eighth Amendment."); *see also Middleton v. Falk,* No. 9:06–CV– 1461 (GTS/DRH), 2009 WL 666397, at \*8 (N.D.N.Y. Mar. 10, 2009) ("Any adverse effects which Middleton suffered as a consequence of the surgery required to attempt to correct his serious retinal detachment are, at best, negligence. As noted, negligence is insufficient to sustain a claim under the Eighth Amendment."). Nor do Harris's allegations that Nosworthy gave him Tylenol instead of Vicodin show deliberate indifference; these allegations state only the bare fact that she took those actions, and give no reason to suspect that Nosworthy acted for reasons that would subject her to Eighth Amendment liability. *See Ravenell v. Van der Steeg,* No. 05 Civ. 4042(WHP), 2007 WL 765716, at \*6 (S.D.N.Y. Mar. 14, 2007) ("That Magill disagreed with Foster does not transform Foster's conservative recommendation into cruel and unusual punishment. The question of what diagnostic techniques and treatments should be administered to an inmate is a 'classic example of a matter for medical judgment'; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients." (quoting *Estelle,* 429 U.S. at 107)); *McKenna v. Wright,* No. 01 Civ. 6571(WK), 2002 WL 338375, at \*8 (S.D.N.Y. Mar. 4, 2002) ("The mere fact that the defendant physicians may have made a different medical decision with respect to Plaintiff's treatment than that purportedly recommended by Dr. Maliakkal does not indicate that they acted for culpable reasons."). Finally, Harris's complaint cites only his disagreement with the medical judgment of the prison infirmary staff in being transferred from the infirmary to general population after his surgery as a reason to infer deliberate indifference from that decision. (*See* Compl. Attach. at 3 ("What baffles me is that I was placed in the infirmary the night before the surgery, but the actual day of the surgery when I returned, I was placed in general population.").) The complaint does not identify any details indicating deliberate indifference apart from plaintiff's own opinion that he was too sedated and groggy to be placed in general population. But the case law is clear that plaintiff's mere disagreement with the medical judgment of the prison's medical staff, even if it amounts to negligence on the staff's part, does not amount to a constitutional violation. *See, e.g., Berry v. Wright,* No. 04–CV–0074 (SR), 2011 WL

231626, at *4 (W.D.N.Y. Jan. 24, 2011) ("While plaintiff may disagree with the decisions made by the defendants in their treatment of him, it is well-settled that an issue of medical judgment is 'precisely the sort of issue that cannot form the basis of a deliberate indifference claim.' " (quoting *Hernandez v. Keane,* 341 F.3d 137, 147 (2d Cir.2003)));

*see also Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.... Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.").

 **\*4** Accordingly, Harris has failed to plead a constitutional violation in his complaint. As Harris has already amended his complaint three times after being informed of the deficiencies in his original complaint by Judge Wood, dismissal with prejudice is appropriate at this stage of the litigation. *See, e.g., Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978) (plaintiff

was not entitled to "a third go-around"); *Treppel v. Biovail Corp.,* No. 03 Civ. 3002(PKL), 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless.").

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss **[22]** is GRANTED and the action is dismissed with prejudice. The Clerk of the Court is requested to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2637429

---

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Allen v. New York City Dept. of Correction,   S.D.N.Y.,
March 17, 2010

2007 WL 765716
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Preston J. RAVENELL, Jr., Plaintiff,

v.

John VAN DER STEEG et al., Defendants.

No. 05 CIV 4042 WHP.
|
March 14, 2007.

**Attorneys and Law Firms**

Preston J. Ravenell Jr., Green Haven Correctional Facility,
Stormville, NY, Plaintiff pro se.

Jonathan S. Saul, Assistant Attorney General, State of New
York, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

PAULEY, J.

 **\*1** Plaintiff *pro se* Preston Ravenell, Jr. ("Plaintiff" or
"Ravenell") brings this action against Dr. John van der
Steeg ("van der Steeg") and Dr. Lawrence Foster ("Foster")
(collectively, the "Defendants") pursuant to 42 U.S.C. §
1983, claiming deprivation of medical treatment in violation
of the Eighth Amendment. Defendants move for summary
judgment pursuant to Fed.R.Civ.P. 56. For the reasons set
forth below, Defendants' motion is granted.

*BACKGROUND*

Plaintiff is incarcerated at Green Haven Correctional Facility
("Green Haven"). On July 30, 2004, he dropped a 60-pound
dumb bell on his hand. (Affidavit of Preston Ravenell, Jr.,
dated Apr. 11, 2006 ("Ravenell Aff.") ¶ 5.) After being
diagnosed with a broken right index finger at the Green Haven
medical clinic, Plaintiff was sent to Putnam Hospital Center
("Putnam Hospital") for further evaluation. (Ravenell Aff. ¶
5; Defendants' Rule 56.1 Statement, dated Mar. 2, 2006 ("Def.
56.1 Stmt.") ¶¶ 11-15.)

Van der Steeg, the attending emergency department physician
at Putnam Hospital, met with Plaintiff and examined x-
rays of the fracture. (Ravenell Aff. ¶¶ 6-8; Def. 56.1
Stmt. ¶¶ 16-17.) Van der Steeg then consulted with Dr.
Jeffrey Passick ("Passick"), the orthopedic surgeon on duty.
(Def. 56.1 Stmt. ¶ 21.) Passick determined that Ravenell
required a "closed reduction," which is a procedure for
setting a broken bone without making an incision in the
skin. (Def. 56.1 Stmt. ¶ 24.) Plaintiff equivocates as to
whether the closed reduction was ever performed. In his
memorandum opposing summary judgment, Ravenell states
that "throughout the entire examination Dr. Steeg[ ] never
attempted to manipulate the fracture back into its normal
position." (Plaintiff's Memorandum of Law in Opposition
to Defendants' Motion for Summary Judgment, dated Apr.
11, 2006 ("Pl.Mem.") at 2-3.) However, in the affidavit he
submits in opposition to the instant motion, Ravenell claims
that "[w]ithout incision, Dr. Steeg began manipulating the
broken bone of my hand in an attempt to realign the fractured
metacarpal bone of my right index finger." (Ravenell Aff.
¶ 9.) Defendants, citing Ravenell's medical records, contend
that Passick performed the closed reduction after making his
recommendation. (Declaration of Dr. John Van der Steeg,
dated Mar. 7, 2006 ("Van der Steeg Decl.") ¶ 8; Declaration
of Jonathan Saul, dated Mar. 7, 2006 ("Saul Decl .") Exs. E,
F.) Additionally, the parties dispute whether Plaintiff's hand
was x-rayed after the purported closed reduction to ensure
that the reduction was successful. (Ravenell Aff. ¶ 10; Reply
Declaration of Dr. John van der Steeg, dated Dec. 20, 2006
¶ 9.) Van der Steeg recommended that Ravenell follow up
with an orthopedist in 5-7 days and prescribed him 600mg of
ibuprofen. (Def. 56.1 Stmt. ¶ 26; Van der Steeg Decl. ¶ 11.)

Ravenell's finger was x-rayed again on August 6, 2004,
revealing that the position of the fracture had not changed.
(Ravenell Aff. ¶ 12; Def. 56.1 Stmt. ¶ 28.) According to
his medical records, Ravenell's finger exhibited "pronounced
swelling, moderate deformity, pain, limited range of motion
of hand and fingers, diminished grip, etc." (Def. 56.1 Stmt.
¶ 27.) On August 20, 2004, Plaintiff consulted with Foster,
an orthopedic surgeon. (Ravenell Aff. ¶ 13; Declaration of
Dr. Lawrence Foster, dated Mar. 7, 2006 ("Foster Decl.")
¶ 4.) Foster noted a non-tender bony prominence and a
mild rotational deformity in the broken finger, as well
as stiffness in Plaintiff's hand. (Ravenell Aff. ¶¶ 14-16;
Foster Decl. ¶ 5; Saul Decl. Ex. J.) Foster recommended

biweekly occupational therapy, but noted the possible need for surgery should the therapy fail to achieve satisfactory results. (Ravenell Aff. ¶ 16; Def. 56.1 Stmt. ¶¶ 33-34; Saul Decl. Ex. J.)

**\*2** Plaintiff visited Foster on September 24, 2004 for a clinical recheck. (Ravenell Aff. ¶ 18; Def. 56.1 Stmt. ¶ 35.) While Plaintiff's range of motion had improved in the joints at the tip and middle of his finger, there was still stiffness at the joint close to the knuckle. (Def. 56.1 Stmt. ¶¶ 37-38.) Foster recommended continued occupational therapy with a follow up evaluation two months later. (Ravenell Aff. ¶ 19; Def. 56.1 Stmt. ¶ 40.)

Plaintiff visited Foster for the last time on October 26, 2004, approximately one month earlier than Foster had initially recommended. (Ravenell Aff. ¶ 21; Def. 56.1 Stmt. ¶ 42.) Although Plaintiff still complained of pain and tenderness in his hand, Plaintiff's strength and range of motion "seem[ed] to be clinically improving," and Foster recommended continued non-surgical treatment. (Ravenell Aff. ¶¶ 20, 22; Foster Decl. ¶ 9; Def. 56.1 Stmt. ¶¶ 43, 48-49.) Plaintiff requested a second opinion, and Foster referred him to Dr. Richard Magill ("Magill"), another orthopedic surgeon. (Ravenell Aff. ¶ 22; Def. 56.1 Stmt. ¶¶ 50, 52; Saul Decl. Ex. M.) On November 18, 2004, Magill recommended surgery for Plaintiff's finger. (Ravenell Aff. ¶ 26; Def. 56.1 Stmt. ¶ 53.) McGill performed the operation on December 22, 2004. (Ravenell Aff. ¶ 27; Def. 56.1 Stmt. ¶ 54.)

Defendants move for summary judgment on the grounds that Plaintiff has failed to establish an Eighth Amendment violation and that they are shielded from liability under the doctrine of qualified immunity.

### *DISCUSSION*

#### I. *Summary Judgment Standard*
Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The materiality of disputed facts is determined by the governing substantive law. *Dister v. Cont'l Group,*

*Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). Material facts are those that "affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shade v. Hous. Auth. of New Haven,* 251 F.3d 307, 314 (2d Cir.2001). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). In determining whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255.

**\*3** If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133 (2d Cir.2000). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Liberty Lobby,* 477 U.S. at 248. Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Liberty Lobby,* 477 U.S. at 256. Where it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The same standards apply when a *pro se* litigant is involved, but such a litigant is afforded wide latitude, and his submissions are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (courts must "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

## II. *Deliberate Indifference Standard*

"[T]o establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (alteration in original)); *accord Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "The standard of deliberate indifference includes both subjective and objective components," and a plaintiff must satisfy both elements to establish an Eighth Amendment violation. *Chance,* 143 F.3d at 702; *accord Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998).

The objective prong of the analysis requires a prisoner to demonstrate that the alleged medical need is "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*"Hathaway I"* ) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A condition constitutes a serious medical need under the Eighth Amendment if it is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (citing *Hathaway I,* 37 F.3d at 66). Under the subjective component, the prisoner must show that the defendant acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("Hathaway II"). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' *Hathaway II,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). The official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

## III. *Application of the Standards*

**\*4** Regarding the objective inquiry, there are serious questions regarding whether Plaintiff could demonstrate at trial that his injury is sufficiently serious to support an Eighth Amendment violation. Most courts have held that a broken finger does not constitute a serious medical need. *See, e.g., Magee v. Childs,* No. 9:04-CV-1089 (GLS)(RFT), 2006 WL 681223, at \*6 (N.D.N .Y. Feb. 27, 2006) ("[I]t has been held that a broken finger does not constitute a serious injury."); *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at \*2-3 (S.D.N.Y. June 10, 1999) (holding that "conditions that have failed to meet [the 'sufficiently serious'] standard include ... a broken finger"); *Rivera v. S.B. Johnson,* No. 95 Civ. 0845(ECH), 1996 WL 549336, at \*2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection."); *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252-53 (D.Me.1988) (broken finger not sufficiently serious to support an Eighth Amendment claim); *but see Leacock v. N.Y. City Health Hosp. Corp.,* No. 03 Civ. 5440(RMB) (GWG), 2005 WL 1027152, at \*5 n.2 (S.D.N.Y. May 4, 2005) (holding that broken finger requiring surgery may be sufficiently serious).

Regardless of the seriousness of Plaintiff's injury, he has failed to show that either van der Steeg or Foster acted with the culpable state of mind required to establish an Eighth Amendment violation.

### A. *Van der Steeg*

The claims against van der Steeg are predicated on his alleged failure (1) to provide "prompt medical care" after Ravenell fractured his finger; (2) to correctly set the fracture; and (3) to take a post-setting x-ray. (Complaint, dated June 29, 2005 ("Compl.") ¶ IV).

First, Ravenell's claims regarding van der Steeg's alleged lack of promptness are contradicted by the undisputed evidence. Plaintiff himself testified that van der Steeg began treating him 15-20 minutes after his arrival at Putnam Hospital. (Saul Decl. Ex. P: Transcript of Deposition of Preston Ravenell ("Ravenell Dep.") at 22.) As a matter of law, a wait this brief cannot constitute deliberate indifference to an injury such as Plaintiff's. *See, e.g ., Ramos v. Artuz,* No. 00 Civ. 0149(LTS), 2003 WL 342347, at \*10 (S.D.N.Y. Feb. 14, 2003) ("[T]he Second Circuit has reserved [a deliberate indifference] classification [arising from defendants' delay] for cases in which, for example, officials ignored a life-

threatening and fast-degenerating condition for three days, or delayed major surgery for over two years" (internal citations and quotations omitted); *Espinal v. Coughlin,* No. 98 Civ. 2579(RPP), 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002) (same).

Nor are the remainder of Plaintiffs' allegations supported by evidence that van der Steeg "knew[ ] of and disregarded an excessive risk to [Plaintiff's] health or safety." *Farmer,* 511 U.S. at 837. Assuming that Plaintiff is correct in asserting either that van der Steeg neglected to set the fracture or that he did so improperly, there is no evidence that van der Steeg acted with a culpable state of mind. Plaintiff has also failed to show that van der Steeg deliberately neglected to take a post-setting x-ray. Indeed, all of the evidence regarding van der Steeg's state of mind shows concern for Ravenell's well being. Van der Steeg promptly examined Plaintiff's hand, gave him a prescription for pain medication, and recommended that Plaintiff follow up with an orthopedic specialist within a week.

**\*5** Absent any evidence of scienter, van der Steeg could only have acted negligently in treating Plaintiff. Indeed, when Plaintiff was asked at his deposition to describe van der Steeg's alleged infractions, he answered "total neglect" and "malpractice." (Ravenell Dep. at 17.) It is well settled that mere "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."

*Chance,* 143 F.3d at 703; *see also Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of mistreatment under the Eighth Amendment.");

*Hathway II,* 99 F.3d at 553 ("[M]ere medical malpractice is not tantamount to deliberate indifference.") (internal citation omitted); *Johnson v. Newport Lorillard,* No. 01 Civ. 9587(SAS), 2003 WL 169797, at *2 (S.D.N.Y. Jan. 23, 2003) (holding that "[b]ecause the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under

[ Section] 1983"). In particular, the failure to treat a fracture properly or to order an x-ray is not actionable absent some evidence of deliberate behavior by the treating physician. *See, e.g.,* *Estelle,* 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Houston v. County of Westchester Dep't of Corr.,* No. 06 Civ. 3395(DC), 2006 WL 3498560, at

\*4-6 (S.D.N.Y. Dec. 5, 2006) (failure to set an arm fracture not deliberate indifference); *Palacio v. Ocasio,* No. 02 Civ. 6726(PAC)(JCF), 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006) ("Defendant['s] decision not to x-ray Palacio's jaw and his failure to diagnose the fracture do not support a claim under 42 U.S.C. § 1983" absent evidence of "a culpable recklessness in the manner in which [the defendant] diagnosed Palacio's injury."); *Torres v. Alers,* No. 04 Civ. 1127(LAP), 2005 WL 2372741, at *3 (S.D.N.Y. Sept. 26, 2005) ("At most, Defendant might be accused of negligence in failing to order an x-ray of Plaintiff's ankle, but ... simple negligence, even if it amounts to medical malpractice, does not establish deliberate indifference."). The record evidence is insufficient to establish that van der Steeg was deliberately indifferent to Ravenell's injury.

### 2. *Dr. Foster*

The claims against Foster are predicated on his failure to provide Ravenell with "prompt surgery." (Compl.¶ IV-A(3).) Yet Foster did promptly prescribe physical therapy. Although he noted at the outset of Plaintiff's treatment that surgery might be required if physical therapy was unsuccessful. Plaintiff's finger responded positively to the physical therapy. (Saul Decl. Exs. H, J, K, M.) When Plaintiff voiced his disagreement with Foster's recommendation and declared his preference for surgery, Foster promptly recommended that Plaintiff obtain a second opinion from Magill. Magill then performed surgery on Plaintiff's finger four months after physical therapy was initially prescribed.

**\*6** Plaintiff offers no evidence to contradict Foster's contention that, in his medical judgment, it was prudent to follow a conservative approach to Plaintiff's injury before exposing Plaintiff to the risks of surgery. That Magill disagreed with Foster does not transform Foster's conservative recommendation into cruel and unusual punishment. The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107. "While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, 'no claim is stated when a doctor disagrees with the professional judgment of another doctor.' " *McKenna v. Wright,* No. 01 Civ. 6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar.

4, 2002) (quoting *White v. Napolean,* 897 F.2d 103, 110 (3d Cir.1990)); *see also Douglas v. Stanwick,* 93 F.Supp.2d 320, 325 (W.D.N .Y.2000) (finding no deliberate indifference where plaintiff's physician countermanded a different doctor's treatment decision based on her medical judgment); *Mercer v. Green Haven Corr. Facility,* No. 94 Civ. 6238(DLC), 1998 WL 85734, at *6 (S.D.N.Y. Feb. 27, 1998) (holding that disagreement among the prisoner's physicians does not constitute deliberate indifference); *Gardner v.. Zaunbrecher,* No. 95 Civ. 1543(RSP), 1996 WL 507072, at *2 (N.D.N .Y. Sept. 4, 1996) (Pooler, J.) (same); *Webb v. Jackson,* No. 92 Civ. 2149(SS), 1994 WL 86390, at *3 (S.D.N.Y. Mar. 16, 1994) ("It is well established that a mere difference in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment ...").

In particular, the courts have rejected deliberate indifference claims predicated on a physician's good faith recommendation of conservative treatment, regardless of whether another physician ultimately prescribed a more aggressive approach. *See, e.g., Sully-Martinez v. Glover,* No. 00 Civ. 5997(GEL), 2001 WL 1491278, at *6 (S.D.N.Y. Nov. 26, 2001) ("Defendants' decision to pursue more conservative treatments for Sully-Martinez's problem reflects, at most, a difference in opinion as to his medical treatment, rather than any deliberate indifference to his medical needs."); *Culp v. Koenigsmann,* No. 99 Civ. 9557(AJP), 2000 WL 995495, at *9 (S.D.N.Y. July 19, 2000) (summary judgment granted in favor of defendant doctors who chose more conservative treatment despite another doctor's recommendation of surgery); *Nelson v. Baggia,* No. 92-3175, 1994 WL 230455, at *3 (C.D.Ill. Feb. 22, 1994) (no deliberate indifference where conservative treatment was followed by surgery). Foster proffers the testimony of Dr. Malcolm Roth, who opines that "[a]lthough some hand specialists might have chosen [surgery], closed treatment with a splint and close follow up with x-rays is a common and accepted form of treatment for this type of injury." (Declaration of Malcolm Z. Roth, dated Mar. 3, 2006 ("Roth Decl.") ¶ 15.) Defendants also offer evidence that no long-term consequences arose from the four-

month delay in surgery. (Roth Decl. ¶ 18.) Plaintiff fails to contradict any of Defendants' evidence. *Arroyo v. City of New York,* No. 99 Civ. 1458(JSM), 2003 WL 22211500, at *3 (S.D.N.Y. Sept. 25, 2003) (no deliberate indifference where "Plaintiff ... did not present any medical opinion testimony to support his argument that it was unreasonable to first attempt to treat his hernia non-surgically, and to resort to surgery only after such methods had failed")

**\*7** Indeed, Plaintiff offers only his own conclusory allegations that Foster consciously disregarded a substantial risk of serious harm through deliberate delay of treatment. (*See* Pl. Mem. at 10.) Plaintiff's " 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)); *see also Sully-Martinez,* 2001 WL 1491278, at *5 (granting summary judgment on Plaintiff's Eighth Amendment claim despite the plaintiff's "conclusory assertions" of deliberate indifference). No reasonable juror could conclude that Foster acted with deliberate indifference.

Because Plaintiff has failed to show that either Defendant acted with deliberate indifference, this Court need not reach the question of qualified immunity. *See Culp,* 2000 WL 995495, at *10.

## *CONCLUSION*

For the reasons set forth above, Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to mark this case closed.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 765716

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Dallio v. Hebert,  N.D.N.Y.,  July 28, 2009

2002 WL 338375

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Edward MCKENNA, Plaintiff,

v.

Lester K. WRIGHT, Associate Commissioner/
Chief Medical Officer Docs, John P. Keane,
Superintendant, Woodbourne Correctional Fac.,
T .J. Miller, Deputy Supt. for Admin., Woodbourne
Corr., Facility, Frank Lancellotti, Physician, Mervat
Makram, Physician, Health Care Unit, Woodbourne
Correctional Facility; and All Unnamed Persons,
Individuals, Officers, Civilians, Individually
and in Their Official Capacities, Defendants.

No. 01 CIV. 6571(WK).
|
March 4, 2002.

**Attorneys and Law Firms**

Edward McKenna, Woodbourne Correctional Facility,
Woodbourne, for Plaintiff: (pro se).

John E. Knudsen, Assistant Attorney General, State of
New York, Office of the Attorney General, New York, for
Defendant.

MEMORANDUM & ORDER

KNAPP, Senior District J.

 **\*1**  On July 17, 2001, Plaintiff Edward McKenna
("Plaintiff"), proceeding *pro se,* filed a Complaint against
Defendants Lester Wright, John Keane, T.J. Miller, Frank
Lancellotti, and Mervat Makram ("Defendants") alleging
violations of his rights under the Eighth and Fourteenth
Amendments to the Constitution. Plaintiff's action is
predicated upon Defendants' alleged failure to provide him
with adequate medical treatment after he was diagnosed with
Hepatitis C in 1999. He asserts that Defendants either failed to
treat or delayed the treatment of his Hepatitis C between 1999
and 2000 and that he consequently developed cirrhosis of the

liver. He also alleges that Defendants continue to provide him
with inadequate medical care even to this day.

Plaintiff now moves us for a preliminary injunction which
would (a) require Defendants to arrange for him to receive
an examination and a plan of treatment for his Hepatitis
C condition from a qualified specialist and (b) require
Defendants to carry out any plan of treatment recommended
by that specialist. For the reasons set forth below, we deny
Plaintiff's motion for a preliminary injunction.

BACKGROUND

Plaintiff is an inmate at the Woodbourne Correctional Facility
("Woodbourne"). He has been consulting with Woodbourne's
physicians and receiving treatment from them for various
ailments and pains since 1998. On July 1, 1999, he was
allegedly informed that he had some form of Hepatitis by
Dr. Frank Lancellotti ("Dr.Lancellotti"). On July 19, 1999,
following a blood test, Plaintiff was further informed that he
had Hepatitis C by Dr. Mervat Makram ("Dr.Makram"). [1]
Both Dr. Lancellotti and Dr. Makram are physicians working
at Woodbourne.

Although there is some dispute as to when Dr. Lancellotti
subsequently discussed Plaintiff's condition with him,
Plaintiff alleges that he was again diagnosed with Hepatitis C
on September 16, 1999 and that he was asked whether or not
he wanted treatment for his condition. Plaintiff purportedly
requested treatment for his Hepatitis C condition at that
time because he had been experiencing stomach pain. [2] *See*
Compl. ¶ 22.

In responding to this request for treatment, Dr. Lancellotti
allegedly inquired as to when Plaintiff was set to appear
before the Parole Board. When Plaintiff explained that he
would appear before the Board around September 2000,
Dr. Lancellotti purportedly informed him that, pursuant
to medical protocols, he could not receive treatment for
Hepatitis C.

More specifically, Dr. Lancellotti allegedly refused to
provide Plaintiff with medical treatment for his Hepatitis C
condition in accordance with the Department of Correctional
Services' ("DOCS") Hepatitis C Primary Care Practice
Guideline ("Hepatitis C Guideline"). DOCS' Hepatitis C
Guideline, developed by various physicians and nurses and
revised on December 17, 1999, and December 13, 2000,

outlines, *inter alia,* a number of criteria which should be considered by physicians in determining whether Hepatitis C treatment is appropriate for an inmate.

**\*2** According to the Hepatitis C Guideline which was supposedly in effect at the time Plaintiff was diagnosed with Hepatitis C, one such criterion was whether or not it was anticipated that the inmate would remain incarcerated for at least 12 months from the time treatment would begin. *See* Compl., Exh. A at 4. Where an inmate's remaining period of incarceration was anticipated to be less than 12 months and the inmate would therefore be unable to "predictably complete a course of treatment," the relevant Hepatitis C Guideline criterion provided that he "should receive a baseline evaluation and be referred to medical follow-up and treatment upon release." *Id.* Plaintiff asserts that Dr. Lancellotti refused to provide him with medical treatment for his Hepatitis C condition because he was eligible for parole release in less than one year from the time of their alleged discussion about treatment.[3]

On August 29, 2000, Plaintiff appeared before the Parole Board. The Board denied his release and informed him that he could return in two years. Thereafter, although Woodbourne's physicians had been treating Plaintiff's general medical condition and stomach pains in the interim between September 1999 and December 2000 (albeit not to Plaintiff's satisfaction), Plaintiff met with Dr. Lancellotti on December 11, 2000 and specifically discussed his Hepatitis C condition with him. At that time, Plaintiff purportedly requested treatment for his Hepatitis C condition because of his continuing stomach pains and breathing problems. *See* Compl. ¶ 25.

In response to Plaintiff's request, Dr. Lancellotti allegedly informed Plaintiff that he had to attend an Alcohol and Substance Abuse Treatment ("ASAT") program before he could receive any such treatment. One of the criterion outlined in the Hepatitis C Guideline for determining whether Hepatitis C treatment is appropriate is whether or not the inmate had successfully completed an ASAT program. *See* Compl., Exh. A at 4; Wright Aff., Exh. A at 4. Plaintiff contends that he is unemployed at the prison because he holds the status of being medically unassignable to work and suggests that this status somehow makes him ineligible to attend an ASAT program. *See* Compl. ¶ 25; Pl.'s Reply Brief at 6 n. 7.

Despite his alleged discussion with Plaintiff about the ASAT program, Dr. Lancellotti notified Plaintiff that he would be sent to the Albany Medical Center for the very stomach pains which had originally led him to request treatment for his Hepatitis C condition in September 1999 and December 2000. On January 10, 2001, Plaintiff traveled to the Albany Medical Center for a computerized axial tomography scan. When Plaintiff subsequently inquired as to the results of the CAT scan, Dr. Lancellotti notified him that he had been diagnosed with cirrhosis of the liver.[4] After being informed of this diagnosis, Plaintiff allegedly told Dr. Lancellotti that he would never have developed cirrhosis had he been provided treatment for his Hepatitis C at an earlier date.[5]

**\*3** On February 2, 2001, Dr. Lancellotti notified Plaintiff that he would be referring him to an outside specialist. Accordingly, on March 19, 2001, Plaintiff consulted with Dr. Benedict Maliakkal ("Dr.Maliakkal") at the Coxsackie Regional Medical Unit regarding the stomach pain which had originally led him to request treatment for his Hepatitis C condition. Following this consultation, Dr. Maliakkal diagnosed him with cirrhosis secondary to Hepatitis C. On April 23, 2001, Dr. Maliakkal operated on Plaintiff in order to, in part, further evaluate his medical condition. After this operation, Dr. Maliakkal issued a report in which he recommended that Plaintiff (1) should continue on his current medication ("Inderal with or without ISMO") and (2) follow-up with him to discuss the management of his Hepatitis C condition through treatment with such therapies as Interferon and Ribavirin.

Plaintiff was never allowed to follow-up with Dr. Maliakkal regarding the possibility of treatment with Interferon and Ribavirin. Although Dr. Makram apparently requested such a follow-up consultation, Plaintiff was subsequently diagnosed with "decompensated" liver cirrhosis.[6] As a result, on June 1 and June 7, 2001, Dr. Lester Wright ("Dr.Wright"), the Deputy Commissioner and Chief Medical Officer of DOCS, as well as Dr. Robert Hentschel ("Dr.Hentschel"), decided that the treatment of Plaintiff's Hepatitis C with such therapies as Interferon and Ribavirin would be inappropriate because, according to both the Hepatitis C Guideline and medical literature on the subject, an individual with decompensated cirrhosis should not receive treatment for Hepatitis C with these therapies as such treatment would be potentially life threatening.

Having determined that treating Plaintiff's Hepatitis C with Interferon and Ribavirin would be inappropriate given the

threat it would pose to his health in light of his related decompensated liver cirrhosis, Dr. Hentschel and Dr. Wright denied Plaintiff a follow-up consultation with Dr. Maliakkal to discuss treatment with such therapies. On July 25, 2001, Dr. Makram explained this decision to Plaintiff. On August 3 and October 5, 2001, the decision was further explained to Plaintiff by Dr. Wright.

After unsuccessfully seeking to obtain both his desired treatment as well as redress for Defendants' alleged failure to provide him with adequate medical care through internal grievance procedures, Plaintiff brought this action in July 2001 against Defendants under 42 U.S.C. § 1983 for the alleged deprivation of his constitutional rights under the Eighth and Fourteenth Amendments to the Constitution. Plaintiff now moves for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). Having never been allowed a follow-up examination with Dr. Maliakkal to discuss the treatment of his Hepatitis C with Interferon and Ribavirin, Plaintiff asks us to order Defendants to (a) arrange for Plaintiff to receive an examination and plan of treatment from Dr. Maliakkal and (b) carry out whatever plan of treatment Dr. Maliakkal may eventually recommend.

## DISCUSSION

**\*4** A preliminary injunction constitutes an extraordinary remedy which should not be routinely granted. *Medical Society of the State of New York v. Toia* (2d Cir.1977) 560 F.2d 535, 538. A party seeking a preliminary injunction must ordinarily " 'establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." ' *Espinal v. Goord* (S.D.N.Y.2002) 180 F.Supp.2d 532, 536.

However, a heightened standard must be applied where, as here, the injunction which Plaintiff seeks is mandatory in nature. *See Norcom Electronics Corp. v. Cim USA, Inc.* (S.D.N.Y.2000) 104 F.Supp.2d 198, 207. A mandatory injunction is one which would "alter the status quo by commanding some positive act." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.* (2d Cir.1995) 60 F.3d 27, 34. In this instance, Plaintiff asks us to order Defendants to

provide him with a treatment which the defendant physicians have already rejected on the basis of their medical judgment. Since such an injunction would alter the current status quo by commanding a positive act, it is a "mandatory" injunction and therefore should only issue "upon a clear showing that the moving party is entitled to the relief requested" or "where extreme or very serious damage will result from a denial of preliminary relief." *Id.* In other words, under this more stringent standard for mandatory injunctions, Plaintiff must demonstrate that he has a clear or substantial likelihood of success on the merits. *See Jolly v. Coughlin* (2d Cir.1996) 76 F.3d 468, 473–474; *S.E.C. v. Unifund SAL* (2d Cir.1990) 910 F.2d 1028, 1040; *Espinal,* 180 F.Supp.2d at 536; *Padberg v. McGrath–McKechnie* (E.D.N.Y.2000) 108 F.Supp.2d 177, 183.

### I. Irreparable Harm

Plaintiff asserts that he has been deprived of his Eighth and Fourteenth Amendment rights through Defendants' deliberate indifference in failing to provide him with adequate medical treatment. Generally, an alleged violation of constitutional rights, such as those encompassed by the Eighth Amendment, creates a presumption of irreparable harm. *See Jolly,* 76 F.3d at 482. *See also Mitchell v. Cuomo* (2d Cir.1984) 784 F.2d 804, 806 (holding that where an alleged deprivation of a constitutional right is involved, no further showing of irreparable harm is necessary); *Zolonowski v. County of Erie* (W.D.N.Y.1996) 944 F.Supp. 1096, 1109 (holding that a presumption of irreparable harm was established where Eighth Amendment rights were allegedly violated).

However, since the movant must show that the alleged irreparable harm is imminent, and not remote or speculative, we cannot rest a finding of irreparable harm solely on past conduct, even where a plaintiff has alleged that such conduct violated the Eighth Amendment. *Garcia v. Arevalo* (S.D.N.Y. June 27, 1994) 1994 WL 383238, \*2. *See also Flack v. Friends of Queen Catherine Inc.* (S .D.N.Y.2001) 139 F.Supp.2d 526, 540 (holding that a presumption created in the context of a preliminary injunction only applies to prospective violations of the law). Here, Plaintiff's action is premised on two separate sets of allegations. On the one hand, Plaintiff alleges that Defendants either delayed or altogether failed in providing him with treatment for his Hepatitis C condition between 1999 and 2000. However, Plaintiff acknowledges that, at the very least, Defendants began providing him with

some form of care around December 2000 for the stomach pains which had originally led him to request treatment for his Hepatitis C condition. Despite this acknowledgment, Plaintiff asserts that even the treatment he has since received violates his constitutional rights.

**\*5** While Plaintiff's first set of allegations with respect to Defendants' past misconduct between 1999 and 2000 cannot support a finding of irreparable harm (and therefore does not warrant injunctive relief), his latter set of allegations regarding his continued deprivation of rights under the Eighth Amendment stemming from Defendants' ongoing medical treatment of his medical condition raises a presumption of irreparable harm.[7] We therefore find that Plaintiff's latter set of allegations satisfies his burden to demonstrate irreparable harm.

## II. Likelihood Of Success On The Merits

Since Plaintiff seeks a mandatory injunction, he must demonstrate that he has a clear or substantial likelihood of success on the merits of his action. *See Tom Doherty Associates, Inc.,* 60 F.3d at 34; *Jolly,* 76 F.3d at 473–474; *Unifund SAL,* 910 F.2d at 1028; *Espinal,* 180 F.Supp.2d at 536; *Padberg,* 108 F.Supp.2d at 183. As Plaintiff cannot show irreparable harm with respect to his allegations relating to Defendants' past conduct between 1999 and 2000 and a preliminary injunction would therefore be unwarranted on the basis of such assertions, we do not address whether Plaintiff has any likelihood of succeeding on the merits of those allegations which relate to past misconduct. Instead, we focus on the set of allegations which have raised a presumption of irreparable harm in this instance. Therefore, we must determine whether Plaintiff has demonstrated a clear or substantial likelihood of succeeding on the merits of his action based on his allegations with respect to his ongoing medical treatment. With these considerations in mind, we turn to the merits of Plaintiff's two causes of action.

### A. Plaintiff's First Cause Of Action

Plaintiff brought his action pursuant to 42 U.S.C. § 1983. "In an action brought under 42 U.S.C. § 1983, the plaintiff must establish that a person acting under color of state law deprived him or her of a federal constitutional right." *Vento v. Lord* (S.D.N .Y. July 31, 1997) 1997 WL 431140, \*3. "Section 1983 itself," however, "creates no

substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James* (2d Cir.1993) 13 F.3d 515, 519, *cert. denied* (1994) 512 U.S. 1240. Here, Plaintiff asserts that he is being deprived of his constitutional rights because Defendants are failing to provide him with adequate medical care.

"A claim under § 1983 for inadequate medical treatment is governed by the standards of the Eighth and Fourteenth Amendments to the Constitution." *Wise v. Halko* (S.D.N.Y. Sept. 12, 1997) 1997 WL 570544, \*2. In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove "deliberate indifference to serious medical needs." *Estelle v. Gamble* (1976) 429 U.S. 97, 106.[8] *See also Chance v. Armstrong* (2d Cir.1998) 143 F.3d 698, 702.

"The standard of deliberate indifference includes both subjective and objective components." *Chance,* 143 F.3d at 702. "First, the alleged medical need must be, in objective terms, 'sufficiently serious.' " *Davidson v. Scully* (S.D.N.Y. Aug. 22, 2001) 2001 WL 963965, \*2. "Second, to satisfy the subjective prong, the defendant mut act with 'a sufficiently culpable state of mind' that amounts to 'deliberate indifference' to the serious medical need." *Id.* at \*3. *See also Gill v. Jones* (S.D.N.Y. Nov. 1, 2001) 2001 WL 1346012, \*7 ("This is a two prong test requiring both a sufficiently serious medical condition as well as deliberate indifference by the Defendants").

#### 1. Serious Medical Condition

**\*6** A condition will be considered sufficiently serious under the Eighth Amendment if it is a " 'condition of urgency, one that may produce death, degeneration, or extreme pain.' " *See Morales v. Mackalm* (2d Cir.2002) 278 F.3d 126, 132. Given the nature of Plaintiff's Hepatitis C symptoms, as well as the defendant physicians' determination that his condition has reached an advanced stage, *see* Pl.'s Aff. in supp. of Mot. for Prelim. Inj., Exh. at 19, Plaintiff has established a sufficiently serious medical condition under the Eighth Amendment. *See Campbell v. Young* (W.D.Va. March 22, 2001) 2001 WL 418725, \*3 ("Here, there is no question that Campbell suffers from a serious medical condition, namely, Hepatitis C and the associated pain and symptoms"); *Carbonell v. Goord* (S.D.N.Y. June 13, 2000)

2000 WL 760751, *9 (holding that Hepatitis C can constitute an objectively serious condition).

2. Deliberate Indifference

"Deliberate indifference 'requires more than negligence.'
" Veloz v. New York (S.D.N.Y.1999) 35 F.Supp.2d 305, 311. However, "while 'mere medical malpractice' is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " Hathway v. Coughlin (2d Cir.1996) 99 F.3d 550, 553. In essence, "a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety."
" Hathway v. Coughlin (2d Cir.1994) 37 F.3d 63, 66, cert. denied (1995) 513 U.S. 1154.

Although Plaintiff has shown that he suffers from a sufficiently serious medical condition, he cannot demonstrate that he has a clear or substantial likelihood of succeeding on the merits of his Eighth Amendment claim because he is unable to show that Defendants acted with the requisite deliberate indifference with respect to his ongoing medical treatment. Instead of illustrating that Defendants acted with deliberate indifference to his serious medical condition, Plaintiff's moving papers and accompanying exhibits, as well as Defendants' opposition papers and affidavits, show that the defendant physicians provided adequate medical care in light of the difficult circumstances presented by Plaintiff's related Hepatitis C and decompensated cirrhosis conditions.

Rather than acting with deliberate indifference and turning a blind eye to Plaintiff's Hepatitis C condition, the physicians examined his medical condition and determined, pursuant to their medical judgment, that treating Plaintiff's Hepatitis C with such therapies as Interferon and Ribavirin would endanger Plaintiff's health rather than improve it given the advanced state of his cirrhosis. In essence, rather than knowing of and disregarding an excessive risk to Plaintiff's health and safety in refusing to treat him with Interferon and Ribavirin, the physicians acted pursuant to their medical judgment (as based on the Hepatitis C Guideline and current medical literature on the relevant subject matter) to protect Plaintiff's health. Such conduct does not constitute deliberate indifference. See Hassan v. Khanyile (S.D.N.Y. May 21,

1998) 1998 WL 264834, *2 (denying a preliminary injunction where the defendant physician acted in the plaintiff's best medical interests in discontinuing the treatment of his Hepatitis C with Interferon); Johnson v. Raba (N.D.Ill. Sept. 24, 1997) 1997 WL 610403, *4 (holding that the defendant physician did not act with deliberate indifference where he refused to treat the plaintiff with the semiexperimental drug Interferon); Dias v. Vose (D.Mass.1994) 865 F.Supp. 53, 58, aff'd (1st Cir.1995) 50 F.3d 1 (holding that physician's refusal to authorize treatment with the highly experimental drug Interferon did not rise to the level of an Eighth Amendment violation). See also Ortiz v. Makram (S.D.N.Y. Dec. 21, 2000) 2000 WL 1876667, *7 (holding that Dr. Lancellotti's treatment decisions did not evidence deliberate indifference where he did not disregard a risk to plaintiff).

*7 Moreover, although Plaintiff disagrees with the physicians' treatment decisions as well as their decompensated cirrhosis diagnosis and claims that he is entitled to consult with a specialist regarding a different diagnosis and treatment plan, such disagreements and allegations do not amount to Eighth Amendment violations. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." Chance, 143 F.3d at 702. Indeed, "[t]here is no right to the treatment of one's choice." Wise, 1997 WL 570544 at *3. Nor does a prisoner have a categorical right to be treated by a specialist. Johnson, 1997 WL 610403 at *4. Hence, "disagreements over medications, diagnostic techniques..., forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." Sonds v. St. Barnabas Hospital Correctional Health Services (S.D .N.Y. May 21, 2001) 151 F.Supp.2d 303, 312. See also Hodge v. Coughlin (S.D.N.Y. Sept. 22, 1994) 1994 WL 519902, *11, aff'd (2d Cir.1995) 52 F.3d 310 (holding that "an allegation of 'misdiagnosis or faulty [medical] judgment' " does not state a claim under the Eighth Amendment).

Accordingly, while Plaintiff may have engaged in his own medical research, determined for himself that a different course of treatment would be appropriate, and may now contend that the defendant physicians misdiagnosed the nature of his cirrhosis, that their treatment decision with respect to his Hepatitis C is therefore incorrect, and that the defendant physicians should have permitted him a follow-up

consultation with a specialist, these allegations do not rise to the level of Eighth Amendment violations. *See McKinnis v. Williams* (S.D.N.Y. Aug. 1, 2001) 2001 WL 873078, *4 (holding that, to the extent the plaintiff contested the diagnosis and treatment he received, such allegations were insufficient to state a valid claim of medical mistreatment under the Eighth Amendment); *Brown v. Selwin* (S.D.N.Y. Sept. 24, 1999) 1999 WL 756404, *6–*7 (holding that plaintiff's disagreement with defendant's medical judgment with respect to treatment and diagnosis were insufficient to constitute an Eighth Amendment violation); *Rios v. Sandl* (E.D.Pa. Dec. 31, 1998) 1998 WL961896, *4, *6–*7 (recognizing that a physician's decision to withhold Interferon treatment for the plaintiff's Hepatitis condition did not constitute an Eighth Amendment violation where the physician felt such treatment was inappropriate); *Allen v. Sanders* (N.D. Tex. June 4, 1998) 1998 WL 318841, *6 (holding that physician's refusal to treat plaintiff's Hepatitis with Interferon did not evidence deliberate indifference where plaintiff failed to show that the physician did not make the decision in his best medical judgment); *Dias,* 865 F.Supp. at 58 (holding that a prisoner's disagreement with a physician's refusal to authorize Interferon treatment for his Hepatitis C condition did not rise to the level of an Eighth Amendment violation); *Bouchard v. Magnusson* (D.Me.1989) 715 F.Supp. 1146, 1147–1149 (holding that officials' refusal to allow plaintiff to consult with a different doctor or to permit him to follow up with a specialist he had already been referred to was not an Eighth Amendment violation). *See also Bartlett v. Correctional Med. Serv., Inc.* (10th Cir.1997) 124 F.3d 216 (table), 1997 WL 572834, *1 (holding that plaintiff's disagreement with his physicians' refusal to treat his Hepatitis C with Interferon did not state a claim under the Eighth Amendment). As such, Plaintiff has failed to demonstrate that he has a clear likelihood of succeeding on the merits of these allegations. [9]

**\*8** Plaintiff attempts to distinguish this case from those legal decisions which are based solely on a plaintiff's disagreement with his prison physicians' treatment decision by arguing that the defendant physicians' medical judgment also contradicts Dr. Maliakkal's medical recommendation. Even assuming *arguendo* that the defendant physicians' refusal to treat Plaintiff with such therapies as Interferon and Ribavirin in light of his decompensated cirrhosis condition explicitly contradicts Dr. Maliakkal's recommendation that Plaintiff be allowed a follow-up visit to discuss the treatment of his Hepatitis C with these therapies, such a disagreement between the medical judgments of the defendant physicians and Dr.

Maliakkal does not rise to the level of an Eighth Amendment violation.

"Not every physician will treat every ailment in exactly the same manner." *Douglas v. Stanwick* (N.D.N.Y.2000) 93 F.Supp.2d 320, 325. The mere fact that the defendant physicians may have made a different medical decision with respect to Plaintiff's treatment than that purportedly recommended by Dr. Maliakkal does not indicate that they acted for culpable reasons. While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, "no claim is stated when a *doctor* disagrees with the professional judgment of another doctor." *White v. Napolean* (3d Cir.1990) 897 F.2d 103, 110. Hence, courts have repeatedly held that "a dispute between two doctors as to the proper course of medical treatment will not give rise to an Eighth Amendment violation." *Hodge,* 1994 WL 519902 at *11; *Miller v. Fisher* (N.D.N.Y. Oct. 26, 1993) 1993 WL 438761, *3 (Mag. J. Hurd), *approved* (N.D.N.Y. Mar. 23, 1995) 1995 WL 131561, *1 (J. Scullin). *See Webb v. Jackson* (S.D.N.Y. Mar. 16, 1994) 1994 WL 86390, *3, *aff'd* (2d Cir.1995) 47 F.3d 1158 ("It is well established that a mere differences [sic] in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment pursuant to section 1983"). *See also Sanchez v. Vild* (9th Cir.1989) 891 F.2d 240, 241; *Culp v. Koenigsmann* (S.D.N.Y. July 19, 2000) 2000 WL 995495, *9; *Douglas v. Stanwick* (S.D.N.Y.2000) 93 F.Supp.2d 320, 325; *Mercer,* 1998 WL 85734 at *6; *Gardner v. Zaunbrecher* (S.D.N.Y. Sept. 4, 1996) 1996 WL 507072, *2.

In this instance, Defendants evaluated Plaintiff's medical condition and determined, pursuant to their medical judgment, that the treatment of Plaintiff's Hepatitis C with such therapies as Interferon and Ribavirin would be inappropriate given the risk such a treatment would pose to Plaintiff's health in light of his closely related decompensated cirrhosis condition. Even assuming that their decision represented a medical judgment which disagreed in substance with Dr. Maliakkal's medical recommendation, such a disagreement among Plaintiff's physicians would not constitute deliberate indifference under these circumstances. *See Douglas,* 93 F.Supp.2d at 325 (holding that physician's decision to countermand a different doctor's treatment decision, made on the basis of her medical judgment, did not constitute deliberate indifference); *Mercer,* 1998

WL 85734 at *6 (holding that mere fact that physician's treatment choice was different than treatment recommended by specialist did not give rise to a violation of the plaintiff's Eighth Amendment constitutional rights); *Gardner,* 1996 WL 507072 at *2 (holding that disagreements among the prisoner's physicians did not constitute deliberate indifference). Accordingly, Plaintiff cannot demonstrate a likelihood of succeeding on the merits of his claim on the basis of the supposed disagreement over treatment between Dr. Maliakkal and the defendant physicians.

### B. Plaintiff's Second Cause Of Action

**\*9** In his second cause of action under 42 U.S.C. § 1983, Plaintiff alleges that Defendants "deprived, with deliberate indifference, plaintiff of rights secured to him by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution by refusing to provide him with necessary medical assessment, treatment and care." Compl. ¶ 47. We now address each of the claims raised by this cause of action respectively.

### 1. Due Process Claim

We are hard pressed to differentiate between Plaintiff's second cause of action for deprivation of due process stemming from Defendants' "deliberate indifference" in providing him with "necessary medical assessment, treatment and care" and Plaintiff's first cause of action under the Eighth and Fourteenth Amendments. Both are based on the same exact allegations and seek relief from Defendants' alleged deliberate indifference in providing Plaintiff with inadequate medical care.

"Constitutional due process mandates...[the] provision of adequate medical care to persons in official custody." *Hatian Centers Council, Inc. v. Sale* (E.D.N.Y.1993) 823 F.Supp. 1028, 1043. The Due Process Clause of the Fourteenth Amendment directly protects *pretrial detainees* from the provision of inadequate medical care by the state.

*See Sulkowska v. City of New York* (S.D.N.Y.2001) 129 F.Supp.2d 274, 291–292, n. 29. In contrast, incarcerated prisoners are protected from cruel and unusual punishment in the form of inadequate medical care by the Eighth Amendment, as applied to the state by the Fourteenth Amendment. *See Estelle,* 429 U.S. at 101–105. As such, Plaintiff's attempt to assert a Section 1983 cause of action for inadequate medical care directly under the Fourteenth

Amendment on the basis of the same allegations as his first Section 1983 cause of action for inadequate medical care under the Eighth and Fourteenth Amendments is redundant. Moreover, since Plaintiff is not a pre-trial detainee, is it unclear whether or not he could assert such an action directly under the Fourteenth Amendment's Due Process clause for the deprivation of his substantive due process rights as opposed to asserting the action under the Eighth Amendment as it is applied to the state through the Fourteenth Amendment. *See Howard v. Goord* (E.D.N.Y. June 6, 2001) 2001 WL 739244, *2 n. 1.

Where a *pro se* incarcerated prisoner has asserted separate claims for deliberate indifference to medical needs under both the Eighth Amendment's prohibition against cruel and unusual punishment as well as the Fourteenth Amendment's Due Process Clause, we construe such claims as if they were brought for the deprivation of Eighth Amendment rights. *See id. See also Amaker v. Haponik* (S.D .N.Y. Mar. 31, 2000) 2000 WL 343772, *6 ("It is well established that 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process' "). Since we have determined that Plaintiff cannot demonstrate a clear or substantial likelihood of success on the merits of his Eighth Amendment claim, we now similarly hold that he cannot demonstrate a clear or substantial likelihood of succeeding on the merits of this aspect of his second cause of action.

### 2. Equal Protection Claim

**\*10** In his second cause of action, Plaintiff also asserts a Section 1983 claim for the deprivation of his rights under the Equal Protection Clause of the Fourteenth Amendment stemming from Defendants' refusal to "provide him with necessary medical assessment, treatment and care." Compl. ¶ 47. Unfortunately, given the opaque nature of Plaintiff's moving papers, it is unclear whether or not Plaintiff grounds his motion for a preliminary injunction solely on his Eighth Amendment claim or whether he also bases his motion on the alleged violation of his equal protection rights. While Plaintiff's *pro se* moving papers do not substantively contend that he is entitled to injunctive relief because of the Equal Protection Clause or that he is likely to succeed on the merits of his equal protection claim, a footnote in his Reply brief in support of a preliminary injunction suggests that he may

be partly relying on his equal protection claim in seeking injunctive relief. *See* Pl.'s Reply Brief at 6 n. 7.

In essence, Plaintiff appears to contend, *inter alia,* that the restrictions on treatment in the Hepatitis C Guideline violate his equal protection rights. As the defendant physicians have determined that Plaintiff should not be treated with Interferon and Ribavirin on the basis of both the relevant medical literature on the subject *as well as the* Hepatitis C Guideline's proviso that treatment for Hepatitis C is contraindicated for persons with decompensated cirrhosis, *see* Wright Aff. ¶ 8, we will address the issue of whether or not Plaintiff has a clear likelihood of succeeding on the merits of his equal protection claim.

Plaintiff's Complaint and moving papers are not a model of clarity with respect to this claim. Although his Complaint is replete with allegations of how he has been denied adequate medical care, it contains no allegations pertaining to how he has been deprived of his equal protection rights beyond his conclusory sentence setting forth his equal protection claim. *See* Compl. ¶ 47.

The only substantive factual allegations which pertain to this claim can be found in the grievance which Plaintiff filed with the prison authorities regarding his medical treatment. That grievance was attached as an exhibit to the Complaint. *See* Compl., Exh. I at 1, 6, 8–9. In his grievance, Plaintiff argued that he had been deprived of his rights under the Equal Protection Clause because inmates with HIV or AIDS were generally allowed unconditional treatment for their disease whereas, pursuant to the Hepatitis C Guideline generally, inmates with Hepatitis C were not. *See* Compl., Exh. I at 6. *See also* Pl.'s Reply Brief at 6 n. 7. Plaintiff also asserted that the Hepatitis C Guideline's provision recommending treatment for only those inmates with Hepatitis C whose anticipated incarceration would last at least 12 months was discriminatory "in its application" because it had the effect of providing incarcerated inmates with Hepatitis C less favorable treatment than that available to non-inmates, such as parolees, with Hepatitis C. *See* Compl., Exhibit I at 8–9.

**\*11**  "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' " *Plyler v. Doe* (1982) 457 U.S. 202, 216. The Second Circuit has explained that "[t]here are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause" and has identified at least three such methods.

*Brown v. City of Oneonta* (2d Cir.2000) 221 F.3d 329, 337. First, a plaintiff can point to a law or policy that expressly classifies persons on the basis of various protected categories. *See* *Hayden v. County of Nassau* (2d Cir.1999) 180 F.3d 42, 48. Second, a plaintiff can identify a facially neutral law or policy that has been applied in an unlawfully discriminatory manner. *Pyke v. Cuomo* (2d Cir.2001) 258 F.3d 107, 110. Finally, a plaintiff can also "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Brown,* 221 F.3d at 337.

Although the true nature of Plaintiff's equal protection claim is somewhat unclear, we construe his equal protection allegations with respect to the Hepatitis C Guideline's adverse effect as an equal protection claim premised on allegations that a policy has an adverse impact and that it was motivated by discriminatory animus. [10] In sum, Plaintiff claims that both the application of the general restrictions in the Guideline as well as the application of the specific provision addressing an inmate's anticipated period of incarceration has an adverse effect because inmates with Hepatitis C receive less favorable treatment options as a result of the Guideline than do inmates with HIV or AIDS or non-inmates with Hepatitis C (such as parolees). [11]

As the Second Circuit has recently clarified, a plaintiff who alleges that the application of a facially neutral statute or policy has an adverse effect "is not obligated to show a better treated, similarly situated group of individuals" in order to establish a claim of equal protection. *Pyke,* 258 F.3d at 110. However, although Plaintiff may not be required to show a similarly situated group of individuals who were more favorably treated in order to support his equal protection claim, he must still establish purposeful discrimination. While Plaintiff has alleged both that the restrictions in the Hepatitis C Guideline in general and particular provisions in the Guideline have an adverse impact on the treatment provided to inmates with Hepatitis C, "a policy does not deny equal protection merely because it is known to affect a particular class adversely." *Johnson v. Wing* (2d Cir.1999) 178 F.3d 611, 615, *cert. denied* (2000) 528 U.S. 1162. Rather, as a general matter, a policy violates the Equal Protection Clause only where its adverse effect reflects purposeful discrimination. *Id.* In this context, "[a] plaintiff need not show that a discriminatory reason was the sole reason for the

disparate treatment, just that it was a substantial or motivating one." ⚠️ *Querry v. Messar* (S.D.N.Y.1998) 14 F.Supp.2d 437, 446.

**\*12** "Discriminatory purpose 'implies that the decisionmaker...selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its *adverse effects* upon an identifiable group." ' *Hayden,* 180 F .3d at 50. Although Plaintiff has asserted allegations of adverse impact, his Complaint, moving papers, and accompanying exhibits are devoid of any factual allegations that the Hepatitis C Guideline was implemented because of the alleged adverse effects it had on the medical treatment provided to inmates with Hepatitis C. Given the absence of such factual allegations, Plaintiff cannot show that he has a likelihood of succeeding on the merits of his equal protection claim. *See* *Hayden,* 180 F.3d at 50–51 (affirming dismissal of equal protection claim where plaintiff's allegations were insufficient to establish that county officials had acted because of a desire to adversely affect plaintiffs); *Johnson,* 178 F.3d at 616 (affirming summary judgment in favor of the defendants on plaintiff's equal protection claim where nothing in plaintiff's allegations supported the finding of a discriminatory purpose); *Lee v. State of New York Dept. of Correctional Services* (S.D.N.Y. Aug. 30, 1999) 1999 WL 673339, \*12 (dismissing plaintiff's equal protection claim where plaintiff had failed to set forth any allegations suggesting that DOCS officials had some discriminatory purpose behind their actions). [12]

3. Retaliation Claim

Although he did not assert allegations or a cause of action under Section 1983 for retaliation in his Complaint, Plaintiff alleges for the first time in his motion for a preliminary injunction that Defendants are refusing to allow him to consult with Dr. Maliakkal or to receive treatment with Interferon or Ribavirin in retaliation for his having filed a prior, unrelated Section 1983 action against prison officials. *See* Pl.'s Aff. in supp. of Mot. for Prelim. Inj. at 8 ("Finally, the Court should be aware that plaintiff is being denied medical treatment in retaliation for a prior Civil Rights Action which is pending before this Court"). *See also* Pl .'s Reply Brief at 7–8.

"It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights." *Rivera v. Goord* (S.D.N.Y.2000) 119 F.Supp.2d 327, 339. To state a retaliation claim under Section 1983, "a plaintiff must show that (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York* (2d Cir.2000) 210 F.3d 79, 85. "Because claims of retaliation are easily fabricated, 'courts must examine prisoners' claims of retaliation with skepticism and particular care...requiring detailed fact pleading....'" *Rivera,* 119 F.Supp.2d at 339. *See also* 🚩 *Dawes v. Walker* (2d Cir.2001) 239 F .3d 489, 491 ("courts must approach prisoner claims of retaliation with skepticism and particular care"); *Bartley v. Artuz* (S.D.N.Y. Oct. 19, 1999) 1999 WL 942425, \*8 ("The standard for pleading retaliation is high because, as the Second Circuit recognized, retaliation claims by prisoners are 'prone to abuse' as [v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes").

**\*13** At the outset, we hold that since Plaintiff never asserted either a cause of action for retaliation or even allegations in support thereof in his Complaint, we need not consider his retaliation arguments. *See* *Mitchell v. Northern Westchester Hospital* (S.D.N.Y.2001) 171 F.Supp.2d 274, 277 n. 1 (refusing to consider claims raised by plaintiff for first time in opposition to motion for summary judgment where such claims were not pleaded in the complaint); *Higgins v. Coombe* (S.D.N.Y. June 16, 1997) 1997 WL 328623, \*12 (refusing to consider allegations of retaliatory transfer raised by *pro se* plaintiff for the first time in his response to defendants' motion to dismiss since they were not pleaded in the complaint and were therefore beyond the scope of the instant action). *See also* *Carbonell v. Acrish* (S.D.N.Y.2001) 154 F.Supp.2d 552, 560–561.

However, even if we were to address Plaintiff's retaliation contentions, we would still find that Plaintiff's allegations are insufficient to support a preliminary injunction in this instance. Here, Plaintiff's allegations of retaliation are wholly conclusory and unsupported by detailed fact pleading. The nature of his retaliation allegations is unsurprising since these allegations are raised as cursory arguments in the course of Plaintiff's moving papers. Since Plaintiff's retaliation allegations are wholly conclusory, Plaintiff cannot demonstrate that he has a clear likelihood of succeeding on

the merits of the retaliation claim set forth in his motion for a preliminary injunction. *See* Gill v. Mooney (2d Cir.1987) 824 F.2d 192, 194–195 (affirming dismissal of claim which alleged retaliation in wholly conclusory terms); *Washington v. Coughlin* (N.D.N.Y. Sept. 23, 1998) 1998 WL 661532, *3 (dismissing retaliation claim where it was unsupported and wholly conclusory); *Benitez v. Beneway* (S.D.N.Y. Aug. 15, 1995) 1995 WL 489694, *5 (dismissing retaliation claim where underlying allegations were conclusory). [13]

CONCLUSION

For the foregoing reasons, we DENY Plaintiff's motion for a preliminary injunction.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 338375

## Footnotes

1    Hepatitis C is a condition which results in the inflamation of the liver. *See* STEDMAN'S MEDICAL DICTIONARY 808 (27th Ed.2000). The ensuing liver cell damage causes, *inter alia,* the retention of bilirubin (a type of bile pigment) as well as a rise in the level of particular enzymes. *See id.* at 202, 808. Of the various forms of hepatitis, Hepatitis C has the highest likelihood of becoming a chronic condition and at least 20% of Hepatitis C patients eventually develop cirrhosis. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 382–383 (17th ed.1999).

2    Although Plaintiff claims that Dr. Lancellotti informed him of this diagnosis on September 16, 1999, the Department of Correctional Services' ("DOCS") Ambulatory Health Record entry for September 16 (which Plaintiff attached to his Complaint, along with numerous other exhibits) does not show any such discussion. *See* Compl., Exh. G at 6. Rather, the Ambulatory Health Record entry for February 24, 2000 evidences a somewhat similar discussion. *See* Compl., Exh. E at 6. The February 24th entry states that Plaintiff's release was set for September 28, 2000, and that Plaintiff did not qualify for Hepatitis C treatment. *See id.* The February 24th entry also states that, regardless of his release date, Plaintiff did not want treatment for his Hepatitis C condition. *See id.* Plaintiff disputes the February 24th entry in virtually its entirety. He contends that he had this discussion with Dr. Lancellotti on September 16, 1999, and that he *did* request treatment for his Hepatitis C condition on that September date. He asserts that his records have been improperly altered and has filed various grievances regarding these discrepancies.

3    According to the more recent Hepatitis C Guideline, the relevant criterion is now whether or not Plaintiff's anticipated period of incarceration is at least 15 months (which includes time for a 12 month course of treatment). *See* Wright Aff., Exh. A at 4.

4    Cirrhosis is a liver disease characterized by, *inter alia,* diffuse damage to liver cells and interference with blood flow in the liver. *See* STEDMAN'S MEDICAL DICTIONARY 355 (27th ed.2000). The condition is the end stage of many forms of liver injury. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 373 (17th ed.1999). Cirrhosis results in a number of major complications, including portal hypertension with variceal bleeding, ascites, or liver failure leading to renal failure and coma. *See id.*

5    Plaintiff also alleges that DOCS' medical records had shown for years that his liver enzymes were very high. He argues that this fact alone would have alerted any competent physician of the need for follow-up tests for Hepatitis A, B, and C. Plaintiff asserts that had he been diagnosed with Hepatitis C in 1997 or 1998 on the basis of these medical records and received timely treatment, he would never have developed cirrhosis of the liver.

6    Decompensated cirrhosis is a type of cirrhosis accompanied, *inter alia,* by ascites. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 334 (28th ed.1994). In other words, it results, among other things, in the accumulation of serous fluid in the peritoneal cavity. *See* STEDMAN'S MEDICAL DICTIONARY 154

(27th ed.2000). Ascites usually appear in advanced stages of cirrhosis. *See* THE SLOANE–DORLAND ANNOTATED MEDICAL–LEGAL DICTIONARY 146 (1987). The prognosis for patients with cirrhosis is usually poor if major complications such as ascites are present. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 374 (17th ed.1999). According to a statement issued by the National Institutes of Health in 1997 on the management of Hepatitis C, patients with decompensated cirrhosis should not be treated with currently available therapy for Hepatitis C. *See* Wright Aff., Exh. B at 2.

7    To the extent that Plaintiff also alleges that any failure to diagnose him with Hepatitis C in 1997 and 1998 violated his constitutional rights, such past alleged misconduct would similarly fail to support the requisite showing of irreparable harm necessary to warrant injunctive relief on the basis of these allegations.

8    Although a state prisoner's claim for inadequate medical treatment primarily involves violations of the Eighth Amendment's prohibition on cruel and unusual punishment, the Fourteenth Amendment is also implicated because the prohibition against such conduct is made applicable to the states by the Fourteenth Amendment.

*See* *Estelle,* 429 U.S. at 101.

9    In his motion for a preliminary injunction, Plaintiff appears to contend for the first time that the defendant physicians violated the consent decree entered by Judge Ward in *Milburn v. Coughlin,* No. 79 Civ. 5077 (S.D.N.Y.) by refusing to allow him to follow-up with Dr. Maliakkal. *See* Pl.'s Aff. in supp. of Mot. for Prelim. Inj. at 2–3 n. 1. In 1980, Judge Ward certified a class of present and future Green Haven Correctional Facility ("Green Haven") inmates challenging the constitutionality of health care services. *See* *Shariff v. Artuz* (S.D.N.Y. Aug. 28, 2000) 2000 WL 1219381, *4 n. 5. The parties in that lawsuit entered into a series of agreements culminating in a 1991 modified consent decree. *Id.* The various *Milburn* consent decrees govern the provision of health care services at Green Haven. *Candelaria v. Coughlin* (S.D .N.Y. Dec. 19, 1994) 1994 WL 707004, *7. Plaintiff cannot support his claim on the basis of the consent decrees entered in *Milburn.* First, Plaintiff is not an inmate at Green Haven; rather, he is an inmate at Woodbourne and has therefore failed to show how the *Milburn* consent decree, which governs the provision of health care services at Green Haven, applies to him. *See* *Candelaria,* 1994 WL 707004 at *7–*8 (holding that inmate who was incarcerated at the Clinton Correctional Facility could not obtain injunctive relief on the basis of the *Milburn* consent decree which governed the provision of health care services at Green Haven); *Cole v. Scully* (S.D.N.Y. April 18, 1995) 1995 WL 231250, n. 5 (refusing to consider plaintiff's allegations that correction officers' conduct violated the *Milburn* consent decree where the plaintiff had failed to show how the *Milburn* decree was relevant to the action). Moreover, even if the *Milburn* consent decree did somehow apply to this action, we could not consider a claim premised on its violation since Judge Ward retains supervision over the consent decree. *See* *Vasquez v. Artuz* (S.D.N.Y. June 28, 1999) 1999 WL 440631, *1 n. 1 ("Vasquez's *Milburn* consent decree violation claim is also not properly before this Court, and should be filed with Judge Ward in this district, who retains supervision over the decree"); *Kaminsky v. Rosenblum* (S.D.N.Y.1990) 737 F.Supp. 1309, 1317 n. 6, *appeal dismissed* (2d Cir.1991) 929 F.2d 922 (holding that the issue of whether the *Milburn* consent decree was violated "is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge [Ward] who retains supervision over that decree").

10   Since the Hepatitis C Guideline explicitly applies to the treatment of inmates with Hepatitis C, *see* Wright Aff., Exh. A, and is not actually applicable to the treatment of either HIV or AIDS or to the treatment of non-inmates, such as parolees, with Hepatitis C, we cannot construe Plaintiff's allegations as stating a challenge to a facially neutral policy that has actually been applied in an unlawfully discriminatory manner.

11   In his Reply brief, Plaintiff asserts for the first time that the Hepatitis C Guideline's ASAT provision violates his equal protection rights. *See* Pl.'s Reply Brief at 6 n. 7. Among the criteria which are outlined in the Hepatitis C Guideline as considerations for Hepatitis C treatment are whether those inmates with a history of substance abuse have successfully completed an ASAT program. *See* Wright Aff., Exh. A at 4. According to Plaintiff, only inmates who are employed are eligible to attend an ASAT program; since Plaintiff is medically

unemployed due to breathing problems, he asserts that the ASAT provision violates his equal protection rights because that treatment consideration is applied more favorably to employed inmates with Hepatitis C than to unemployed inmates with Hepatitis C. *See* Pl.'s Reply Brief at 6 n. 7. As an initial matter, we hold that since Plaintiff only raised this equal protection allegation for the first time in his Reply brief, we need not address this argument. *See* *Carbonell v. Acrish* (S.D.N.Y.2001) 154 F.Supp.2d 552, 560–561 (refusing to consider an equal protection challenge raised by the plaintiff for the first time in his reply brief).

*See also* *Mitchell v. Northern Westchester Hospital* (S.D.N.Y.2001) 171 F.Supp.2d 274, 277 n. 1.; *Higgins v. Coombe* (S.D.N.Y. June 16, 1997) 1997 WL 328623, *12. However, even assuming *arguendo* that we did consider this new challenge and that the ASAT provision violated the Equal Protection Clause, such allegations could not support a preliminary injunction under these circumstances. Whether or not Defendants delayed Plaintiff's treatment or refused to treat him altogether in the past on the basis of the ASAT provision, that provision is not the basis of his ongoing medical treatment. Rather, the physicians have refused to treat Plaintiff's Hepatitis C with Interferon and Ribavirin because both the relevant medical literature on the subject and another provision in the Hepatitis C Guideline provide that such treatment is inappropriate where the patient has decompensated cirrhosis in light of the risk such treatment would pose to the patient's life. *See* Wright Aff. ¶ 8. *See also* Pl.'s Aff. in supp. of Mot. for Prelim. Inj., Exh. at 23 (Dr. Hentschel's recommendation that such Interferon and Ribavirin therapy be denied because the patient was cirrhotic). Since any purported past reliance on the ASAT provision in the Guideline is not the reason why Plaintiff is allegedly suffering irreparable harm stemming from the physician's current treatment decisions, Defendants' past conduct in allegedly refusing to treat Plaintiff's Hepatitis C on the basis of the ASAT provision cannot establish the requisite irreparable harm necessary to support a preliminary injunction.

12    Even had we construed Plaintiff's equal protection claim as a challenge against a policy which expressly distinguished between groups on the basis of some protected category, Plaintiff would still be unable to show that he has a clear likelihood of succeeding on the merits of this claim. Since inmates with Hepatitis C, without more, do not fall within the type of express protected classification in *Brown* for which a plaintiff is not required to establish a similarly situated group, Plaintiff would need to show that inmates with Hepatitis C were treated differently than similarly situated individuals. *See* *Gagliardi v. Village of Pawling* (2d Cir.1994) 18 F.3d 188, 193; *Caracciola v. City of New York* (S.D.N.Y. Mar. 17, 1999) 1999 WL 144481, *6. As Plaintiff compares the treatment provided to inmates with Hepatitis C to that provided to non-inmates with hepatitis or inmates with HIV or AIDS, he would be unable to establish that he was being treated differently than similarly situated individuals. *See* *Hrbek v. Farrier* (8th Cir.1986) 787 F.2d 414 (holding that inmates are not similarly situated to non-inmates); *Daleure v. Kentucky* (W.D.Ky.2000) 119 F.Supp.2d 683, 691 (same); *Allen,* 1998 WL 318841 at *2–*3 (concluding that inmate with hepatitis failed to state an equal protection claim based on discriminary treatment because he was not similarly situated to an inmate with HIV).

13    Since Plaintiff has not requested a hearing with respect to his motion and since the affidavits, exhibits, and moving papers submitted to us themselves demonstrate that Plaintiff does not have a clear or substantial likelihood of succeeding on the merits of his various claims, we have not held an evidentiary hearing on Plaintiff's motion for a preliminary injunction. *See* *LaRouche v. Webster* (S.D.N.Y.1983) 566 F.Supp. 415, 419 n. 5 ("There is no doubt that a preliminary injunction may be 'denied without a hearing...when the written evidence shows the lack of a right so clearly that receiving further evidence would be manifestly pointless' ").

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 66 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Carlos ABREU, Plaintiff,
v.
Eric FARLEY, et al., Defendants.

6:11-CV-06251 EAW
|
Signed 03/15/2019

**Attorneys and Law Firms**

Richard A. McGuirk, Nixon Peabody LLP, Andrew Peter
Zappia, LeClairRyan, Rochester, NY, for Plaintiff.

Hillel David Deutsch, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff Carlos Abreu ("Plaintiff"), currently
incarcerated at the Marcy Correctional Facility, [1] filed
this action pursuant to 42 U.S.C. § 1983, alleging
constitutional violations arising out of his incarceration at
the Five Points Correctional Facility ("Five Points"). (Dkt.
1). After this Court's initial screening of Plaintiff's first
complaint, the Court granted Plaintiff leave to proceed *in
forma pauperis* ("IFP"). (Dkt. 3). Soon thereafter, Plaintiff
was appointed *pro bono* counsel to assist in the prosecution
of this action. (*See* Dkt. 9). Plaintiff has since filed voluminous
pleadings, alleging numerous grounds for which he believes
he is entitled to relief against an array of individuals.

Presently before the Court is Defendants' motion to revoke
Plaintiff's IFP status and for partial summary judgment.
(Dkt. 61). For the reasons set forth below, the Court
holds Defendants' motion to revoke Plaintiff's IFP status in
abeyance pending the Second Circuit's decision in *Shepherd
v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017), grants in part
and denies in part Defendants' motion for partial summary

judgment, and stays this action until the Court resolves
Defendants' motion for IFP revocation.

**BACKGROUND**

Plaintiff arrived at Five Points on or about March 25, 2010
(Dkt. 46 at ¶ 93), and alleges that he has been subject
to countless constitutional infractions, and other allegedly
wrongful conduct, which purportedly continued into 2012.
Despite *pro bono* counsel's efforts to refine Plaintiff's
allegations, the operative complaint remains voluminous
and is composed of 531 paragraphs. Plaintiff's counsel also
requests that the Court consider two supplemental *pro se*
filings submitted by Plaintiff as part of a related case that has
since been consolidated into this action. (Dkt. 93 at 25-26;
*see* Dkt. 40; Dkt. 93-5; Dkt. 93-6; Dkt. 93-7; Dkt. 93-8; Dkt.
93-9; Dkt. 93-10).

The following facts are taken from Defendants' and Plaintiff's
Rule 56 statements of undisputed facts. (*See* Dkt. 59-1;
Dkt. 93-1). Between 2010 and January of 2012, Plaintiff
was examined "well over 100 times" by medical staff at
Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Although
Plaintiff disputes that he was prescribed appropriate medical
treatment for back and neck pain on a number of occasions
(Dkt. 93-1 at ¶ 2; *cf.* Dkt. 59-1 at ¶ 2), he does not dispute
that he was prescribed "an albuterol inhaler for asthma and
Lipitor for elevated lipids" (Dkt. 93-1 at ¶ 2). It is also
undisputed that Plaintiff received medication, bloodwork,
physical examinations, and x-rays between March 25, 2010,
and January 23, 2012 (*see* Dkt. 59-1 at ¶ 6; Dkt. 93-1 at ¶
6), and that he refused to take medications and to undergo
physical examinations on several occasions while at Five
Points (*see* Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8).

**\*2** The parties dispute whether Plaintiff was of general good
health while housed at Five Points (Dkt. 59-1 at ¶ 4; Dkt.
93-1 at ¶ 4), and whether many of Plaintiff's alleged injuries
and ailments were ever properly diagnosed or observed by
Five Points medical staff (Dkt. 59-1 at ¶ 5; Dkt. 93-1 at ¶
5). Plaintiff also disputes Defendants' assertion that he was
"not in imminent danger of serious physical harm at any
point during the relevant period" underlying this action (Dkt.
59-1 at ¶ 3), and argues that he "endured repeated assaults,
living under a constant and imminent danger [of] being
subjected to ongoing threats of further physical assaults"
while housed at Five Points (Dkt. 93-1 at ¶ 3). The parties do
not dispute that only doctors, physicians assistants, and nurse

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 67 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

practitioners may provide prescription medication to inmates at Five Points, that corrections officers and counselors may not do so, and that general nurses may provide limited medical treatment only in emergency circumstances. (*See* Dkt. 59-1 at ¶ 9; Dkt. 93-1 at ¶ 9).

The New York State Department of Corrections and Community Supervision ("DOCCS") maintains a policy that corrections staff seek a court order if an inmate loses 15% of his or her baseline weight, or even prior to that point if the inmate "appears in imminent need of hydration or nutrition." (Dkt. 59-1 at ¶ 10; Dkt. 93-1 at ¶ 10). In addition, it is undisputed that Plaintiff's baseline weight remained above 200 pounds between March 2010 and January 2012 (Dkt. 59-1 at ¶ 11; Dkt. 93-1 at ¶ 11), and at no point did it drop by 30 pounds, or 15% of Plaintiff's baseline weight (Dkt. 59-1 at ¶ 12; Dkt. 93-1 at ¶ 12).

At times, Plaintiff complained that he suffered from rectal bleeding, but on at least one occasion, Dr. Daniel Weinstock ("Dr. Weinstock") took Plaintiff's stool samples and discovered no blood after running hemoccult tests on April 18 and April 26, 2011. (Dkt. 59-1 at ¶ 16; Dkt. 93-1 at ¶ 16). Although Plaintiff disputes Defendants' assertion that he "frequently harassed medical staff" (Dkt. 59-1 at ¶ 17; Dkt. 93-1 at ¶ 17), it is undisputed that Five Points staff submitted written misbehavior reports regarding Plaintiff's conduct on several occasions (Dkt. 59-1 at ¶ 18; Dkt. 93-1 at ¶ 18; *but see* Dkt. 93-1 at ¶ 18 (also arguing that "false misbehavior reports were written in retaliation against [Plaintiff]") ).

While Plaintiff claims that Defendants' decision not to provide him with an interpreter during his Tier II and Tier III violation hearings violated his right to due process (Dkt. 93-1 at ¶ 19), he does not dispute that he was found guilty of Tier II and Tier III violations 17 times during the relevant period underlying this action (Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19). Relatedly, Plaintiff's fluency in the English language is a point of contention between the parties. (Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23). For example, Defendants contend that Plaintiff could meaningfully converse with corrections staff in English (Dkt. 59-1 at ¶ 23), but Plaintiff states that his understanding of the English language is limited and notes that Spanish is his native language (Dkt. 93-1 at ¶ 23). Despite his disciplinary violations, Plaintiff received a "time cut" for each violation, save one, during the period extending from February 23, 2010, to July 5, 2013. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff was not required to serve any time in the Special Housing Unit ("SHU") and did not lose any good

time credits as a result of these violations. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff did spend two months' time in the SHU for an incident occurring in May 27, 2010, but he did not serve this time until December 2013 because he had accumulated SHU time from other incidents predating 2010. (Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22).

DOCCS Directive 4421 sets forth DOCCS' policy regarding inmate mailings. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Directive 4421 permits inmates to mail five first-class legal letters free of charge per week and allows inmates an advance of up to $20 for additional legal mail. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Inmates also receive free postage for documents that "must be sent pursuant to a Court Order, statute of limitations or legal deadline, if, by rule, such correspondence must be sent prior to receipt of the next week's free postage allowance." (Dkt. 59-1 at ¶ 26; Dkt. 93-1 at ¶ 26). Plaintiff almost always exhausted his weekly allotment of five free legal letters and used up his $20 advance immediately upon arriving at Five Points. (Dkt. 59-1 at ¶ 27; Dkt. 93-1 at ¶ 27). However, Plaintiff disputes that he was afforded free postage when a deadline so entitled him —although "on several occasions, a court order or other deadline entitled him to free postage"—and states that certain correspondence he addressed to courts, government officials, and legal organizations was refused postage. (Dkt. 93-1 at ¶ 27).

## PROCEDURAL HISTORY

**\*3** On May 10, 2011, Plaintiff commenced this action by filing a voluminous 340-page complaint, alleging various injuries arising from the actions of over 130 defendants. (*See* Dkt. 1). Plaintiff also filed a motion for leave to proceed *in forma pauperis* (Dkt. 3) and a motion for appointment of counsel (Dkt. 4). By Order, dated May 25, 2011, Plaintiff was granted *in forma pauperis* status, and was directed to amend his complaint in compliance with Rule 8 of the Federal Rules of Civil Procedure. (Dkt. 5); *see* Fed. R. Civ. P. 8(a)(2) (providing that a pleading must contain "a short and plain statement of the claim"). On August 11, 2011, Plaintiff's motion for appointment of counsel was granted and *pro bono* counsel was assigned. (Dkt. 9). On April 1, 2013, Plaintiff filed a 101-page amended complaint (Dkt. 35), and on September 19, 2013, a related case—also instituted by Plaintiff—was merged with this matter (Dkt. 40). The *pro se* complaint and supplemental filings submitted in the related

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 68 of 141

*Abreu v. Farley, Not Reported in Fed. Supp. (2019)*

case constituted a Supplemental Complaint in the instant action. (*Id.* at 12; *see* Dkt. 41).

On February 21, 2014, Plaintiff filed a 103-page second amended complaint (the "SAC"), which, alongside the *pro se* Supplemental Complaint, remains the operative pleading in this matter. (Dkt. 46). This action was reassigned to the undersigned on January 5, 2015. (Dkt. 48).

On April 6, 2015, Defendants filed a motion for partial summary judgment in lieu of an answer. (Dkt. 59). Defendants also request that the Court revoke Plaintiff's IFP status. (*See* Dkt. 59-2 at 5-6). After several appearances and extensions of time, Plaintiff filed responsive papers on July 15, 2016, opposing Defendants' motion. (Dkt. 93). Defendants filed reply papers in further support of their motion on September 21, 2016. (Dkt. 105).

## DISCUSSION

### I. Defendants' Motion to Revoke Plaintiff's IFP Status is Held in Abeyance

A party commencing a civil action in this Court ordinarily must pay a $350.00 filing fee, as well as a $50.00 administrative fee. [2] *See* 28 U.S.C. § 1914. Of course, the Court may grant a party leave to proceed IFP if it determines that the party is unable to pay the filing fee. *See id.* § 1915. Nonetheless, not all litigants may be granted leave to proceed IFP. As set forth in 28 U.S.C. § 1915(g), the "three strikes" provision prevents prisoners from proceeding IFP if they have brought three or more lawsuits that have been dismissed as frivolous or for failure to state a claim:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the

> prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

Thus, under that statute, a prisoner with three strikes may proceed IFP only if he can show that he is "under imminent danger of serious physical injury." *Id.* "An imminent danger is not one that has dissipated by the time a complaint is filed; rather it must be one existing at the time the complaint is filed." *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) (internal quotation marks and citation omitted). [3]

**\*4** The Second Circuit has instructed that, when determining whether a prisoner has shown an imminent danger, a court should "not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question." *Id.* (internal quotation marks omitted). That instruction suggests that a court should consider only the allegations in the complaint when considering whether the imminent danger applies, although the Second Circuit has not specifically limited the imminent danger review to the four corners of the complaint. *See id.*; *see also Abreu v. Lira*, No. 9:12-CV-1385 (NAM/DEP), 2014 WL 4966911, at *2 (N.D.N.Y. Sept. 30, 2014), *adopting report and recommendation*, 9:12-CV-1385 (NAM/DEP) (N.D.N.Y. Apr. 11, 2014).

But several courts in this Circuit—including some cases involving Plaintiff—have revoked the IFP status of a three-strikes litigant when the defendant challenges the court's preliminary finding that the litigant is entitled to the imminent danger exception, using evidence outside the four corners of the complaint to refute that preliminary finding. *See Abreu v. Brown*, 317 F. Supp. 3d 702, 705 (W.D.N.Y. 2018) ("The Court agrees with those courts that it may look beyond the complaint when considering a defendant's challenge to the preliminary finding that a three-strikes litigant is entitled to the imminent danger exception."); *Tafari v. Baker*, No. 6:16-cv-06427(MAT), 2017 WL 1406274, at *2 (W.D.N.Y. Apr. 20, 2017) (collecting cases stating the same); *Bernier v. Koenigsmann*, No. 15-CV-209A, 2017 WL 603217, at *4 (W.D.N.Y. Feb. 15, 2017) ("Although courts assessing imminent danger should not make an overly detailed inquiry, they are allowed to look at information outside the four corners of a complaint."); *Green v. Venettozzi*, No. 14-CV-1215 (BKS/CFH), 2016 WL 6902545, at *3 (N.D.N.Y.

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 69 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Oct. 31, 2016) ("To refute a preliminary finding with facts that satisfy the imminent danger exception, the Court may look outside the four corners of the complaint."), *report and recommendation adopted*, 2016 WL 6902180 (N.D.N.Y. Nov. 23, 2016); *Abreu v. Lira*, 2014 WL 4966911, at *2 ("In reviewing the issues surrounding plaintiff's claim that at the time he filed the complaint, he was facing imminent danger of serious physical injury, the Court agrees ... that it is appropriate for the Court to review evidence outside the allegations of the complaint upon defendants' challenge to plaintiff's IFP status."); *Jackson v. Jin*, No. 12-CV-6445-FPG, 2014 WL 1323211, at *1 (W.D.N.Y. Mar. 31, 2014) ("In determining whether the imminent danger exception applies, the Court may consider more recent medical evidence."). Some circuit courts have reached the same result. *See Stine v. U.S. Fed. Bureau of Prisons*, 465 F. App'x 790, 794 n.4 (10th Cir. 2012) ("[A]fter a district court provisionally grants IFP on the basis of a showing of imminent danger, the defendants are permitted to mount a facial challenge, based on full development of the facts, to the district court's provisional determination on the face of the complaint that the prisoner satisfies the imminent danger element." (quotation and alteration omitted) ); *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010) ("[W]hen a defendant contests a plaintiff's claims of imminent danger, a court must act to resolve the conflict. A contrary conclusion would mean that a three-strikes plaintiff could proceed IFP whenever his allegations of imminent danger were facially plausible, even if the defendant had incontrovertible proof that rebutted those allegations."); *Gibbs v. Roman*, 116 F.3d 83, 86 (3d Cir. 1997) ("If the defendant, after service, challenges the allegations of imminent danger ..., the district court must then determine whether the plaintiff's allegation of imminent danger is credible ... in order for the plaintiff to proceed on the merits [IFP]."), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001).

**\*5** Although this Court recently agreed with this line of cases, *see Abreu v. Brown*, 317 F. Supp. 3d at 705, an appeal pending before the Second Circuit from a decision revoking IFP status after it was initially granted will likely clarify the law of this Circuit regarding this issue, *see Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). A review of the briefs submitted on appeal in *Shepherd* reveals that the parties dispute, among other things, the weight afforded to any evidence contradicting a plaintiff's claim of imminent danger, the distribution of the burden of proof, and the quantum of evidence required to grant a motion to revoke IFP status.

*See Shepherd*, No. 17-2261, Dkt. 90; Dkt. 98. Indeed, the Second Circuit has recently deferred any decision regarding Plaintiff's motion for leave to proceed *in forma pauperis* and for appointment of counsel on the appeal from this Court's decision in *Abreu v. Brown*, and that appeal is now held in abeyance pending the Second Circuit's decision in *Shepherd. See Abreu v. Brown*, No. 18-2722, Dkt. 30 (2d Cir. Sept. 14, 2018). Therefore, the Second Circuit appears poised to clarify the law in this Circuit as it relates to motions to revoke IFP status. Because the *Shepherd* decision is likely to establish principles that this Court will be bound to apply in ruling upon Defendants' motion for IFP revocation, the Court is disinclined to presume the Second Circuit's position before *Shepherd* is decided. Accordingly, in the interests of judicial economy, the Court holds Defendants' motion to revoke Plaintiff's IFP status in abeyance pending the Second Circuit's decision in *Shepherd*.

## II. **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact...." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 70 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) ). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). A party may move for summary judgment in lieu of an answer. *See, e.g.*, *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014); *Beckford v. N.Y. State Office of Mental Health*, No. 06-CV-00561(SR), 2010 WL 1816689, at *1 (W.D.N.Y. May 3, 2010); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Wegman v. Grimmke*, No. 03-CV-234S, 2004 WL 2202642, at *2 (W.D.N.Y. Sept. 30, 2004). Although summary judgment is generally not appropriate until after some discovery has occurred in a case, *Nelson v. Deming*, 140 F. Supp. 3d 248, 257-58 (W.D.N.Y. 2015), a motion for summary judgment in lieu of an answer is appropriate where the facts are undisputed and no amount of discovery would change the outcome, *Parra v. Wright*, No. 11-CV-6270 CJS, 2013 WL 6669235, at *7 (W.D.N.Y. Dec. 18, 2013). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred—the moving party must demonstrate that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *See Anderson*, 337 F.3d at 206. [4]

### III. Plaintiff's Due Process Claims Are Dismissed

**\*6** Plaintiff argues that he was deprived of a liberty interest without due process of law when he was not afforded an interpreter during several disciplinary hearings at which he was found guilty of the alleged wrongdoing. (*See* Dkt. 93 at 47-51). "The failure to provide interpretive services or assistive devices during disciplinary hearings has been found to be a denial [of] due process." *Young v. Polizzi*, No. 9:16-CV-0660 (FJS/CFH), 2018 WL 3949967, at *8

(N.D.N.Y. July 11, 2018) (citing *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) ), *report and recommendation adopted*, 2018 WL 3949942 (N.D.N.Y. Aug. 16, 2018). However, "[a]s a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property." *Ocasio v. Deluke*, No. 08-CV-51 GLS/DRH, 2010 WL 6001595, at *16 (N.D.N.Y. Sept. 3, 2010) (citing *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) ), *report and recommendation adopted*, 2011 WL 864898 (N.D.N.Y. Mar. 8, 2011), *aff'd*, 468 F. App'x 89 (2d Cir. 2012).

"The Supreme Court held in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L.Ed.2d 418 (1995), that to state a claim for a violation of due process, a prisoner first must identify a liberty interest protected by the Due Process Clause of which he was deprived." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999). To prevail on a claim for a violation of procedural due process, a prisoner "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998) ).

While the parties dispute whether Plaintiff required an interpreter at the disciplinary hearings (*see* Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23), [5] Plaintiff has failed to raise a triable issue of fact as to whether he was deprived of a protected liberty interest. Indeed, Plaintiff concedes that he was not confined to the SHU for any of the disciplinary violations he was found guilty of committing, save just one. (*See* Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20); *see generally Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (finding that the plaintiff had "suffered no interference with a liberty interest and has no valid claim for relief" for procedural due process where he "was never penalized on the charges of committing unhygienic acts"); *Strasser v. New*

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 71 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

*York*, No. 9:10-CV-141 (FJS/DEP), 2012 WL 253391, at *3 (N.D.N.Y. Jan. 26, 2012) (dismissing a procedural due process claim where the plaintiff failed to allege whether he served any disciplinary confinement before his violation was administratively reversed).

**\*7** Plaintiff did serve time in the SHU during December of 2013 for an incident occurring in May 27, 2010, but it was for a period of just two months. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The Second Circuit has stated that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Generally, the plaintiff must demonstrate that the conditions of confinement under such relatively brief periods "were more severe than the normal SHU conditions ... or a more fully developed record show[s] that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65.

In response to Defendants' properly supported summary judgment motion with respect to this incident (*see* Dkt. 59-6), Plaintiff has failed to set forth proof suggesting that his confinement in the SHU, beginning in December 2013 and lasting for just two months, was any more severe than normal, *Gaines v. City of New York*, No. 14 Civ. 6403 (ER), 2016 WL 951580, at *3 (S.D.N.Y. Mar. 9, 2016) (granting the defendants' motion to dismiss where the plaintiff failed to allege "any facts regarding the conditions of his confinement to suggest that it imposed 'atypical and significant hardship' "); *Vogelfang v. Copra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (stating that "[a]bsent additional particularized allegations regarding the harshness of the confinement—which plaintiff does not adduce—[sixty days of keeplock confinement], under the case law, is insufficient to rise to the level of a due process violation"); *Sales v. Barizone*, No. 03 Civ. 6691RJH, 2004 WL 2781752, at *7 (S.D.N.Y. Dec. 2, 2004) ("Sales' other due process claim arising out of two months' confinement in the SHU, however, cannot survive the *Sandin* test absent further allegations."); *Williams v. Goord*, 111 F. Supp. 2d 280, 289 (S.D.N.Y. 2000) (finding that 75 days of solitary confinement under normal conditions did not implicate a due process liberty interest). As a result, Plaintiff has failed to establish that he was deprived of a protected liberty interest. Therefore, the Court grants summary judgment dismissing Plaintiff's due process claims.[6]

## IV. Plaintiff's Eighth Amendment Claims

### A. General Principles

**\*8** "The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "A prison deprivation violates the Eighth Amendment only when there is an 'unnecessary and wanton infliction of pain.' " *Barclay v. New York*, 477 F. Supp. 2d 546, 553 (N.D.N.Y. 2007) (quoting *Wilson v. Setter*, 501 U.S. 294, 297 (1991) ). "In order to prove that a prison condition amounted to cruel and unusual punishment, a plaintiff must satisfy both an objective and a subjective standard." *Stokes v. Goord*, No. 9:03-CV-1402 (LEK/DRH), 2007 WL 995624, at *4 (N.D.N.Y. Mar. 30, 2007) (citing *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) ). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citations omitted).

#### 1. Subjective Element

"The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by "wantonness" ' in light of the particular circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) ); *see Swift v. Tweddell*, 582 F. Supp. 2d 437, 444 (W.D.N.Y. 2008) ("To establish deliberate indifference, then, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted).

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 72 of 141

## 2. Objective Element

The objective requirement "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); "[o]nly 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation,' " *Salahuddin*, 467 F.3d at 279 (quoting *Wilson*, 501 U.S. at 298). "States must not deprive prisoners of their 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.' " *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993) ). In other words, the objective component requires that a prisoner "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

### B. Allegations of Contaminated Food

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980) ). "In food tampering claims a plaintiff must allege that he suffered an actual injury, 'the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment.' " *Calvin v. Schmitt*, No. 15 CV-6584 (NSR), 2017 WL 4280683, at *5 (S.D.N.Y. July 7, 2017) (alteration in original) (quoting *Harris v. Ashlaw*, No. 9:07-CV-0358(LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007) ).

Here, Plaintiff's alleged food contamination is too speculative to survive summary judgment. Plaintiff alleges that the food loaves [7] he received "were wet[,]" as if C.O. Countryman had spit in his food. (Dkt. 93-5 at ¶ 41; *see also id.* at ¶ 107 (alleging that C.O. Countryman "was spitting on my loa[ves]") ). He also alleges that some of the food items he received had been opened and mixed around or were broken into pieces. (*See id.* at ¶ 107). "[A] plaintiff's allegation that 'Defendants spit in his food and 'violat[ed] [his] bread by making holes in it,' without more, has been found insufficient to state an Eighth Amendment violation."

*Bee v. Krupp*, No. 08 Civ.10141 (SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) (quoting *Chavis v. Kienert*, No. 9:03-CV-0039(FJSRFT), 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005) ). Plaintiff's allegations that C.O. Countryman either spit on his loaves or otherwise tampered with his food are conclusory and unsubstantiated. Without more, such bare-bone allegations are insufficient to sustain an Eighth Amendment conditions-of-confinement cause of action. *See Sital v. Burgio*, 592 F. Supp. 2d 355, 359 (W.D.N.Y. 2009) ("the allegations in the Amended Complaint that Defendant Karamonos 'spit' in [p]laintiff's food and poked his finger in [p]laintiff's food are conclusory and unsubstantiated.... Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal" (quoting *Zimmerman v. Seyfert*, No. 9:03-CV-1389(TJM), 2007 WL 2080517, at *29 (N.D.N.Y. July 19, 2007) ) ); *Bee*, 2009 WL 2981910, at *3 (concluding that the plaintiff's allegations that " 'visible globs of spit' were present in his food" did not give rise to an Eighth Amendment violation).

**\*9** Plaintiff also makes the general assertion that his food was "regularly and frequently contaminated and or spoiled." (Dkt. 93-5 at ¶ 190). He further alleges that he became nauseous and was forced to vomit after eating the food loaves. (*Id.*). Plaintiff also allegedly experienced stomach pains and anal bleeding, which were "*possibly* due to bacterias [sic], and parasites due to the spoiled foods" and the "dirty hands" of the correctional officers and their practice of "spitting" into his food. (*Id.* (emphasis added) ). Plaintiff's allegations are self-serving and completely unsupported. *See Martinez v. Lape*, No. 9:09-CV-0665 (TJM/RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) ("Other than the unsupported broad assertion that he contracted H. pylori from the food or water at Coxsackie, Plaintiff fails to allege how the expired food and juice posed an immediate risk to his health, inflicted pain and suffering, or otherwise amounted to an extreme deprivation."), *report and recommendation adopted*, 2011 WL 4528980 (N.D.N.Y. Sept. 28, 2011). Conclusory claims of spoiled food are insufficient to survive a dispositive motion. *See Black v. Fischer*, No. 9:08-CV-0232, 2010 WL 2985081, at *8 (N.D.N.Y. July 1, 2010) (stating that the "plaintiff's food complaints consist entirely of broad and conclusory allegations which, while at first blush troublesome, are devoid of the specifics necessary to prove such a claim"); *Dorsey v. Fisher*, No. 9:09-CV-1011 (GLS)(DEP), 2010 WL 2008966, at *7 (N.D.N.Y. May 19, 2010) (dismissing an Eighth Amendment claim based on contaminated food where the plaintiff alleged, in

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 73 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

"conclusory fashion," a conspiracy to "poison[ ] his food with infected DNA").

Furthermore, the injuries that allegedly resulted from Plaintiff's ingestion of the food loaves are not borne out by the medical evidence. *See Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes makes general allegations regarding the health effects he suffered because of the alleged contaminated and inadequate food, there is nothing in his medical records to indicate that he suffered any adverse health effects from the food served to him by defendants."). While a Court must view the evidence in the light most favorable to the non-movant on a motion for summary judgment, "[v]ague assertions supported only by self-serving statements," even if found "in the nonmoving party's affidavit[,] are insufficient to defeat a properly supported summary judgment motion." *Moe v. United States*, 668 F. Supp. 2d 497, 502 (W.D.N.Y. 2009); *see also Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (rejecting the plaintiff's "allegations that his food was contaminated" by blood, feces, semen, and chemicals as so "conclusory and fantastic as to rise to the level of factually frivolous"). Indeed, outside his general allegations that the correctional officers had "dirty hands" and were "spitting" in his food, Plaintiff provides no credible basis to support the assertion that he was actually exposed to harmful "bacteria[ ]" or "parasites." *See generally Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes contends that defendants delivered him the food, he fails to allege that he saw any of them actually contaminate or tamper with his food.").

Therefore, Plaintiff's Eighth Amendment claim for cruel and unusual punishment, based upon the alleged contamination of his food, is dismissed because he has failed to raise an issue of material fact sufficient to satisfy the objective element of this cause of action.

### C. Deliberate Medical Indifference

For purposes of opposing Defendants' motion, Plaintiff "focuses on his most serious untreated medical conditions." (Dkt. 93 at 30). These conditions include the injuries he allegedly sustained during an "assault that occurred on March 30, 2010, the chronic back and neck pain that was at issue in the March 30, 2010 assault, for which he requires at least pain medication and a back brace, and the acute incident of a potential heart attack he suffered on April 2, 2010." (*Id.*).

"The Eighth Amendment [also] forbids 'deliberate indifference to serious medical needs of prisoners....' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ). This category of Eighth Amendment violation also requires the satisfaction of objective and subjective elements. In the context of a deliberate indifference claim, the objective component requires that "the alleged deprivation of adequate medical care ... be 'sufficiently serious,' " *Salahuddin*, 467 F.3d at 279 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ), while the subjective component requires that "the charged officials ... be subjectively reckless in their denial of medical care," *Spavone*, 719 F.3d at 138.

**\*10** The "sufficiently serious" element is analyzed more broadly where the alleged claim amounts to "a failure to provide any treatment for an inmate's medical condition" than "where the inadequacy is in the medical treatment given." *Salahuddin*, 467 F.3d at 280. In the former scenario, the focus is on whether "the inmate's *medical condition* is sufficiently serious," whereas the latter situation emphasizes the treatment itself. *Id.* (emphasis added); *see Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.").

"It appears that no courts have specifically addressed neck pain in the context of a deliberate indifference claim." *Medina v. Barrett*, No. 14-CV-6377-FPG, 2018 WL 1383232, at *6 (W.D.N.Y. Mar. 19, 2018). However, "courts have held that '[s]evere back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.' " *Guarneri v. Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (quoting *Nelson v. Rodas*, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at * 14 (S.D.N.Y. Sept. 17, 2002) ); *see Mosley v. Woodby*, No. 9:11-CV-1490, 2013 WL 5347272, at *4 (N.D.N.Y. Sept. 23, 2013) ("Courts have found chronic, debilitating back pain to be a serious injury for Eighth Amendment purposes.").

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 74 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Plaintiff appears to quarrel with the medical treatment he received at Five Points and challenges the propriety of the Five Points medical staffs' decision to interrupt treatment previously prescribed by other correctional facilities. Specifically, Plaintiff disputes Dr. Weinstock's decision to remove his back brace on March 30, 2010, even though Plaintiff informed Dr. Weinstock that it had been prescribed by physicians at another correctional facility, who had also recommended physical therapy and pain medication to treat his chronic back pain. (Dkt. 93 at 30; *see* Dkt. 46 at ¶¶ 101, 103-04). However, Plaintiff's contentions merely challenge Dr. Weinstock's medical judgment, and Plaintiff submits no medical evidence demonstrating that a back brace should have been continued as a form of treatment. *See Evan v. Manos*, 336 F. Supp. 2d 255, 263 (W.D.N.Y. 2004) (stating that the plaintiff's opinion that the defendant "should have prescribed a back brace is also inadequate to give rise to any issue of fact about whether his constitutional rights were violated," and noting that "[t]here is no medical evidence that a back brace was medically called for or that it would have relieved plaintiff's alleged pain"). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Disagreement over treatment relates to an issue of medical judgment and at worst, amounts to medical malpractice, not a constitutional violation." *Tavares v. N.Y.C. Belleview Hosp.*, No. 13 CV 3148 (PKC)(MHD), 2015 WL 7736544, at *5 (S.D.N.Y. Nov. 30, 2015) (citing *Estelle*, 429 U.S. at 106).

Indeed, Dr. Weinstock indicates that his decision to remove the back brace and to discontinue some of Plaintiff's pain medications was based upon his medical examination of Plaintiff and objective medical evidence, such as x-rays. (Dkt. 59-9 at ¶¶ 24-28); *see Lewis v. Alves*, No. 01-CV-0640A(SR), 2004 WL 941532, at *6 (W.D.N.Y. Mar. 22, 2004) (stating that the defendant's decision to deny drug treatment while the plaintiff completed "an alcohol and drug treatment program was based upon objective medical criteria and the exercise of [the defendant's] medical judgment," and thus, could not support a medical indifference claim); *see also Munlyn v. Pietrie*, No. 13-CV-6170FPG, 2014 WL 3695488, at *6 (W.D.N.Y. July 24, 2014) (stating that the plaintiff's allegations only reflect his "disagreement with [the medical staff's] evaluation and assessment of his medical circumstances" where he claims that they "did not believe he had any pain, or disputed the severity of the pain," and then they "refused [the p]laintiff's requests to see the doctor,"

removed his neck brace and walking cane, disapproved physical therapy, and told him "to stop lying"). Furthermore, Dr. Weinstock affirms that Plaintiff was often seen multiple times a week by the Five Points medical staff (Dkt. 59-9 at ¶ 7), an averment that is borne out by the medical records submitted by Defendants (*see* Dkt. 59-10).

**\*11** Plaintiff also argues that Defendants consistently ignored his chronic back and neck pains. (Dkt. 93 at 31 & n.8). However, "a delay in medical treatment does not necessarily give rise to an Eighth Amendment violation." *Pagan v. Corr. Med Servs.*, No. 11 Civ. 1357 (ER), 2013 WL 5425587, at *12 (S.D.N.Y. Sept. 27, 2013). Where delays in medical treatment have implicated Eighth Amendment concerns, "they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012).

As such, Plaintiff's allegations must be viewed in context; it appears that Plaintiff frequently sought and received some form of medical attention, and it is undisputed that he was examined by medical personnel "well over 100 times" while housed at Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Simply because Plaintiff was not examined each and every day he complained of some form of chronic pain does not demonstrate that Defendants were deliberately indifferent to a serious medical need. At least under the circumstances presented here, where the medical records reveal that Plaintiff was examined and/or prescribed medications multiple times a month and sometimes several times a week, Plaintiff's assertion that Defendants ignored his complaints of pain fails to establish a viable constitutional cause of action. (*See* Dkt. 59-10). Indeed, many of Plaintiff's medical evaluations were only separated by a matter of days. *See Youngblood v. Glasser*, No. 9:10-CV-1430 (NAM/DEP), 2012 WL 4051846, at *8 (N.D.N.Y. Aug. 22, 2012) ("Plaintiff maintains that his constitutional rights were violated as a result of a five-day delay in arranging for a physician to examine his hemorrhoids. Proof of such complaints and the modest delay at issue is not sufficient to establish an Eighth Amendment claim."), *report and recommendation adopted*, 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Williams v. Raimo*, No. 9:10-CV-245 (MAD/GHL), 2011 WL 6026111, at *5 (N.D.N.Y. Dec. 2, 2011) (noting that any delay in treating "a prisoner's injuries from the weekend to the next business day does not constitute deliberate indifference where the prisoner 'submitted no medical evidence showing any negative effect of the delay' " (quoting *Croft v. Hampton*, 286 F. App'x

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 75 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

955, 959 (8th Cir. 2008) ) ); *Alster v. Goord*, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (dismissing the plaintiff's medical indifference cause of action where he claimed that the defendants "waited two days after he complained of abdominal pain to take him to the hospital"); *Evan*, 336 F. Supp. 2d at 261 (finding that a "nine-day delay between being placed on the callout list and plaintiff's initial visit" was not actionable where the plaintiff "has not identified anything that [the defendant] could or should have done had he examined plaintiff sooner, nor has he shown that he was harmed by any delay in treatment"); *see also Colon v. Plescia*, No. CIVA9:07-CV-0727(DNH/DE), 2009 WL 2882944, at *7 (N.D.N.Y. July 27, 2009) ("Where a plaintiff's claim is based on a delay in medical treatment, the plaintiff must show that substantial harm resulted from the delay itself."), *report and recommendation adopted*, 2009 WL 2914160 (N.D.N.Y. Sept. 4, 2009). [8]

**\*12** Notably, despite Plaintiff's claim of medical indifference, it is undisputed that he failed to cooperate with medical staff or refused to take his prescribed medications on several occasions. (Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8); *see generally Buffaloe v. Fein*, No. 12 Civ. 9469 (GBD) (AJP), 2014 WL 1224446, at *2 (S.D.N.Y. Mar. 20, 2014) (noting that the plaintiff's "medical records indicate that he often refused treatment" and that a "plaintiff's refusal of medical treatment 'has been found to effectively rebut[ ] ... claims of deliberate indifference to serious medical needs' " (alteration in original) (quoting *Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003) ) ). Whether or not Plaintiff ultimately agreed with the medical staff's evaluations and the medication and treatments prescribed during his numerous examinations, Plaintiff's "personal dissatisfaction" with the treatment received does not give rise to a constitutional violation. *See Wright v. Conway*, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008) ("Wright's complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed.").

Plaintiff also references a "potential heart attack" that he allegedly suffered on or about April 2, 2010. (*See* Dkt. 93 at 32-33). Plaintiff alleges that Dr. Weinstock and nurse Annette Holm ("Nurse Holm") ignored his complaints of chest pain, which he could feel spreading over his left shoulder. (*See* Dkt. 46 at ¶¶ 124-26). Plaintiff further alleges that he had difficulty breathing and speaking at that time as well. (*Id.* at ¶ 125). The medical staff allegedly ignored these symptoms even though they suggested that Plaintiff was suffering from a "potential heart attack." (*Id.* at ¶ 126).

Plaintiff fails to provide any evidence—medical or otherwise —to explain the difference between a "potential" heart attack and an actual heart attack, or to associate his alleged symptoms with any other cardiovascular health-related issues. Furthermore, a review of the medical records reveals that Plaintiff was examined several times on April 2, 2010, and in the following days. (*See* Dkt 59-10 at 131-33). For example, on April 2, 2010, Plaintiff complained of chest pain and discomfort in his left shoulder, but the medical staff noted that he was "talking easily," without any shortness of breath, and that his blood pressure had been taken. (*Id.* at 133). Dr. Weinstock was notified of the assessment, and the medical staff ordered Plaintiff to be evaluated again in an hour. (*Id.*). After one hour had passed, Plaintiff was observed "talking easily" without shortness of breath. (*Id.*). Plaintiff was instructed to request an escort back to the infirmary if he experienced an increase in pain, shortness of breath, or dizziness, but was otherwise told to return for a follow-up in the morning. (*Id.*).

The next morning, Plaintiff complained of a cough, chronic pain in his right arm, neck, back, both wrists, legs, face, and head, but apparently did not indicate whether he felt pain in his chest or shoulder. (*Id.*). Plaintiff was then provided with some ritussin and ibuprofen. (*Id.*). Later that morning, Plaintiff returned to the infirmary, where he again complained of pain in his back, wrist, head, face, and right arm, but displayed no signs of redness or swelling. (*Id.* at 132). Plaintiff did not appear to exhibit any shortness of breath, and he was "talking easily." (*Id.*). Plaintiff also indicated that he "doesn't feel too much compression to [his] chest." (*Id.*). On April 7, 2010, Plaintiff again complained of some "difficulty breathing," but was examined and prescribed treatment. (*Id.* at 131). The medical notes dated April 10, 2010, reveal that Plaintiff was "talking easily" without any shortness of breath, and no subjective complaints of chest or shoulder pain were recorded. (*Id.*).

In sum, the above-referenced medical progress notes wholly undermine Plaintiff's contention that he suffered a sufficiently serious cardiovascular event that was ignored by the Five Points medical staff. Even if Plaintiff suffered a "potential heart attack," the medical records demonstrate that he was provided with consistent care and treatment at the time his symptoms arose and in the days that followed—Plaintiff points to no medical evidence demonstrating that the medical staff were "subjectively reckless" in their examination of Plaintiff's condition. *Spavone*, 719 F.3d at 138.

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 76 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

**\*13** Plaintiff has strategically chosen to focus his opposition papers on a few of the most allegedly egregious instances of deliberate indifference to a serious medical need asserted by Plaintiff in this action. Although the Court has reviewed the balance of Plaintiff's alleged medical indifference claims against the medical records submitted by Defendants, "in deciding a motion for summary judgment, a District Court is not required to 'scour the record on its own in a search for evidence' where the non-moving party fails to adequately present it." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 426 (S.D.N.Y. 2014) (quoting *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) ). Here, Defendants have established that Plaintiff was medically examined on "numerous occasions" while incarcerated at Five Points, and sometimes multiple times a week. (Dkt. 59-4 at ¶¶ 4-6; *see* Dkt. 59-7 at ¶ 9; Dkt. 59-9 at ¶ 4, 7, 18). Despite Plaintiff's frequent complaints of medical ailments, these complaints were not substantiated by objective medical examination. (*See* Dkt. 59-4 at ¶ 9; Dkt. 59-7 at ¶¶ 10-12; Dkt. 59-9 at ¶¶ 9, 24-28, 34, 68-69). Furthermore, Plaintiff was often prescribed medications to relieve him of the subjective pain or discomfort he complained of, and he would usually receive medications at least once a day while housed in the SHU. (*See* Dkt. 59-4 at ¶¶ 6-7, 20; Dkt. 59-7 at ¶ 8; Dkt. 59-9 at ¶¶ 5, 18, 23-24, 28, 30). These averments are borne out by the medical records submitted by Defendants. (*See* Dkt. 59-10). In response, Plaintiff has submitted no medical evidence to substantiate his claims of deliberate indifference—instead, he relies on only his conclusory claims. In light of the robust medical records documenting Plaintiff's treatment, Plaintiff's self-serving averments are insufficient to raise a triable issue of fact as to whether he suffered constitutionally inadequate medical care during his confinement at Five Points. *See Scott v. Koenigsmann*, No. 9:12-CV-1551, 2016 WL 1057051, at *12 (N.D.N.Y. Mar. 14, 2016) (finding the record did not establish that the defendant "acted with deliberate indifference or deliberately ignored [the p]laintiff's complaints of pain" where the plaintiff "received a plethora of prescription medication for chronic low back pain and was routinely treated at Sick Call, by nurse practitioners and consulted with medical providers").

Accordingly, summary judgment is granted in favor of Defendants dismissing Plaintiff's Eighth Amendment claim for deliberate medical indifference. [9]

**D. Eighth Amendment Excessive Use of Force**

**\*14** In order for an Eighth Amendment excessive force claim to survive a motion for summary judgment, the evidence, viewed in the light most favorable to the non-moving party, must go "beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," and instead "support a reliable inference of wantonness in the infliction of pain...." *Whitley v. Alters*, 475 U.S. 312, 322 (1986). " '[S]ome degree of injury is ordinarily required to state a claim' of excessive use of force in violation of the Eighth Amendment." *Taylor v. N.Y. Dep't of Corr.*, No. 10 CIV. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (quoting *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) ). Accordingly, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). Indeed, "[t]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) ).

However, "an inmate 'need not prove "significant injury" to make out an excessive force claim.' " *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 688 (S.D.N.Y. 2016) (quoting *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999) ). "[T]he core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

Factors to consider in determining whether prison officials unnecessarily and wantonly inflicted pain include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Hudson*, 503 U.S. at 7). [10]

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 77 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

**1. Alleged Use of Excessive Force on March 30, 2010**

Plaintiff alleges that on March 30, 2010, C.O. Countryman and correctional officer Jacob Smith used excessive force to remove Plaintiff's back brace and to restrain Plaintiff after he protested the manner in which the correctional officers attempted to remove the brace. (Dkt. 46 at ¶¶ 104-06). Both correctional officers allegedly "dragged Plaintiff out of the sick-call room, and violently slammed Plaintiff to the floor face down." (*Id.* at ¶ 107). C.O. Countryman then "tightened the handcuffs on Plaintiff's wrists, twisting both hands and wrists maliciously," and then "twisted Plaintiff's legs, causing extreme pain and suffering to Plaintiff's body, legs and back." (*Id.* at ¶¶ 108-09). C.O. Countryman then "shoved and pushed Plaintiff into a wall," and then he, correctional officer Richard Cioffa, and other unidentified correctional officers "took Plaintiff's back brace violently from his body...." (*Id.* at ¶ 110).

**\*15** A review of the medical evidence reveals that the medical staff did not observe any injuries subsequent to the alleged assault. Although Plaintiff complained of pain in his arm, face, and wrist, no visible injuries, edema, or redness were observed ten minutes after the use of force occurred. (*See* Dkt. 59-10 at 134-35). Plaintiff made similar complaints the following day, but no swelling or any deformity was noted; nonetheless, the medical staff prescribed Motrin to relieve any discomfort, (*Id.* at 134).

However, the Court does not require corroborating medical evidence demonstrating the presence of an injury to conclude that an excessive force claim survives summary judgment. *See Ninortey v. Shova*, No. 05 CIV. 542 (SHS), 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008) (noting that courts in the Southern District of New York "have not required that injuries caused by the alleged use of excessive force be corroborated by medical records"); *Beckles v. Bennett*, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at *16 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment even though "the nurse noted no sign of physical injury after the incident," where "the medical records provided by [the p]laintiff show that he complained repeatedly and consistently about pain to the back and kidney, beginning immediately after the incident and continuing for months"). "Where 'a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically,' summary judgment is improper 'even where the plaintiff's evidence of injury [is] slight and

the proof of excessive force [is] weak.' " *Clarke v. Anderson*, No. 10-CV-319S, 2012 WL 3292879, at *5 (W.D.N.Y. Aug. 10, 2012) (quoting *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009) ). "[T]he absence of visible injuries does not mean ... that [the p]laintiff was not harmed," and thus, "the records, standing alone, are not sufficient to permit the Court to conclude as a matter of law that [the p]laintiff was not subjected to the excessive use of force or that he suffered only *de minimis* injuries." *Ninortey*, 2008 WL 4067107, at *12; *see also United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) (finding that the prisoner's pain resulting from the force used demonstrates a sufficient injury); *Campbell v. City of New York*, No. 06 CV 5743 (HB), 2010 WL 2720589, at *8 (S.D.N.Y. June 30, 2010) ("That there is at best limited medical evidence in the record to corroborate [the plaintiff's] story is insufficient to dismiss his excessive force claim as a matter of law.").

Furthermore, a "plaintiff's injuries are but one factor to consider in the excessive force analysis." *Cole v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *12 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016); *see also Dellamore v. Stenros*, 886 F. Supp. 349, 352 (S.D.N.Y. 1995) (rejecting the argument that the excessive force claim should be dismissed because the plaintiff's "medical records do not show any injuries from the use of an alleged chokehold," and explaining that "if a chokehold was used, the fact that it did not cause any physical injuries goes to the amount of damages, if any, to which [the plaintiff] may be entitled, rather than the legal sufficiency of his allegation"). Indeed, Defendants do not appear to dispute the fact that some force was used to restrain Plaintiff on March 30, 2010, nor do they argue that the amount of force used was appropriate to maintain order and discipline. Instead, Defendants simply contend that any injury sustained was *de minimis* in the absence of substantiating medical proof. (*See* Dkt. 59-2 at 50-51). That Plaintiff's primary source of proof may be his own testimony does not mean there are no material issues of fact as to the circumstances underlying the force used and whether such force was maliciously and sadistically applied. *See Griffin*, 193 F.3d at 91 (reversing the dismissal of an excessive force claim, even though the plaintiff's evidence was "extremely thin" and "the only evidence he intended to offer in support of his claims was his own testimony and that the only injuries he suffered were a bruised shin and swelling"); *see also Jordan v. Fischer*, 773 F. Supp. 2d 255, 272 (N.D.N.Y. 2011) (denying a motion

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 78 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

for summary judgment where the "plaintiff's excessive force claim will turn on issues of credibility").

**\*16** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on March 30, 2010.

**2. Alleged Use of Excessive Force on November 21, 2010**

Plaintiff alleges that on November 21, 2010, Nurse Cheasman was informed that Plaintiff had filed grievances and complaints against her. (Dkt. 46 at ¶ 212). After being so advised, Nurse Cheasman approached Plaintiff's cell, "opened the window panel of the solid door," and proceeded to "physically assault[ ] Plaintiff with a bucket, injuring Plaintiff's fingers and hands." (*Id.*).

Plaintiff's medical records indicate that he complained of hand pain for several medical visits subsequent to the alleged assault; however, no injuries were ever discerned and Plaintiff was always found to have full use of his hands. (*See* Dkt. 59-10 at 107-08, 110). On November 22, 2010, Plaintiff specifically informed medical staff that he had been assaulted by the "log nurse" with a "medical bucket." (*Id.* at 110). However, the progress notes also reveal that Plaintiff "refused to unwrap hands and show this nurse any injuries." (*Id.*). Defendants argue that Plaintiff's assertion that Nurse Cheasman assaulted him is "far too vague to make out a claim to which any Defendant can respond." (Dkt. 59-2 at 64).

The fact that Plaintiff's medical records suggest that he suffered no visible injury to his fingers, and that he had no difficulty moving his fingers, does not wholly contradict Plaintiff's sworn allegations that he was assaulted by Nurse Cheasman in a manner that was unrelated to the maintenance of prison discipline and order. Indeed, Plaintiff's medical records indicate that he continued to complain of hand pain for several subsequent medical visits, and that he specifically stated that a nurse had struck him with a bucket. Although Nurse Cheasman has affirmed that she never acted "wantonly or willfully against Plaintiff" and never sought to harm him (*see* Dkt. 59-4 at ¶¶ 24-25), Defendants' reliance upon Plaintiff's medical records fails to establish their entitlement to judgment as a matter of law, *see Abascal v. Fleckenstein*, No. 06-CV-349S, 2012 WL 638977, at \*6 (W.D.N.Y. Feb. 27, 2012) (denying summary

judgment where the plaintiff alleged that the correctional officer committed a brief, yet unprovoked assault, "unrelated to any effort to maintain or restore discipline," despite having only resulted in a minor injury); *see also Cole*, 2016 WL 5394752, at \* 11 (acknowledging that "a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation," but recognizing that "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated ... whether or not significant injury is evident" (quoting *Wright*, 554 F.3d at 268-69) ); *see generally Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("Where the parties' versions of facts differed markedly, '[t]he issue of excessive force was ... for the jury, whose unique task it was to determine the amount of excessive force used, the seriousness of the injuries, and the objective reasonableness of the officer's conduct.' ").

**\*17** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on November 21, 2010.

**3. Alleged Use of Excessive Force on December 18, 2010**

Plaintiff alleges that on December 18, 2010, Nurse Cheasman assaulted him by "slamming the hatch of Plaintiff's cell door on Plaintiff's left arm when Plaintiff was attempting to retrieve a cup that contained [his] medications." (Dkt. 46 at ¶ 247). However, a review of Plaintiff's medical records over the days that followed this alleged incident reveals that he did not complain of any pain in his left arm and was only treated for a sore throat. (Dkt. 59-10 at 100). The Court recognizes that there is authority supporting the proposition that "where undisputed medical records '*directly and irrefutably* contradict a plaintiff's descriptions of his injuries' attributed to an alleged use of excessive force, 'no reasonable jury could credit plaintiff's account of the happening.' " *Henry v. Brown*, No. 14-CV-2828 (LDH)(LB), 2016 WL 3079798, at \*2 (E.D.N.Y. May 27, 2016) (quoting *Davis v. Klein*, No. 11-CV-4868 ENV, 2013 WL 5780475, at \* 1 (E.D.N.Y. Oct. 25, 2013) ); *see also Felder v. Diebel*, No. 10-CV-343 JTC, 2012 WL 6690239, at \*5 (W.D.N.Y. Dec. 21, 2012) (finding that the plaintiff's "medical records ... indicate no signs of injuries consistent with his allegations and no medical treatment," and concluding that "the amount of force used in this case was *de minimis*").

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 79 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Nonetheless, the instant matter presents the unique scenario where a medical staff member is charged with the use of excessive force. Under these circumstances, the person alleged to have committed the unconstitutional act is potentially also responsible for recording and maintaining the very progress notes relied upon by Defendants in arguing that any amount of force used must have been *de minimis*. The Court cannot decipher the identity of the medical personnel who recorded the progress notes relevant to the December 18, 2010, incident simply by reading the signature transcribed therein. Put another way, Defendants have failed to provide a persuasive reason to dissociate Nurse Cheasman, a member of the medical staff, from the rest of the medical personnel charged with recording and maintaining the medical progress notes at issue. [11] As a result, Defendants have not carried their burden of demonstrating the absence of a triable issue of fact regarding the excessive force claims asserted against Nurse Cheasman.

**\*18** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on December 18, 2010.

### 4. Alleged Use of Excessive Force on September 27, 2011

Plaintiff alleges that on September 27, 2011, C.O. Countryman violently assaulted him in the presence of Nurse Holm, Dr. Weinstock, and correctional sergeant Remy Babineaux ("Sgt. Babineaux"). (Dkt. 93-5 at ¶ 34). Plaintiff has submitted use of force reports that were completed after the alleged incident took place. (*See, e.g.*, Dkt. 93-6 at 7). Furthermore, the medical records indicate that force was used to restrain Plaintiff, and that he sustained minor injuries. (Dkt. 59-10 at 44). Clearly some degree of force was used on this occasion, and thus, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see Henry v. City of New York*, No. 02 Civ. 4824, at *6, 2003 WL 22077469 (S.D.N.Y. Sept. 8, 2003) ("[W]here there is a factual dispute about the circumstances surrounding ... the degree of force used, the Second Circuit requires a jury determination of the reasonableness of that force."). Therefore, Defendants' motion for summary judgment is denied to the extent it seeks

to dismiss any excessive force claim arising from the events taking place on September 27, 2011.

### E. Other Eighth Amendment Claims

To the extent Plaintiff's allegations also raise several other claims falling within the broader category of "cruel and unusual punishment," those claims are dismissed—with one exception, related to lighting as discussed below. For example, Plaintiff alleges that he was only provided with one clean bed sheet instead of two clean bed sheets for two weeks. (Dkt. 46 at ¶¶ 339-40). However, "such a temporary and minimal deprivation is *de minimus* at best, and as such does not rise to constitutional proportions." *Ahlers v. Nowicki*, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *5 (N.D.N.Y. Mar. 18, 2014) (where the plaintiff claimed "he was forced to sleep on dirty sheets for approximately four nights"). In addition, Plaintiff alleges that he was not afforded adequate access to certain reading materials and the general library cart while he was housed in the SHU (Dkt. 46 at ¶ 202), but this assertion fails to state an Eighth Amendment claim, *see Lunney v. Brureton*, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *9 (S.D.N.Y. Jan. 21, 2005) (rejecting the plaintiff's claim that "the general library court was not 'properly stocked' as it was 'void of magazines, newspapers and periodicals' ... because magazines, newspapers and periodicals are not considered one of life's 'basic necessities' within the meaning of the Eighth Amendment" (collecting cases) ), *report and recommendation adopted*, 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005).

Although Plaintiff sets forth general and conclusory allegations that he was deprived of recreational privileges (Dkt. 46 at ¶¶ 443, 459), he only once specifically alleges that correctional officer Eric Farley ("C.O. Farley") actually "denied [him] his daily access to the recreation yard for three days" (*id.* at ¶ 297). "Because exercise is one of the basic human needs protected by the Eighth Amendment, a plaintiff may prevail on an Eighth Amendment claim for deprivation of exercise by alleging that defendants were deliberately indifferent to a sufficiently serious deprivation of exercise." *Dillon v. City of New York*, No. 12 Civ. 6746 (LAP), 2013 WL 3776252, at *3 (S.D.N.Y. July 18, 2013). "However, not every deprivation of exercise amounts to a constitutional violation. Rather, a plaintiff must show that he was denied all meaningful exercise for a substantial period of time." *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001). Assuming C.O. Farley denied Plaintiff recreational access for three days, such a minor deprivation of these

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 80 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

privileges does not state a viable Eighth Amendment cause of action. *See* Davidson v. Coughlin, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (finding that the denial of "all outdoor exercise" for "fourteen days in a row" does not "implicate Eighth Amendment concerns"); *Chappie v. Coughlin*, 92 CIV. 8629 (TPG), 1996 WL 507323, at *2 (S.D.N.Y. Sept. 5, 1996) (finding that the deprivation of recreational privileges for three days does not violate the Eighth Amendment); *see also* Calderon v. Wheeler, No. 9:06-CV-0963 (GTS/DEP), 2009 WL 2252241, at *14 (N.D.N.Y. July 28, 2009) ("Deprivations of exercise for limited periods have been found in several instances not to support a constitutional claim under the Eighth Amendment."); Ford v. Phillips, No. 05 CIV. 6646 (NRB), 2007 WL 946703, at *9 (S.D.N.Y. Mar. 27, 2007) ("[A]s a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment."); Hattley v. Goord, No. 02 Civ. 2339(WHP) (RLE), 2003 WL 1700435, at *8 (S.D.N.Y. Mar. 27, 2003) (noting that one hour of recreation per day and 23 hours of confinement "are the normal conditions of an SHU").

**\*19** Plaintiff also makes various allegations regarding the lighting conditions at Five Points. In particular, Plaintiff alleges that he was subject to 24-hour illumination of his prison cell on several occasions. (*See, e.g.*, Dkt. 46 at ¶¶ 208, 273, 281). "Requiring inmates to live in constant illumination can[,] ... under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *10 (N.D.N.Y. Sept. 6, 2013); *see Holmes v. Fischer*, No. 09-CV-00829S(F), 2016 WL 552962, at *17 (W.D.N.Y. Feb. 10, 2016) (same). "Indeed, the Second Circuit has recognized that sleep deprivation due to constant illumination can be [a] sufficiently serious condition[ ] that jeopardizes a prisoner's health." *Collins v. Fischer*, No. 15-CV-103 (KMK), 2018 WL 1626528, at *6 (S.D.N.Y. Mar. 30, 2018) (citing *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.") ). "Nevertheless, 'to succeed on a claim of illegal illumination, [a] plaintiff must produce evidence that the constant illumination had harmful effects on his health beyond mere discomfort.' " *Holmes*, 2016 WL 552962, at *17 (quoting *Vasquez v. Frank*, No. 05-C-528-C, 2007 WL 3254702, at *5 (W.D. Wis. Nov. 2, 2007), *aff'd*, 290 F. App'x 927 (7th Cir. 2008) ).

Plaintiff alleges that the constant illumination of his prison cell caused him to suffer eye problems, headaches, sleeplessness, and depression. (*See, e.g.*, Dkt. 46 at ¶¶ 181, 191, 208, 256, 281). In particular, he alleges three specific occasions where his prison cell was illuminated for extended durations. Plaintiff asserts that C.O. Farley ordered the "light to remain on in [his] cell" for an unspecified period of time on October 1, 2010, and that correctional lieutenant Charles Coventry ("Lieutenant Coventry") kept his cell light on "for approximately 24 hours" on November 11, 2010. (*See id.* at ¶¶ 191, 208). Notably, Plaintiff further alleges that on January 14, 2011, C.O. Farley "altered his cell light so that it remained on 24 hours a day" (*id.* at ¶ 273), causing Plaintiff to be "unable to sleep for close to two weeks because his cell light was on day and night" (*id.* at ¶ 274).

"The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact-driven,' generally turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." *Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2016 WL 873853, at *5 (N.D.N.Y. Jan. 8, 2016) (quoting *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at * 18-19 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 F. App'x 82 (2d Cir. 2015) ), *report and recommendation adopted*, 2016 WL 879310 (N.D.N.Y. Mar. 7, 2016), *vacated* (Mar. 7, 2016), *and report and recommendation adopted*, 2016 WL 1261107 (N.D.N.Y. Mar. 30, 2016). Defendants have not submitted any evidence disputing the fact that Plaintiff was subjected to periods of 24-hour prison cell illumination. Instead, Defendants argue that Plaintiff has failed to set forth any injury caused by these lighting conditions that rises to the level of an Eighth Amendment violation. (*See* Dkt. 59-2 at 33-34). In several cases where summary judgment was deemed appropriate, the court relied upon the low wattage of the light bulbs illuminating the inmate's prison cell. *See, e.g., Booker*, 2014 WL 1289579, at *18 & n.27 (noting that "a 3-watt LED bulb is much less bright than the 9 or 13-watt illumination that was found acceptable" in other cases); *McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010) ("The record indicates that Vermont prisons are using compact fluorescent lighting between 5 and 8 watts, fluorescent bulbs between 7 and 8 watts, and 10-watt incandescent bulbs. These intensities are in a range that courts have generally found permissible under the Constitution." (collecting cases) ) (footnote omitted), *report and recommendation adopted sub nom. McGee v. Pallito,*

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 81 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

No. 1:04-CV-00335, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), *vacated on other grounds and remanded sub nom. Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014) (finding class counsel's representation deficient). By contrast, Defendants have not provided any indication of the intensity of the cell lights installed at Five Points.

**\*20**  The Court recognizes that Plaintiff's medical records disclose very little to suggest that his cell lights caused any alleged ailments. Nevertheless, Plaintiff appears to have complained of blurry or impaired vision on several occasions (*see, e.g.*, Dkt. 59-10 at 2-3, 48, 59, 108, 112), and he associated these symptoms with his cell lights at least twice, indicating that the "lights hurt[ ] his eyes," and that the "lights ... annoy me" (*id.* at 50, 99). In fact, Plaintiff lodged the former complaint on January 16, 2011, just two days after C.O. Farley allegedly "altered his cell light so that it remained on 24 hours a day." (Dkt. 46 at ¶ 273; Dkt. 59-10 at 50). Although other causes could have resulted in or at least contributed to Plaintiff's alleged sleeplessness and eye problems, Defendants have failed to submit evidence supporting such a conclusion on their motion. *Cf.* McGee, 2010 WL 5300805, at *7 ("The affidavit of Dr. Burroughs-Biron establishes that there are a number of potential causes for the symptoms being alleged."). Furthermore, in the absence of evidence demonstrating the intensity of the lighting or the need for such illumination to sustain a secure prison environment, the fact that Plaintiff's medical records do not conclusively establish that his injuries were caused by the prison cell lights is not determinative. *Cf.* Huertas v. Sec'y Penn. Dep't of Corr., 533 F. App'x 64, 68 & n.7 (3d Cir. 2013) (noting that the plaintiff failed to provide "competent medical evidence" demonstrating that his injuries were caused "because of the lighting" conditions, but relying on the defendants' explanation "that the constant illumination is required for security purposes" and the lack of evidence that "the lights were kept on for any impermissible purpose" in affirming summary judgment); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 368 (N.D.N.Y. 2010) (distinguishing case law where the defendants "failed to cite any legitimate penological justification for their conduct" and relying on record submissions regarding safety and security concerns to grant summary judgment on the plaintiff's "retaliatory lighting" claim).

Therefore, because Plaintiff alleges that he suffered periods of 24-hour illumination of his prison cell, which resulted in headaches, eye problems, depression, and the inability "to sleep for close to two weeks" (Dkt. 46 at ¶ 274; *see id.* at ¶¶ 181, 191, 208, 256, 273, 281), in the absence of admissible evidence refuting these sworn statements, Defendants have failed to establish their entitlement to judgment as a matter of law, *see* Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996) (denying summary judgment, despite the defendants' supporting evidence to the contrary, where the plaintiff "alleged that large florescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was 'constantly illuminated, and [he] had no way of telling night or day,' and that this condition caused him 'grave sleeping problems' and other mental and psychological problems"), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998); *cf. Murray v. Edwards Cty. Sheriffs Dep't*, 248 F. App'x 993, 998 (10th Cir. 2007) (distinguishing *Keenan* because the plaintiff's "own testimony indicated that the lights *only sometimes* disturbed his sleep and that he suffered headaches as a result of his loss of sleep *only every now and then*") (emphases added). Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claim for the unlawful illumination of his prison cell may proceed against C.O. Farley and Lieutenant Coventry.

Plaintiff further asserts that various correctional officials allegedly entered his prison cell and unlawfully searched his materials on several occasions. (Dkt. 46 at ¶¶ 130, 183-84, 218, 273, 436). However, Plaintiff does not appear to allege that any of these searches occurred with greater frequency than twice in a single month. *See Lashley v. Wakefield*, 367 F. Supp. 2d 461, 471 (W.D.N.Y. 2005) ("The number of searches during the five or six month time period is not excessive, in light of the policy at Five Points that cells are searched once or twice a month."); *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 498 (S.D.N.Y. 2014) ("[T]he three searches specifically alleged, as well as the general allegation that Plaintiffs were subject to 'intense discriminatory search[e]s, ['] are insufficient to satisfy the objective element of an Eighth Amendment claim."). Plaintiff's conclusory assertions that the searches took place "without cause" and "to harass" Plaintiff are insufficient to raise a triable issue of fact, and thus, Defendants are granted summary judgment on this claim as well. *Polk v. Olles*, No. 12-CV-01106S(F), 2015 WL 10381751, at *8 (W.D.N.Y. Dec. 29, 2015) ("Plaintiff offers only conclusory assertions in support of his position that the cell search was other than a routine random search, which statements are insufficient to avoid summary judgment."), *report and recommendation adopted*, 2016 WL 777313 (W.D.N.Y. Feb. 29, 2016).

## V. Plaintiff's Common Law Causes of Action

**\*21** Plaintiff has also asserted common law causes of action for assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. (Dkt. 46 at 99-101). Defendants have not set forth specific arguments addressing these claims. While assault and battery claims are treated similarly to a Fourth Amendment excessive force claim, *see Kavazanjian v. Rice*, No. 03-CV-1923 (FB) (SMG), 2008 WL 5340988, at \*7 (E.D.N.Y. Dec. 22, 2008) ("[I]n effect, 'the test for whether a plaintiff can maintain [a state-law assault-and-battery] cause of action against law enforcement officials is ... the exact same test as the one used to analyze a Fourth Amendment excessive force claim.' " (quoting *Hogan v. Franco*, 896 F. Supp. 1313, 1315 n.2 (N.D.N.Y. 1995) ) ), an Eighth Amendment excessive force claim is not so analytically aligned with its common law counterparts, *see Davidson v. Brzezniak*, No. 95-CV-00204-RJA, 2011 WL 3236209, at \*13 (W.D.N.Y. July 28, 2011) ("Although there is some overlap between the standards for assessing a prison official's liability for assault and battery under the common law and liability under the Eighth Amendment for use of excessive force, the standards are not identical."); *Dufort v. Burgos*, No. 04-CV-4940 (FB) (LB), 2005 WL 2660384, at \*2 (E.D.N.Y. Oct. 18, 2005) (same). As Judge Friendly explained several decades ago:

> Certainly the constitutional protection [of the cruel and unusual punishment clause] is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it; still less is it as extensive as that afforded by the common law tort action for assault[.]

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (citation omitted), *rejected on other grounds by Graham v. Connor*, 490 U.S. 386 (1989); *see also Hernandez v. Lattimore*, 612 F.2d 61, 67 (2d Cir. 1979) ("Just as malpractice does not become a constitutional violation merely because the victim is a prisoner, so, too, not every assault and battery gives rise to a cause of action under the Eighth Amendment because the victim happens to be a prisoner." (citation omitted) ).

Since Defendants have set forth no specific arguments addressing any of these distinct causes of action, Defendants have failed to carry their burden of demonstrating their entitlement to judgment as a matter of law, and thus, Plaintiff's common law claims may proceed. *See, e.g., Guzman v. Sposato*, No. 13-CV-6829 (JMA) (AYS), 2018 WL 1597395, at \*5 (E.D.N.Y. Mar. 31, 2018) (stating that while the defendants "have ... moved for summary judgment based on qualified immunity," they have "not offered any specific argument as to why they are entitled to qualified immunity as to the excessive force claims," and concluding that the plaintiff's excessive force claims survive summary judgment); *Shao v. City Univ. of N.Y.*, No. 12-CV-1566 (RJS), 2014 WL 5038389, at \*6 (S.D.N.Y. Sept. 30, 2014) (stating that while the defendants "purport to seek summary judgment with respect to all of [the p]laintiff's claims, [the d]efendants do not specifically address [the p]laintiff's hostile work environment claim in either their opening brief or reply brief," and finding that the defendants have failed to demonstrate that they are entitled to judgment as a matter of law on that claim); *Frederick v. Sheahan*, No. 6:10-CV-6527 (MAT), 2014 WL 3748587, at \*9 (W.D.N.Y. July 29, 2014) ("At this juncture, the Court declines to grant summary judgment in Sgt. Holton's favor as to this claim, since he did not specifically address or move to dismiss the failure to supervise claim."); *see also Sprott v. Franco*, No. 94 Civ. 3818 (PKL), 1997 WL 79813, at \*1 n.1 (S.D.N.Y. Feb. 25, 1997) (noting that the defendants "do not specifically argue for summary judgment with respect to plaintiff's § 1981 claim in their notice of motion or in their supporting memorandum of law," and stating that "[t]he Court will not consider this issue without the benefit of briefing from the parties"); *see generally Adeghe v. Janssen Pharm., Inc.*, No. 16 CIV. 2235 (LGS), 2017 WL 4839063, at \*2 (S.D.N.Y. Oct. 24, 2017) (noting that the defendant "made no particularized arguments" as to certain claims in its initial motion for summary judgment and finding that the defendant's "new arguments to support summary judgment on the claims it had neglected to specifically address in its initial briefing ... need not be considered" on its motion for reconsideration).

## VI. First Amendment Retaliation Claims

**\*22** Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take

Case 9:20-cv-01115-TJM-TWD  Document 47  Filed 11/05/21  Page 83 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

exception and the ease with which claims of retaliation may be fabricated, [courts in this Circuit] examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see Khudan v. Lee*, No. 12-CV-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Courts generally review claims of 'retaliation by prisoners "with skepticism" because of the ease with which a retaliation claim may be fabricated.' " (quoting *Bolton v. City of New York*, No. 13-CV-5749 RJS, 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) ) ), *app. dismissed*, No. 16-3534, 2016 WL 10100723 (2d Cir. Dec. 8, 2016). Accordingly, retaliation claims must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.' " *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ).

To the extent Plaintiff alleges that certain defendants falsified his medical records or omitted certain information from them (*see, e.g.*, Dkt. 46 at ¶¶ 150, 156, 224, 233, 306-07, 313, 329), those allegations, standing alone, do not provide a basis to support a § 1983 cause of action, *see Micolo v. Fuller*, No. 6:15-CV-06374(MAT), 2016 WL 6404146, at *3 (W.D.N.Y. Oct. 28, 2016) (noting that "the only omission attributed to Jones is a failure to record all of [the p]laintiff's alleged injuries in the treatment note" and stating that "this alleged omission does not amount to a constitutional violation"); *Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015) ("Williams' complaints that prescribed medication was not provided to him, or that the doctors wrote false information in his medical record, might amount to malpractice, but not a constitutional violation."); *see also Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 415 (W.D.N.Y. 2010) ("The law is clear that 'the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process.' " (quoting *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009) ) ). Nonetheless, "[a] prisoner may be able to state a constitutional claim by alleging facts indicating that false charges were brought against him in retaliation for the prisoner's exercise of a constitutionally protected right, such as the filing of grievances." *Crenshaw*, 681 F. Supp. 2d at 415.

To prevail on a First Amendment retaliation claim, a prisoner must demonstrate that: "(1) he engaged in protected speech or activity; (2) the defendant took adverse action against him;

and (3) there was a causal connection between the protected speech or activity and the adverse action." *Simmons v. Adamy*, 987 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (citing *Espinal v. Goord*, 558 F.3d 119, 227 (2d Cir. 2009) ).

Plaintiff alleges that several correctional officers filed false misbehavior reports against him in retaliation for his filing of grievances against them, and that certain medical personnel denied him appropriate care and medications in retaliation for the grievances he filed against them as well. (*See, e.g.*, Dkt. 46 at ¶¶ 215, 220, 272, 279, 328, 418, 420, 422, 424, 428, 430, 432, 434, 436, 438, 440, 442, 445, 450, 453, 456). "Because the filing of prison grievances is a protected activity, Plaintiff meets the first prong of the test." *Nelson v. McGrain*, No. 6:12-CV-6292 (MAT), 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) (citation omitted). "The Second Circuit has defined 'adverse action' in the prison context as 'retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " " *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *10 (N.D.N.Y. Mar. 24, 2015) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) ). "[C]ourts have found that 'denial of medical evaluation, treatment, and adequate pain medication' can suffice to establish adverse action under a First Amendment retaliation analysis." *Castro v. Heath*, No. 9:12-CV-01250 (MAD), 2013 WL 5354241, at *10 (N.D.N.Y. Sept. 23, 2013) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009) ); *see Williams v. Fisher*, No. 02 CIV. 4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (finding the second element satisfied where the plaintiff alleged that medical staff revoked a "necessary medical rehabilitative treatment" as a result of the filing of a grievance). In addition, "[i]t is well settled that filing ... a false misbehavior report is an adverse action." *James v. Mosko*, No. 13-CV-5-LJV-MJR, 2016 WL 8671478, at *6 (W.D.N.Y. July 22, 2016) (citation omitted), *report and recommendation adopted*, 2017 WL 397474 (W.D.N.Y. Jan. 30, 2017); *Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) ("The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation." (citing *Gill*, 389 F.3d at 384) ), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("Filing a false misbehavior report about Mateo ... would deter a similarly situated person of ordinary firmness from exercising his First

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 84 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Amendment rights."). Thus, Plaintiff has also sufficiently alleged an "adverse action," satisfying the second element of a First Amendment retaliation claim.

**\*23** However, Plaintiff has failed to raise a triable question of fact as to whether there is a causal connection between the filing of his grievances and the alleged adverse actions at issue.

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Bunting v. Conway*, No. 04-CV-0731A (HKS), 2010 WL 5332280, at \*7 (W.D.N.Y. Nov. 1, 2010) (citing *Colon*, 58 F.3d at 872), *report and recommendation adopted*, 2010 WL 5313308 (W.D.N.Y. Dec. 20, 2010).

Given that many of the alleged adverse actions seem to have occurred within weeks or even days of Plaintiff's grievances, it appears that Plaintiff relies on the temporal proximity between the filing of his grievances and the alleged retaliatory acts to establish the necessary causal connection—although Plaintiff's opposition papers do not discuss this element in any great detail. (*See* Dkt. 93 at 51-54). However, while "the temporal proximity of the filing of the grievance" and an "adverse action" is "circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment." *Williams*, 111 F. Supp. 2d at 290; *see Ayers v. Stewart*, 101 F.3d 687, 1996 WL 346049 (Table), at \*1 (2d Cir. 1996) (stating that the plaintiff's "reliance on circumstantial evidence of retaliation—namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him—does not suffice to defeat summary judgment"); *see also Colon*, 58 F.3d at 873 ("If ... circumstantial evidence represented the sum total of Colon's proof, we might be

inclined to affirm the grant of summary judgment based on the weakness of Colon's case."); *see generally Flaherty*, 713 F.2d at 13 (acknowledging the ease in which a plaintiff may manufacture a claim for retaliation, and stating that summary judgment is appropriate if the claim appears insubstantial). Furthermore, the sheer volume of grievances filed by Plaintiff diminishes the weight attributed to the temporal proximity of any of his retaliatory allegations. (*See* Dkt. 46 at ¶ 408 (alleging that Plaintiff filed about 155 grievances "from March 25, 2010 through June 5, 2011") ); *Andino v. Fischer*, 698 F. Supp. 2d 362, 385 (S.D.N.Y. 2010) ("While there is some proximity between the complaints and the alleged adverse actions, this results from the large number of complaints in a short period of time.").

In addition, Plaintiff accumulated a lengthy disciplinary record while incarcerated. It is undisputed that "[b]ecause Plaintiff had accumulated so much SHU time from incidents occurring prior to 2010, he did not serve" an SHU penalty imposed for an incident occurring in May 27, 2010, until over three years later in December 2013. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The fact that Plaintiff was ultimately found guilty of at least some of the charged conduct asserted in many if not all of the misbehavior reports filed against him (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 61; *see also* Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19)—and that those findings were subsequently affirmed (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 72)—"certainly suggests that there was a valid basis for the issuance of the report, and [P]laintiff's conclusory assertion that it was retaliatory in nature fails to state a plausible claim," *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *see White v. Bergenstock*, No. 9:08-CV-717, 2009 WL 4544390, at \*7 (N.D.N.Y. Nov. 25, 2009) (stating that since "the charges in the misbehavior report have never been overturned[,] ... there is no sufficient allegation that the misbehavior report was false in any material respect"); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 478 (N.D.N.Y. 2009) (noting that the plaintiff "has alleged that he was ultimately convicted of the disciplinary charge leveled" against him and that "the conviction was affirmed on appeal, plausibly suggesting that what caused him to receive the referenced misbehavior report was his own misconduct"). Furthermore, a large number of Plaintiff's allegations pertaining to the retaliatory conduct purportedly advanced against him are alleged "upon information and belief." (*See, e.g.*, Dkt. 46 at ¶¶ 220, 241, 248, 272, 281, 328, 415, 418, 420, 422, 424, 428, 430, 432, 434, 438, 440, 442, 445, 450, 453, 456). "[C]onclusory allegations 'upon information and belief,' as [P]laintiff advances here,

Case 9:20-cv-01115-TJM-TWD  Document 47  Filed 11/05/21  Page 85 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

cannot defeat summary judgment." *Little v. Massari*, 526 F. Supp. 2d 371, 376-77 (E.D.N.Y. 2007); *see Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 677 n.4 (2d Cir. 2016) ("The verified answer is stated only '[u]pon information and belief,' rather than on the basis of personal knowledge, and therefore may not be considered in opposition to summary judgment." (alteration in original)

(citation omitted) ); *Dellacava v. Painters Pension Fund of Westchester & Putnam Ctys.*, 851 F.2d 22, 26 (2d Cir. 1988) (stating that an explanation based " ' upon information and belief' ... could not have been considered in the summary

judgment motion"); *cf. Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, *and not merely on information and belief* has the effect of an affidavit and may be relied on to oppose summary judgment." (emphasis added) ).

 **\*24** The Court is cognizant of the Second Circuit's instruction to view claims of First Amendment retaliation in this context with care and skepticism given their potential for abuse. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Certainly, the number of grievances and sick-call requests filed by Plaintiff provide substantial fodder for the manufacture of numerous claims of retaliation. *See generally Davidson v. Bartholome*, 460 F. Supp. 2d 436, 444 (S.D.N.Y. 2006) (noting that the "possibility of abuse" of a retaliation claim is "ever present," but was "especially apparent in the instant case" where the plaintiff had "filed approximately 150 previous lawsuits"). Indeed, in light of Plaintiff's failure to raise a triable issue of fact pertaining to his claim for deliberate medical indifference, as previously discussed, Plaintiff cannot sustain a viable claim for the retaliatory denial of constitutionally adequate medical treatment. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) ("As for the delay in Bilal's receipt of prescription pain medication, we conclude, for substantially the same reasons that we reject Bilal's Eighth Amendment claim, that the record presented fails to bring Bilal's retaliation claim within 'the ambit of constitutional

protection.' " (quoting *Dawes*, 239 F.3d at 493) ); *Vail v. Lashway*, No. 9:12-CV-1245 (GTS/RFT), 2014 WL 4626490, at \*19 (N.D.N.Y. Sept. 15, 2014) (dismissing a retaliation claim where "there is no evidence that [the p]laintiff was ever deprived of adequate medical care," and stating that the court's "conclusion in this regard is, on its

own, likely sufficient to grant summary judgment against [the p]laintiff's medical retaliation claims"); *Cole v. Levitt*, No. 07-CV-00767(M), 2009 WL 4571828, at \*10 (W.D.N.Y. Dec. 4, 2009) ("Having concluded that Dr. Levitt was not deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no evidentiary basis to conclude that her conduct was retaliatory."); *see generally Adams*, 2015 WL 1312738, at \*10 (stating that "[e]ven where a complaint or affidavit contains specific assertions, the allegations may still be deemed conclusory if [they are] ... largely unsubstantiated by any other direct evidence" (quotation omitted) ).

Therefore, for the foregoing reasons, Plaintiff's First Amendment retaliation claim is dismissed. [12]

## VII. **Plaintiff's Right to Access to the Courts**

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). The right of access to the courts "requires state prisons 'to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Bellezza v. Holland*, No. 09 CIV. 8434, 2011 WL 2848141, at \*4 (S.D.N.Y. July 12, 2011) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977) ). "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.' " *Davis*, 320 F.3d at 351 (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ). "[P]risoners who bring a claim for the violation of a derivative right of access to the courts must demonstrate 'actual injury' in order to have standing." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). "In other words[,] 'the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials.' " *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) (quoting *Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) ).

 **\*25** Nowhere in Plaintiff's submissions does he provide factual proof that a non-frivolous legal claim was frustrated due to the alleged interference with his legal mail. Instead,

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 86 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Plaintiff only alleges, in conclusory form, that "[a]s a result of the failure of [certain of his] legal documents to reach the court, Plaintiff's rights were violated in the associated court proceedings." (Dkt. 46 at ¶ 352). Plaintiff fails to elaborate upon this general allegation in any respect. Accordingly, because Plaintiff has failed to raise a triable issue of fact as to whether he suffered an "actual injury" from any alleged interference with his legal mail, Plaintiff's claim is dismissed. [13]

## VIII. Failure to Provide Kosher Meals in Violation of the First Amendment's Free Exercise Clause

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) ). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *see Jackson*, 196 F.3d at 320 ("An inmate is therefore entitled to a reasonable accommodation of his religious beliefs."). The reach of the free exercise clause extends to 'an inmate's diet and participation in religious meals.' " *Riehl v. Martin*, No. 9:13-CV-439 GLS/TWD, 2014 WL 1289601, at *8 (N.D.N.Y. Mar. 31, 2014) (quoting *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) ); *see Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) ("[P]rison officials must provide a prisoner a diet that is consistent with his religious scruples."). The right to participate in religious meals includes the right to a kosher diet. *See Thaxton v. Simmons*, No. 9:10-CV-1318 MAD/RFT, 2012 WL 360104, at *5 (N.D.N.Y. Jan. 5, 2012) ("Among those protected rights is the right to receive a kosher diet."), *report and recommendation adopted*, 2012 WL 360141 (N.D.N.Y. Feb. 2, 2012).

"Whether or not brought by prisoners, free exercise claims often test the boundaries of the judiciary's competence, as courts are 'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.' " *Ford, 352 F.3d at 588* (quoting *Patrick, 745 F.2d at 157*). "An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held'

and in the individual's 'own scheme of things, religious.' " *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (quoting *Patrick, 745 F.2d at 157*). However, "scrutiny of the prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.' " *Ford, 352 F.3d at 588* (quoting *Patrick, 745 F.2d at 157*).

**\*26** Plaintiff has alleged that his "religious belief is Jewish" and that his "religion is jews too." (Dkt. 93-5 at ¶ 87; *see* Dkt. 46 at ¶ 182 (alleging that Plaintiff had informed correctional sergeant T. Barber ("Sgt. Barber") "that he was Jewish" ). Plaintiff claims that he was supposed to receive Kosher loaves, but instead he was being fed non-Kosher loaves because Defendants did not care about his religious beliefs. (*See* Dkt. 93-5 at ¶ 103). However, "[n]o where [sic] in the Complaint does Plaintiff allege the sincerity of his beliefs and what role the kosher diet plays therein." *Thaxton*, 2012 WL 360104, at *6; *see Meadows v. Lesh*, No. 10-CV-00223 M, 2010 WL 3730105, at *3 (W.D.N.Y. Sept. 17, 2010) (acknowledging that the sincerity of a religious belief is usually a factual issue, but stating that "the complaint must still assert sufficient allegations necessary to establish that plaintiff's claim is based upon a sincerely held religious belief"). Indeed, "[m]ere membership in an established religion is not enough to show that a prisoner has sincerely held religious beliefs." *Thaxton*, 2012 WL 360104, at *6 (citing *Ford, 352 F.3d at 588*). Although Plaintiff alleges that he was not provided Kosher loaves, he fails to allege that his adherence to a Kosher diet is a "sincerely held" religious belief, nor does he explain why a Kosher diet is important to his religion. *See Woodward v. Ali*, No. 9:13-CV-1304 LEK/RFT, 2015 WL 5711899, at *8 (N.D.N.Y. Sept. 29, 2015) (noting that the plaintiff "has not explained why the removal of his name from the Ramadan feed-up list and denial of two meals substantially burdened his exercise of religious beliefs" and finding that "in the absence of any admissible facts with respect to [the p]laintiff's personally held beliefs or how [the d]efendants' conduct impacted those beliefs, we find that [the p]laintiff has failed to meet his burden of showing that his professed religious beliefs are sincerely held and were infringed"); *Turner v. Oakland Police Officers*, No. C 09-03652 SI, 2010 WL 816797, at *4 (N.D. Cal. Mar. 9, 2010) (dismissing the plaintiff's free exercise claim where, "[a]bsent some description of plaintiff's religion, his religious practices, and the role and importance of blessing

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 87 of 141

oil in the religion, it is impossible to determine whether plaintiff's beliefs are sincerely held and whether blessing oil is rooted in that religious belief"); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 GTS/DEP, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (granting summary judgment on a free exercise claim where the plaintiff failed to "allege[ ] or establish[ ] how receiving non-vegetarian meals infringed on his sincerely held religious beliefs" (citing *Benjamin v. Coughlin*, 905 F.2d 571, 580 (2d Cir. 1990) ) ); *see also Odom v. Dixion*, No. 04-CV-889F, 2008 WL 466255, at *6 (W.D.N.Y. Feb. 15, 2008) (describing a plaintiff's burden of demonstrating his religious beliefs are sincerely held as "a threshold requirement for any religious freedom claim under either the First Amendment or the [Religious Land Use and Institutionalized Persons Act]").

Recognizing that "the issue of sincerity can rarely be determined on summary judgment," *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1353 (10th Cir. 1997), *opinion vacated in part on reh'g en banc on other grounds*, 159 F.3d 1227 (10th Cir. 1998), and that "courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists," *Fifth Ave. Presbyterian Church*, 293 F.3d at 574, the Court nevertheless concludes that Plaintiff has failed to raise a triable issue of fact as to whether his beliefs are sincerely held, *see generally Ochoa v. Cornell*, No. 9:05-CV-1068 GLSRFT, 2007 WL 3049889, at *7 (N.D.N.Y. Oct. 18, 2007) ("Ochoa fails to allege the nature and content of his beliefs, how he came to hold them, and what difference they have made in his life. Ochoa does not describe his participation in other religious activities such as Sabbath observances, dietary strictures, religious meetings, holy feast days, or other significant religious activities to which he purportedly adheres to so that we may comfortably determine that he has pled enough facts to establish that his beliefs are both religious and sincerely held."). Accordingly, Plaintiff's First Amendment Free Exercise Clause claims are dismissed. *See Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) ("Because Farid has neither alleged nor submitted any proof that he sincerely holds to any religious belief that mandates the use of Tarot cards, we conclude that summary judgment was appropriate on the free exercise claim.").

## IX. Plaintiff's Equal Protection Clause and Section 1985 Causes of Actions

### A. Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.' " *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) ). "In order to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate evidence of 'purposeful discrimination ... directed at an identifiable or suspect class.' " *Harnage v. Caldonero*, No. 3:16CV1876(AWT), 2017 WL 2190057, at *3 (D. Conn. May 18, 2017) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) ).

Plaintiff has failed to allege membership in a protected class and has submitted no evidence demonstrating that he was treated disparately from similarly situated individuals. Indeed, it is well-established that "[p]risoners are not a part of a suspect class." *Tavares v. Amato*, 954 F. Supp. 2d 79, 99 (N.D.N.Y. 2013) (citing *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ); *see Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class...."); *see also Harvey v. Harder*, No. 9:09-CV-154 TJM/ATB, 2012 WL 4093792, at *7 n.12 (N.D.N.Y. July 31, 2012) (noting that the assertion of an equal protection claim would be meritless because the plaintiff "has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification"), *report and recommendation adopted*, 2012 WL 4093760 (N.D.N.Y. Sept. 17, 2012). Plaintiff's allegations of discrimination are based "upon information and belief" and acts of verbal harassment or are otherwise too conclusory to demonstrate a triable issue of fact. (*See, e.g.*, Dkt. 46 at ¶¶ 1, 103, 172, 197, 415); *Giano*, 54 F.3d at 1057 (concluding that the plaintiff's "equal protection claim fails" where he "presents no evidence" of discrimination "against a particular class of inmates"); *see generally DeJesus v. Tierney*, No. 9:04-CV-298, 2006 WL 839541, at * 11 (N.D.N.Y. Mar. 28, 2006) (stating that it is "well settled that verbal harassment itself does not rise to the level of a constitutional violation," and that "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations").

Case 9:20-cv-01115-TJM-TWD Document 47 Filed 11/05/21 Page 88 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

**\*27** "When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018). This category of equal protection violation is commonly known as a "class of one" claim. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). In other words, the Plaintiff must be "*prima facie* identical" to the person or persons who have received different treatment. *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (quotation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

> Overall, "to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."

*Progressive Credit Union*, 889 F.3d at 49 (quoting *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) ).

It is unclear whether Plaintiff has asserted a "class of one" equal protection claim, but to the extent that he has attempted to do so, Plaintiff "has not alleged sufficient facts to show the requisite degree of similarity to" any other inmate. *Harnage*, 2017 WL 2190057, at *3; *see Riley v. Roycroft*, No. 16 CV 2227 (VB), 2017 WL 782917, at *8 (S.D.N.Y. Feb. 28, 2017) (granting motion to dismiss where the plaintiff alleges that he was not given certain medication that "was provided to other inmates with the same medical condition," because he "fails to allege facts that demonstrate a substantial similarity between himself and the other inmates with whom he compares himself"); *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 545 (S.D.N.Y. 2014) (dismissing the plaintiff's "class of one" equal protection claim because he "has provided no facts from which it may be plausibly

inferred that ... any other citizens were similarly situated" and "provides no information about their properties, situations or conduct that would support the conclusory statement that they were similarly (let alone extremely similarly) situated"). In fact, Plaintiff's SAC "does not identify any comparators or similarly situated entities at all," and thus, to the extent Plaintiff raises a "class of one" equal protection claim, it "is deficient as a matter of law." *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010).

### B. Plaintiff's § 1985 Claim

Similarly, Plaintiff's allegations that Defendants unlawfully conspired to violate his constitutional rights in contravention of 42 U.S.C. § 1985(3) also fail to raise a triable issue of fact because "Plaintiff nowhere alleges that he was a victim of a conspiracy due to his membership in some protected class." *Malsh v. Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995).

"42 U.S.C. § 1985(3) prohibits conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges or immunities under the laws.' " *Id.* (quoting *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290-91 (2d Cir. 1992) ). "Such a claim requires more than simply a showing that the defendants acted jointly to achieve some end, and that they used unlawful means to do so. Instead, plaintiff must show that defendants were motivated by animus toward plaintiff based on his membership in some protected class." *Robinson v. Allstate*, 706 F. Supp. 2d 320, 328 (W.D.N.Y. 2010) (citations omitted), *aff'd sub nom. Robinson v. Allstate Ins. Co.*, 508 F. App'x 7 (2d Cir. 2013).

**\*28** A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006) ).

Because Plaintiff has failed to demonstrate that any conspiracy to violate his constitutional rights arose due to

his membership in a protected class, Plaintiff's § 1985(3) claim is without merit. In *Katz v. Klehammer*, 902 F.2d 204 (2d Cir. 1990), the Second Circuit found that the plaintiff's "complaint is completely devoid of any claim of class-based animus, whether economic, political, or otherwise," and found that the § 1985(3) claim "was properly dismissed as frivolous." *Id.* at 208 (noting also that the Supreme Court has "strictly construed" the requirement that plaintiffs demonstrate class-based animus). "The Supreme Court added a 'class-based animus' requirement to § 1985(3) to prevent it from being broadly, and erroneously, interpreted as providing a federal remedy for 'all tortious, conspiratorial interferences with the rights of others.' " *Malsh*, 901 F. Supp. at 764 (quoting *Jews for Jesus, Inc.*, 968 F.2d at 291); *see Dolan*, 794 F.3d at 296 (stating that "the term class 'unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors' " and to hold otherwise would permit "innumerable tort plaintiffs" to raise § 1985 claims "by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with" (quoting *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993) ) ). Although Plaintiff summarily alleges that the discrimination he suffered was "based on his mental illness, race and ethnicity" (Dkt. 46 at ¶ 1; *see id.* at ¶¶ 103 (alleging discrimination "on the basis of Plaintiff's race, ethnicity, and language"), 197 (alleging discrimination "based on Plaintiff's race"), 415 (alleging discrimination "on the basis of his ethnicity and religion") ), Plaintiff "fails to allege *any facts showing* he was treated differently due to his membership in a protected class," *Klein v. Zugabie*, No. 15 CIV. 9093 (NSR), 2017 WL 374733, at *8 n.12 (S.D.N.Y. Jan. 24, 2017) (emphasis added); *see Hollman v. County of Suffolk*, No. 06-CV-3589 JFB ARL, 2011 WL 2446428, at *11 (E.D.N.Y. June 15, 2011) (granting summary judgment on the plaintiff's § 1985 claim where he "only offers conclusory allegations that the actions involved discriminatory animus," and finding "no evidence of racial or other class-based animus on the record"); *see also Grant v. City of Syracuse*, No. 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) ("Alonzo's argument in support of his conspiracy claim consists of conclusory statements that the Arresting Officers' alleged misconduct can only be explained by implicit racial bias. While it is undisputed that

Alonzo is African-American, conclusory statements linking officers' actions to race are insufficient to survive summary judgment." (citation omitted) ). Therefore, Plaintiff's § 1985 cause of action is also dismissed. [14]

## X. **Plaintiff's Official Capacity Claims**

**\*29** Defendants argue that "Plaintiff sues certain defendants in their official and individual capacities" (Dkt. 59-2 at 69), although Defendants do not cite to any allegation suggesting that Plaintiff seeks recourse against any defendant in his or her official capacity. However, to the extent Plaintiff seeks such relief, the Eleventh Amendment bars Plaintiff's official-capacity causes of action. *See Gray-Davis v. New York*, No. 5:14-CV-1490 GTS/TWD, 2015 WL 2120518, at *7 (N.D.N.Y. May 5, 2015) ("The Eleventh Amendment has been found to bar official capacity claims for money damages against [DOCCS] officials and parole officers."); *Tompkins v. Beane*, No. 9:10-CV-1200 LEK/RFT, 2012 WL 3079537, at *6 (N.D.N.Y. July 30, 2012) ("Plaintiff's claims against corrections officers in their official capacities are ... barred by the Eleventh Amendment."); *Tolliver v. N.Y. State Corr. Officers*, No. 99CIV.9555(JGK), 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) (dismissing official capacity claims where "[a]ll of the defendants in this case are state officials because they are employees of [DOCCS]").

## XI. **The Failure to Demonstrate the "Personal Involvement" of Several Named Defendants**

Plaintiff has also failed to allege the personal involvement of several of the named defendants in any of the purported constitutional violations set forth in his SAC and supplemental papers. "Because Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden*, 186 F.3d at 264 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ).

Correctional officer Matthew Null ("C.O. Null") is only alleged to have instructed Plaintiff to stand back from his prison cell door so that "C.O. Null could observe whether Plaintiff was wearing pants." (Dkt. 46 at ¶ 324). This allegation fails to implicate C.O. Null in an unconstitutional act or any other wrongful conduct. As such, any claim asserted against C.O. Null is dismissed.

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 90 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Correctional officers Jason Lortus ("C.O. Lortus") and M. Ranger ("C.O. Ranger") are alleged to have denied Plaintiff medical attention after Nurse Cheasman allegedly hit Plaintiff's hands with a bucket. (*Id.* at ¶ 213). Plaintiff alleges that the incident was not recorded in a logbook, which "violat[ed] the doctor's directives, policies, and regulations." (*Id.*). As discussed above, Plaintiff received adequate care and treatment, and the medical records indicate that he was examined on November 22, 2010, but refused to show his hands to the medical staff. (*See* Dkt. 59-10 at 110). Plaintiff's allegations against C.O. Lortus and C.O. Ranger also fail to establish their involvement in any constitutional violation. *See also White v. Rock*, No. 9:13-CV-392 (GTS/CFH), 2016 WL 11478222, at * 12 (N.D.N.Y. Feb. 23, 2016) ("The claim that a defendant failed to file an injury report is insufficient to satisfy the subjective prong of the deliberate indifference test."), *report and recommendation adopted*, 2016 WL 1248904 (N.D.N.Y. Mar. 29, 2016); *Harris v. Howard*, No. 907-CV-1065 TJM/GJD, 2009 WL 537550, at *12 (N.D.N.Y. Mar. 3, 2009) ("Failure to complete reports is simply not an Eighth Amendment claim under any view of the facts."); *Mitchell v. Keane*, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("Williams' failure to fill out an injury report does not state an Eighth Amendment claim. An injury report is not medically necessary for a minimally civilized life."), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Accordingly, C.O. Lortus and C.O. Ranger are also dismissed from this action.

Similarly, Plaintiff has named the Assistant Commissioner of DOCCS Mental Health Services, Diane Vanburen, as a defendant, but has not set forth any allegations that plausibly suggest her personal involvement in any constitutional violation. (Dkt. 46 at ¶ 86). The same can be said for defendant Eileen R. Diniston, the Regional Health Services Administrator (*id.* at ¶ 72), as well as Acting Deputy Superintendent Thomas Tanea (Dkt. 93-5 at 3). No allegations of wrongdoing are asserted against these defendants as well. As a result, they too are terminated from this action.

**\*30**   Likewise, Plaintiff names the Commissioner of the New York State Office of Mental Health, Michael Hogan, the Director of Mental Health Services for DOCCS, Doris Romero, and the Assistant Commissioner of the New York State Office of Mental Health, Howard Holanchock, as defendants in this action, but fails to make any specific allegations of wrongdoing against them either. Instead, he collectively refers to these individuals as the "MHU Defendants" (Dkt. 46 at ¶ 87), and generally claims "[f]or the abuses and complaints chronicled herein, the MHU

Defendants are jointly and severally liable due to their participation in the wrongs against Plaintiff and/or their wrongful refusal to address the issues when brought to their attention through complaints and grievances" (*id.* at ¶ 349). However, because none of these three defendants is alleged to have committed any wrongful act, individually or in the collective, the SAC fails to set forth sufficient facts that plausibly suggest their personal involvement in the harms otherwise set forth therein. Therefore, these three defendants are also dismissed from this action.

Relatedly, insofar as Plaintiff seeks relief for Defendants' failure to take action on his grievances or to process his administrative appeals (*see, e.g.*, Dkt. 46 at ¶¶ 248, 264, 271, 313, 320, 408-09, 413), these allegations fail to state a constitutional claim under § 1983. "Generally, the receipt of a letter is insufficient to establish personal involvement under § 1983. Instead, courts typically require something more before finding personal involvement." *Ward v. Rabideau*, 732 F. Supp. 2d 162, 169 (W.D.N.Y. 2010) (citations omitted); *see Candelaria v. Higley*, No. 04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim."); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("Personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); *Gayle v. Lucas*, No. 97 CIV. 0883 (MGC), 1998 WL 148416, at *4 (S.D.N.Y. Mar. 30, 1998) ("Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983."). As such, Plaintiff's allegations that Defendants ignored or failed to act upon his grievances or letters do not state a viable § 1983 claim. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability."). [15]

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 91 of 141

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

**\*31**  Furthermore, "[g]rievance procedures are the internal procedures and requirements of DOCCS, and as such, prison inmates neither have a constitutionally protected right to a grievance procedure, nor, as a general rule, is there a federal right to have them properly administered." *Gomez v. Sepiol*, No. 11-CV-1017SR, 2014 WL 1575872, at \*15 (W.D.N.Y. Apr. 11, 2014) (citations omitted); *see Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim."). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001). In addition, because "[t]here is no constitutional right to an inmate appeals process," *Dolberry v. Levine*, 567 F. Supp. 2d 413, 416 (W.D.N.Y. 2008) (quoting *Washington v. Early*, No. 103CV05263LJOSMSPC, 2008 WL 795603, at \*15 (E.D. Cal. Mar. 24, 2008), *report and recommendation adopted*, 2008 WL 2261399 (E.D. Cal. June 2, 2008) ), any failure to process Plaintiff's administrative appeals does not support a § 1983 cause of action.

## XII. Plaintiff's Claim for the Failure to Intervene

Lastly, "because '[t]here can be no failure to intervene ... where there was no constitutional violation,' " *Hardy v. Daly*, No. 17-2906, 2018 WL 4631831, at \*1 (2d Cir. Sept. 26, 2018) (quoting *Tavares v. City of New York*, No. 08 Civ. 3782, 2011 WL 5877550, at \*7 (S.D.N.Y. Oct. 17, 2011) ), Plaintiff's cause of action for the failure to intervene is dismissed, except insofar Plaintiff has sufficiently stated such a claim associated with the use of excessive force claims that have been permitted to proceed.

## XIII. The Matter is Stayed Pending the Resolution of Defendants' Motion to Revoke Plaintiff's IFP Status

Because some of Plaintiff's claims survive Defendants' motion for partial summary judgment, and Defendants' motion to revoke Plaintiff's IFP status is held in abeyance pending the Second Circuit's decision in *Shepherd*, the Court *sua sponte* considers whether to stay the balance of this action until Defendants' revocation motion can be resolved.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see Javier H. v. Garcia-Botello*, 218 F.R.D. 72, 74 (W.D.N.Y. 2003) ("[A] 'federal district court has the inherent power, in the exercise of its discretion, to stay an action.' " (quoting *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1010 (E.D.N.Y. 1992) ) ). "Accordingly, the decision to issue a stay is 'firmly within a district court's discretion.' " *Tradewinds Airlines, Inc. v. Soros*, No. 08 CIV. 5901JFK, 2009 WL 435298, at \*3 (S.D.N.Y. Feb. 23, 2009) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995) ); *see Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) ("[A] court *may* decide in its discretion to stay civil proceedings when the interests of justice seem to require such action." (quoting *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ) ). A court may determine that a stay is appropriate and "in the interest of judicial economy, ... pending the outcome of proceedings which bear upon the case, even if such proceedings are not necessarily controlling of the action that is to be stayed." *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005).

In determining whether to stay a lawsuit, courts weigh the following factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

**\*32**  *Luv N'Care, Ltd. v. Regent Baby Prod. Corp.*, No. 10 CIV. 9492, 2014 WL 572524, at \*2 (S.D.N.Y. Feb. 13, 2014) (quoting *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) ).

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 92 of 141

Under the facts presented here, a stay would not unduly prejudice Plaintiff. In fact, considering the robust medical documentation submitted by Defendants on this motion, and the law as it currently stands in this Circuit, Plaintiff faces an uphill battle to persuade the Court that he may maintain his IFP status. To be sure, the Second Circuit may solidify the approach presently used by courts in this Circuit to evaluate such motions. However, it may also divert from this approach, or, at the very least, elucidate nuances thereof in a manner favorable to Plaintiff. In other words, it is in Plaintiff's interest to await the Second Circuit's opinion in *Shepherd* because, as it currently stands, Plaintiff's IFP status would likely be revoked. Defendants would also benefit from the issuance of a stay. Indeed, it would be in their interests to avoid wasting limited resources in discovery disputes against a plaintiff who may not be entitled to IFP status. A stay is in the interests of judicial economy as well. A premature resolution of Plaintiff's IFP status may result in duplicative proceedings before this Court should the Second Circuit decide to depart from the approach taken by the other circuit courts that have opined on the issue. Lastly, while there is no evidence that any non-parties are specifically interested in the outcome of this matter, it is in the public interest to prevent the limited time and resources of the judiciary, the Office of the New York State Attorney General, and *pro bono* counsel from being unnecessarily diverted to a matter that could possibly be impacted should the Court revoke Plaintiff's IFP status.

Accordingly, the Court finds that it is in the interests of justice to require this action be stayed pending the resolution of Defendants' motion to revoke Plaintiff's IFP status.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment (Dkt. 59) is granted in part and denied in part, and Defendants' motion to revoke Plaintiff's IFP status (Dkt. 59) is held in abeyance pending the Second Circuit's decision in *Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). To the extent Plaintiff asserts 📄 § 1983 excessive use of force and related failure to intervene claims as well as common law causes of action against Barry Countryman, Jacob Smith, Richard Cioffa, Correctional Officer VanHorn, Kimberly Cheasman, Annette Holm, Remy Babineaux, Richard Goodliff, Correctional Sergeant T. Barber, Nurse T. Carroll, and Correctional Sergeant D. Gleason, those claims survive Defendants' motion for partial summary judgment. In addition, Plaintiff's Eighth Amendment conditions-of-confinement claims asserted against Charles Coventry and Eric Farley for unlawful prison cell illumination will also proceed to discovery. The Clerk of Court is directed to terminate all other defendants from this action and is also directed to stay this matter until further order of the Court.

**\*33**  SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1230778

## Footnotes

1    Plaintiff's address has been ascertained from the most recent filing containing his location in this action (Dkt. 117 (notice of interlocutory appeal) ), and Plaintiff's address as provided in a different action, *see Abreu v. Brown*, Case No. 6:14-cv-06599, Dkt. 60 (W.D.N.Y. Mar. 12, 2018).

2    Effective May 1, 2013, the Judicial Conference of the United States added an administrative fee of $50.00 to the cost of filing a civil lawsuit in district court. *See* September 2012 Report of the Proceedings of the Judicial Conference of the United States, *available at* <http://www.uscourts.gov/about-federal-courts/reports-proceedings-judicial-conference-us>.

3    Whether the "imminent danger" must exist at the time the initial complaint was filed or whether it can arise at the time the complaint is amended has not been expressly resolved by the Second Circuit. One district court has noted that "at least some cases have indicated that even when amended complaints are filed, the imminent danger must have existed at the time the initial complaint is filed." *Antrobus v. Dapecevic*, No. 17-CV-5840 (KMK), 2018 WL 3242272, at \*4 (S.D.N.Y. July 3, 2018) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (considering the allegations in both the initial and amended complaints, but concluding

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 93 of 141

*Abreu v. Farley, Not Reported in Fed. Supp. (2019)*

that the facts alleged did not "support a finding that [the plaintiff] was in imminent danger at the time he filed his initial complaint") ); *accord Jackson v. McPartland*, No. 06-CV-6524 CJS, 2008 WL 619364, at *1 (W.D.N.Y. Mar. 4, 2008) ("[E]ven construing the *pro se* Plaintiff's Complaint and Amended Complaint liberally, as the Court is required to do, it is clear that Plaintiff has not alleged that he was in imminent danger at the time he filed this lawsuit."). Nonetheless, the Second Circuit has not definitively ruled on this issue, and there is authority outside this Circuit that supports placing the point of reference at the time the amended complaint is filed. *See Jonassen v. United States*, 671 F. App'x 668, 668 (9th Cir. 2016) ("The district court revoked Jonassen's in forma pauperis status without considering Jonassen's proposed Third Amended Complaint ('TAC'), which made plausible allegations that Jonassen was 'under imminent danger of serious physical injury' at the time he lodged the TAC."); *Burke v. St. Louis City Jails*, 603 F. App'x 525, 525-26 (8th Cir. 2015) ("[T]he District Court should have considered whether Burke met the imminent-danger exception when he filed his amended complaint, not when he filed his original complaint." (citing *Martin v. Shelton*, 319 F.3d 1048, 1051 (8th Cir. 2003) ) ).

4    The Court notes that in various places throughout his opposition papers, Plaintiff argues that summary judgment is inappropriate because no discovery has taken place. (*See, e.g.*, Dkt. 93 at 23, 34-35, 54). However, the lack of discovery, in and of itself, cannot justify denial of a properly supported motion for summary judgment. Moreover, although Fed. R. Civ. P. 56(d) permits a party to oppose a motion for summary judgment on the grounds that it needs discovery, any such opposition must demonstrate "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." *Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 5 F. Supp. 3d 410, 420 (W.D.N.Y. 2014) (quoting Fed. R. Civ. P. 56(d) ). "The affidavit must explain: '[ (1) ] the nature of the uncompleted discovery; [ (2) ] how the facts sought are reasonably expected to create a genuine issue of material fact; [ (3) ] what efforts the affiant has made to obtain those facts; and [ (4) ] why those efforts were unsuccessful.' " *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 127 (S.D.N.Y. 2013) (quoting *Hoffmann v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012) ). "The failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *hunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13-14 (2d Cir. 2013) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) );

*see Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 446 (N.D.N.Y. 2013) (stating that if "a proper affidavit or declaration" is not submitted in support of a Rule 56(d) motion, the "application fails on this basis alone"); *see also Whelehan*, 5 F. Supp. 3d at 421 ("Merely referencing the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(d) affidavit.").

Plaintiff has failed to submit an affidavit or declaration satisfying the requirements of Rule 56(d). Although the Court recognizes the early stage of this litigation, Plaintiff's conclusory requests for additional discovery in his opposition papers are insufficient to oppose Defendants' motion for summary judgment on that basis.

5    The Court notes that, under New York law, "[a]n interpreter is only required when the inmate speaks no English." *Zhang v. Murphy*, 1 A.D.3d 784, 785 (3d Dep't 2003); *see* 7 N.Y.C.R.R. § 253.2 ("A non-English speaking inmate who cannot read and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken, and provided with a translator who shall be present at the hearing."); *Maldonado v. Racette*, 175 A.D.2d 963, 963 (3d Dep't 1991) ("[T]he regulations only require the presence of an interpreter when the inmate does not speak any English."); *see also Rodriguez v. Murphy*, 19 A.D.3d 913, 913 (3d Dep't 2005) (rejecting the "petitioner's contention that he should have been provided with the assistance of a Spanish interpreter" where "the record reveals that [the] petitioner 'was sufficiently fluent in English to understand and knowledgably participate in the disciplinary hearing' " (quoting *Santiago v. Goord*, 253 A.D.2d 970, 970 (3d Dep't 1998) ) ).

6    To the extent Plaintiff seeks to raise an independent due process claim concerning the denial of his federal Freedom of Information Act ("FOIA") or New York State Freedom of Information Law ("FOIL") requests (Dkt.

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 94 of 141

46 at ¶¶ 389, 405-06), the Court construes Plaintiff's allegations as arising solely under FOIL because FOIA "applies only to federal agencies." *Chisholm v. United of Omaha Life Ins. Co.*, 514 F. Supp. 318, 321 (D. Conn. 2007) ("Although [the plaintiff] does not say so, this Court construes her constitutional claims as having been brought under 42 U.S.C. § 1983, and her FOIA claims as arising under the Connecticut Freedom and Information Act, since the federal Freedom of Information Act, applies only to federal agencies." (citations omitted) (citing *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 484 (2d Cir. 1999) ) ). Furthermore, it is well-settled that the denial of a FOIL request "does not implicate Fifth or Fourteenth Amendment due process rights, where [the] plaintiff did not pursue state law remedies." *Murray v. Coleman*, 737 F. Supp. 2d 121, 126 (W.D.N.Y. 2010), *on reconsideration* (Dec. 14, 2010); *see Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 607 (E.D.N.Y. 2011) ("[I]t is well-settled in New York that section 1983 is not a proper vehicle for bringing a FOIL claim." (quotation omitted) ); *see also Old St. George's LLC v. Bianco*, 389 F. App'x 33, 35 (2d Cir. 2010) ("[W]ith respect to appellants' claims relating to the alleged interference by officials of the Town of Yorktown with appellants' ability to access the Town's public records, we agree with the district court that the complaint alleges, at best, only a violation of New York's Freedom of Information Law, and not a federal constitutional claim."). Accordingly, insofar as Plaintiff alleges a § 1983 cause of action arising out of his FOIL disputes, such a claim is untenable and is dismissed.

7    A "food loaf" generally "contains a variety of ingredients, including carrots and potatoes." *Alexander v. Whitney*, No. 9:04-CV-1298 (LEK/GJD), 2008 WL 904897, at *6 n.8 (N.D.N.Y. Mar. 31, 2008).

8    Insofar as Plaintiff asserts a medical indifference claim based upon the many allegedly unwarranted denials of his sick-call slips (*see, e.g.*, Dkt. 46 at ¶¶ 190, 193, 196, 200-01, 203-04, 206, 216-17, 223, 226, 245, 252, 265, 267, 285), it too is unsupported by the evidence, *see Kee v. Hasty*, No. 01 Civ.2123 (KMW)(DF), 2004 WL 807071, at *29 (S.D.N.Y. Apr. 14, 2004) (rejecting the plaintiff's "overly conclusory" allegations that the defendants failed to treat him where he failed "to specify the dates on which [he] was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied"); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 309 (S.D.N.Y. 2001) ("[A] generalized claim that an inmate was denied access to medical treatment will not suffice."); *Vento v. Lord*, No. 96 Civ. 6169 (SS), 1997 WL 431140, at *4 (S.D.N.Y. July 31, 1997) (dismissing the deliberate medical indifference claim where the plaintiff complained that "the medical staff will not see me fit ... for medical attention," but failed to provide sufficient allegations regarding the denial of his sick call requests or the nature of those requests). Indeed, "[t]he issue in this case is not whether [the plaintiff] was seen every time that he requested sick call, but whether the defendants were deliberately indifferent to his serious medical needs concerning his back pain." *Butler v. Weissman*, No. CIV.9:00-CV-1240 (LEK/GLS), 2002 WL 31309347, at *5 (N.D.N.Y. June 20, 2002). In light of the extensive medical record, which demonstrates that Plaintiff was frequently seen in the infirmary multiple times a month, and sometimes several times a week, any claim of medical indifference based upon the wrongful denial of Plaintiff's sick-call slips is unsustainable. *See Davidson v. Desai*, 817 F. Supp. 2d 166, 190-91 (W.D.N.Y. 2011) (concluding that the plaintiff failed to point to "a request seeking sick call for a serious medical need sufficient to support a jury verdict on the claim" where the plaintiff's medical record establishes that he "was seen in sick call multiple time[s] each month"); *see generally Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment." (citing *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ) ).

9    To the extent Plaintiff raises a related claim for the deprivation of constitutionally protected medical confidentiality (Dkt. 46 at ¶¶ 221, 258-59, 292), the Court notes that "[c]ourts within this Circuit have accorded constitutional privacy protection to a handful of medical conditions only, including HIV, transsexualism and sickle cell anemia," *Myers v. Dolac*, No. 09-CV-6642P, 2013 WL 5175588, at *7 (W.D.N.Y. Sept. 12, 2013).

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 95 of 141

Constitutional protection will only extend to a medical condition that "is both serious in nature and the type that is 'excruciatingly private and intimate in nature' such as those 'likely to provoke ... an intense desire to preserve one's medical confidentiality.' " *Id.* (quoting *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 64 (2d Cir. 2011) ). As such, this constitutional right is limited in scope and exists only under "narrow parameters." *Matson*, 631 F.3d at 65 (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) ). In determining whether constitutional protection extends to a particular medical condition, "courts must determine whether the disease is 'contagious ... or attributed in any way to socially repugnant conduct and whether it could be said that society as a whole views [the disease] as directly associated with any disease which might conceivably be characterized as loathsome.' " *Myers*, 2013 WL 5175588, at *7 (quoting *Matson*, 631 F.3d at 66).

The instant matter "is not a case in which plaintiff has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence." *Rodriguez v. Ames*, 287 F. Supp. 2d 213, 220 (W.D.N.Y. 2003) (rejecting the plaintiff's claim where he had been "diagnosed with proctitis, a nontoxic inflammation of the mucose tissue of the rectum, and internal hemorrhoids"); *see Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000) (finding no right to privacy attendant to medical records containing information about the plaintiff's treatment for genital conditions); *see also Myers*, 2013 WL 5175588, at *7 ("[C]ourts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis and sleep apnea."); *Ebert v. Hargreaves*, No. 4:11CV3139, 2012 WL 642470, at *3 (D. Neb. Feb. 28, 2012) (assuming that prisoners enjoy a limited right to privacy in medical information, the plaintiff failed to establish a violation of that right where he alleged that the defendant spoke about the plaintiff's "back pain in front of other inmates"); *see generally Kendall v. Kittles*, No. CO CIV. 628 (GEL), 2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004) ("Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts."). Accordingly, Plaintiff has failed to raise a triable issue of fact as to whether he was deprived his limited right to privacy in medical information.

10    Although Plaintiff submits responsive papers opposing summary judgment on almost every one of his alleged assaults (*see* Dkt. 93 at 36-45), Defendants indicate that they have only moved to dismiss the allegations pertaining to the March 30, 2010, and September 27, 2011, incidents (*see* Dkt. 105-2 at 8; *see also* Dkt. 59-2 at 79 ("[T]he Supplement should be dismissed in its entirety with the exception of the alleged incident of January 17, 2012.") ). Despite Defendants' clarification, the Court will also address the alleged use of force events pertaining to nurse Kimberly Cheasman ("Nurse Cheasman") because Defendants' motion papers allude to at least one of these events and request that all claims alleged against her be dismissed. (*See* Dkt. 59-2 at 63-65). Accordingly, the Court does not address the assaults allegedly taking place on May 10, 2010, February 21, 2011, March 21, 2011, December 5, 2011, and January 17, 2012, and thus Plaintiff's § 1983 claims for excessive use of force and his common law claims arising from these incidents may proceed.

11    This observation differs from general claims that medical personnel falsified medical records to minimize any injuries or illnesses. Such speculation is insufficient to defeat a motion for summary judgment. *See, e.g., Slater v. Lacapriccia*, No. 13-CV-1079S, 2018 WL 437931, at *6 n.8 (W.D.N.Y. Jan. 16, 2018) ("Slater contends that [the d]efendants and other medical providers falsified his medical records by not accurately recording his complaints and minimizing his conditions. But Slater has presented no evidence to support this allegation, which is essentially a denial of [the d]efendants' evidence." (citation omitted) ). Here, because Nurse Cheasman is alleged to have herself committed an act of excessive force against Plaintiff—and because the Court is required to view Plaintiff's sworn allegations in the light most favorable to him—the Court is not prepared to give dispositive weight to the very medical progress notes that Nurse Cheasman is arguably tasked with maintaining. In other words, Defendants cannot simply point to the absence of any medical evidence where those same medical records are kept and maintained by the person charged with

the use of unconstitutional force. This is, by itself, insufficient to carry Defendants' burden on a motion for summary judgment.

12    To the extent Plaintiff also alleges that certain correctional officers and medical personnel made hostile remarks or threats against him on various occasions (*see, e.g.*, Dkt. 46 at ¶¶ 145, 164, 212, 215, 225, 248, 286, 288, 348), these allegations fail to give rise to a viable claim for retaliation, *see Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 373 (S.D.N.Y. 2011) (finding that the plaintiff's retaliation "claim fails because an inmate 'has no right to redress simply because [an officer] made a hostile or derogatory comment about him.' " (quoting *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 446 (S.D.N.Y. 2006) (dismissing retaliation cause of action where the defendant "became hostile and began cursing" at the plaintiff and told the plaintiff "that he was going to issue him a 'false' misbehavior ticket") ) ); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

13    To the extent Plaintiff also alleges that he was denied access to the courts due to constitutionally inadequate access to law library resources (*see, e.g.*, Dkt. 46 at ¶¶ 211, 354, 363, 368, 404, 407), this too fails to raise a triable issue of fact because Plaintiff has failed to establish that he suffered an "actual injury" as a result of any of these purported deprivations, *see Benjamin v. Kerik*, 102 F. Supp. 2d 157, 162 (S.D.N.Y. 2000) (noting that the Supreme Court has "held that prisoners do not have a freestanding right to law libraries or legal assistance," and that inmates "must show actual injury" (citing *Lewis v. Casey*, 518 U.S. 343, 353 n.4 (1996) (rejecting "a freestanding right to libraries," and stating that the "[d]enial of access to the courts could not possibly cause the harm of inadequate libraries, but only the harm of lost, rejected, or impeded legal claims") ) ), *aff'd sub nom. Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001); *see also Smith v. Donaher*, No. 12-CV-6035-CJS, 2013 WL 2531750, at *9 (W.D.N.Y. June 10, 2013) ("Plaintiff was not denied access to the courts merely because of the amount of time that it took to make the copies."); *Muhammad v. Hodge*, No. 07-CV-0232(SR), 2010 WL 1186330, at *5 (W.D.N.Y. Mar. 24, 2010) ("Courts in the Second Circuit have repeatedly held that a prisoner does not have a constitutional right to free copies....").

14    While the Second Circuit does not appear to have directly addressed the issue, a number of courts have ruled that "[t]he 'class of one' theory is insufficient to form the basis for a § 1985 action." *Chance v. Reed*, 538 F. Supp. 2d 500, 509 (D. Conn. 2008) (citing *Am. Nat'l Bank & Tr. Co. of Chicago v. Town of Cicero*, No. 01 C 1396, 2001 WL 1631871, at * 12 (N.D. I11. Dec. 14, 2001) ) ("While the 'class of one' may qualify under a section 1983 equal protection claim, plaintiffs fail to cite, and this Court fails to find, any case stating that such a class qualifies for protection under section 1985."); *see Royal Oak Entm't, LLC v. City of Royal Oak, MI.*, 205 F. App'x 389, 399 (6th Cir. 2006) ("Plaintiffs argue that just as they may comprise a 'class of one' for purposes of their equal protection claim, they are a 'class of one' for purposes of their § 1985(3) claim. Not surprisingly, Plaintiffs provide no authority whatsoever for this claim, and we reject it."); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (affirming summary judgment on § 1985(3) claims where the plaintiff "does not allege that the complained-of discrimination resulted from its membership in any qualifying class"); *McCleester v. Dep't of Labor & Indus.*, No. CIV.A. 3:06-120, 2007 WL 2071616, at * 15 (W.D. Pa. July 16, 2007) ("The emerging consensus among federal authority therefore falls against the 'class of one' theory in the § 1985(3) context."). Although the Court is inclined to agree with the overwhelming consensus of authority that a § 1985(3) conspiracy cannot be sustained by allegations merely sufficient to support a "class of one" equal protection claim, the Court need not decide that issue on the facts presented. Because Plaintiff has failed to allege a "class of one" equal protection claim, he has likewise failed to allege a § 1985(3) based upon a "class of one" theory—assuming such a claim even exists.

**Abreu v. Farley, Not Reported in Fed. Supp. (2019)**

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 97 of 141

15   Similarly, to the extent Plaintiff alleges that certain supervisory defendants failed to overturn or otherwise rectify the actions of Five Points medical staff (*see, e.g.*, Dkt. 46 at ¶¶ 140-41, 264), this claim fails to establish a viable § 1983 cause of action as well. Initially, insofar as Plaintiff's claim would impose *respondeat superior* liability upon officials in supervisory positions for the actions of their subordinates, Plaintiff's claim is rejected because, as previously discussed, a § 1983 claim must be premised upon the "personal involvement" of the defendant and cannot be based simply upon theories of vicarious liability. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."); *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."). In addition, supervisory officials without any medical training are permitted to rely upon the medical decisions of experienced and credentialed medical personnel. *See Hardy v. Diaz*, No. 908-CV-1352GLSATB, 2010 WL 1633379, at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so."), *report and recommendation adopted*, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *see also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (affirming summary judgment where a supervisory official, who "had no medical training," gave "automatic and complete deference" to certain medical decisions made by the medical staff); *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (finding it not unreasonable for a "non-medical prison official" to refrain from "dictat[ing] the specific medical treatment to be given to particular prisoners—for whatever reason"). Such reliance does not demonstrate "personal involvement" in a constitutional violation. *See Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) (dismissing claims against "the Superintendent" of the correctional facility where he had "no medical training, and [was] entitled to rely on the medical decisions of the doctors ... in making his decision affirming the denial of [the p]laintiff's grievances"). Accordingly, insofar as Plaintiff alleges that Deputy Superintendents of Administration Jeffrey Minnerly and Matthew Thomas failed to resolve issues related to Plaintiff's medical treatment, Plaintiff's allegations fail to state a claim pursuant to § 1983.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 98 of 141

White v. Rock, Not Reported in Fed. Supp. (2016)

2016 WL 11478222
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John H. WHITE, Plaintiff,

v.

David ROCK; et al., Defendants.

No. 9:13-CV-392 (GTS/CFH)
|
Signed 02/23/2016

**Attorneys and Law Firms**

JOHN H. WHITE, Plaintiff Pro Se, 08-A-3366, Attica Correctional Facility, Box 149, Attica, New York 14011.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, OF COUNSEL: C. HARRIS DAGUE, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendants.


**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

 **\*1**  Plaintiff pro se John H. White ("White"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Compl."). Presently before the undersigned is defendants' motion for summary judgment and dismissal of White's complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 139. White has opposed the motion. Dkt. Nos. 161, 163, 164, 169, 170, 172, 178. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.


**I. BACKGROUND**


**A. Facts** [2]

The facts are related herein in the light most favorable to White as the nonmoving party. See subsection II(A) infra. At all relevant times, White was confined at Upstate Correctional Facility ("Upstate C.F."). Dkt. No. 139-2 at 1. [3] White is currently serving a term of incarceration of twenty-five years to life for murder in the second degree, attempted robbery in the first degree, and attempted robbery in the second degree. Dkt. No. 139-2 at 2-3. In June 2010, defendant David Rock ("Rock") was the Superintendent of Upstate C.F., defendant Donald Uhler ("Uhler") was the Deputy Superintendent of Security, and defendant Michael Lira ("Lira") was the Deputy Superintendent of Programs. Dkt. No. 139-4 at 5.

 **\*2**  On June 27, 2010, White was notified, by a public address announcement, that he had a visitor at the facility. Dkt. No. 139-6 at 8. At approximately 9:00 A.M. or 10:00 A.M., defendant Officer Raymond Drake ("Drake") came to White's cell in the Special Housing Unit ("SHU"), [4] and told White that his visitor was arrested and that the visit was cancelled. Id. at 9. White began kicking the cell door to "get attention from the staff." Id. at 10. Drake yelled at White to "calm down" and then walked away. Id. at 10. White knelt down on his hands and knees with his face and chest on the ground in an attempt to utilize the "audio system" to make a "verbal record" of what transpired. Id. at 10, 12-13. The door to White's SHU cell was "a big heavy steel contraption" that was "thick and made out of steel or metal or iron." Dkt. No. 139-6 at 11. If White attempted to talk through the door, the sound would be muffled; therefore, White had to speak through the space between the door and the floor. Id. White was on the floor for less than three minutes. Id. at 12.

While White was still on the floor with his face near the bottom of the door, Drake returned and began kicking the door. Dkt. No. 139-6 at 10, 12. White testified that Drake kicked the door five times in a hard manner, analogous to a "football punt." Id. at 13. The SHU door had a roll bar at the top of the door and rested on a slide. Id. at 11. As a result, the door would "rock" and "shake" when struck. Id. When Drake kicked the door, it rocked and hit White, with force similar to a punch, on the right side of his face near his nose, jaw, right eye, and right temple. Dkt. No. 139-6 at 12, 14.

White suffered a split lip that bled for four hours, a bloody nose with swelling, and swelling to the right side of his face. Dkt. No. 139-6 at 14-15. White asked Drake to contact medical, and Drake refused. Id. at 14. White asked Drake why he kicked the door and Drake responded, "because I can." Id. White asked Drake to contact the sergeant, and defendant Sergeant Jon Oropallo ("Oropallo") arrived at White's cell. Id. White asked Oropallo for medical attention, and Oropallo refused. Dkt. No. 139-6 at 14.

**White v. Rock, Not Reported in Fed. Supp. (2016)**

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 99 of 141

On June 28, 2010, at approximately 6:15 A.M., defendant Nurse Elizabeth White ("Nurse White") responded to White's sick call request and examined White at his cell. [5] Dkt. No. 139-4 at 2; Dkt. No. 139-6 at 18. On June 30, 2010, medical staff responded to White's sick call request and examined White at his cell. [6] Dkt. No. 139-6 at 19; Dkt. No. 140 at 8. White complained of jaw pain. Dkt. No. 139-6 at 18. On July 2, 2010, Travers responded to White's sick call request and provided White with four packets of Tylenol. Dkt. No. 139-2 at 2; Dkt. No. 139-6 at 19.

On July 3, 2010, White was treated again by Nurse White. Dkt. No. 139-6 at 19. Nurse White provided him Tylenol for "general pains." Id.; Dkt. No. 139-4 at 3; Dkt. No. 140 at 9. Nurse White did not observe any injury to White's lip, face, nose, or eye. Id. On July 7, 2010, Travers responded to White's sick call request. Dkt. No. 139-4 at 3. White's condition was reported as "no change as documented above." Dkt. No. 140 at 9.

On July 8, 2010, Oropallo and Nurse White came to White's cell to complete a formal injury report regarding the June 27, 2010 incident with Drake. Dkt. No. 139-6 at 19-20. White stated, "I was on the floor talking at bottom of door. He kicked the door and the door hit my face." Dkt. No. 140 at 18. Nurse White completed the medical portion of the Inmate Injury Report. Dkt. No. 139-4 at 4. Nurse White observed White through the cell door and reported, "[n]o injury noted at this time. Inmate argumentative and uncooperative with further evaluation." Dkt. No. 139-4 at 4; Dkt. No. 140 at 18. Nurse White noted that no treatment was "indicated at this time." Id.

**\*3** On July 9, 2010, Drake prepared a Memorandum to Oropallo regarding White. Dkt. No. 164 at 41. Drake claimed that on June 27, 2010, he told White that his visit was canceled. Id. After learning this, White "became angry and started yelling." Id. Drake stated that he did not assault White or cause White to sustain any injury. Id. On July 9, 2010, Oropallo prepared a Memorandum addressed to Lieutenant T. Lombard ("Lombard"). [7] Dkt. No. 164 at 42. Oropallo stated that he interviewed White on July 8, 2010 regarding a complaint that White "authored" on June 27, 2010. Id. Oropallo reported that on June 27, 2010, he arrived at White's cell after Drake informed him that White wanted to speak with a supervisor. Id. At that time, White did not express any medical concerns, and Oropallo did not witness any injuries or blood from an alleged injury. Dkt. No. 164 at 42. During the July 8 interview, White was "visually assessed at his cell" by Nurse White with "no injuries noted." Id. During

the interview, White made the same "accusations as he stated in his complaint and added nothing further." Id. White was "argumentative" and insisted on preparing his own inmate injury report. Id.

On July 12, 2010, Lombard prepared a memorandum for Captain D. Quinn ("Quinn"). [8] Dkt. No. 164 at 43. Lombard indicated that on July 12, 2010, he interviewed Inmate E. Allen ("Allen"), an alleged witness to the June 27, 2010 incident. Id. Allen stated that the incident happened, "just as White wrote it." Id. Allen claimed that Drake kicked the door while White was kicking the door and yelling out from under the door. Id.

White received additional medical treatment on July 13, 2010; July 14, 2010; July 15, 2010; and July 19, 2010 for complaints of jaw pain, and "regularly" received Tylenol and Ibuprofen. Dkt. No. 139-6 at 21; Dkt. No. 139-4 at 4-5. At some point, White also attended a dental "call-out" and was seen by a dentist. Dkt. No. 139-6 at 21.

## B. Procedural History

On April 8, 2013, White filed his complaint in this action. Dkt. No. 1 ("Compl."). [9] Following an initial review of White's complaint, the Court directed Drake, Oropallo, White, Lashway, Rock, Uhler, and Lira to respond to White's Eighth Amendment excessive force claims and deliberate indifference to medical care claims. Dkt. No. 42 at 13-14. On May 11, 2015, defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of White's complaint. Dkt. No. 139.

## II. DISCUSSION [10]

**\*4** White alleges that he was subjected to Eighth Amendment violations related to the use of excessive force and deliberate indifference to a serious medical condition. See generally Compl. White also asserts supervisory claims against Rock, Uhler, Lira, and Lashway, and alleges that defendants violated various sections of the New York State Corrections Law and DOCCS policies/procedures. See id.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Eleventh Amendment

Defendants move for summary judgment and dismissal of White's claims against them in their official capacity. Dkt. No. 139-3 at 10. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890) ). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

**\*5** A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974) ). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Here, because White seeks monetary damages against defendants for acts allegedly occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity. Accordingly, the undersigned recommends that defendants' motion for summary judgment and dismissal

of White's claims for monetary damages against defendants in their official capacity be granted.[11]

### C. Eighth Amendment[12]

#### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson, 503 U.S. at 9-10. T he Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (citations omitted). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims, 230 F.3d at 22 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ).

*6 The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness[.]" Sims, 230 F.3d at 21 (citation and internal quotation marks omitted). The

wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, White claims that, on June 27, 2010, Drake kicked his cell door several times, "caus[ing] plaintiff bodily harm [including] swelling of the face, nose & jaw, with a discharge of blood from the mouth & nose." See Dkt. Compl. at 5; Dkt. No. 42 at 7. White alleges that Drake "launch[ed]" a steel door into his skull and facial area with "rapid and successive" kicks. See Dkt. No. 164 at 9. Defendants argue that, even assuming that White's allegations are true, the level of force exerted was de minimis, and, thus, summary judgment is warranted. See Dkt. No. 139-3 at 11-12. Defendants contend that the "rocking on its track of a metal SHU cell door approximately 2 inches, 5 times," is insufficient to satisfy the objective prong of an excessive force claim. See Dkt. No. 139-3 at 11.

Viewing the evidence in a light most favorable to White, there are genuine issues of material fact precluding summary judgment on the excessive force claim, including the level of force used, the extent of White's injuries, and whether Drake used force in a malicious manner. See Grippin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se ... whether or not significant injury is evident."). With respect to the objective analysis, the record contains conflicting testimony and evidence regarding the severity of White's injuries following the incident. White testified

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 102 of 141

that immediately following the incident, he was "bleeding profusely." Dkt. No. 139-6 at 14. White contends that his nose continued to bleed for approximately four hours and asserts that he was not permitted to photograph his injuries or prepare an Injury Report on the day of the incident. Id.; Dkt. No. 164 at 11. Oropallo concedes that on the day of the incident, White reported what transpired, but Oropallo did not prepare an Injury Report/Facility Health Services Report until July 8, 2010. See Dkt. No. 140 at 18; Dkt. No. 164 at 42. White received medical attention the day after the incident. Dkt. No. 139-4 at 2; Dkt. No. 139-6 at 18. White testified that he told Nurse White that he was "injured by an officer the previous day," and asserts that his face was swollen at the time of the examination. Dkt. No. 139-6 at 18. Conversely, Nurse White avers that she did not observe any facial injuries and claims that White did not complain of any such injuries. Dkt. No. 139-4 at 3. Nurse White's medical note indicates that she provided "Tylenol for general pain." Dkt. No. 139-4 at 3; Dkt. No. 140 at 7.

**\*7** Where the issue of "whether [the] plaintiff's injuries [...] were significant enough to avoid the de minimis label depends on the resolution of a triable issue of fact," summary judgment is not appropriate. See McCrory v. Belden, No. 01 Civ. 0525, 2003 WL 22271192, at \*6 (S.D.N.Y. Sept. 30, 2003) (" 'Minor' injuries suffice for an Eighth Amendment claim, and bruising or equivalent injuries may be found be a reasonable fact-finder to constitute minor rather than de[ ]minimis harm.") (citation omitted); see also Webster v. City of New York, 333 F. Supp. 2d 184, 197 (S.D.N.Y. 2004) (finding that, while the plaintiff's injuries appeared to be minor and a reasonable fact-finder "may well conclude that they do not rise to the level of a constitutional violation," the injuries were not, "as a matter of law, de minimis.").

The cases cited by defendants in support of the motion are distinguishable from the facts at hand. Dkt. No. 139-3 at 11-12. In those cases, the parties did not dispute the nature and extent of the injuries that the plaintiffs sustained as a result of the uses of force. In the absence of any genuine, material issue of fact regarding the injuries, the courts in those cases determined, as a matter of law, that the force exerted was de minimis. See Bermudez v. Waugh, No. 9:11-CV-0947 (MAD/DEP), 2013 WL 654401, at \*5 (N.D.N.Y. Feb. 21, 2013) (granting summary judgment where the defendant's conduct resulted in injuries that the plaintiff described as a "little red mark" or "red bruise"); Rincon v. City of New York, No. 03 Civ. 8276, 2005 WL 646080, at \*5 (S.D.N.Y. Mar. 21,

2005) (dismissing excessive force claim where the plaintiff admitted she was treated only for swelling in her right leg and wrist); Brown v. Busch, 954 F. Supp. 588, 595-96 (W.D.N.Y. 1997) (dismissing excessive force claim where medical records established that two hours after the incident, the plaintiff had a small abrasion on his back); DeArmas v. Jaycox, No. 92 Civ. 6139, 1993 WL 37501, at \*4 (S.D.N.Y. Feb. 8, 1993) (dismissing excessive force claim because a medical examination, conducted within hours of the alleged assault, revealed no bruising, swelling, redness, or reports of pain). Here, as stated, there are disputed material facts with respect to the seriousness of White's injuries; thus, the Court cannot determine, as a matter of law, that the amount of force used was de minimis.

As for the subjective prong of the excessive force analysis, although it is undisputed that defendants were tasked with the safety and order of inmates, there are disputed factual issues regarding whether the use of force was necessary, reasonable, or was applied in a malicious manner. The only factual account in the record of what transpired on the day of the incident is taken from White's deposition testimony. White testified that the assault was unprovoked, and that Drake was aware that White was on the floor when he kicked the door:

> Q. Do you believe that Drake knew you were on the ground with your face against the door when he kicked it?
>
> A. Yes. I believe that because there was at no time did Drake hear or see me standing to either side of the door and whether it be the left side of the door or the right side of the door yelling through these areas or the front area where the window is at. The only obvious place I could be was on the ground.

Dkt. No. 139-6 at 13.

Defendants have not offered any evidence challenging White's account of the events surrounding the use of force, and have failed to provide an account from Drake addressing whether he was aware that White was laying at the base of the door when he kicked it. Were a trier of fact presented with White's account of the events, the trier or fact could arguably infer that Drake acted maliciously, insofar as he was aware that the door would hit White because he knew White was laying at the bottom of the door. See Crawford v. Braun, No. 99 Civ. 5851, 2001 WL 127306, at \*4 (S.D.N.Y. Feb. 9, 2001) (finding that disputed issues of fact regarding

whether force was applied in a good faith manner preclude summary judgment even absent a significant injury); cf. Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*16 (N.D.N.Y. Mar. 28, 2014) (finding that the plaintiff could not establish wanton or malicious conduct where the defendant "busted open" a bathroom door, causing the door to hit the plaintiff who was on the other side, where the defendant "could not have know [that the plaintiff] was positioned in such a way that the door would hurt [the] plaintiff if [the defendant] opened it forcefully.").

 **\*8** In these circumstances, the governing law dictating that the evidence must be viewed in a light most favorable to the non-moving party directs the Court to credit White's version of events for the purposes of this motion. See In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in the favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury) (citing cases); Robinson v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (citations omitted). Thus, viewing the evidence in the light most favorable to White, he has presented sufficient evidence to raise genuine issues of material fact as to the objective and subjective prongs of the Eighth Amendment excessive force analysis. Accordingly, the undersigned recommends that defendants' motion on this ground be denied. [13]

### 2. Deliberate Indifference to Medical Needs

White claims that Drake, Oropallo, Nurse White, Lashway, Rock, Uhler, and Lira delayed medical treatment and failed to provide adequate medical treatment. See Dkt. No. 139-6 at 21-22. Specifically, White alleges that defendants failed to "document" his "abnormalities," refused to allow him to be examined by a nurse within twenty-four hours of the alleged incident, failed to refer him to a specialist, and refused to order "x-rays, c-scan, MRI (etc.)." See Dkt. No. 164 at 19; Dkt. No. 139-6 at 21-22. White further contends that Nurse White and Lashway were "apathetic" to his complaints and failed to make an accurate and timely injury report. See Dkt. No. 139-6 at 21, 25.

The Eighth Amendment's prohibition against cruel and unusual punishment extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). A

prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66.

A claim for deliberate indifference to medical needs has two necessary components, one objective and the other subjective. See Hathaway, 99 F.3d at 553. The objective test asks whether there was a sufficiently serious medical need. Chance, 143 F.3d at 702. Deprivation of medical treatment is "sufficiently serious" if there exists "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury' in order to state an Eighth Amendment claim for denial of medical care." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson, 503 U.S. at 9).

 **\*9** As there is no bright-line test to determine whether a medical condition is sufficiently serious, the Second Circuit has identified several factors that are relevant to the objective prong's inquiry, including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (quoting McGuckin v. Smith, 974 F.3d 132, 137 (2d Cir. 2000) ).

Under the subjective prong, the prisoner must demonstrate that the defendants were deliberately indifferent to his serious medical needs. The prisoner may do so when he demonstrates that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "[P]rison officials who actually knew of a substantial risk to inmate heath or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 104 of 141

avoided." Id. at 844 (citation and internal quotation marks omitted),

To assert a claim for deliberate indifference, an inmate must allege that: (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. Farmer, 511 U.S. at 835. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (footnotes omitted). "[M]ere disagreement over the proper treatment does not create a constitutional claim.... [s]o long as the treatment was adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703 (citation omitted). Thus,

> disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

Sonds v. St. Barnabas Hosp. Corr. Health Services, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

### a. Objective Prong

White has failed to establish, with competent, admissible proof, that he suffered from a serious medical condition. White claims, without providing medical support, that he sustained skull trauma and a brain hemorrhage.[14] See Dkt.

No. 164 at 20, 21, 25. Construing the record in a light most favorable to White, White suffered a "split lip," "bloody nose," swelling, and jaw pain. See Dkt. No. 139-3.

**\*10** Courts in this Circuit, including within this District, have consistently held that "cuts, lacerations, bruises, and other superficial injuries," are not "sufficiently serious to support" a deliberate indifference claim. Goodwin v. Kennedy, No. CV 13-1774, 2015 WL 1040663, at \*12 (E.D.N.Y. Mar. 10, 2015) (citation omitted) (holding that "a split lip, which bled and became swollen ... [and] needed stitches" did not constitute serious medical condition); Latouche v. Tompkins, No. 09-CV-308 (NAM/RFT), 2011 WL 1103022, at \*14 (N.D.N.Y. Mar. 4, 2011) (finding that a four to five centimeter bruise, a two to three centimeter cut, a scratch on the plaintiff's face, and pain from a bump on the right and left sides of his face are not objectively sufficiently serious to support a claim of medical indifference), adopting Report-Recommendation, 2011 WL 1103045 (N.D.N.Y. Mar. 23, 2011); Dallio v. Hebert, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. 2009) (holding that two black eyes, bruising in kidney area, kick marks, open lacerations on knees, bruising and red spots on thigh, lacerations on arms and wrists, a headache, and numbness in hands and fingers are not "conditions of urgency that may produce death, degeneration, or extreme pain.") (collecting cases). Accordingly, plaintiff has failed to demonstrate that his split lip, bloody nose, and swelling to his face amounts to a serious medical need. Dkt. No. 139-6 at 14-15.

### b. Subjective Prong

Even assuming that White suffered from a "serious medical condition" sufficient to establish the objective element of the Eighth Amendment, White has failed to raise a question of material fact with respect to the subjective prong of the deliberate indifference analysis.

### i. Delay in Medical Treatment

White claims that defendants Drake, Oropallo, Nurse White, Lashway, Rock, Uhler, and Lira intentionally denied or delayed access to medical care. See Dkt. No. 164 at 24.

As set out by the Eastern District,

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 105 of 141

When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged <u>delay</u> or <u>interruption</u> in treatment rather than the prisoner's <u>underlying medical condition</u> alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.

⚠ <u>Brunskill v. County of Suffolk</u>, No. 11-CV-586, 2012 WL 2921180, at *3 (E.D.N.Y. July 11, 2012) (quoting 📙 <u>Smith</u>, 316 F.3d at 185) (internal quotation marks omitted). Courts have determined that a delay may constitute deliberate indifference when "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." ⚠ <u>Brunskill</u>, 2012 WL 2921180, at *3 (citation omitted).

In this instance, White's claims are not supported by the record. The evidence reveals that White was treated on June 28, 2010, just one day after the alleged incident with Drake. Although he claims that he was in pain, White has failed to produce any evidence that the one-day delay caused him to suffer "substantial harm." Further, he has not demonstrated that the one-day delay was an effort to punish him. Cf. ⚠ <u>Brunskill</u>, 2012 WL 2921180, at *3. Even where a plaintiff makes conclusory allegations of extreme pain, a very short delay in treatment is insufficient where the plaintiff cannot show adverse medical effects or demonstrable physical injury resulting from a minor delay in treatment. See, e.g., <u>Evans v. Manos</u>, 336 F. Supp. 2d 255, 260, 262 (W.D.N.Y. 2004) (holding that subjective claims of pain, unaccompanied by substantial medical complications, are not sufficient to create a factual issue that the plaintiff was suffering from a "serious" and unmet medial need as "delay alone will not give rise to a constitutional claim unless the delay causes substantial harm.") (citation omitted). Consequently, White cannot establish that defendants were deliberately indifferent to his medical needs by delaying to treatment by one day.

See ⚠ <u>Watts v. New York City Police Dep't</u>, 100 F. Supp. 3d 314, 327 (S.D.N.Y. 2015) (finding that one-day delay in providing medical treatment did not constitute deliberate indifference); <u>Brooks</u>, 2014 WL 1292232, at *16 (holding that the plaintiff failed to establish the objective element against a defendant who did not allow the plaintiff to obtain immediate medical treatment after the defendant allegedly kicked open a bathroom door which struck the inmate in the head because the two-day delay in treatment did not involve a significant risk of degeneration of the plaintiff's medical condition or require the plaintiff to endure extreme pain); <u>Williams v. Raimo</u>, No. 9:10-CV-245 (MAD/GHL), 2011 WL 6026111, at *5 (N.D.N.Y. Dec. 2, 2011) ("[P]laintiff failed to provide any evidence to suggest that he was substantially harmed from the one-day delay in treatment.") (citing <u>Croft v. Hampton</u>, 286 F. App'x 955, 959 (8th Cir. 2007) ).

### ii. Disagreements Regarding Treatment

**\*11** White claims that he was not (1) sent for treatment with a specialist, (2) provided "self-carry medication," (3) referred for a "skull examination," or (4) prescribed a timely MRI. See Dkt. No. 164 at 19, 24. Even assuming White's allegations to be true, "[i]nmates do not have a right to chose [sic] a specific type of treatment." 📙 <u>Veloz v. New York</u>, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004). A medical "professional's decision not to administer a specific medical test, regardless of a prisoner's disagreement with that decision, 'is a classic example of the type of medical judgment that is given judicial deference, and does not form the basis of a deliberate indifference claim.' " <u>Curtis v. Williams</u>, No. 11 Civ. 1186 (JMF), 2013 WL 1915447, at *7 (S.D.N.Y. May 9, 2013) (quoting <u>Verley v. Goord</u>, 02-Civ-1182 (PKC/DF), 📙 2004 WL 526740, at *12 (S.D.N.Y. Jan. 23, 2004) and 📙 <u>Estelle</u>, 429 U.S. at 107) ("[A] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

With respect to the MRI, White concedes that an "MRI was actually taken," but asserts that there was a "nine month" lag between when the test was ordered and when it was administered. Dkt. No. 164 at 25. To the extent that White attempts to assert a "deliberate indifference" claim against any defendant as a result of that delay, this claim is subject to dismissal. The record lacks any evidence that would permit a rational jury to conclude that any named

**White v. Rock, Not Reported in Fed. Supp. (2016)**

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 106 of 141

defendant was responsible or personally involved in any decision regarding White's MRI. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."

Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Further, the medical records are void of any reference to radiological films. White's claims amount to a disagreement over treatment, and, as such, are insufficient to establish an Eighth Amendment claim. See Dkt. No. 164 at 19-20, 24; Sonds, 151 F.Supp.2d at 312; see Wright v. Conway, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008) ("[The plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed."). White's "dissatisfaction" with his level of care and course of treatment does not support a finding of deliberate indifference. See Soto v. Wright, No. 11 Civ. 2289, 2013 WL 474291, at *5 (S.D.N.Y. Feb. 1, 2013) (citation omitted).

### iii. Apathy

White claims that Nurse White and Lashway made repetitive entries documenting his "pain and suffering" but their treatment was "cursory" and they displayed "apathy to [his] complaints." See Dkt. No. 164 at 25. In support of his argument that a display of apathy amounts to deliberate indifference, White cites Ruffin v. Deperio, 97 F. Supp. 2d 346 (S.D.N.Y. 2000). In Ruffin, the plaintiff, a diabetic inmate, sustained an injury in an accident in March 1994. Id. at 349. The plaintiff's condition deteriorated but he did not undergo surgery until July 1995. Id. In opposition to the defendants' motion for summary judgment, the plaintiff provided admissible evidence, including medical records, deposition testimony, and expert witness testimony that established that the defendants' "treatment" of the plaintiff consisted of nothing more than documenting his worsening condition, including "blackening of his toes" and rising glycerin levels, and providing ineffective medications. Id. at 353-54. The defendants argued that the plaintiff's allegations were merely a "disagreement over the course of treatment." Id. at 354. The Southern District held that, "[a] defendant may not escape liability if the evidence shows that he 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.' " Id. (quoting Farmer, 511 U.S. at 842); Hudak v. Miller, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder could infer actual knowledge of them on [the defendants'] part, this Court must deny summary judgment."). The Southern District held further that the defendants' "apathy or unconcern" for the plaintiff's plainly serious medical needs could amount to deliberate indifference and refused to award summary judgment, as the defendants' conduct was not remedied by the fact that the plaintiff was provided with some treatment and referred to outside specialists. See id. at 353.

**\*12** White's reliance upon Ruffin is misplaced. In this instance, White has failed to produce competent, admissible evidence that defendants' conduct was "a substantial departure from accepted professional judgment" and thereby placed him at risk for serious medical problems. From June 28, 2010 until August 31, 2010, White was seen by medical staff on approximately twenty-five occasions. See Dkt. No. 140 at 1-17. White's medical records lack any reference to complaints of specified pain. White continually complained of "general pains" and jaw pain, and was repeatedly treated by Nurse White, Lashway, and other members of the medical staff with Tylenol and Ibuprofen. See id. The record does not establish that White was ignored, that his pain increased in severity, or that his condition deteriorated. Unlike the defendants' failure to act in response to the "obvious symptoms of serious medical problems" in Ruffin, the treatment that Nurses White and Lashway provided does not rise to the level of apathy presented in Ruffin. See Taylor v. Kooi, No. 9:09-CV-1036 (FJS/DEP), 2012 WL 7784264, at *11-12 (N.D.N.Y. Feb. 29, 2012) (declining to apply Ruffin, which preceded Salahuddin v. Goord, 467 F.3d 263 (2d Cir. 2006), where there was no evidence that the plaintiff's condition deteriorated or that his condition was ignored during a five-year period when the plaintiff was provided X-rays, pain medication, and continued monitoring).

Accordingly, White has failed to establish facts sufficient to demonstrate that Nurse White or Lashway made a "substantial departure from accepted professional judgment and that the evidence of risk was sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to [the] plaintiff." Ruffin, 97 F. Supp. 2d at 355.

#### iv. Failure to Prepare a Timely Injury Report

White alleges that Nurse White and Lashway failed to prepare a timely and accurate injury report. See Dkt. No. 139-6 at 21. The claim that a defendant failed to file an injury report is insufficient to satisfy the subjective prong of the deliberate indifference test. See Harris v. Howard, 07-CV-1065 (TJM/GJD), 2009 WL 537550, at *12 (N.D.N.Y. Mar. 3, 2009) (holding that the defendant nurses' failure to complete an injury report "is not an Eighth Amendment claim under any view of the facts."); Mitchell v. City of New York, 09-CV-3623, 2010 WL 3734098, at *3 (S.D.N.Y. Sept. 23, 2010); Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) (finding a failure to fill out an injury report does not state an Eighth Amendment claim as "[a]n injury report is not medically necessary for a minimally civilized life."). Further, White does not present any evidence from which a reasonable fact finder could conclude that defendants acted with a "sufficiently culpable mental state." Salahuddin, 467 F.3d at 282. The record establishes that from June 28, 2010 until July 19, 2010, White requested and received Nurses Sick Call on ten separate occasions. Dkt. No. 139-4; Dkt. No. 140. The medical record belies White's claim that any defendant intentionally denied him medical care. Accordingly, the undersigned recommends that defendants' motion for summary judgment and dismissal of White's claim that defendants violated his Eighth Amendment rights through their deliberate indifference to his serious medical needs be granted.

#### C. Supervisory Liability

White claims that Rock, Uhler, and Lira failed to adequately train or supervise their subordinates.[15] See Dkt. No. 139-6 at 22. White also asserts that Rock, Uhler, and Lira were deliberately indifferent to his serious medical needs because the defendants "should have known" that his condition was deteriorating because White "routinely encountered each [defendant] and they failed to act on his complaints." See Dkt. No. 164 at 26. White also claims that Lashway failed to properly train the nurses under her supervision. See Dkt. No. 139-6 at 22.

Supervisory officials may not be held liable merely because they hold a position of authority. Black v. Coughlin, 76

F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

**\*13** (1) [T]he defendant participated directly in the alleged constitutional violation,

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ). Section 1983 liability cannot be based upon a defendants' position in the prison hierarchy. See Colon, 58 F.3d at 873.

Conclusory claims that a supervisory official has failed to provide proper training and supervision, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in Colon. See Bridgewater v. Taylor, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011); White v. Fischer, No. 9:09-CV-0240 (DNH/DEP), 2010 WL 624081, at *6 (N.D.N.Y. Feb. 18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); see also Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009) (affirming dismissal of complaint against a supervisor when the complaint did not allege any personal involvement and "lack[ed] any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights); Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) ("Dismissal of a section 1983 claim is proper where, as here, the plaintiff 'does no more than allege that [defendant] was in charge of the prison.' ") (quoting Williams v. Vincent, 508 F.2d 541, 546 (2d Cir. 1974) ).

**White v. Rock, Not Reported in Fed. Supp. (2016)**

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 108 of 141

### 1. Rock, Uhler, and Lira

White has failed to establish the personal involvement of Rock, Uhler, or Lira for the claims of excessive force or deliberate indifference to his serious medical needs. The record lacks any evidence suggesting that Rock, Uhler, or Lira directly participated, were involved in, or even aware of the alleged incident with Drake. White's attempt at establishing personal involvement based upon defendants' supervisory roles is inappropriate. See Colon, 58 F.3d at 873. The record is lacks evidence that White complained to any supervisory defendant, other than Oropallo, about the incident with Drake.

Similarly, with regard to the medical indifference claims against the above defendants, White refers generally to "encountering" defendants, but fails to establish, with admissible evidence, when the "encounters" took place or the sum and substance of any conversation that White had with these defendants regarding alleged constitutional violations. Without more, White's conclusory allegations are insufficient to defeat defendants' motion for summary judgment. Moreover, as discussed supra, summary judgment is warranted because White failed to raise an issue of material fact with respect to his Eighth Amendment claims related to the deliberate indifference to his serious medical needs. Hernandez v. Keane, 341 F.3d 137, 144-45 (2d Cir. 2003) (" 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983.") (quoting Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) ); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [the p]laintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisory liability.") (internal quotation marks and citation omitted).

**\*14** Accordingly, it is recommended that summary judgment be granted as to White's claims for supervisory liability and deliberate indifference against defendants Rock, Uhler, and Lira.

### 2. Lashway

White claims that Lashway "failed to properly train" nurses under her supervision. For the reasons set forth above in section II (C)(1), White's supervisory claims against Lashway are also ripe for summary judgment.

Accordingly, the undersigned recommends that summary judgment be granted as to White's supervisory claims against Lashway.

### D. Remaining Claims [16]

### 1. Oropallo, Lashway and Nurse White

White claims that defendants Oropallo, Lashway, and Nurse White violated DOCCS Directive #4933 (Special Housing Units); DOCCS Directive #4065 (Reporting Injuries and Occupational Illnesses); DOCCS Directive #4059 (Response to Health Care Emergencies), 9 N.Y.C.R.R. §§ 7651.10(h), [17] and 7651.12(a). [18] See Dkt. No. 164 at 13-17, 23-24; Dkt. No. 170; Dkt. No. 178.

"Violations of state law do not give rise to claims under 42 U.S.C. § 1983 ... [, and, m]ore specifically, a violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983." Tuitt v. Chase, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877439, at *10 (N.D.N.Y. Jan. 30, 2013) (citation omitted); Cusamano v. Sobek, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (collecting cases). Similarly, a state employee's violation of the New York Regulations and prison procedures, without more, does not give rise to liability under § 1983. See Cepeda v. Urban, No. 12-CV-0408, 2014 WL 2587746, at *5-6 (W.D.N.Y. June 10, 2014) (citations omitted); see also Austin v. Fischer, No. 09 Civ. 4812, 2010 WL 3187642, at *4 (S.D.N.Y. Aug. 11, 2010) (quoting Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 363 (2d Cir. 2004) ) (" '[s]tate procedures designed to protect substantive liberty interests entitled to protection under the federal constitution do not themselves give rise to additional substantive liberty interests.' "). A violation of a DOCCS directive, with out more is also not "a violation of any New York State law, statute, or regulation." Collins v. Ferguson, 10-CV-6350 (FPG), 2015 WL 1044359,

**Case 9:20-cv-01115-TJM-TWD**  Document 47  Filed 11/05/21  Page 109 of 141

White v. Rock, Not Reported in Fed. Supp. (2016)

at *7 (W.D.N.Y. Mar. 10, 2015) (citation omitted). As discussed supra, the undersigned recommends dismissal of all federal claims against Oropallo, Lashway, and Nurse White as White has failed to produce admissible establishing that these defendants violated White's constitutional rights. With respect to violations of DOCCS Directives, as it is well settled that violations of state law or DOCCS directives do not give rise to claims under section 1983, the undersigned also recommends summary judgment be granted on these state claims against Oropallo, Lashway, and Nurse White.

### 2. Drake

**\*15** White claims that Drake violated New York Correction Law § 137(5) and various sections of the DOCCS Employee Manual (Rev. 2013). [19] See Dkt. No. 164 at 13.

New York Correction Law § 137(5) provides, in pertinent part, "[n]o inmate in the care or custody of the department shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection." N.Y. Corr. Law § 137(5).

White's New York Correction Law § 137(5) claim is barred pursuant to New York Correction Law § 24(1). Section 24(1) provides:

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

New York Correction Law § 24(1); Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996). "Section 24 is not a bar to claims

against corrections officers and employees under § 1983." Parris v. New York State Dep't of Corr. Services, 947 F. Supp. 2d 354, 356 (S.D.N.Y. 2013) (citing Haywood v. Drown, 556 U.S. 729, 740-41 (2009) ).

Courts look at the following factors to determine whether a defendant's action is within the scope of employment for purposes of determining applicability of section 24:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted) (holding that the defendant's alleged sexual harassment against another employee was not undertaken in the discharge of his duties and, thus, was beyond the protection afforded to officers under § 24).

The test to determine whether the defendants' actions fall within the scope of their employment is " 'whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of instructions.' " Cruz v. New York, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citation omitted). Conduct that is "purely for personal reasons unrelated to the employer's interests, ... which is a substantial departure from the normal methods of performing [an officer's or employee's] duties is not considered within the scope of employment." Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision, No. 11-CV-079S, 2013 WL 5347468, at *2 (W.D.N.Y. Sept. 23, 2013) (quoting Gore v. Kuhlman, 217 A.D.2d 890, 891 (N.Y. App. Div. 1995) ). "Custody and control of inmates and the maintenance of prison safety and security are the primary

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD   Document 47   Filed 11/05/21   Page 110 of 141

duties and responsibilities of correction officers." Cepeda v. Coughlin, 128 A.D.2d 995, 997 (N.Y. App. Div. 1987).

 **\*16** Based upon the record herein, Drake was on duty in the correctional facility and performing his "basic job function(s)" at the time of the alleged constitutional violations. See Crosby v. Russell, No. 10-CV-0595 (TJM/DEP), 2014 WL 3809129, at \*6 (N.D.N.Y. Aug. 1, 2014) ("Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common[ ]' conduct by a DOCCS officer or sergeant."). " 'While they may allege constitutional deprivations and actions exceeding the scope of a correction[ ] officer's authority, these types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against correction[ ] officers in their individual capacities.' " See Ames v. New York Dep't of Corr. & Cmty. Supervision, No. 9:12-CV-01487 (MAD), 2015 WL 4126326, at \*14 (N.D.N.Y. Mar. 24, 2015) (quoting Crump v. Ekpe, No. 07-CV-1331, 2010 WL 502762, at \*18 (N.D.N.Y. Feb. 8, 2010) ); Williams v. Fischer, 09-CV-1258 (NAM/DEP), 2011 WL 1812527, at \*11 (N.D.N.Y. Feb. 9, 2011) (citing, inter alia, Baker v. Coughlin, 77 F.3d 12, 15-16 (2d Cir. 1996) ). Thus, White's pendent state law claims are barred by New York Corrections Law § 24.

Furthermore, for the reasons set forth supra, Drake's alleged violations of various sections of the DOCCS Employee Manual fail to give rise to a constitutional claim actionable under § 1983. See Flynn v. Ward, No. 15-CV-1028 (GLS/CFH), 2015 WL 8056060, at \*4 (N.D.N.Y. Dec. 4, 2015) (dismissing the plaintiff's claim that the defendants violated the Facility Operations Manual because "[a] Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations."). Accordingly, the undersigned recommends summary judgment be granted on these claims against Drake.

### E. Qualified Immunity

Defendants argue that, even if White's claims are substantiated, they are nevertheless entitled to qualified immunity. Defendants assert that, "for all the reasons outlined above setting forth the medical treatment provided to Plaintiff during the time period in issue," defendants acted reasonably. Dkt. No. 139-3 at 19.

Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991) (citing Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) ). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194 (2001). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.

Here, with respect to Nurse White, Oropallo, Lashway, Rock, Uhler, and Lira, the second prong of the inquiry need not be addressed with respect to White's claims because, as discussed supra, it has not been shown that these defendants violated White's constitutional rights. Accordingly, in the alternative to a dismissal on the merits, it is recommended that defendants' motion on behalf of Nurse White, Oropallo, Lashway, Rock, Lira, and Uhler, on this ground be granted. Having determined that White's excessive force claim presents triable issues of fact, the undersigned recommends denying the motion for summary judgment on the basis of qualified immunity as it relates to defendant Drake.

### III. CONCLUSION

 **\*17 WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 139) be **GRANTED as to**:

(1) the Eighth Amendment medical indifference claims against all defendants;

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 111 of 141

(2) the supervisory liability claims against Rock, Uhler, Lira, and Lashway; and

(3) the state law claims against Drake, Nurse White, Lashway, and Oropallo; and it is further;

(4) all claims against defendants in their official capacities; or, in the alternative, that summary judgment be granted as to defendants Rock, Uhler, Lira, Lashway, Drake, White, and Oropallo on the basis of qualified immunity; and it is further

**RECOMMENDED** that White, Lashway, Oropallo, Rock, Uhler, and Lira be **dismissed** as defendants from this action; and it is further

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 139) be **DENIED as to**:

(1) the Eighth Amendment excessive force claim against defendant Drake; and

(2) defendants' qualified immunity defense as to defendant Drake; it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court**. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11478222

## Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Local Rule 7.1(a)(3) states:
     Summary Judgment Motions
     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
     ....
     The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute....
     N.D.N.Y. L. R. 7.1(a)(3) (emphasis in original). Defendants filed a Statement of Material Facts with citations to exhibits. White annexed exhibits to his Memorandum of Law in opposition to defendants' motion. The parties have not objected to the authenticity of any documents. Therefore, to the extent that the "facts"

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 112 of 141

asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion. See ☐ U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing ☐ Daniel v. UnumProvident Corp., 261 F. App'x 316, 319 (2d Cir. 2008) ) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party.") (citation omitted). The facts recited are for the relevant time period as referenced in the complaint.

3    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

5    The facts regarding what transpired during this examination are disputed.

6    The progress note memorializing White's June 30, 2010 treatment is illegible. Dkt. No. 140-8. White testified that he was treated by Nurse M. Travers and defendant Nurse Amber Lashway ("Lashway"). Dkt. No. 139-6 at 19. Travers is not a defendant herein. The record does not include an affidavit from Lashway or Travers.

7    Lombard is not a defendant herein.

8    Quinn is not a defendant herein.

9    The Court observes that White initially filed a complaint regarding the actions allegedly occurring on June 27, 2010 on August 9, 2010. Adopting Magistrate Judge Homer's Report-Recommendation, District Judge Suddaby granted defendants' motion to dismiss, dismissed White's complaint without prejudice, and denied White's cross motion to amend his complaint. See White v. Drake, 10-CV-1034 (GTS/DRH), 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011). In granting the motion to dismiss, Judge Suddaby concluded that White complaint should be dismissed but that White

should be required to file a new action rather than be permitted to simply file an Amended Complaint in this action on the following additional grounds: (1) plaintiff will not be untimely prejudiced by the Court's current Decision and Order, because the three-year limitations period governing his claims ... does not yet appear to have expired, and because no reason exists to believe that plaintiff in forma pauperis status has changed since it was granted ..., and (2) if the court were to simply accept for filing the proposed Amended Complaint that has been submitted, the Court would actually be prejudicing plaintiff because the pleading deficiencies in that Amended Complaint ... would cause the Court to dismiss the action with prejudice.

Id. at *8. It appears that plaintiff's commencement of the instant action is in accordance with Judge Suddaby's September 26, 2011 Decision and Order dismissing the action without prejudice.

10    All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

11    White's opposition papers provide that he "withdraws civil penalties against defendants in their official capacities on basis of the established case law of the Supreme Court of the United States." Dkt. No. 164 at 6.

12    White argues that defendants mistakenly rely upon the Fourth Amendment in their analysis of his excessive force claim. Dkt. No. 164 at 6-8. The undersigned's reading of defendants' opposition papers suggests that defendants argued against the excessive force claim pursuant to the Eighth Amendment; regardless, assessing the excessive force claims under the Eighth Amendment is proper. See ☐ Bonilla v. Jaronczyk, 354 F. App'x 579, 581 (2d Cir. 2009) ("While claims of excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment, post-conviction excessive force claims [...], are properly considered under the Eighth Amendment.") (internal quotation marks and citation omitted).

13    In his Memorandum of Law in opposition to defendants' motion, White claims that defendants, "concealed materially relevant evidence of [the] steel door that is much needed to combat their summary judgment motion." Dkt. No. 164 at 9. White also argues that defendants failed to provide him with relevant video

evidence of the incident. Dkt. No. 164 at 10–11. To the extent that White is attempting to defeat defendants' motion on the basis that he requires additional discovery, that claim/request is denied. Upon review of White's opposition, the Court directed defendants to provide the Court with a copy of the subject video that defendants were instructed to provide to plaintiff's counselor for his viewing following April 9, 2015 telephone conference and subsequent Decision and Order (Dkt. No. 137). Dkt. No. 179. Defendants provided the Court with the video (Dkt. No.180) and claim that the video was made available to plaintiff pursuant to the Court's April 9, 2015 Decision and Order (Dkt. No. 137). Defendants contend that, despite being provided with an opportunity to view the video, White refused to view the video. Dkt. No. 180-2. Assuming, for the purposes of this motion only, that the video is in proper evidentiary form, the undersigned concludes the video is not relevant to the motion herein as it provides no support for plaintiff's claims. The undersigned has carefully reviewed the entire video, which is five minutes and twenty-five seconds in length. The video contains audio; however, no conversation can be discerned.

14    White alleges that defendants "have offered no proof that plaintiff did not suffer any brain hemorrhages." Dkt. No. 164 at 20. White misinterprets defendants' burden on the motion for summary judgment. As plaintiff has asserted a deliberate indifference claim under the Eighth Amendment, the *plaintiff* bears the burden of proving that defendants acted with deliberate indifference to a serious medical need, not defendants. Wilson v. Seiter, 501 U.S. 294, 297 (1991).

15    White's claims against Rock, Lira, and Uhler that are based upon their alleged failure to follow DOCCS procedures and regulations are discussed infra.

16    The Court previously dismissed plaintiff's claim that Rock, Uhler, and Lira violated state laws or regulations regarding the preservation of facility videos and failed to "follow their own state regulations and directives." Dkt. No. 42 at 20.

17    Section 7651.10 is entitled Ambulatory Health Care Services and provides, in pertinent part:

> (h) Where an inmate is punitively segregated in a cell or room apart from the general population of the facility for a period in excess of 24 hours, such inmate shall be visited by a member of the health care staff in accordance with paragraph (c) of subdivision (6) of section 137 of the Correction Law.
> 9 NYCRR § 7651.10.

18    Section 7651.12 is entitled Medical Emergency Services and provides, in pertinent part:

> (a) Each correctional facility shall provide access to emergency services which permit the medical evaluation, treatment and disposition of medical emergency cases on a 24-hour basis each day.
> 9 NYCRR § 7651.12.

19    White alleges violations of sections 2.1, 2.2, and 9.4 of the DOCCS Employee Manual. The DOCCS Employee Manual is not part of the record herein. According to plaintiff's iteration of the Manual, section 2.1 addresses the need to avoid "unethical conduct" and section 2.2 provides that the employee is to avoid violation of any state or federal law, or any rule, regulation, or DOCCS directive. Dkt. No. 163 at 13. Plaintiff alleges that section 9.4 addresses the need to submit a "use of force report" by any employee who uses force against an inmate. Id.

---

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**White v. Rock, Not Reported in Fed. Supp. (2016)**

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 114 of 141

2016 WL 1248904
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John H. WHITE, Plaintiff,

v.

David ROCK, Superintendent; Donald Uhler,
Dep. of Security; Michael Lira, Dep. of Programs;
Raymond Drake; Jon Oropallo; Elizabeth
White; and Amber Lashway, Nurse, Defendants.

9:13-CV-392(GTS/CFH)
|
Signed 03/29/2016

**Attorneys and Law Firms**

JOHN H. WHITE, 08-A-3366, Southport Correctional
Facility, P.O. Box 2000, Pine City, New York 14871, Plaintiff,
Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, OF COUNSEL: LOIS JIM,
ESQ., Assistant Attorney General, Albany, New York 12224,
Counsel for Defendants.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by John H. White ("Plaintiff") against
the seven above-captioned employees of the New York
State Department of Corrections and Community Supervision
("Defendants") pursuant to 🔖 42 U.S.C. § 1983, are the
following: (1) Defendants' motion for summary judgment;
(2) United States Magistrate Judge Christian F. Hummel's
Report-Recommendation recommending that Defendants'
motion be granted in part and denied in part; and (3) Plaintiff's
Objections to the Report-Recommendation. (Dkt. Nos. 139,
186, 189.) For the reasons set forth below, Magistrate
Judge Hummel's Report-Recommendation is accepted and
adopted in its entirety; all of the claims asserted in Plaintiff's
Complaint are dismissed except for his Eighth Amendment
excessive force claim against Defendant Drake, which
survives Defendants' motion.

## I. RELEVANT BACKGROUND

### A. Magistrate Judge Hummel's Report-Recommendation

Generally, in his Report-Recommendation, Magistrate Judge
Hummel rendered the following recommendations: (1) that
Plaintiff's claims for monetary damages against Defendants in
their official capacities be dismissed pursuant to the Eleventh
Amendment; (2) that Plaintiff's Eighth Amendment excessive
force claim against Defendant Drake survive Defendants'
motion due to a genuine dispute of material fact as to
both the objective and subjective prongs of the standard
governing that claim; (3) that Plaintiff's Eighth Amendment
deliberate indifference claim be dismissed based on his failure
to adduce admissible record evidence establishing either the
objective or subjective prongs of the standard governing
that claim; (4) that Plaintiff's supervisory-liability claims
be dismissed based on his failure to adduce admissible
record evidence establishing the supervisory Defendants
personal involvement in the Eighth Amendment deliberate
indifference violation alleged; (5) that Plaintiff's state law
claims be dismissed as not actionable under 🔖 42 U.S.C.
§ 1983 and/or as barred by New York Correctional Law
§ 24(1); and (6) that, in the alternative, Plaintiff's claims
against Defendants Rock, Uhler, Lira, Oropallo, White, and
Lashway be dismissed because, based on the current record,
they are protected from liability as a matter of law based on
the doctrine of qualified immunity. (Dkt. No. 186, Part II.)

### B. Plaintiff's Objections to the Report-Recommendation

Generally, in his Objections, Plaintiff argues that the Court
should reject the Report-Recommendation for the following
reasons: (1) Magistrate Judge Hummel erroneously found
that Plaintiff provoked Defendant Drake; (2) by refusing to
comply with Plaintiff's request to contact the medical staff to
treat Plaintiff's injuries, Defendant Drake not only failed to
perform his professional duties but interfered with his medical
treatment; (3) Defendant Drakes statement to Plaintiff
following the attack (i.e., that he kicked the door which
struck Plaintiff's head "Because I can") further demonstrates
Drake's professional misconduct; (4) by refusing to comply
with Plaintiff's request to contact the medical staff to treat
Plaintiff's injuries, Defendant Drake similarly interfered
with his medical treatment; (5) by failing to document
Plaintiff's injuries and failing to arrive at Plaintiff's cell
in a timely fashion, Defendant White not only failed to
perform his professional duties but interfered with his

White v. Rock, Not Reported in Fed. Supp. (2016)

Case 9:20-cv-01115-TJM-TWD    Document 47    Filed 11/05/21    Page 115 of 141

medical treatment; (6) by failing to arrive at Plaintiff's cell in a timely fashion, Defendant Oropallo not only failed to perform his professional duties but interfered with his medical treatment; (7) Magistrate Judge Hummel improperly overlooked all of the shortcomings of Defendants' motion, improperly considered the video evidence belatedly provided by Defendants, and improperly failed to sanction Defendants for spoliation of evidence; and (8) Defendants' colleagues have improperly confiscated Plaintiff's records, and the Court has improperly let that confiscation occur. (*See generally* Dkt. No. 189.)

## II. STANDARD OF REVIEW

**\*2** When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence. ..." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id*. [4]

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Hummel's thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court adds the following three points.

First, Plaintiff's objections to the Report-Recommendation (described above in Part I.B. of this Decision and Order) consist largely if not exclusively of reiterations of arguments previously asserted in his opposition memorandum of law. (*Compare* Dkt. No. 189 at 2-8 [Plf.'s Obj.] *with* Dkt. No. 164 [Plf.'s Opp'n Memo. of Law at Point III with regard to Plf.'s Eighth Amendment claim] *and* Dkt. Nos. 170, 178 [Plf.'s Suppl. Opp'n Memo of Law with regard to professional violations].) As a result, most if not all of the "challenged" portions of the Report-Recommendation are entitled to only a clear-error review, which they easily survives. The remainder of the challenged portions of the Report-Recommendation survive a *de novo* review for the reasons stated by Defendants and Magistrate Judge Hummel.

Second, the Court notes that Plaintiff's argument that corrections officers failed to properly preserve video evidence appears to have been rejected by the Court in its Decision and Order of January 24, 2014. (Dkt. No. 42 at Part III.C.10.a.) Moreover, an alternative reason for rejecting Plaintiff's discovery argument (*see* note 13 of Dkt. No. 186) is that he has not satisfied the requirements of a request made pursuant to Fed. R. Civ. P. 56(d). Cornell v. Kapral, 09-CV-0387, 2011 WL 94063, at *4 & n.2 (N.D.N.Y. Jan. 11, 2011) (Suddaby, J.), *aff'd*, 483 F. App'x 590, 591-92 (2d Cir. 2012).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 186) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 139) is **GRANTED in part** and **DENIED in part** such that all of the claims asserted in Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED except** for Plaintiff's Eighth Amendment excessive force claim asserted against Defendant Drake, which **SURVIVES** Defendants' motion; and it is further

**ORDERED** that Pro Bono Counsel be appointed for Plaintiff for purposes of trial only (and not for any appeal) and that, upon assignment of Pro Bono Counsel, a final pretrial conference with counsel be scheduled, at which counsel for both parties shall appear with settlement authority.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1248904

---

## Footnotes

1    *See also* *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2    *See* *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf.* *U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    *See* *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments

and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4      *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 537550
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George HARRIS, Plaintiff,

v.

Theresa HOWARD, Nurse, Health
Care Provider # 231, et al., Defendants.

No. 9:07–CV–1065 (TJM/GJD).

|

March 3, 2009.

West KeySummary

1    **Prisons** 🔑 Particular Conditions and
Treatments

**Sentencing and Punishment** 🔑 Medical
Care and Treatment

Dismissal of prisoner's claim for constitutionally
inadequate medical treatment was warranted.
Prisoner basically claimed that he disagreed with
the treatment that a doctor gave him, and inferred
from the doctor's silence on the subject of
prisoner's alleged degenerative bone "condition"
that the doctor knew about the condition, but
did not intend to do anything about it. The
record indicated that the doctor reviewed x-rays
with prisoner, in which the doctor learned about
problems in prisoner's neck, scheduled prisoner
to see a neurologist, and that the neurologist
scheduled three MRI examinations, but prisoner
took issue with the fact that the doctor refused
to order an electromyogram (EMG). Prisoner's
disagreement with the doctor's medical decision
was not a basis for an Eighth Amendment claim.
U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

George Harris, pro se.

Adele M. Taylor–Scott, Asst. Attorney General, for
defendants.

**MEMORANDUM DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

*1 In this amended civil rights complaint, plaintiff alleges
a denial of proper medical care as well as a variety of other
constitutional, federal law, and state law violations resulting
from plaintiff's attempts at complaining about his medical
care. Amended Complaint (AC). (Dkt. No. 38). Plaintiff
names sixteen defendants in his amended complaint. AC ¶
5(A)-(P). Plaintiff seeks declaratory and substantial monetary
relief. AC ¶ 97(a)-(d).

Presently before the court are two motions filed by defendants
and two motions filed by plaintiff. [1] (Dkt.Nos.52, 53, 61,
76). Both of defendants' motions are for judgment on the
pleadings [2] pursuant to FED. R. CIV. P. 12(c). (Dkt.Nos.52,
76). In response to defendants' first motion for judgment
on the pleadings, plaintiff filed a "Motion for Sanctions"
and a "Motion to Strike Insufficient Defense and Rule 12(c)
Motion." (Dkt. Nos.53, 61). Defendants have responded
to both of plaintiff's motions. (Dkt. Nos.57, 66). For the
following reasons, this court agrees with defendants and will
deny plaintiff's motions and grant the defendants' motions
for judgment on the pleadings, dismissing this action in its
entirety.

**DISCUSSION**

**1. *Judgment on the Pleadings***

After the pleadings are closed, a motion to dismiss for
failure to state a claim is properly brought as a motion for
judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).
*Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983)
(citations omitted). *See* Fed.R.Civ.P. 12(b), 12(c) and 12(h)
(2). The motion for judgment on the pleadings is then treated
according to the same standard as a motion to dismiss under
Rule 12(b)(6). *Id.*

To survive a motion to dismiss, the plaintiff must provide
"the grounds upon which his claim rests through factual
allegations sufficient 'to raise a right to relief above the
speculative level.' " *Camarillo v. Carrols Corp.,* 518

F.3d 153, 156 (2d Cir.2008) (quoting *inter alia* ATSI *Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted). The court must heed its particular obligation to treat pro se pleadings with liberality. Phillips v. Girdich, 408 F.3d 124, 128 (2d Cir.2005); Tapia–Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir.2000) (citing Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir.1989)).

## 2. Facts [3]

**\*2** Because defendants have made motions for judgment on the pleadings, all the statements in plaintiff's complaint are assumed to be true. Erickson, 127 S.Ct. at 2200. The court will recite the facts as stated by plaintiff. Plaintiff begins the amended complaint by stating that on February 13, 2007, he was incarcerated at Marcy Correctional Facility. AC ¶ 12. At approximately 1:30 p .m., while plaintiff was working at his job as an Inmate Law Clerk in the facility Law Library, he began to lose feeling on the right side of his body. *Id.* Plaintiff states that his supervisor allowed plaintiff to return to his housing unit. *Id.* He requested "Sick Call" on February 15, 2007. [4] AC ¶ 14. At approximately 6:15 a.m. on February 15, 2007, defendant Poole was called to plaintiff's housing unit with a van to take plaintiff to the facility Clinic because plaintiff was having trouble walking on his own. AC ¶ 15.

Plaintiff states that when the van arrived at the Clinic, plaintiff saw defendant Nurse Theresa Howard standing at the door. *Id.* He recognized defendant Howard because plaintiff had an

"ongoing conflict" with this defendant, resulting in plaintiff filing a grievance against her. *Id.* Plaintiff concedes that defendant Howard was not assigned to assist plaintiff, but was merely waiting for the van so that she could be transported to her assigned duty station for the day. *Id.* When the van arrived, defendant Poole asked defendant Howard to open the van door so that plaintiff could get out. Plaintiff states that as he attempted to exit the van, he began to "pitch forward," and instead of assisting plaintiff, defendant Poole remained in the driver's seat of the van and watched while plaintiff fell to the ground hitting his head, back, and right side of his body. *Id.* Plaintiff claims that defendant Howard merely jumped out of plaintiff's way and let him fall to the ground. *Id.*

Plaintiff also alleges that although various inmates who observed plaintiff fall attempted to assist him, defendant Howard told the inmates to "stand back." Without first checking plaintiff for injuries, defendant Howard walked into the Clinic to get plaintiff a stretcher and to notify defendant Corrections Officer Farley and her "fellow nurses" about the incident. Defendant Howard returned with a stretcher and two inmate porters who assisted plaintiff onto the stretcher. Defendant Howard then got into the van with defendant Poole, and they drove away. *Id.* Plaintiff states that none of the three defendants (Poole, Howard, or Farley) wrote or filed an Unusual Incident Report and/or an Inmate Injury Report in violation of Department of Correctional Services (DOCS) Directive # 4605. *Id.* Plaintiff claims that due to the gross negligence of these three defendants, he was injured.

After plaintiff was wheeled into the Emergency Treatment Room (ETR), plaintiff was informed by an unknown nurse [5] that plaintiff was going to be examined by defendant Dr. Syed Haider–Shah. AC ¶ 16. Plaintiff "voiced his desire not to be seen by Defendant [Haider–Shah]," but stated that he was willing to be examined by any other doctor. *Id.* Plaintiff claims that he never actually refused to be seen by Dr. Haider–Shah, however, defendant Nurse LaLonde misinterpreted plaintiff's statement and asked plaintiff to sign a "Medical Refusal Form." *Id.* Plaintiff claims that when he refused to sign the form, defendant LaLonde, called defendant Nurse Karen Dooley, and asked her to sign the form, disregarding plaintiff's desire to be examined by a doctor. *Id.*

**\*3** Defendants LaLonde and Dooley went to inform defendant Administrative Nurse MartinKaras, who came in the room to speak with plaintiff. AC ¶ 17. Plaintiff states that although he tried to explain the situation, defendant Martin–Karas had plaintiff removed from the Clinic by

defendant Corrections Officer Farley. *Id.* Plaintiff also claims that defendant Martin–Karas told plaintiff not to return. *Id.* Plaintiff states that no defendant explained the risks of leaving the Clinic without first obtaining medical treatment. *Id.*

Plaintiff left the Clinic because he was afraid that he would be charged with refusing a direct order if he did not leave voluntarily. AC ¶ 18. Plaintiff also states that he was afraid that "acts of retaliation would follow." *Id.* When he returned to his housing unit, plaintiff reported the incident to defendant Corrections Officer Grant, and told defendant Grant that defendant Martin–Karas made it clear that plaintiff was not to return to the Clinic "for anything." AC ¶ 19. At approximately 8:30 a.m. on February 15, 2007, plaintiff discovered that he was urinating blood. AC ¶ 20. Plaintiff claims that he told defendant Grant, who asked plaintiff if he wished to go to the Clinic. *Id.* Plaintiff states that he was concerned that if he went back to the Clinic, defendant Farley would charge him with misbehavior since defendant Martin–Karas told plaintiff not to return to the Clinic. *Id.* Plaintiff speculated that the blood could be related to his fall from the van earlier that morning. *Id.*

Plaintiff states that defendant Howard never filed a "Report of Inmate Injury" related to plaintiff's fall out of the van. AC ¶ 21. On March 6, 2007, after a conversation with his corrections counselor, plaintiff decided to file a grievance regarding defendant Howard's failure to file the proper incident report in violation of DOCS directives. *Id.* Plaintiff filed four grievances that were consolidated by the Grievance Supervisor. *Id.* Plaintiff complains that his grievances were not properly handled. AC ¶¶ 22–25. Plaintiff had a grievance hearing on March 27, 2007, but the committee was deadlocked. AC ¶ 22. Plaintiff alleges that DOCS uses this "deadlock" as a method to avoid making a decision to correct "medical errors." *Id.*

Plaintiff appealed the committee's decision, and on April 10, 2007 defendant Superintendent Lape denied plaintiff's grievance. AC ¶ 23. Plaintiff states that he appealed the Superintendent's decision to the Central Office, and that during this time, he still had not seen a doctor regarding the numbness on the right side of his body. Plaintiff states that defendants LaLonde, Dooley, and Karas prevented plaintiff from seeing a doctor on February 15, 2007, and that no one corrected that error. *Id.*

On April 23, 2007, plaintiff wrote a letter to defendant Constant, the Director of Nursing and Auxiliary Services,

complaining about the actions of defendants Howard, LaLonde, Dooley, and Karas. AC ¶ 24. Although defendant Constant responded to his letter, she did not address any of the issues that plaintiff raised. *Id.* Instead, she suggested that plaintiff go to sick call and have his issues addressed by the medical staff. *Id.* Plaintiff states that he understood defendant Constant to mean that plaintiff could go back to the Clinic without fear of "medical retaliation." *Id.* On May 18, 2007, plaintiff again put his name on the list for sick call, and apparently saw an unnamed nurse who scheduled plaintiff to see Dr. Haider–Shah on May 27, 2007. *Id.*

**\*4** Plaintiff states that on May 7, 2007, he wrote a letter to DOCS Commissioner, defendant Brian Fischer, detailing all of the above complaints. AC ¶ 25. Defendant Fischer sent plaintiff's letter to defendant Dr. Lester Wright, DOCS Chief Medical Officer, for investigation. *Id.* Defendant Wright wrote to plaintiff on May 18, 2007, stating that the department had conducted an investigation into the events of February 15, 2007, and that the staff of the Primary Care Unit was not responsible for maintaining injury reports. *Id.* Plaintiff claims that this answer had nothing to do with the complaints that plaintiff filed. *Id.*

Plaintiff saw defendant Dr. Haider–Shah on May 7, 2007.[6] AC ¶ 26. Plaintiff told Dr. Haider–Shah about the right-sided numbness and about plaintiff's fall from the van on February 15, 2007. AC ¶ 26. Plaintiff also told the doctor that defendant Martin–Karas told plaintiff not to return to the Clinic, and Dr. Haider–Shah told plaintiff that he "knew all about it." *Id.* Plaintiff asked Dr. Haider–Shah if the doctor was aware of plaintiff's degenerative bone condition, and the doctor stated that he was aware of the condition. Plaintiff asked whether the doctor was going to do anything about plaintiff's condition, and the doctor did not reply. Plaintiff claims that defendant Haider–Shah "kept himself informed about Plaintiff's health but never intended to do anything about it." *Id.* Plaintiff states that defendant Haider–Shah admitted that he had no plans to treat plaintiff for his degenerative condition. *Id.*

Plaintiff had another appointment with Dr. Haider–Shah on May 25, 2007 to review a May 8, 2007 x-ray report. *Id.* Plaintiff states that Dr. Haider–Shah learned from the x-ray that plaintiff had a problem in his neck and scheduled plaintiff to see a neurologist on June 15, 2007. *Id.* The neurologist ordered three MRI examinations for September 21, 2007. Plaintiff saw Dr. Haider–Shah on August 27, 2007, discussed his treatment, and asked the doctor if he would order an Electromyogram (EMG). However, Dr. Haider–Shah refused

to order the test. Plaintiff filed a grievance about the refusal, but again, the committee was deadlocked. Plaintiff claims that the deadlock was "designed to prolong much needed Medical attention and treatment." *Id.*

On June 1, 2007, plaintiff again wrote to Commissioner Fischer about defendant Howard's failure to file a proper incident report after plaintiff fell out of the van on February 15, 2007. AC ¶ 27. Defendant Fischer again sent plaintiff's letter to defendant Wright for investigation, who copied his May 18, 2007 response and sent it to plaintiff again. AC ¶ 28. On July 17, 2007, plaintiff wrote another letter to defendant Fischer, informing him that the staff had entered into a conspiracy to submit false statements. *Id* .

Defendant Wright sent plaintiff's June 1, 2007 letter to defendant Sally Baxter, Nurse Administrator for investigation. AC ¶ 29. Defendant Baxter told plaintiff in a letter dated July 5, 2007, that her investigation showed that all treatments were appropriate. *Id.* However, plaintiff states that none of his complaints have been addressed. By letter dated June 4, 2007, defendant Kelleher, Director of Nurse Investigations was asked [7] to conduct an investigation and inform plaintiff of the findings. *Id.* Plaintiff states that as of the date of the amended complaint, plaintiff had not received any report, indicating that an investigation was conducted or that a hearing was scheduled.

**\*5** On July 12, 2007, defendant Wright sent plaintiff a letter stating that defendant Howard claimed that she never witnessed the February 15, 2007 incident because she was assigned to S–Block that day. AC ¶ 30. Plaintiff states that defendant Wright's letter stated that plaintiff was "Unwilling to Remain" for the examination by the primary care provider. *Id.* Plaintiff claims that the statements in defendant Wright's letter were false, and that plaintiff never refused to see Dr. Haider–Shah. *Id.*

On July 30, 2007, plaintiff fainted in his housing unit and was taken to the Clinic on a stretcher. AC ¶ 31. Plaintiff claims there was no medical staff supervision on his way to the Clinic. Plaintiff states that from the Clinic, he was sent to St. Elizabeth Medical Center. Plaintiff states that no one ever determined why he fainted. Plaintiff states that he later requested a copy of the medical records from the hospital, but when they arrived at the facility, someone opened them improperly, and defendant Diane Kastia, Mail Room Supervisor sent the records to plaintiff. *Id.* Plaintiff has been unable to determine who opened this envelope or whether

any medical records were removed. Plaintiff filed a grievance about this incident. The hearing was held on September 18, 2007, but plaintiff had to file another grievance on September 10, 2007 because the "same thing happened again." Plaintiff states that the second time that he received medical records in the mail, they were sent to the Clinic because defendant Kastia knew of plaintiff's previous grievance, and she "joined in the conspiracy" to violate plaintiff's constitutional rights and "use this procedure to retaliate against plaintiff for filing [sic] Grievance in this matter." *Id.* Plaintiff claims that defendant Kastia violated plaintiff's Fourth Amendment rights because she should have known that hospital records are protected by privacy laws. AC ¶ 32.

On July 24, 2007, plaintiff received a letter from defendant Karen Bellamy, the Director of the Inmate Grievance Program, responding to a letter that plaintiff had written to defendant Fischer, telling plaintiff that there were no more appeals for one of his grievances. AC ¶ 33. Plaintiff states that this letter was an attempt to misdirect plaintiff because plaintiff "merely asked Defendant [Fischer] to review the grievances and send orders to the staff, telling them to correct the mistakes that were made in failing to file the appropriate incident and injury reports. *Id.* On September 17, 2007, plaintiff wrote to defendant Bellamy, complaining about the unprofessional conduct taking place in the Grievance Office. AC ¶ 34. Plaintiff states that he never received a response, a "clear example" of how defendant Bellamy has failed to carry out her duties to correct a wrong.

### 3. *Motion for Sanctions*
Plaintiff has moved to sanction defendants pursuant to FED. R. CIV. P. 11. Rule 11 specifically provides for 21 days prior to the opposing party prior to filing a motion for sanctions. *Id.* Rule 11(c)(2). Plaintiff's motion for sanctions was filed the day after defendants moved to dismiss plaintiff's action pursuant to FED. R. CIV. P. 12(c). (Dkt. Nos. 52–(Motion to Dismiss5/21/08); 53–(Motion for Sanctions–5/22/08). For that reason alone, plaintiff's motion may be denied.

**\*6** Defendants, however, have responded in opposition to the substance of the motion, and a review of the defendants' memorandum in opposition to the motion shows that plaintiff's request for Rule 11 sanctions may be denied regardless of the improper timing of the motion. Plaintiff accuses defendants of a variety of violations, including "intentional delay" by filing and withdrawing a previous motion to dismiss. Plaintiff also faults defendants for requesting a stay of discovery pending the court's decision

on the motion for judgment on the pleadings and accuses defendants of "evading" service. Plaintiff has problems with defendants filing papers on the "eve" of a deadline.

The fact that a party files a paper on the eve of a deadline is not a reason for sanctions. The fact that a party asks for an extension of time to file an answer or a motion is not a reason for sanctions and does not represent an intentional delay of the action. Plaintiff has not been prejudiced by any extensions requested by defense counsel. In fact, plaintiff obtained the names of the "Jane Doe" defendants and amended his complaint, allowing for service on these defendants. As defense counsel states in her response, the Attorney General's Office has nothing to do with service on defendants. Service is accomplished by the United States Marshal on behalf of plaintiff's proceeding *in forma pauperis*. The Attorney General's Office does not represent individual defendants until they request representation **after being served** with the complaint.

There is nothing sanctionable in withdrawing a motion to dismiss when new defendants have been served, who may request legal representation from the same counsel. In addition, when an amended complaint is filed, defendants have withdrawn motions to dismiss that are addressed to the original complaints. *See e.g.* Sniado v. Bank Aus. AG, 352 F.3d 73, 76–77 (2d Cir.), *vacated and remanded on other grounds,* 542 U.S. 917, 124 S.Ct. 2870, 159 L.Ed.2d 774 (2004). Additionally, while a motion to dismiss does not automatically stay discovery, a motion to dismiss may in some instances "provide 'good' cause for a protective order ... staying discovery." Spencer Trask Software & Information Services, 206 F.R.D. 367, 368 (S.D.N.Y.2002), *cited in* Picture Patents, LLC v. Terra Holdings, 2008 U.S. Dist. LEXIS 98030, 2008 WL 5099947, *7 (S.D.N.Y. Dec. 3, 2008). Thus, there is nothing sanctionable in defendants' request for a stay of discovery, pending a decision on their motions to dismiss.

The court has reviewed all of plaintiff's bases for requesting sanctions and finds that none of them may succeed. Thus, plaintiff's motion for sanctions (Dkt. No. 53) is **denied.**

### 4. *Motion to Strike*

Plaintiff has also moved to strike the Rule 12(c) motion and "certain paragraphs of the accompanying answer." (Dkt. No. 61). The answer that was filed immediately prior to the motion

for judgment on the pleadings was the answer to the amended complaint, filed by the then-served defendants. (Dkt. No. 51). The three remaining defendants filed their answer after they had been served with process. (Dkt. No. 75).

**\*7** In support of his motion, plaintiff states that motions for judgment on the pleadings are not "favored" by the Second Circuit. While the standard is strict, [8] and as stated above, all the factual statements in the complaint are still accepted as true for purposes of a motion for judgment on the pleadings, the case the plaintiff cites does not state that the motion is "disfavored." George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551 & n. 2 (2d Cir.1977).

However, the court notes that it is motions to **strike** defenses that are "not favored" and will not be granted unless the insufficiency is "clearly apparent." Mastrocchio v. Unnamed Supervisor Special Inv. Unit, 152 F.R.D. 439, 441 (D.R.I.1993) (quoting Louisiana Sulphur Carriers, Inc. v. Gulf Resources and Chemical Corp., 53 F.R.D. 458, 460 (D.Del.1971)). *See also Allstate Ins. Co. v. Choi,* 2007 U.S. Dist. LEXIS 249, *27 (E.D.N.Y. Jan. 2, 2007). In *Louisiana Sulphur Carriers, Inc.,* the court stated that motions to strike are often denied, even when they are technically correct and well-founded because of their dilatory character and tendency to create piecemeal litigation. *Id.* A motion to strike defenses should only be granted where it can be shown that the defense could not succeed under any set of circumstances. *Id.* at 440–41 (citing Narragansett Tribe of Indians v. So. R.I. Land Devel., 418 F.Supp. 798, 802 (D.R.I.1976)).

In this case, plaintiff asks the court to strike the motion for judgment on the pleadings as well as various defenses listed in the answer, including the defense of failure to state a claim. (Dkt. No. 61 at p. 2). Plaintiff claims that the defendants have already admitted that plaintiff states a constitutional claim. Plaintiff is referring to defendants' memorandum of law in support of their motion for judgment on the pleadings. (Dkt. No. 52 at p. 1). In defendants' "Preliminary Statement," they state as follows:

> ... As demonstrated below, the plaintiff's perceived threats, insults and shortcomings of corrections personnel outlined in the amended complaint, merely exemplify

plaintiff's *unfounded* belief that he is entitled to have it his way while incarcerated in a penal institution. *They do amount to actionable constitutional violations.* Based upon the facts alleged, therefore, *plaintiff cannot state a cause of action for which relief may be granted, and the amended complaint must be dismissed.*

*Id.* (emphasis added). Plaintiff seizes upon the second sentence above, in arguing that defendants admit that he does state a claim. However, it is clear from the sentence before and the sentence following the statement in question that the sentence plaintiff refers to clearly contains a typographical error. Defendants clearly meant to state that plaintiff's claims "do [not] amount to actionable constitutional violations." Otherwise, the other two sentences, and the entire motion do not make sense. The last sentence above states clearly that defendants are arguing that plaintiff "cannot state a cause of action." This court will strike *neither* the motion *nor* the defense of failure to state a claim based upon a typographical error in the defendants' memorandum of law.

**\*8** The court has reviewed the rest of the defenses that plaintiff wishes the court to strike, and while it does seem that some of the defenses are not applicable to plaintiff's case, since this court is dismissing this action for failure to state a claim, the fact that there are inapplicable defenses in the answer does not affect this court's decision. [9]

**5. *Eleventh Amendment***

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted).

The caption of plaintiff's complaint states that he is suing defendants in their "Individual and Official Capacities." (Dkt. No. 38). To the extent that plaintiff is attempting to sue defendants for damages in their official capacities or to the extent that his complaint can be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so. Any such claims are dismissed.

**6. *Personal Involvement***

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* See *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In this case, defendants argue that plaintiff has not alleged sufficient personal involvement of defendants Lape, Constant, Fischer, Wright, Baxter, Bellamy, and Kelleher.

**A. Defendants Constant, Fischer, Wright, Baxter, and Kelleher**

Plaintiff's only allegation against defendant Director of Nursing and Auxiliary Services Donna Constant states that on April 23, 2007, plaintiff wrote a letter to defendant Constant, complaining about the February 15, 2007 actions of defendant Nurses Howard, LaLonde, and Dooley, together with Nurse Administrator Martin–Karas. AC ¶ 24. Plaintiff claims that although defendant Constant wrote back to plaintiff, suggesting that he go to sick call and have his

medical issues addressed, she did not address any of plaintiff's other issues. *Id.* Plaintiff states that as a result, he did go to sick call and was scheduled to see the doctor. *Id.*

**\*9** In plaintiff's causes of action, he suddenly accuses defendant Constant of failing to train her subordinates regarding "reporting and responding to accidents." AC ¶¶ 57–63. He accuses her of conspiring with other defendants in failing to instruct medical personnel on correct procedures on the proper use of the Medical Facility and proper treatment. AC ¶ 60. Finally, he states that somehow this defendant was responsible for plaintiff's injuries. AC ¶ 61–62. He includes this language in all of the causes of action against supervisory personnel.

Plaintiff simply has not stated any facts to support any of these conclusory allegations that he makes at the end of his amended complaint. Defendant Constant's apparent failure to answer to plaintiff's satisfaction **one** letter written to her is insufficient to allege her personal involvement. Generally, the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006). Additionally, conclusory allegations are insufficient to state a claim under section 1983. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987). There are absolutely no facts to support plaintiff's conclusory claim of personal involvement.

The same is true for defendant Fischer. Defendant Fischer is the Commissioner of DOCS. In the body of the amended complaint, plaintiff states that he wrote a letter to defendant Fischer on May 7, 2007, clearly stating all of plaintiff's complaints regarding his medical care, including the defendant nurses' failure to file an injury report. AC ¶ 25. Plaintiff also informed defendant Fischer that plaintiff wrote a letter to defendant Constant. Plaintiff also states that he wrote to defendant Fischer on June 1, 2007, and July 17, 2007. AC ¶¶ 27, 28. Plaintiff claims that defendant Fischer referred plaintiff's letters to defendant Lester Wright for investigation. AC ¶ 25, 28.

Defendant Wright sent plaintiff a letter stating that the Division had conducted an investigation into the matter and told plaintiff that the staff of the medical unit was not responsible for maintaining injury reports. AC ¶ 25. Defendant Wright also sent plaintiff another letter in response to the second request from defendant Fischer. AC ¶ 28.

Plaintiff claims that it was a copy of the same letter. *Id.* As stated above, defendant Fischer's referral of plaintiff's letter to a subordinate for investigation does not make defendant Fischer personally responsible for any of the claims alleged in the letter. *Sealey, supra.*

Plaintiff states that he wrote to defendant P. Daniel Kelleher, the Director of Nurse Investigations in New York City. AC ¶ 29. Plaintiff states that he never heard from defendant Kelleher, and there is nothing to show that an investigation was conducted or a hearing scheduled. *Id.* Plaintiff has shown no personal involvement by defendant Kelleher.

**\*10** It appears from plaintiff's complaint that defendant Lester Wright, M.D., Deputy Commissioner and Chief Medical Officer of DOCS also referred plaintiff's letters to another individual for investigation. Plaintiff states that defendant Wright referred plaintiff's letter of June 1, 2007 to defendant Sally Baxter, Nurse Administrator, who wrote plaintiff a letter on July 5, 2007, stating that defendant Karas had informed defendant Baxter that according to defendant Dr. Haider–Shah, all plaintiff's medical treatments were appropriate. AC ¶ 29. However, plaintiff states that on July 12, 2007, defendant Wright wrote to plaintiff, stating for the first time, that defendant Howard claimed that she did not witness the February 15, 2007 incident. It is unclear whether this additional involvement with plaintiff's investigation would render defendant Wright and Baxter more personally involved with any allegations that plaintiff might be attempting to make. Thus, this court will not dismiss the case against defendants Wright and Baxter on the basis of lack of personal involvement. The court will dismiss the case against these defendants on an alternative basis.

### B. Former Superintendent Lape
Defendant Lape is the former Superintendent of Marcy Correctional Facility. He is alleged to have denied plaintiff's first four consolidated grievances after the grievance committee was deadlocked. AC ¶ 23. Plaintiff alleges that defendant Lape denied the grievance himself, and that plaintiff had included his claims of denial of medical care, thus, this court will not dismiss this action against defendant Lape for lack of personal involvement.

### C. Karen Bellamy
Karen Bellamy is the Director of the Inmate Grievance Program. The extent of her involvement in plaintiff's case was to respond to a letter that plaintiff wrote to defendant Fischer,

explaining to plaintiff that he could not appeal a grievance by writing to the Commissioner, and that there were no further appeals for Grievance No. MCY–12790–07. AC ¶ 33. Plaintiff claims that this was an attempt to misdirect plaintiff. *Id.* Plaintiff also alleges that he wrote to defendant Bellamy on September 17, 2007, complaining about unprofessional actions that were taking place in the Grievance Office, but defendant Bellamy did not respond. Her failure to respond to plaintiff's letter does not make her personally responsible for any of plaintiff's complaints, and the amended complaint may be dismissed against her in its entirety for lack of personal involvement and for lack of merit as discussed below.

### 7. *Medical Care*

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

**\*11** In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105–106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U .S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### A. Dr. Haider–Shah

**\*12** In this case, plaintiff seems more concerned with the alleged failure of defendants to report the February 15, 2007 incident than with the care that he received. Plaintiff alleges that the defendants' conduct "was not conducive to the Goals of Professional performance of their duties ...." AC ¶ 36. To

the extent that plaintiff claims that the defendants did not properly report the incident or were "unprofessional," or even violated state law, he cannot pursue a section 1983 action on those bases. With respect to Dr. Haider–Shah, plaintiff basically claims that he disagreed with the treatment that the doctor gave plaintiff. Plaintiff infers from Dr. Haider–Shah's silence on the subject of plaintiff's alleged degenerative bone "condition," that the doctor knew about the condition, but did not intend to do anything about it. A disagreement with the doctor's treatment or lack of treatment for a condition is not the basis for a constitutional violation.

The court would point out that plaintiff states that on May 8, 2007, Dr. Haider–Shah reviewed x-rays with plaintiff, in which the doctor learned about problems in plaintiff's neck. AC ¶ 26. Plaintiff states that Dr. Haider–Shah then scheduled plaintiff to see a neurologist, and that the neurologist scheduled three MRI examinations. *Id.* Plaintiff then takes issue with the fact that Dr. Haider–Shah refused to order an EMG on August 27, 2007. *Id.* Once again, plaintiff's disagreement with Dr. Haider–Shah's medical decision is not the basis for a civil rights action. Thus, this case may be dismissed as against Dr. Haider–Shah.

### B. Nurses Howard, LaLonde, Dooley, and Martin–Karas

The only allegations that plaintiff makes against Nurse Howard is that she let plaintiff fall out of the van, and she did not check him for injuries before she went to get the stretcher. Plaintiff also states that she improperly failed to complete an Unusual Incident Report and an Inmate Injury Report in violation of regulations and Directives. Failure to complete reports is simply not an Eighth Amendment claim under any view of the facts. Whether defendants were unprofessional and in violation of their duty to wear name tags is not actionable under section 1983. The worst that can be said for Nurse Howard is that she did not catch plaintiff when he fell out of the van. Whether Nurse Howard was negligent in failing to catch plaintiff and whether she should have checked him for injuries prior to getting help for him does not rise to the level of deliberate indifference even if plaintiff alleges that he was seriously injured as a result of the fall.[10] *See Daniels v. Williams, supra.* Thus, this complaint may be dismissed as against Nurse Howard.

Plaintiff claims that when he was taken into the Clinic on February 15, 2007, he was told by an unnamed nurse that he would be examined by Dr. Haider–Shah. AC ¶

16. Plaintiff states that he voiced his desire not to be examined by Dr. Haider–Shah, but agreed to be seen by any other facility doctor. *Id.* Defendant LaLonde apparently interpreted plaintiff's statement to mean that he was refusing to see Dr. Haider–Shah and attempted to get plaintiff to sign a Medical Refusal form. When plaintiff did not do so, defendant LaLonde called defendant Dooley to witness the refusal, allegedly disregarding "plaintiff's desire to be seen by a doctor, as an emergency medical need." *Id.* Defendant Martin–Karas was called to the area, and according to plaintiff, ordered him out of the Clinic, never to return. AC ¶ 17.

**\*13** The court notes that plaintiff could not dictate who would or would not examine him. Plaintiff states that he only "voiced a desire" to see a different doctor, but that defendants, particularly defendant Martin–Karas had their minds made up. There are no facts in the complaint that would indicate that defendants LaLonde and Dooley would have known that plaintiff had a serious medical need that was not being addressed. Plaintiff admits that he voiced a desire not to be examined by Dr. Haider–Shah, but that he would be examined by another doctor. Although plaintiff states that he attempted to explain that he would see any other doctor, plaintiff essentially caused his own delay in obtaining medical care. Plaintiff cannot blame the defendants when he started the delay by stating that he did not wish to see Dr. Haider–Shah. *See Ross v. Kelly,* 784 F.Supp. 35, 46–47 (W.D.N.Y.) (plaintiff cannot blame the defendants when he is largely to blame for the delay), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

Plaintiff's own statements do not indicate that he was experiencing any emergency situation of which defendants LaLonde and Dooley would have been aware. Plaintiff states that a nurse came into the emergency treatment room to remove the "medical equipment," so that plaintiff could "leave as best he could since he was in so much pain." AC ¶ 18. However, plaintiff left the Clinic area by himself, and there is no indication that he told defendants LaLonde, Dooley, or Martin–Karas that he was in "so much pain." Thus, plaintiff has not alleged an Eighth Amendment claim against these nurses.

### C. Corrections Officer Poole

The only claim that plaintiff makes against defendant Poole is that he did not get out of the van to help plaintiff. Because defendant Poole did not do so, he was not there when plaintiff

lost his balance and fell out of the van. Plaintiff also appears to fault defendant Poole for not getting out of the van after plaintiff fell. At best, any allegations against this defendant are based upon negligence and not deliberate indifference. As stated above, negligence is not actionable under section 1983. There is no indication that defendant Poole was aware that plaintiff would lose his balance and fall out of the van, and if defendant Poole violated some State regulations regarding the transportation of inmates to the Clinic, there still would be no constitutional claim stated. A violation of state law requirements alone, does not rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744–45 (S.D.N.Y.2002). *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

#### D. Corrections Officers Farley and Grant

It is unclear what plaintiff claims against defendant Farley. Apparently Officer Farley was present in the Clinic on February 15, 2007. AC ¶¶ 15, 17. Plaintiff first states that after he fell out of the van, defendant Howard went into the Clinic to tell the other nurses, arrange for a stretcher, and inform defendant Farley. AC ¶ 15 at p. 8. There is no claim against defendant Farley in this statement. The only other mention of defendant Farley is that after defendant Martin–Karas ordered plaintiff out of the Clinic, she told Officer Farley to order plaintiff to leave the area without allowing anyone to inform plaintiff "of the risks of leaving the Clinic area without medical treatment." AC ¶ 17. This statement sounds more like a complaint against defendant Martin–Karas than Officer Farley. There simply is no statement in the amended complaint that would approach deliberate indifference to anything by Officer Farley. He appears to have merely been the officer assigned to the Clinic on February 15, 2007. Thus, the complaint may be dismissed as to defendant Farley.

 **\*14** The same is true for defendant Officer Grant. Plaintiff states that when he returned to his housing unit after the February 15, 2007 incident at the Clinic, he told defendant Grant what happened and told defendant Grant that defendant Martin–Karas told plaintiff not to return to the clinic. AC ¶ 19. Defendant Grant was the housing unit officer. Plaintiff then states that later that morning, he informed defendant Grant that plaintiff had blood in his urine. AC ¶ 20. The amended complaint states that defendant Grant asked plaintiff if he wanted to go to the Clinic, but plaintiff told defendant Grant that plaintiff had been forbidden from returning to the Clinic. *Id.* Plaintiff told defendant Grant that plaintiff was afraid that he would get a misbehavior report if defendant

Grant attempted to call the Clinic about the blood in plaintiff's urine. *Id.*

A review of the amended complaint shows that plaintiff does not allege any wrongdoing against either defendants Farley or Grant, and certainly no facts even approaching a statement of deliberate indifference to plaintiff's serious medical needs. Defendant Grant merely asked plaintiff if he wished to go to the Clinic. Plaintiff declined the assistance. Thus, the amended complaint may be dismissed as against these two defendants.

#### 8. *Grievance/Investigative Procedures*

To the extent that plaintiff claims that his grievances were handled improperly or unprofessionally, courts have consistently held that because grievances procedures are undertaken voluntarily by New York and other states, they are ***not constitutionally required. See Ramos v. Hanslmaier,*** 96 Civ. 744, 1997 U.S. Dist. LEXIS 6082, \*6–7 (S.D.N.Y. Feb. 19, 1997) (multiple citations omitted). *See also Bullock v. Horn,* CV–99–1402, 2000 U.S. Dist. LEXIS 21573, 2000 WL 1839171, \*22–23 (M.D.Pa.2000) (plaintiff claimed improper refusal to process grievance); *Hoover v. Watson,* 886 F.Supp. 410, 418–19 (D.Del.), *aff'd,* 74 F.3d 1226 (3d Cir.1995); *Muhammad v. McMickens,* 86 Civ. 7376, 1988 U.S. Dist. LEXIS 552, 1988 WL 7789, \*8–9 (S.D.N.Y. Jan. 25, 1988). Because the grievance procedures are not constitutionally required, a state's violation of those procedures or its failure to enforce them does not give rise to a claim under section 1983, under the due process clause, or otherwise. *Id.*

Thus, regardless of plaintiff's complaints about the grievance procedure or how his claims were investigated, his claims regarding those procedures must be dismissed.

#### 9. *Right to Privacy*

In his amended complaint, plaintiff names Diane Kastia, the Mail Room Supervisor. Plaintiff states that after he fainted in the housing unit and was hospitalized for four days, he requested that his medical records be sent to him. AC ¶ 31. Plaintiff states that the medical records arrived at the facility by regular mail, and that defendant Kastia [11] opened the envelope before she sent the records to plaintiff. Plaintiff states that after he filed a grievance, the next time that medical records were sent to plaintiff, they were sent to the Clinic. *Id.* Plaintiff claims that this shows that defendant Kastia became involved in a "conspiracy" against plaintiff, and her actions

in sending the records to the Clinic were "in retaliation" for plaintiff filing the grievance. *Id.*

**\*15** The Due Process Clause of the Fourteenth Amendment [12] protects inmate from the unwanted disclosure of health-related information. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994), *cited in Verley v. Goord,* 2004 U.S. Dist. LEXIS 857, \*60 (S.D.N.Y. Jan. 22, 2004). Prison officials may impinge upon that right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). Inmates also have a constitutional right to send an receive mail, which may be infringed where the infringement is "reasonably related to a legitimate penological interest." *Rodriguez v. Ames,* 224 F.Supp.2d 555, 564 (W.D.N.Y.2002) (citing *inter alia Turner v. Safely,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

With respect to the "disclosure" of medical information, the court notes that an inmate's privacy right varies with the inmate's condition, with a greater interest in the disclosure of highly sensitive conditions. *Webb v. Goldstein,* 117 F.Supp.2d 289, 298 (E.D.N.Y.2000). In *Rodriguez v. Ames,* the court also held that where the information is spread through "humor or gossip," it is more likely that the inmate's right to privacy will have been violated. 287 F.Supp.2d at 220 (citing *Powell,* 175 F.3d at 112).

In this case, plaintiff simply claims that someone in the mail room opened an envelope that contained plaintiff's medical records from his four-day hospitalization after he fainted in the housing unit. Plaintiff states that there was a positive "tilt-table" test, showing that plaintiff became unconscious after four minutes and thirteen seconds on the tilt-table, but that no reason for his fainting was determined. AC ¶ 31. This information is not of the sensitive nature [13] discussed in *Powell* or *Doe.* Additionally, the information in this case was not "disseminated" or made public to other inmates. Plaintiff alleges that an envelope containing the medical records was opened and sent to plaintiff. Technically, there was a disclosure of the information, but the information was not of a highly sensitive nature, and the person who saw the information was entrusted to open all inmates incoming correspondence.

Plaintiff claims that defendant Kastia's decision to send plaintiff's medical records to the Clinic the second time shows that she was retaliating against plaintiff for complaining about her previous conduct. However, assuming the truth of these facts, defendant Kastia's actions were perfectly logical and were taken in an attempt to protect plaintiff's privacy. Sending medical records to the Clinic where plaintiff would be treated is not a violation of plaintiff's privacy rights. Plaintiff cannot seriously claim that sending medical records to the Clinic was retaliation for filing a grievance.

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

**\*16** It has been held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Odom v. Dixon,* 04–CV–889, 2008 U.S. Dist. LEXIS 11748, 2008 WL 466255, \*62–63 (W.D.N.Y. Feb. 15, 2008) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003)). In *Dawes v. Walker,* 239 F.3d 489, 492–93 (2d Cir.2001), the Second Circuit recognized that there are situations in which *de minimis retaliation* is "outside the ambit of constitutional protection." *Id.* (citing *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999)).

In this case, there is no adverse action. Even if defendant Kastia sent plaintiff's medical records to the Clinic, it is unclear how this action is adverse to plaintiff or how this

action would deter plaintiff from asserting his rights. Thus, the complaint may be dismissed as against defendant Kastia.

**10.** *Due Process and Equal Protection*

Plaintiff's Eleventh Cause of Action contains a claim for "due process" and "equal protection" violations in conjunction with plaintiff's attempt to obtain medical assistance. The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citation omitted). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.' " *Enquist v. Or. Dep't of Agric.,* ––– U.S. ––––, ––––, 128 S.Ct. 2146, 2152, 170 L.Ed.2d 975 (2008). However, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination and instead claims that he has been irrationally singled out as a "class of one." *Id.* (internal quotations omitted).

To establish an equal protection violation, the plaintiff must show that the defendants applied a different standard to similarly situated individuals. *Wiggins v. N.Y. City Dep't of Corr.,* 06 Civ.1946, 2008 U.S. Dist. LEXIS 61262, 2008 WL 3447573, *21 (S.D.N.Y. Aug. 12, 2008) (citing *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 111 (2d Cir.2006)). Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, plaintiff must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id* . In a "class-of-one" claim, the Equal Protection clause requires a "rational basis for the difference in treatment." *Id* . (citing *Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).

In this case, plaintiff does not explain how he was denied either "due process" or "equal protection" by any of the defendants. His Eighth Amendment claim has been discussed above, thus, there is no "substantive due process" claim, and plaintiff does not state how he was treated differently that any other inmate that was similarly situated to him. Thus, plaintiff's equal protection and due process claims may be dismissed.

**11.** *Criminal Statutes*

**\*17** Plaintiff alleges that defendants conspired under 18 U.S.C. §§ 241 and 242 to violate his civil rights. As stated above, plaintiff has not stated a civil rights violation. In any event, these statutes are criminal in nature, and there is no private right of action to enforce them. *Williams v. Jurow,* 05 Civ. 6949, 2007 U .S. Dist. LEXIS 97494, 2007 WL 5463418, *24–25 (S.D.N.Y. June 29, 2007) (citations omitted). Additionally, plaintiff's conclusory allegations of conspiracy fail under the civil rights statutes as well.

**12.** *Supplemental Jurisdiction*

Plaintiff has alleged various state law causes of action. This court has already determined that plaintiff states no constitutional claims, and the court has dismissed all claims over which it had original jurisdiction. Any state law claims against the defendants are barred by section 24 of the New York State Corrections Law. *Murphy v. West,* 533 F.Supp.2d 312, 317 (W.D.N.Y.2008) (citing *inter alia Baker v. Coughlin,* 77 F.3d 12, 14–15 (2d Cir.1996); N.Y. CORRECT. LAWW § 24. In any event, when all the federal claims are dismissed prior to trial, the court should decline to exercise supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(c)(3). *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Thus, this court will dismiss all of plaintiff's supplemental state law causes of action.

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's motion for sanctions (Dkt. No. 53) is **DENIED,** and it is

**ORDERED,** that plaintiff's motion to strike (Dkt. No. 61) is **DENIED,** and it is

**ORDERED,** that defendants' motions for judgment on the pleadings (Dkt. Nos. 52 and 76) be **GRANTED** and the amended complaint **DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 537550

## Footnotes

1    The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of these motions, and as such, any appeal taken from this order, if appropriate, will be to the Court of Appeals for the Second Circuit.

2    Defendants have filed two motions for judgment on the pleadings because defendant Nurses Karen Dooley; and Theresa LaLonde and defendant Mail Room Supervisor, Diane Kastia were served subsequent to defendants' original motion for judgment on the pleadings. See (Dkt.Nos.70, 71, 73). The second motion for judgment on the pleadings was filed on behalf of the three later-served defendants. (Dkt. No. 76).

3    Plaintiff's amended complaint is quite lengthy and contains fourteen causes of action, including two "pendent" causes of action. AC ¶¶ 12–34 (Facts), ¶¶ 35–89 (twelve federal causes of action), and ¶¶ 90–96 ("pendent" state claims).

4    Plaintiff claims that he waited until February 15, 2007 because "Sick Call" was not available on February 1401. AC ¶ 13.

5    Plaintiff states that this nurse was not wearing a name tag in violation of New York Regulations. Plaintiff cites section 29.1 of Title 8 of the New York Code of Rules and Regulations. NEW YORK CODE RULES & REGS tit.8, § 29.1. This particular section governs "Unprofessional Conduct." Section 29.1 contains "General provisions," defining unprofessional conduct. Failure to wear a name tag is not included in this section.

6    In paragraph 24, plaintiff states that he was scheduled to see Dr. Haider–Shah on May 27, 2007, however, in paragraph 26, plaintiff states that he saw Dr. Haider–Shah on May 7, 2007. It is unclear whether plaintiff saw the doctor earlier than expected or whether one of the dates is a typographical error.

7    The amended complaint does not indicate who sent plaintiff's letters to defendant Kelleher for investigation. The court assumes that plaintiff sent the information to this defendant by letter of June 4, 2007. AC ¶ 29.

8    Although plaintiff states in a footnote that the standard for a motion to dismiss has not changed, he is incorrect.

     In Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the court did away with the "no set of facts" language.

9    The court does note, however, that this court's dismissal will be without prejudice. If plaintiff should succeed in presenting a future amended complaint that may proceed, the court will admonish defendants to review their defenses, and raise the defenses that actually may apply to the facts. Although not making any specific findings on the issue, the court refers to the defenses of "res judicata;" "statute of limitations," failure to properly serve," "failure to acquire personal jurisdiction over defendants based on improper service," and redundant defenses (¶¶ 24 and 25 of the answer filed May 21, 2008). The court notes that the same errors were made in the answer filed on July 29, 2008. (Dkt. No. 75).

10   The court notes that plaintiff never alleges that he was seriously injured or that he needed emergency assistance after he fell out of the van. In fact, his concern when he entered the Clinic was that he not be examined by Dr. Haider–Shah.

11   It is actually unclear who plaintiff claims opened the envelope because although plaintiff states in one sentence that the envelope was opened by Kastia, the next sentence states that "[p]laintiff tried to find out the name of this person but was blocked at every turn." AC ¶ 31. Defendant Kastia is the "supervisor," and would have had to have been "personally involved" in order for plaintiff to bring this action against her. For purposes of this decision, the court will assume that defendant Kastia opened the envelope.

12   Plaintiff cites the Fourth Amendment, however, it is under the Fourteenth Amendment that an inmates right to privacy is protected. Doe, supra. The court will interpret the pro se plaintiff's papers to raise the strongest arguments they suggest. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir.2006). The court will assume that plaintiff in this case has cited the appropriate basis for his claim.

13   Powell involved transsexualism, and Doe involved HIV status. Powell, 175 F.3d at 109; Doe, 15 F.3d at 265.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1226482
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Terell VIERA, Plaintiff,

v.

M. SHEAHAN, Thomas Lepkowski,
Chantil J. Bates, John A. Rogers, and
Dylan J. Caporiccio, Defendants.

6:17-CV-06844 EAW
|
Signed 03/31/2021

**Synopsis**

**Background:** State prison inmate, proceeding pro se, brought action against former superintendent of correctional facility and corrections officers, asserting § 1983 claims alleging denial of reasonable access to courts in violation of First Amendment. Defendants moved for summary judgment.

**Holdings:** The District Court, Elizabeth A. Wolford, J., held that:

[1] inmate failed to establish officers' personal involvement in alleged constitutional violation, and

[2] inmate failed to establish superintendent's personal involvement in alleged constitutional violation.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (9)

**[1]** **Time** 🔑 Mailbox rule in general

Where prisoner proceeds pro se, filing date is governed by "prisoner mailbox rule," which provides that effective filing date is day upon which prisoner delivers petition to prison officials for mailing.

**[2]** **Civil Rights** 🔑 Persons Liable in General

Personal involvement in deprivation of federal constitutional right is sine qua non of liability under § 1983. 📄 42 U.S.C.A. § 1983.

**[3]** **Constitutional Law** 🔑 Prisoners

Under the First Amendment, a prisoner has a right to reasonable access to the courts while incarcerated to challenge convictions or conditions of confinement. U.S. Const. Amend. 1.

**[4]** **Civil Rights** 🔑 Criminal law enforcement; prisons

On a § 1983 claim by a prisoner alleging denial of reasonable access to the courts in violation of the First Amendment, to establish the requisite personal involvement of the defendant, the prisoner must show that the defendant caused the plaintiff injury or that the defendant took or was responsible for actions that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim. U.S. Const. Amend. 1; 📄 42 U.S.C.A. § 1983.

**[5]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Civil Rights** 🔑 Prisons and jails; probation and parole

State prison inmate failed to establish that two corrections officer were personally involved in alleged disappearance of inmate's mail, as required to support inmate's § 1983 claim alleging denial of reasonable access to the courts in violation of the First Amendment; one officer's sole alleged involvement was working as floor officer and responsible for handing out general mail, and there was no evidence that inmate's envelope was in mail that officer was given to hand out, and allegation that other officer was involved in disappearance of mail was speculation unsupported by factual allegations. U.S. Const. Amend. 1; 📄 42 U.S.C.A. § 1983.

**[6]** **Civil Rights** ⚷ Vicarious or respondeat superior liability in general

A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. 42 U.S.C.A. § 1983.

**[7]** **Civil Rights** ⚷ Criminal law enforcement; prisons

State prison inmate failed to establish that former superintendent of correctional facility was personally involved in alleged denial of inmate's reasonable access to courts in violation of First Amendment, arising from mailroom staff's refusal to send packages, as required to support inmate's § 1983 claim against superintendent; although superintendent did not respond to inmate's letter complaining about mail issue, he passed letter to acting deputy superintendent of programs, who sent response, and superintendent's affirmance of administrative denial of inmate's grievance arising from mail issue was insufficient to establish personal involvement. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[8]** **Civil Rights** ⚷ Criminal law enforcement; prisons

If a prison official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official generally will not be deemed personally involved with respect to the subject matter of the letter, as required for finding of liability on § 1983 claim for denial of inmate's reasonable access to courts in violation of First Amendment. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[9]** **Civil Rights** ⚷ Criminal law enforcement; prisons

Affirmance of the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement, as required for official's liability under § 1983. 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Terell Viera, Auburn, NY, Pro Se.

Heather Lynn McKay, New York State Attorney General's Office Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** *Pro se* plaintiff Terell Viera ("Plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), claims that defendants M. Sheahan ("Sheahan"), Thomas Lepkowski ("Lepkowski"), Chantil J. Bates ("Bates"), John A. Rogers ("Rogers"), and Dylan J. Caporiccio ("Caporiccio") (collectively "Defendants") unconstitutionally interfered with his legal mail while he was housed at the Southport Correctional Facility ("Southport"). (Dkt. 59). Presently before the Court is a motion for summary judgment filed by Sheahan, Rogers, and Caporiccio (collectively "Moving Defendants"). (Dkt. 62). For the reasons that follow, the motion is granted.

**BACKGROUND**

The following facts are taken from Moving Defendants' Statement of Undisputed Facts (Dkt. 62-1), and the exhibits submitted in support of the motion. Despite being afforded several extensions of time to file a response to the pending motion, Plaintiff failed to submit an opposing statement of material facts as required by this District's Local Rules of Civil Procedure. However, Plaintiff did file a declaration setting forth his version of the relevant events (Dkt. 90), which the Court has reviewed. Plaintiff's declaration does not

contradict the material facts set forth by Moving Defendants and summarized below. Accordingly, the Court has accepted Moving Defendants' factual assertions to the extent they are supported by the evidence of record.

As noted above, Plaintiff is an inmate in the custody of DOCCS. (Dkt. 62-1 at ¶ 1). Sheahan is the former superintendent of Southport, and Rogers and Caporiccio are corrections officers employed by DOCCS. (*Id.* at ¶ 2).

At the time of the alleged interference with his mail, Plaintiff was serving a sentence in the special housing unit ("SHU") for two incidents of assault at the Clinton Correctional Facility. (*Id.* at ¶ 3). Plaintiff had further been sentenced to a cumulative total of 300 days of loss of packages privileges, running from April 27, 2016, to February 21, 2017. (*Id.* at ¶ 4).

Plaintiff first arrived at Southport in or about June 2016, and was able to send and receive mail without issue. (*Id.* at ¶ 5). In early October 2016, Plaintiff sent a letter to an individual named Patty Shanno ("Shanno"), who runs a private typing service in New Jersey. (*Id.* at ¶¶ 5-6). Plaintiff received a response from Shanno agreeing to type up papers related to a petition for a writ of habeas corpus Plaintiff had filed in federal court. (*Id.* at ¶ 5).

On October 30, 2016, Plaintiff attempted to mail to Shanno legal papers including a notice of motion, an affidavit, and a 65-page handwritten memorandum of law. (*Id.* at ¶ 8). Plaintiff placed his papers in a 9x12 inch envelope addressed to Shanno and included an appropriate disbursement form. (*Id.* at ¶ 9). Rogers, who was collecting inmate mail on that date, took the open envelope from Plaintiff, checked it for contraband, and then placed it in the box for outgoing mail. (*Id.* at ¶ 10). Plaintiff's envelope was returned to him the next day, with an affixed note from mailroom staff stating, "You don't have package privileges, you need to break it down in state envelope." (*Id.* at ¶ 11).

 **\*2**  Later in the day on October 31, 2016, Plaintiff attempted to mail his papers to Shanno a second time. (*Id.* at ¶ 12). Plaintiff again gave the envelope to Rogers, who stated that he had already tried to send it out for Plaintiff, but would try again. (*Id.*). Plaintiff asked Rogers why his mail was being returned, and Rogers indicated that he did not know and that it was "probably something to do upfront," but that he would put Plaintiff's papers in the mail again. (*Id.* at ¶ 13). Plaintiff's second envelope was returned on November 1, 2016, with an affixed note from mailroom staff stating, "No

package privileges per directive and your SHU orientation manual." (*Id.* at ¶ 15).

Plaintiff attempted to mail his papers to Shanno in the same manner a third time. (*Id.* at ¶ 16). Plaintiff's third envelope was returned on November 3, 2016, with a notice stating, "No package privileges ... only for legal look at your orientation manual and directive 4422-4421. Break it down in state envelope & send it. Thank you." (*Id.* at ¶ 16).

Plaintiff made a final attempt to mail his papers on the evening of November 3, 2016. (*Id.* at ¶ 16). Plaintiff again handed the envelope and the disbursement form to Rogers. (*Id.*). Plaintiff's envelope was not returned to him after this fourth attempt, nor did he receive a copy of the disbursement form back as proof that his papers had been sent to Shanno. (*Id.* at ¶ 23). Plaintiff does not know what happened to his fourth envelope. (*Id.* at ¶ 26). Plaintiff was transferred out of Southport shortly thereafter. (*Id.* at ¶ 24).

On November 2, 2016, Plaintiff sent a letter to Sheahan complaining that mailroom staff was refusing to mail his papers to Shanno due to his loss of package privileges. (*Id.* at ¶ 17). Sheahan did not respond to this letter. (*Id.* at ¶ 18). Instead, on November 10, 2016, Plaintiff received a response from the Acting Deputy Superintendent of Programs informing him that he could send out his packet of papers "as long as it is addressed to the Courts or an Attorney that is representing you." (*Id.* at ¶ 19).

On November 10, 2016, Plaintiff filed a grievance asserting that "the mailroom staff threw out [his] mail instead of mailing it out." (*Id.* at ¶ 27). During the course of the investigation into this grievance, "mailroom staff responded that Plaintiff did not have package privileges and the mail was sent back to him on November 4, 2016." (*Id.* at ¶ 28).

As security staff at Southport, Rogers and Caporiccio played no role in the processing of mail by mailroom staff. (*Id.* at ¶ 30). Caporiccio was working as a B-block floor officer on November 4, 2016, and one of his responsibilities was to "hand out general mail to the inmates housed" on the floor to which he was assigned. (Dkt. 62-3 at ¶¶ 3, 5).

## PROCEDURAL HISTORY

Plaintiff commenced this action on December 7, 2017. (Dkt. 1). The operative pleading is the second amended complaint, filed on June 26, 2020. (Dkt. 59).

Moving Defendants filed the instant motion for summary judgment on August 17, 2020. (Dkt. 62). [1] Plaintiff's response deadline was initially set for October 16, 2020 (Dkt. 63), but the Court granted multiple requests by Plaintiff for an extension (Dkt. 75; Dkt. 85), ultimately setting a final response deadline of March 10, 2021 (Dkt. 85).

[1] Plaintiff's response papers are postmarked March 15, 2021, and were received by the Court on March 19, 2021. (Dkt. 90). Defendants contend that the response was accordingly untimely. (Dkt. 93 at 1). However, the affidavit of service included with Plaintiff's response, which is notarized, indicates that Plaintiff placed the papers in the mailbox at the Auburn Correctional Facility, where he is currently housed, on March 8, 2021. (Dkt. 90-2 at 1). "Where a prisoner proceeds *pro se*, the filing date is governed by the 'prisoner mailbox rule,' which provides that the effective filing date is the day upon which the prisoner delivers the petition to prison officials for mailing." *Mingo v. United States*, 360 F. Supp. 2d 591, 593 (S.D.N.Y. 2005); *see also Houston v. Lack*, 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (establishing prisoner mailbox rule). Accordingly, the effective filing date of Plaintiff's response is March 8, 2021, prior to the deadline set by the Court.

**\*3** Moving Defendants filed their reply on March 29, 2021. (Dkt. 93).

## DISCUSSION

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact...." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. Plaintiff's Claims against Rogers and Caporiccio

Moving Defendants argue that Plaintiff's claims against Rogers and Caporiccio must be dismissed because these defendants were not personally involved in the alleged refusal to mail Plaintiff's papers to Shanno. The Court agrees.

[2] Plaintiff's claims are asserted pursuant to 42 U.S.C. § 1983, which provides a cause of action against individuals who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution. "Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983." *Rupp v. City of Buffalo*, No. 17-CV-1209S, 2021 WL 1169182, at \*5 (W.D.N.Y. Mar. 29, 2021); *see also Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (a § 1983 plaintiff must establish "that each Government-

official defendant, through the official's own individual actions, has violated the Constitution").

**\*4** **[3]** **[4]** "Based in the First Amendment to the U.S. Constitution, a prisoner has a right to reasonable access to the courts while incarcerated to challenge convictions or conditions of confinement." *Winters v. City of New York*, No. 1:19-CV-07271 (MKV), 2020 WL 4194633, at \*3 (S.D.N.Y. July 21, 2020). "For purposes of ⬜ Section 1983, to establish the requisite 'personal involvement' of a defendant in a denial-of-access-to-the-courts claim, 'a plaintiff must show that the defendant caused the plaintiff injury or, put less succinctly, that the defendant took or was responsible for actions that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim.' " *Wilson v. Bradt*, No. 14-CV-6226 CJS, 2018 WL 4409993, at \*10 (W.D.N.Y. Sept. 17, 2018) (quoting *Oliva v. Town of Greece*, 630 F. App'x 43, 45 (2d Cir. 2015)).

**[5]** On the record before the Court, Plaintiff cannot establish that either Rogers or Caporiccio took any action that frustrated his effort to pursue his legal claims. As to Caporiccio, his sole alleged involvement in this case is that he was working as a B-block floor officer on November 4, 2016, and was responsible for handing out general mail. While Plaintiff contends in opposition to the instant motion that Caporiccio did not return his fourth envelope when he "handed out mail to inmates of B-block, 9 gallery on the fourth (4th) of November 2016" (Dkt. 90-1 at 9), this is pure speculation on his part, unsupported by any evidentiary proof. There is no evidence before the Court to support the conclusion that Plaintiff's fourth envelope was in the mail that Caporiccio was given to hand out on November 4, 2016. Indeed, Plaintiff admitted at his deposition that he has no knowledge of what happened to his fourth envelope after he gave it to Rogers. (Dkt. 62-6 at 101). Moreover, in his declaration submitted in opposition to the instant motion, Plaintiff asserts that "mailroom staff ... never returned the envelope to Plaintiff on November 4th, 2016." (Dkt. 90 at ¶ 29 (emphasis added)). Further, Caporiccio flatly denies, under penalty of perjury, having failed to return Plaintiff's mail. (Dkt. 62-3 at ¶ 9). On these facts, no reasonable jury could conclude that Caporiccio was personally involved in the alleged interference with Plaintiff's attempts to mail his papers to Shanno.

As to Rogers, it is undisputed that on the first three occasions that Plaintiff gave him an envelope addressed to Shanno, Rogers appropriately deposited it in the outgoing mail. It is

further undisputed that Rogers had no role in the mailroom's screening and rejection of those envelopes. Plaintiff asserts that Rogers was personally involved in the disappearance of the fourth envelope because "he was the last known person known to Plaintiff to have taken care, custody and control over Plaintiff's legal envelope before its disappearance." (Dkt. 90-1 at 8). However, Rogers denies, under penalty of perjury, having confiscated, destroyed, failed to process, or failed to return Plaintiff's mail. (Dkt. 62-4 at ¶ 9). Plaintiff has offered no evidentiary proof to contradict this statement by Rogers, and his speculation that Rogers must have engaged in some sort of malfeasance because the fourth envelope was neither returned to him nor delivered to Shanno is insufficient to defeat the instant motion for summary judgment. *See* ⬜ *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("Speculation alone is insufficient to defeat a motion for summary judgment.").

In sum, Plaintiff has failed to come forward with any evidence from which a reasonable jury could conclude that either Rogers or Caporiccio personally took action that frustrated Plaintiff's efforts to pursue his legal claims. Rogers and Caporiccio are accordingly entitled to summary judgment on Plaintiff's claims against them.

### III. Plaintiff's Claims Against Sheahan

**\*5** The Court turns next to Plaintiff's claims against Sheahan. Moving Defendants also argue that Plaintiff cannot establish Sheahan's personal involvement in the claimed violation of his rights. Again, the Court agrees.

**[6]** "A defendant in a ⬜ § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under ⬜ § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal alterations, quotations, and citations omitted). Although in 🔺 *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit identified five categories of evidence that may establish the liability of a supervisory official, more recently, in ⬜ *Tangreti*, the Second Circuit clarified that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."

983 F.3d at 618. The Second Circuit explained further that "[t]he factors necessary to establish a [ § 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly." *Id.* (second alteration in original) (internal quotations and citations omitted).

**[7]** Here, Plaintiff contends that Sheahan was personally involved in the claimed deprivation of his rights because (1) he did not respond to Plaintiff's letter of November 2, 2016, and (2) he affirmed the denial of Plaintiff's grievance. (*See* Dkt. 90 at ¶¶ 20-22, 44-47). These facts are insufficient to establish the requisite personal involvement by Sheahan.

**[8]** With respect to Sheahan's failure to respond to Plaintiff's letter of November 2, 2016, "[t]he general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter[.]" *Von Stein v. Pruyne*, No. 15-CV-7039 (CS), 2020 WL 3498431, at *13 (S.D.N.Y. June 29, 2020). Here, the record demonstrates that responsibility for responding to Plaintiff's letter was passed to the Acting Deputy Superintendent of Programs, who sent a response on November 10, 2016. (*See* Dkt. 62-8 at 32). Sheahan's receipt of this letter and referral of the matter to a subordinate does not establish his personal involvement in the alleged failure to process Plaintiff's mail.

**[9]** As to Sheahan's affirmance of the denial of Plaintiff's grievance, "[i]t is clear that affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983[.]" *Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) (quotation omitted). A conclusion to the contrary would lead to "the untenable consequence that virtually every inmate who sues for constitutional torts by prison guards could name the superintendent as a defendant since the plaintiff must pursue his prison remedies" pursuant to the Prison Litigation Reform Act "and invariably the plaintiff's grievance will have been passed upon by the

superintendent." *Madison v. Mazzuca*, No. 02 CIV. 10299 RWS, 2004 WL 3037730, at *10 (S.D.N.Y. Dec. 30, 2004) (quotation and alterations omitted). Accordingly, while the record does show that Sheahan affirmed the denial of Plaintiff's grievance (*see* Dkt. 62-8 at 4), this is insufficient, without more, to establish Sheahan's personal involvement in the claimed violation of Plaintiff's rights.

**\*6** Plaintiff has failed to point to any facts from which a rational jury could find personal involvement by Sheahan. Instead, the record before the Court demonstrates that Plaintiff is attempting to hold Sheahan liable based solely on his position as superintendent at Southport. This is not legally permissible and Sheahan is entitled to summary judgment.

For all these reasons, the Court finds that Moving Defendants are entitled to summary judgment on Plaintiff's claims against them because a reasonable jury could not find that they were personally involved in the alleged violation of Plaintiff's right to access the courts. Accordingly, the Court does not reach Moving Defendants' alternative arguments that (1) Plaintiff cannot establish that he was actually hindered or impeded from raising nonfrivolous legal claims, (2) Plaintiff has failed to exhaust his administrative remedies, (3) they are entitled to qualified immunity, and (4) Plaintiff's claims are barred pursuant to Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (*See* Dkt. 62-10 at 10-18).

## CONCLUSION

For the foregoing reasons, Moving Defendants' motion for summary judgment (Dkt. 62) is granted, and Plaintiff's claims against defendants Sheahan, Rogers, and Caporiccio are dismissed. The Clerk of Court is directed to terminate Sheahan, Rogers, and Caporiccio as defendants in this matter.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2021 WL 1226482

**Footnotes**

---

1      Nov-moving defendants Bates and Lepkowski were not initially included in this lawsuit, and their deadline for filing dispositive motions is June 8, 2021. (Dkt. 94).

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2431259
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

BISHOP NURSING HOME, Defendant.

5:21-CV-410 (MAD/ATB)
|
Signed 06/15/2021

**Attorneys and Law Firms**

PATRICK GUILLORY, 753 James Street, Apt. #1129, Syracuse, New York 13203, Plaintiff pro se.

**ORDER**

Mae A. D'Agostino, U.S. District Judge:

**\*1** Plaintiff commenced this action on April 12, 2021, submitting a complaint pursuant to 42 U.S.C. § 1983, along with a motion to proceed *in forma pauperis* ("IFP"). *See* Dkt. Nos. 1, 2. In an Order and Report-Recommendation dated April 19, 2021, Magistrate Judge Baxter conducted an initial review of the complaint and IFP application and found Plaintiff financially eligible for IFP status, granting his motion to proceed IFP therein. *See* Dkt. No. 6. As to the complaint, Magistrate Judge Baxter recommended that this action be dismissed without prejudice, but without opportunity for amendment. *See id.* at 7. Plaintiff did not object to the report.

Plaintiff brings claims pursuant to 42 U.S.C. § 1983 against Defendant Bishop Nursing Home ("Bishop") for allegedly "operating a dangerous establishment." Dkt. No. 1 at 2. Specifically, he complains that the "call bell in the restroom do[es] not work and patients have to wait an hour" or more for assistance from a nurse. *Id.* at 3. Plaintiff also alleges that the "electronics" in the patients' rooms do not work. *Id.* Plaintiff states three causes of action concerning Bishop's "neglect" toward patients, "defective" room equipment, and Bishop's "refus[al] to move patients to another room when other patients are being disruptive." *Id.* Plaintiff requests that this Court "order an FBI investigation into the first, second, and third causes of action." *Id.* at 4.

After conducting an initial review of the complaint, Magistrate Judge Baxter found that "Plaintiff is suing Bishop, a privately owned, for-profit care facility." Dkt. No. 6 at 4. Because Plaintiff failed to plausibly allege that Bishop acted under color of state law, Magistrate Judge Baxter found that the complaint failed to state any claims for relief under Section 1983. *See id.* at 4. Accordingly, Magistrate Judge Baxter recommended that Plaintiff's complaint be dismissed without prejudice for lack of subject matter jurisdiction. *See id.* at 4-5. Because the problem with Plaintiff's complaint is substantive such that better pleading will not cure it, Magistrate Judge Baxter further recommended that this action be dismissed without leave to amend. *See id.* at 6.

Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed IFP, "(2) ... the court shall dismiss the case at any time if the court determines that - ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

**\*2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party declines to file objections or files "[g]eneral or conclusory objections or objections which merely recite the same arguments [presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted); *see also McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007). After the appropriate review, "the court may accept, reject or modify, in whole or in part, the findings

or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1).

A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point") (citation omitted). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report-recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

Having carefully reviewed the April 19, 2021 Order and Report-Recommendation, Plaintiff's submissions, and the applicable law, the Court finds that Magistrate Judge Baxter correctly determined that this action must be dismissed without prejudice for lack of subject matter jurisdiction. To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that a right secured by the Constitution or laws of the United States was violated by a person acting under the color of state law, or a state actor. *See West v. Atkins*, 487 U.S. 42, 48-49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Private parties are generally not state actors, and are therefore not subject to liability under Section 1983. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties....") (internal quotation marks and citation omitted). For purposes of Section 1983, the actions of a nominally private entity are attributable to the state when: "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant

in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Caballero v. Shayna*, No. 18-CV-1627, 2019 WL 2491717, *3 (E.D.N.Y. June 14, 2019) (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable to the state.'" *Id.* (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

**\*3** In the present case, the named Defendant is a privately owned, for-profit care facility and Plaintiff alleges no facts suggesting that Bishop is a state actor under any of the aforementioned exceptions, or that Bishop's actions are otherwise fairly attributable to the state. *See* Dkt. No. 6 at 4. Because Plaintiff failed to plausibly allege that the named Defendant acted under color of state law, Magistrate Judge Baxter correctly determined that the complaint fails to state any claims for relief under Section 1983. *See DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 69 (E.D.N.Y. 2019) (acknowledging that, in the context of Section 1983, public functions do not include operating nursing homes) (citing *Manhattan Cmty. Access Corp. v. Halleck*, ––– U.S. ––––, 139 S. Ct. 1921, 1926, 204 L.Ed.2d 405 (2019)); *White v. St. Joseph's Hosp.*, 369 Fed. App'x. 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as the hospitals, nursing home, and cemetery named as defendants in [plaintiff's] complaint, are generally not proper § 1983 defendants because they do not act under color of state law.").

Moreover, Magistrate Judge Baxter correctly determined that leave to re-plead should be denied. Generally, a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Because lack of subject matter jurisdiction is a substantive defect, *Deul v. Dalton*, No. 1:11-CV-0637, 2012 WL 235523, *8 n.19

(N.D.N.Y. Jan. 25, 2012), dismissal without leave to amend is appropriate in this case.

Finally, the Court acknowledges that Plaintiff has waived any right to challenge the report on appeal by failing to object to the report within fourteen days. *See* *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003). In accordance with the requirement that *pro se* litigants be given notice of this rule, *see* *Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989), Plaintiff received sufficient notice upon receipt of the report. *See* Dkt. No. 6 at 7.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's April 19, 2021 Order and Report-Recommendation is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that this action is **DISMISSED without prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 2431259

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.